Jonathan M. Genish (Cal. State Bar No. 259031)
jgenish@blackstonepc.com
Matthew W. Dietz (Cal. State Bar No. 274665)
mdietz@blackstonepc.com
Jill J. Parker (Cal. State Bar No. 274230)
jparker@blackstonepc.com
**BLACKSTONE LAW, APC**
8383 Wilshire Boulevard, Suite 745
Beverly Hills, California 90211
Telephone: (310) 622-4278

Attorneys for Plaintiff and the Certified Class

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN HARTSTEIN, in her representative capacity and on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br> vs.<br><br>HYATT CORPORATION, a Delaware corporation doing business in California; and DOES 1 through 100, inclusive.<br><br>    Defendants. | Case No.: 2:20-CV-04874-DSF-JPR<br><br>Assigned to Hon. Dale S. Fischer<br><br>**DECLARATION OF JILL J. PARKER IN SUPPORT OF PLAINTIFF KAREN HARTSTEIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:    January 24, 2022<br>Time:    1:30 p.m.<br>Courtroom:  7D<br><br><br>Complaint Filed: April 24, 2020<br>FAC Filed:   January 4, 2021<br>Trial Date:   September 6, 2022 |

## DECLARATION OF JILL J. PARKER

I, Jill J. Parker, declare and state as follows:

1.      I am an attorney duly licensed to practice law in all Courts of the State of California as well as all United States District Courts in the State of California.  I am an attorney in the law firm of Blackstone Law, APC, attorneys of record for Plaintiff Karen Hartstein ("Plaintiff").  I have personal knowledge of the facts contained herein, and, if called to testify I could and would competently do so.

2.      On October 28, 2020, I received an electronic production of documents from Defendant Hyatt Corporation's ("Defendant") counsel, Brian P. Long.  These documents were Bates numbered HYATT000001-206.  Attached hereto as <u>Exhibit A</u> is a true and correct copy of documents Bates numbered HYATT000008-162 regarding Defendant's March 2020 "furlough/temporary layoff."

3.      On November 9, 2020, I received an electronic production of documents from Defendant's counsel, Michael Afar.  These documents were Bates numbered HYATT000207-337.  Included as HYATT000335-337 was an excerpt from the Hyatt Regency Huntington Beach Resort & Spa Colleague Handbook, which was authenticated by Gregory Cornwell on pages 117-118 of Volume I of his deposition transcript.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of documents Bates numbered  HYATT000335-337, containing an excerpt from the Hyatt Regency Huntington Beach Resort & Spa Colleague Handbook.

4.      On April 6, 2021, my office received an electronic production of documents from Defendant's counsel's Legal Secretary, Fern Jenkins, bates numbered HYATT001195-1198 and entitled "Colleague Complimentary Rooms Rate Policy." This document was authenticated by Gregory Cornwell on pages 357-358 of Volume II of his deposition transcript.  Attached hereto as <u>Exhibit C</u> is a true and correct copy of documents Bates numbered HYATT001195-1198 and titled "Colleague Complimentary Rooms Rate Policy."

5.      On July 23, 2021 Ms. Jenkins transmitted a copy of Defendant's Response

to Plaintiff's Requests for Admissions, Set Three, to me via e-mail.  Attached hereto as Exhibit D is a true and correct copy of the relevant excerpt from Defendant's Response to Plaintiff's Requests for Admissions, Set Three.

6.   On October 26, 2021, Defendant's counsel's Legal Secretary, Rebecca Garner, transmitted a copy of Defendant's Supplemental Response to Plaintiff's Request for Admissions, Set Three to me via e-mail.  Attached hereto as Exhibit E is a true and correct copy Defendant's Supplemental Response to Plaintiff's Request for Admissions, Set Three.

7.   On October 4, 2021, Ms. Garner transmitted a copy of Defendant's Response to Plaintiff's Requests for Admissions, Set Four to me via e-mail.  A true and correct copy of Defendant's Response to Plaintiff's Requests for Admissions, Set Four is attached hereto as Exhibit F.

8.   On November 10, 2020, Jonathan M. Genish, counsel for Plaintiff, took the Deposition of Defendant's Rule 30(b)(6) designee, Gregory Cornwell.  A true and correct copy of the relevant portions from Volume I of Mr. Cornwell's November 10, 2020 deposition is attached hereto as Exhibit G.

9.   On April 7, 2021, Mr. Genish took the second session of Mr. Cornwell's deposition in his capacity as Defendant's Rule 30(b)(6) designee.  A true and correct copy of the relevant portions from Volume II of Mr. Cornwell's April 7, 2021 deposition transcript is attached hereto as Exhibit H.

10.   On August 19, 2021, Mr. Genish took the deposition of Nikki Massey, Hyatt's Senior Vice President of Human Resources for the Americas.  A true and correct copy of the relevant portions from Ms. Massey's August 19, 2021 deposition transcript is attached hereto as Exhibit I.

11.   On October 27, 2021, Mr. Genish took the deposition of Defendant's Ruel 30(b)(6) designee Christen Garb.  A true and correct copy of the relevant portions from Ms. Garb's deposition transcript is attached hereto as Exhibit J.

12.   On November 1, 2021,  Jonathan M. Genish, Matthew W. Dietz, and I met

**DECLARATION OF JILL J. PARKER IN SUPPORT OF**
**PLAINTIFF KAREN HARTSTEIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

and conferred telephonically with Defendant's counsel, Holger Besch, Brian Long, and Francesca Hunter.  The parties discussed their intention to file motions for summary judgment and agreed on a briefing schedule and a five-page extension to the parties' respective briefs.  The parties submitted a joint stipulation reflecting this proposed briefing schedule to the Court on November 2, 2021, which was granted the same day.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of November 2021, at Beverly Hills, California

_____
Jill J. Parker

**DECLARATION OF JILL J. PARKER IN SUPPORT OF**
**PLAINTIFF KAREN HARTSTEIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT A

A N *d* A Z. | NAPA
CALIFORNIA

March 20, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We will continue to monitor our day-to-day and week-to-week business, and colleagues will continue to be scheduled based on business needs. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on March 22, 2020. We regret this short notice, which was necessitated by the events described above. We hope that Andaz Napa's business returns to normal in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

HYATT000008

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of furlough/temporary layoff, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED

General Manager

ANDAZ SAN DIEGO
600 F Street
San Diego, California, USA, 92101
T +1 619 849 1234
F +1 619 849 1235

March 25, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency. In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 29, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in six to eight weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of May. To ease any financial hardships, if you would like, we also can pay out any earned vacation/PTO pay on that date at your request, although we are not separating anyone's employment at this time. As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know. Thank you.

Sincerely,



General Manager

HYATT000010

ANDAZ | SAN DIEGO

ANDAZ SAN DIEGO
600 F Street
San Diego, California, USA, 92101
T +1 619 849 1234
F +1 619 849 1235

Marzo 25, 2020

Estimados colegas,

Como saben, los acontecimientos recientes que rodean la pandemia del Coronavirus (COVID-19) están teniendo un significativo imprevisto impacto en todo el país y el mundo. El 11 de marzo, la Organización Mundial de la Salud declaró que COVID-19 es una pandemia, y el 13 de marzo, el Presidente declaró una emergencia nacional. Adicional a esto, muchos condados y ciudades están emitiendo órdenes de quedarse en casa e igualmente el cierre de restaurantes. Desafortunadamente, estos eventos han reducido drásticamente nuestros niveles de negocio y con cancelaciones sin precedentes el impacto de esta calamidad física está resultando catastrófico para nuestro negocio.

Lamentamos informarle que como resultado de estos eventos, el Hotel ha determinado que tendrá que suspender temporalmente las operaciones a partir del 29 de Marzo de 2020. Como resultado, todos los empleados (excepto un equipo principal que serán notificados por aparte) serán separados temporalmente de su empleo en esa fecha o al final de la semana. Lamentamos este breve aviso, que fue necesario por los eventos descritos anteriormente. Esperamos que el hotel reabra alrededor de 6 a 8 semanas; sin embargo, la fecha no es segura y dependerá de las circunstancias en ese momento. Mientras tanto, el Hotel cubrirá los beneficios de salud de todos durante el mes de Mayo. Para apoyar cualquier dificultad financiera, si lo desea, también podemos pagar las horas que tiene disponible de vacaciones/PTO, aunque no estamos separando el empleo de nadie en este momento.  Al igual que empleados en ausencias personales no acumularan días de vacaciones/PTO durante el periodo que a sido despedido temporalmente, a menos que y en la medida que utilicen tiempo pagado durante el despido temporal.

Si ha perdido su trabajo o ha sido despedido temporalmente, puede ser elegible para el seguro de desempleo (UI). Más información sobre la UI y otros recursos disponibles para los trabajadores están disponibles en labor.ca.gov/coronavirus2019. También puede obtener más información del EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o en www.edd.ca.gov.

Además, si no puede trabajar debido a tener o estar expuesto a COVID-19 (según lo certificado por un profesional médico), usted puede ser elegible para los beneficios del Seguro Estatal de Discapacidad (SDI) del EDD. Si no puede trabajar porque está cuidando a un familiar enfermo o en cuarentena con COVID-19 (según lo certificado por un profesional médico), puede ser elegible para beneficios de Licencia Familiar Pagada (PFL, por sus siglas en inglés) con el EDD. Puede encontrar más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Tenga en cuenta también que debido a la crisis COVID-19, el EDD estatal ha removido el período de espera normal de 7 días para el desempleo y las prestaciones de SDI. Por lo tanto, los empleados serán elegibles para tales beneficios inmediatamente sin ningún período de espera.

Desearíamos no haber comunicado esta desafortunada noticia. Aunque, Cal-WARN ha sido suspendido en parte por la Orden Ejecutiva N-31-20 del Gobernador, proporcionamos este aviso de acuerdo con los requisitos de avisos aplicables según la Ley de Notificación de Capacitación para el Ajuste de Trabajadores de California, Código Laboral de California, Secciones 1400 y siguientes. y la ley federal, y le notificamos con la mayor anticipación de tiempo, como se debe para estos casos.

Sabemos que es un momento muy difícil para todos y lamentamos estas medidas drásticas. Nuestra prioridad número uno sigue siendo el bienestar de nuestros colegas y reconocemos el impacto que esto tiene en todos y cada uno de ustedes y en sus seres queridos. Dada la rapidez con la que ocurren las cosas en esta situación, no podemos predecir el curso o el alcance de esta pandemia ni la duración exacta de la suspensión temporal de las operaciones; sin embargo, continuaremos proporcionando actualizaciones a medida que tengamos más información. Si tiene cualquier duda, por favor póngase en contacto con nosotros.

Sinceramente,



REDACTED

Gerente General

HYATT000011



March 19 2020

Dear Colleague,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency. In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 20, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that that the Hotel will re-open around May 11, 2020; however, that date is not certain and will depend on the circumstances at that time. In the meantime, the Hotel will be covering everyone's health benefits for the month of April. To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time. As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the closure, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know. Thank you.

Sincerely,

REDACTED , General Manager

REDACTED , Colleague Experience Manager



Marzo 19 2020

Estimados Colega,

Como saben, los acontecimientos recientes que rodean la pandemia del Coronavirus (COVID-19) están teniendo un significativo imprevisto impacto en todo el país y el mundo. El 11 de marzo, la Organización Mundial de la Salud declaró que COVID-19 es una pandemia, y el 13 de marzo, el Presidente declaró una emergencia nacional. Adicional a esto, muchos condados y ciudades están emitiendo órdenes de quedarse en casa e igualmente el cierre de restaurantes. Desafortunadamente, estos eventos han reducido drásticamente nuestros niveles de negocio y con cancelaciones sin precedentes el impacto de esta calamidad física está resultando catastrófico para nuestro negocio.

Lamentamos informarle que como resultado de estos eventos, el Hotel ha determinado que tendrá que suspender las operaciones y cerrar temporalmente el Hotel a partir del 20 de Marzo de 2020. Como resultado, todos los empleados (excepto un equipo principal que serán notificados por aparte) serán separados temporalmente de su empleo en esa fecha o al final de la semana. Esperamos que el hotel reabra alrededor de Mayo 11, 2020; sin embargo, la fecha no es segura y dependerá de las circunstancias en ese momento. Mientras tanto, el Hotel cubrirá los beneficios de salud de todos durante el mes de Abril. Para apoyar cualquier dificultad financiera, si lo desea, también podemos pagar las horas acumuladas de vacaciones de acuerdo a su solicitud durante el proceso regular de nómina, aunque no estamos separando el empleo de nadie en este momento.

Si ha perdido su trabajo o ha sido despedido temporalmente, puede ser elegible para el seguro de desempleo (UI). Más información sobre la UI y otros recursos disponibles para los trabajadores están disponibles en labor.ca.gov/coronavirus2019.

También puede obtener más información del EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o en www.edd.ca.gov.

Además, si no puede trabajar debido a tener o estar expuesto a COVID-19 (según lo certificado por un profesional médico), usted puede ser elegible para los beneficios del Seguro Estatal de Discapacidad (SDI) del EDD. Si no puede trabajar porque está cuidando a un familiar enfermo o en cuarentena con COVID-19 (según lo certificado por un profesional médico), puede ser elegible para beneficios de Licencia Familiar Pagada (PFL, por sus siglas en inglés) con el EDD. Puede encontrar más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Tenga en cuenta también que debido a la crisis COVID-19, el EDD estatal ha removido el período de espera normal de 7 días para el desempleo y las prestaciones de SDI. Por lo tanto, los empleados serán elegibles para tales beneficios inmediatamente sin ningún período de espera.

Desearíamos no haber comunicado esta desafortunada noticia. Aunque, Cal-WARN ha sido suspendido en parte por la Orden Ejecutiva N-31-20 del Gobernador, proporcionamos este aviso de acuerdo con los requisitos de avisos aplicables según la Ley de Notificación de Capacitación para el Ajuste de Trabajadores de California, Código Laboral de California, Secciones 1400 y siguientes. y la ley federal, y le notificamos con la mayor anticipación de tiempo, como se debe para estos casos.

Sabemos que es un momento muy difícil para todos y lamentamos estas medidas drásticas. Nuestra prioridad número uno sigue siendo el bienestar de nuestros colegas y reconocemos el impacto que esto tiene en todos y cada uno de ustedes y en sus seres queridos. Dada la rapidez con la que ocurren las cosas en esta situación, no podemos predecir el curso o el alcance de esta pandemia ni la duración exacta del cierre; sin embargo, continuaremos proporcionando actualizaciones a medida que tengamos más información. Si tiene cualquier duda, por favor póngase en contacto con nosotros.

Sinceramente,

REDACTED , Gerente General

REDACTED , Recursos Humanos





June 12, 2020

Dear REDACTED

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective Friday, June 12, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify and reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through Friday, June 12, 2020. You

1

will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 20 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 323-785-6005 or REDACTED @andaz.com if you have any questions about this notice.




*General Manager*

HYATT000015

TO:          ███REDACTED███

FROM:        ███REDACTED███, General Manager

DATE:        September 18, 2020

VIA:         Electronic Mail or U.S. Mail

SUBJECT:     WARN Act Notice

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary layoff.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus and recent surge of confirmed infections, extensions of various government mandates and "mass gathering" orders, cancellation of conferences and events, and the prolonged decline in domestic and international travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there have been encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough which was anticipated to be temporary. Due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your employment with Hyatt will be terminated, effective Friday, September 18, 2020.  All local and state laws will be followed with respect to pay out of earned vacation.  You will be provided information about continued health coverage under separate cover.

This memo shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  Any bumping rights available to union members

will be governed by the applicable collective bargaining agreement provisions.  There are no bumping rights for non-union members.  We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted.

Additional Notice to California employees: If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You may be eligible for UI benefits and we encourage you to apply for those benefits as soon as possible.  Additional information on applying for UI and other resources available for workers is available at the website of the California Employment Development Department: https://edd.ca.gov/Unemployment/ and https://www.edd.ca.gov/unemployment/File_an_Unemployment_Insurance_Claim.htm.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 323-785-6005 or REDACTED @andaz.com if you have any questions about this notice.



REDACTED
*General Manager*

4812-6997-2166, v. 1





REDACTED

July 03, 2020

Dear REDACTED

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and
group meetings that resulted in a drop in our business and your temporary furlough.  As a
business that caters to global travelers and hosts large events around the world, this pandemic
impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue
would be temporary. Since that time, it has recently become apparent that there will be longer-
term revenue impacts as a result of the continued spread of the virus, extensions of various
government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of
conferences and events, and significant decline in travel, all of which have resulted in the sudden
and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has
now become clear that the demand for travel, events, and hospitality services will take
substantially longer to resume than previously anticipated.  With likely on-going social
distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict
when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to
make painful choices that would have seemed unthinkable just a short time ago.  The reality is
we need to take further action to support the long-term operation of the hotel in a completely
new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.
During that time, we maintained our employment relationship with you as a valued member of
the Hyatt family and we have done everything we can to support our colleagues and avoid the
situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable
additional impact of this pandemic on our business that is outside of our control, unfortunately,
we must now inform you that your furlough will become a layoff effective July 03, 2020 and
your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and
June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and
dental plans for those three months in order to assist you financially if you worked 40 or less
hours in each of the months.  During your furlough, we offered the option of receiving your
earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we

HYATT000018

would like to reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through July 03, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 408-328-6501 or REDACTED or REDACTED at 408-328-6507 or REDACTED if you have any questions about this notice.


REDACTED
General Manager



03.20.20
REDACTED
Housekeeping Department

Dear Avante Team Member,

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that effective immediately we are reducing workweek schedules and reducing work hours for all our employees due to the impact of COVID-19 in our industry and the lack of work. As of today, we can't provide a specific date as to when this measure will end.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

Please contact REDACTED at 408-328-6507 or REDACTED should you have any questions or concerns. We will provide a weekly update via email.

Please know that we appreciate your understanding during this challenging time. You are a valued member of our Avante family and we are hopeful that the impact of COVID-19 on our business passes quickly.


Warm regards,


REDACTED
General Manager, Hotel Avante



03/20/20



Department of Housekeeping  - Hotel Avante

DEAR REDACTE:

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that during this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel. Beginning on 03/22/20 your email will be paused and will reactive upon your return to work.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

During the furlough, it is important that we are able to communicate with you regarding any changes to your furlough or hotel activities. Please contact REDACTED at 408-328-6507 or REDACTED should you have any questions or concerns. We will provide a bi-weekly update via email.

Please know that we appreciate your understanding during this challenging time. You are a valued member of our HOTEL AVANTE and we are hopeful that the impact of COVID-19 on our business passes quickly.


Warm regards,


REDACTED
General Manager –
Wild Palms Hotel and Hotel Avante



**Furlough Frequently Asked Questions:**

*How will this impact my pay?*
As you will not work during your furloughed time period you will not receive any compensation from the hotel unless you elect to use your eligible benefit time.

*I have benefit time, may I use this while on furlough?*
Yes. You may apply your benefit time available to you during the time in which you are furloughed. Please inform Human Resources to further discuss your use of benefit time.

*Does my health insurance continue? Will I have to pay my portion of health insurance while furloughed?*
Yes, you will remain eligible for health insurance while on furlough. You will be required to continue your portion of your premium contributions.  Because your furlough is unpaid, should you miss or have an incomplete benefit contribution, we will work together to discuss payment options.

*Can I use my Hyatt Employee Rate or Comp rooms that I have booked? Am I able to book rooms to use while I am on furlough?*
Yes. You will remain eligible for these benefits. We encourage you to be mindful of travel restrictions and ask that you follow the Centers for Disease Control guidance on travel as it may impact your return to work.

*Can I taskforce at other hotels?*
If you are interested in assisting hotels that may have need for temporary assistance, please contact your director of Human Resources.

*Can I apply for Unemployment Benefits while I'm furloughed?*
Yes.  You can apply for unemployment benefits when furloughed.  Please visit https://covid19.ca.gov/ and https://www.edd.ca.gov/about_edd/coronavirus-2019.htm for further and specific guidance on applying for unemployment benefits.  Please note your state ultimately determines eligibility and award of unemployment benefits.

*Am I able to work for another employer while I'm furloughed?*
Yes. We understand that this unexpected loss of wages may cause hardship for you and your family. Please consider that working for another employer may impact your potential unemployment benefits.

HYATT000022



03/20/20


REDACTED
Department of Sales  - Avatar Hotel

DEAR REDACTED:

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that during this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel. Beginning on 03/22/20 your email will be paused, and will reactive upon your return to work.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

During the furlough, it is important that we are able to communicate with you regarding any changes to your furlough or hotel activities. Please contact REDACTED at 408-454-6881 or REDACTED should you have any questions or concerns. We will provide a bi-weekly update via email.

Please know that we appreciate your understanding during this challenging time. You are a valued member of our AVATAR HOTEL and we are hopeful that the impact of COVID-19 on our business passes quickly.


Warm regards,


REDACTED
General Manager – Avatar Hotel



**Furlough Frequently Asked Questions:**

*How will this impact my pay?*
As you will not work during your furloughed time period you will not receive any compensation from the hotel unless you elect to use your eligible benefit time.

*I have benefit time, may I use this while on furlough?*
Yes. You may apply your benefit time available to you during the time in which you are furloughed. Please inform Human Resources to further discuss your use of benefit time.

*Does my health insurance continue? Will I have to pay my portion of health insurance while furloughed?*
Yes, you will remain eligible for health insurance while on furlough. You will be required to continue your portion of your premium contributions.  Because your furlough is unpaid, should you miss or have an incomplete benefit contribution, we will work together to discuss payment options.

*Can I use my Hyatt Employee Rate or Comp rooms that I have booked? Am I able to book rooms to use while I am on furlough?*
Yes. You will remain eligible for these benefits. We encourage you to be mindful of travel restrictions and ask that you follow the Centers for Disease Control guidance on travel as it may impact your return to work.

*Can I taskforce at other hotels?*
If you are interested in assisting hotels that may have need for temporary assistance, please contact your director of Human Resources.

*Can I apply for Unemployment Benefits while I'm furloughed?*
Yes.  You can apply for unemployment benefits when furloughed.  Please visit https://covid19.ca.gov/ and https://www.edd.ca.gov/about_edd/coronavirus-2019.htm for further and specific guidance on applying for unemployment benefits.  Please note your state ultimately determines eligibility and award of unemployment benefits.

*Am I able to work for another employer while I'm furloughed?*
Yes. We understand that this unexpected loss of wages may cause hardship for you and your family. Please consider that working for another employer may impact your potential unemployment benefits.

HYATT000024



3/20/2020
REDACTED
Avatar Hotel
REDACTED
REDACTED

Dear REDACTED

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on travel and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with some governments prohibiting group gatherings or travel from place-to-place and many companies imposing travel restrictions for their employees.  These circumstances have brought down both transient and group bookings significantly and have drastically reduced our business levels, with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our hotel and the industry. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business, so we can emerge from this crisis strongly.

In an effort to prioritize the health and wellbeing of our colleagues and guests, and out of an abundance of caution, we have made the difficult decision to temporarily suspend services and operations at **Avatar Hotel**. This decision will take effect on Sunday March 22, 2020 and we anticipate resuming operations on Friday  May 15, 2020, however, that date is not certain and will depend on the circumstances at that time. Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

During this time, it is important that we are able to communicate with you regarding updates and the status of your return to work.   Included with this communication is a list of questions and answers that may help you navigate through this period. Please contact REDACTED at 408-454-6881 or REDACTED should you have any additional questions or concerns. We will provide an update via email on a biweekly basis.

Please know that we are committed to limiting the impact of these events on the welfare of our colleagues and to provide care to you in every way possible as we navigate the next several weeks. We appreciate your understanding during this challenging time. You are a valued member of our Avatar Hotel family and we are hopeful that the impact of COVID-19 on our business passes quickly.


Warm regards,


REDACTED
General Manager, Avatar Hotel

HYATT000025



**Frequently Asked Questions:**

***How will this impact my pay?***
As you will not work during this time, you will not receive any compensation from the hotel unless you elect to use your eligible benefit time. (any accrued and unused vacation hours)

***Does my health insurance continue? Will I have to pay my portion of health insurance?***
Yes, your benefits will continue as is through the end of the current month. We are actively considering options beyond the current month on how we may best approach the continuation of your coverage and look forward to sharing that with you as soon as we have a response.

***Can I use my Hyatt Employee Rate or Comp rooms that I have booked? Am I able to book rooms to use?***
Yes. You will remain eligible for these benefits. We encourage you to be mindful of travel restrictions and ask that you follow the Centers for Disease Control guidance on travel as it may impact your return to work.

***Can I apply for Unemployment Benefits?***
Yes.  You can apply for unemployment benefits.  Please visit https://www.edd.ca.gov/unemployment/ for further and specific guidance on applying for unemployment benefits (https://covid19.ca.gov/ and https://www.edd.ca.gov/about_edd/coronavirus-2019.htm).  Please note your state ultimately determines eligibility and award of unemployment benefits.

***Am I able to work for another employer?***
Yes. We understand that this unexpected loss of wages may cause hardship for you and your family. Please consider that working for another employer may impact your potential unemployment benefits.



REDACTED
REDACTED

June 19, 2020

Dear REDACTED,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough. As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely. We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated. With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago. The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today. However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now

1

HYATT000027

inform you that your furlough will become a layoff effective June 19, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 19, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.    You  also  may  obtain  information  from  the  EDD  at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL)    benefits    with    the    EDD.    You    can    find    more    information    at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

HYATT000028

Please contact me at 408-235-8900 or REDACTED or REDACTED at 408-328-6507 or REDACTED if you have any questions about this notice.

REDACTED
General Manager

3

HYATT000029



CARMEL VALLEY RANCH

March 18, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant unforeseen impact across the country and the world. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency. In addition, ski resorts in the area have recently closed. Unfortunately, these events have drastically reduced our business levels.  With unprecedented cancellations at the Resort, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Resort has determined that it will need to be suspending operations and temporarily closing the Resort effective March 18, 2020. As a result, all employees (except a core team who will notified separately) will be temporarily laid off from their employment on that date or by the end of the week. To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time. We anticipate that the Resort will re-open around mid-May 2020; however, that date is not certain and will depend on the circumstances at that time. In the meantime, the Resort will be covering everyone's health benefits for the month of April, including both the Resort's and employees' portions of the insurance premiums.

Employees will be eligible for apply for unemployment benefits with the State EDD. Here is a link to an information sheet from the EDD: https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf regarding benefits, and here is another helpful link: https://www.edd.ca.gov/unemployment/partial_claims.htm. You also can get further information online at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, employees will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. In addition, although we do not believe that Cal-WARN has been triggered by the COVID-19 pandemic, we also are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.*

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the closure, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know. Thank you.

Sincerely,

REDACTED

Senior Vice President, Field Operations



March 19, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 20, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable

HYATT000031

notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,

REDACTED

Area General Manager



March 21, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency. In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 22, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue per their collective bargaining agreement. To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time. As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act,

HYATT000033

California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, you can reach us through phone at (415)535-2624 or email at gh.san.francisco@hyatt.com.  Thank you.

Sincerely,



REDACTED

REDACTED



March 28, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 29, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April and May.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000035

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, you can reach us through phone at (415)614-5401 or email at kabukimailbox@jdvhotels.com.  Thank you.

Sincerely,



REDACTED



March 28, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 29, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue per their collective bargaining agreement.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, you can reach us through phone at (415)614-5401 or email at kabukimailbox@jdvhotels.com.  Thank you.

Sincerely,



REDACTED



Hyatt Regency Huntington Beach Resort & Spa
21500 Pacific Coast Hwy
Huntington Beach, CA 92648
Telephone:  (714) 845-4807
Fax:  (714) 845-4637



March 24, 2020

Dear REDACTED,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We will continue to monitor our day-to-day and week-to-week business, and colleagues will continue to be scheduled based on business needs. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on March 24, 2020. We regret this short notice, which was necessitated by the events described above. We hope that the Hyatt Regency Huntington Beach Resort and Spa's business returns to normal in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the months of April and May.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

During this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of furlough/temporary layoff, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Warm regards,



REDACTED
Director of Human Resources
Hyatt Regency Huntington Beach Resort & Spa

HYATT000040



Hyatt Regency Huntington Beach Resort & Spa
21500 Pacific Coast Hwy
Huntington Beach, CA 92648
Telephone:  (714) 845-4807
Fax:  (714) 845-4637

REDACTED
REDACTED

March 18, 2020

Dear REDACTED,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We will continue to monitor our day-to-day and week-to-week business, and colleagues will continue to be scheduled based on business needs. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on March 18, 2020. We regret this short notice, which was necessitated by the events described above. We hope that the Hyatt Regency Huntington Beach Resort and Spa's business returns to normal in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the months of April and May.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

During this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of furlough/temporary layoff, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Warm regards,



REDACTED
Director of Human Resources
Hyatt Regency Huntington Beach Resort & Spa



Hyatt Regency Huntington Beach Resort & Spa
21500 Pacific Coast Hwy
Huntington Beach, CA 92648
Telephone:  (714) 845-4807
Fax:  (714) 845-4637



REDACTED
REDACTED

June 18, 2020

Dear ,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 27, 2020 and your employment with Hyatt will be terminated as of that date.

HYATT000043

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 27, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above. In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24, 2020 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-

HYATT000044

2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at (714) 845-4600 or REDACTED@hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
General Manager
Hyatt Regency Huntington Beach Resort & Spa



March 20, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 21, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,

REDACTED – General Manager

REDACTED – Director of Human Resources

# Colleague Resources – Recursos de Empleados

Hyatt Regency Indian Wells
44-600 Indian Wells Lane, Indian Wells, CA 92210
REDACTED – HR Director: 760.674.4125 / REDACTED @hyatt.com
REDACTED – Assistant HR Director: 760.674.4126 / REDACTED @hyatt.com
REDACTED – HR Manager: 760.674.4124 / REDACTED @hyatt.com

Payment of Benefits (Pagos de Beneficios) Health, Vision, and Dental Insurance Premiums
Arrange payments with Human Resources or send to (Envie pagos a esta direccion o con HR):
PO Box 842171
1950 N Stemmons Fwy Suite 5010
Dallas, Texas  75284-2171

Employment Development Department (Departamento de Desempleo)
www.edd.ca.gov/unemployment
44199 Monroe St # B, Indio, CA 92201 8am-5pm
760.863.2500

Employee Assistance Program (Programa de Assistencia para Empleados)
Confidential Emotional Support – Work-Life Solutions – Legal Guidance – Financial Resources – Online Support
www.guidanceresources.com
877.734.4337

Hyatt Benefits Center (Centro de Beneficios de Hyatt)
Health Insurance – VSP Vision – Cigna Dental
www.myhyattrewards.com
1.877.629.1234 Monday-Friday 10am-6pm EST

T. Rowe Price – Retirement Savings Plan (Plan de Cuenta de Retiro)
www.rps.troweprice.com
800.811.2849

To access your Benefits and other Information (Para Beneficios y Informacion de Finanzas)
www.hyattconnect.com
For all Benefits i.e. Health Insurance, follow sequence: My Hyatt Rewards> Continue>Health Insurance
For Financial info i.e. Check-Stubs, follow sequence: ADP ColleagueSelfService>Pay>DownloadStatement
Para Beneficios como Aseguransa Medica, seguir: My Hyatt Rewards> Continue>Health Insurance
Para talones de cheque, seguir: ADP ColleagueSelfService>Pay>DownloadStatement

For Questions, email Leadership Committee: hr.indian.wells@hyatt.com
Para Preguntas, correo electronico: hr.indian.wells@hyatt.com

HYATT000048





June 19, 2020

Dear 

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough. As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely. We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated. With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago. The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today. However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 19, 2020 and your employment with Hyatt will be terminated as of that date.

1

As you know, Hyatt continued medical and dental benefits during the months of April, May and June. In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired. Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 19, 2020. You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act. We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above. In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 20 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000050

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 760.674.4175 or REDACTED@hyatt.com if you have any questions about this notice.



3

HYATT000051



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

August 7, 2020


Dear Colleague,


As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus and recent surge of confirmed infections, extensions of various government mandates and "mass gathering" orders, cancellation of conferences and events, and the prolonged decline in domestic and international travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there have been encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your layoff which was anticipated to be temporary. Due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your employment with Hyatt will be terminated, effective Friday, August 7, 2020.

This memo shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  Any bumping rights available to union members will be governed by the applicable collective bargaining agreement provisions.  There are no bumping rights for non-union members.  We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted.

HYATT000052



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

Additional Notice to California employees: If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You may be eligible for UI benefits and we encourage you to apply for those benefits as soon as possible.  Additional information on applying for UI and other resources available for workers is available at the website of the California Employment Development Department: https://edd.ca.gov/Unemployment/ and https://www.edd.ca.gov/unemployment/File_an_Unemployment_Insurance_Claim.htm.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 858.552.6030 or REDACTED hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED

REDACTED
General Manager
Hyatt Regency La Jolla

HYATT000053



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

[Colleague Name]
[Employee GID]


Dear [Name],

We appreciate you taking the time to speak with us regarding your employment status with Hyatt Regency La Jolla.  We regret that the impacts of COVID-19 have continued to have drastic impacts on our hotel forcing us to make very difficult decisions surrounding our staffing model, impacting you and many of our colleagues. This letter will serve as your change in relationship pursuant to provisions of Section 1089 of the California Unemployment Insurance Code.  Your employment has been terminated effective Friday, August 7, 2020.

As a reminder, please note all earned and accrued vacation balances were previously paid out to you on Friday, June 18, 2020.  Below is a summary of the transition package you will receive at as a part of your transition, which will be paid to you on Friday, August 21, 2020.

| Summary | |
|---|---|
| Average Weekly Wage | |
| Week(s) of Severance Pay | |
| Amount of Severance Pay | |
| Separation Date | Friday, August 7, 2020 |
| Final Payroll Date (Severance Pay Only) | Friday, August 21, 2020 |

If you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Should you have any questions or would like clarification on the information above, please contact REDACTED REDACTED, Director of Human Resources at REDACTED or 858.552.6007.



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

«First_Name» «Last»
«Address_1» «Address_2»
«CITY1», «State» «Zip»

June 18, 2020

Dear «First_Name»,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.
You were previously provided notice of your furlough, which was anticipated to be temporary.  At that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we continue to maintain that relationship today. Unfortunately, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, we must now inform you that your furlough will be extended until [insert anticipated return date].

This extension of your furlough will not impact your benefits coverage subject to the terms of any applicable benefit plans. You will continue to remain an active employee of Hyatt during the furlough. As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. Beginning July 1, 2020, you will be responsible for colleague contributions to the medical and dental plans for which you are eligible in order to maintain continuous coverage.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired. We continue to offer that option during the continuation of your furlough. Further, we would like to clarify that colleagues continued to accrue vacation time during the initial furlough period and will continue to do so during furlough continuation.



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 et seq. and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 858.552.6030 or REDACTED hyatt.com if you have any questions about this notice.


Sincerely,



REDACTED
General Manager
Hyatt Regency La Jolla



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

June 18, 2020

Dear Colleague,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 18, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 19, 2020.  You will also be paid meeting pay twice, once for a discussion with your leaders and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

HYATT000057



Hyatt Regency La Jolla
3777 La Jolla Village Drive
San Diego, CA  92122
lajolla.hyatt.com

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter on March 19, 2020 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 et seq. and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 858.552.6030 or REDACTED hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
General Manager
Hyatt Regency La Jolla

TO:      REDACTED

FROM:      REDACTED   General Manager

DATE:      June 8, 2020

VIA:      Electronic Mail or U.S. Mail

SUBJECT:      WARN Act Notice

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough which was anticipated to be temporary. Due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your employment with Hyatt will be terminated on June 19, 2020.

You will be paid all earned and unused vacation in accordance with law.  You will be provided information about continued health coverage under separate cover.

You may be eligible for unemployment insurance benefits (UI) and we encourage you to apply for those benefits as soon as possible.  More information on applying for UI and other resources available for workers is available at the link to the applicable state unemployment insurance

HYATT000059

department in the state where you work which can be found on the listing appended to this notice.

This memo shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact myself or REDACTED at 619-221-4800 or REDACTED hyatt.com or REDACTED@hyatt.com if you have any questions about this notice.

Warm regards,



REDACTED
General Manager

UNEMPLOYMENT INSURANCE AND STATE WARN ACT APPENDIX

You may be eligible for unemployment insurance benefits (UI) if you are not already receiving them.  More information on UI and other resources available for workers is available at the links below, based on the state where you work.

**Alabama**
Department of Labor
https://labor.alabama.gov/unemployment.aspx

**Alaska**
Department of Labor and Workforce Development
https://labor.alaska.gov/unemployment/

**Arkansas**
Division of Workforce Services
https://www.dws.arkansas.gov/unemployment/
https://www.dws.arkansas.gov/unemployment/how-to-file-a-ui-claim/

**Arizona**
Department of Economic Security
https://des.az.gov/services/employment/unemployment-individual/apply-ui-benefits

**California**
Employment Development Department
https://edd.ca.gov/Unemployment/
https://www.edd.ca.gov/unemployment/File_an_Unemployment_Insurance_Claim.htm

Additional Notice to California employees: If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.

**Colorado**
Department of Labor and Employment
https://www.colorado.gov/pacific/cdle/unemployment
https://www.colorado.gov/pacific/cdle/file-claim

**Connecticut**
Department of Labor
http://www.ctdol.state.ct.us/ui-online/

**Washington, DC**
Department of Employment Services
https://does.dc.gov/page/unemployment-compensation

**Delaware**

HYATT000061

Department of Labor
https://ui.delawareworks.com/

**Florida**
Department of Economic Opportunity
http://www.floridajobs.org/Reemployment-Assistance-Service-Center/reemployment-assistance/claimants
http://www.floridajobs.org/Reemployment-Assistance-Service-Center/reemployment-assistance/general-information

**Georgia**
Department of Labor
https://dol.georgia.gov/unemployment-benefits
https://dol.georgia.gov/file-unemployment-insurance-claim

**Hawaii**
Department of Labor and Industrial Relations
https://labor.hawaii.gov/ui/

**Idaho**
Department of Labor
https://www.labor.idaho.gov/dnn/Unemployment-Benefits

**Iowa**
Workforce Development
https://www.iowaworkforcedevelopment.gov/file-claim-unemployment-insurance-benefits

**Illinois**
Department of Economic Security
https://www2.illinois.gov/ides/individuals/UnemploymentInsurance/Pages/default.aspx

**Indiana**
Department of Workforce Development
https://www.in.gov/dwd/3474.htm

**Kansas**
Department of Labor
https://www.getkansasbenefits.gov/Home.aspx

**Kentucky**
Department of Workforce Investment (Kentucky Career Center)
https://kcc.ky.gov/career/Pages/default.aspx

**Louisiana**
Department of Labor - Louisiana Workforce Commission
http://www.laworks.net/UnemploymentInsurance/UI_MainMenu.asp

HYATT000062

http://www.laworks.net/UnemploymentInsurance/UI_Claimants.asp

**Maine**
Department of Labor, Bureau of Unemployment Compensation
https://www.maine.gov/unemployment/

**Massachusetts**
Labor and Workforce Development, Department of Unemployment Assistance
https://www.mass.gov/how-to/apply-for-unemployment-benefits

**Maryland**
Department of Labor, Division of Unemployment Insurance
https://www.dllr.state.md.us/employment/unemployment.shtml

**Michigan**
Department of Labor and Economic Opportunity, Unemployment Insurance Agency
https://www.michigan.gov/leo/0,5863,7-336-78421_97241---,00.html

**Minnesota**
Department of Employment and Economic Development
https://www.uimn.org/
https://www.uimn.org/applicants/howapply/index.jsp

**Missouri**
Department of Labor and Industrial Relations
https://labor.mo.gov/unemployed-workers

**Montana**
Department of Labor and Industry
http://uid.dli.mt.gov/claimants

**North Carolina**
Department of Commerce, Division of Employment Security
https://des.nc.gov/apply-unemployment

**North Dakota**
Job Service North Dakota
https://www.jobsnd.com/unemployment-individuals
https://apps.nd.gov/jsnd/uiiaclaims/login.htm

**Nebraska**
Department of Labor
https://www.dol.nebraska.gov/UIBenefits

**New Hampshire**
Department of Employment Security

https://www.nhes.nh.gov/services/claimants/index.htm

**New Jersey**
Department of Labor and Workforce Development, Division of Unemployment Insurance
https://myunemployment.nj.gov/labor/myunemployment/

**New Mexico**
Department of Workplace Solutions
https://www.dws.state.nm.us/en-us/Unemployment

**Nevada**
Department of Employment, Training and Rehabilitation
http://ui.nv.gov/css.html

**New York**
Department of Labor
https://dol.ny.gov/unemployment/file-your-first-claim-benefits

Additional Notice to New York employees: You are also hereby notified that, as a result of your employment loss, you may be eligible to receive job retraining, re-employment services, or other assistance with obtaining new employment from the New York State Department of Labor or its workforce partners upon your termination. You may also be eligible for unemployment insurance benefits after your last day of employment. Whenever possible, the New York State Department of Labor will contact your employer to arrange to provide additional information regarding these benefits and services to you through workshops, interviews, and other activities that will be scheduled prior to the time your employment ends. If your job has already ended, you can also access reemployment information and apply for unemployment insurance benefits on the Department's website or you may use the contact information provided on the website or visit one of the Department's local offices for further information and assistance.

**Ohio**
Department of Job and Family Services
https://unemploymenthelp.ohio.gov/

**Oklahoma**
Employment Security Commission
https://oesc.ok.gov/
https://www.ok.gov/oesc/Claimants/index.html

**Oregon**
Employment Department
https://www.oregon.gov/employ/Unemployment/Pages/default.aspx

**Pennsylvania**
Department of Labor and Industry, Office of Unemployment Compensation
https://www.uc.pa.gov/unemployment-benefits/file/Pages/Filing%20Instructions.aspx

HYATT000064

**Rhode Island**
Department of Labor and Training
http://www.dlt.ri.gov/ui/

**South Carolina**
Department of Employment and Workforce
https://dew.sc.gov/individuals/apply-for-benefits

**South Dakota**
Department of Labor & Regulation, Reemployment Assistance Division
https://dlr.sd.gov/ra/individuals/default.aspx

**Tennessee**
Department of Labor and Workforce Development
https://www.tn.gov/workforce/unemployment.html
https://www.tn.gov/workforce/unemployment/apply-for-benefits.html

**Texas**
Workforce Commission
https://www.twc.texas.gov/jobseekers/unemployment-benefits-services

**Utah**
Department of Workforce Services
https://jobs.utah.gov/ui/home

**Virginia**
Employment Commission
https://www.vec.virginia.gov/unemployed

**Vermont**
Department of Labor
https://labor.vermont.gov/unemployment-insurance

**Washington**
Employment Security Department
https://esd.wa.gov/unemployment

**Wisconsin**
Department of Workforce Development
https://dwd.wisconsin.gov/uiben/

Additional Notice to Wisconsin Employees: As a resource, we are providing the following
contact information for the state workforce development board:

      Wisconsin Department of Workforce Development

HYATT000065

Dislocated Worker Unit
201 E. Washington Avenue, Room E100
P.O. Box 7972
Madison, WI 53707-7972
Tel: 608-266-7406

The Department of Workforce Development provides additional resources related to career planning, job search, job skills training, and other support services, which is available at: https://jobcenterofwisconsin.com/presentation/Employers/Default.aspx.

Contact information for the local workforce development board serving the area in which your worksite is located, as well as any resources provided by the local board, is available here: https://dwd.wisconsin.gov/dislocatedworker/wda/wda-map.htm#1.

**West Virginia**
Workforce WV
https://workforcewv.org/unemployment
https://www.workforcewv.org/unemployment/claimants/filing-an-initial-claim

**Wyoming**
Department of Workforce Services
http://wyomingworkforce.org/workers/ui/
https://wyui.wyo.gov/benefits/home.do

4815-2134-0348, v. 1

HYATT000066



March 26, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 29, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED

General Manager

**HYATT REGENCY**
**MISSION BAY SPA AND MARINA**

1441 Quivira Road
San Diego, CA 92109
USA

T + 619 224 1234
F + 619 224 0348
missionbay.hyatt.com



Marzo 26, 2020

Estimados colegas,

Como saben, los acontecimientos recientes que rodean la pandemia del Coronavirus (COVID-19) están teniendo un significativo imprevisto impacto en todo el país y el mundo. El 11 de marzo, la Organización Mundial de la Salud declaró que COVID-19 es una pandemia, y el 13 de marzo, el Presidente declaró una emergencia nacional. Adicional a esto, muchos condados y ciudades están emitiendo órdenes de quedarse en casa e igualmente el cierre de restaurantes. Desafortunadamente, estos eventos han reducido drásticamente nuestros niveles de negocio y con cancelaciones sin precedentes el impacto de esta calamidad física está resultando catastrófico para nuestro negocio.

Lamentamos informarle que como resultado de estos eventos, el Hotel ha determinado que tendrá que suspender temporalmente las operaciones a partir del 29 de Marzo de 2020. Como resultado, todos los empleados (excepto un equipo principal que serán notificados por aparte) serán separados temporalmente de su empleo en esa fecha o al final de la semana. Esperamos que el hotel reabra alrededor de en 8 a 12 semanas; sin embargo, la fecha no es segura y dependerá de las circunstancias en ese momento. Para apoyar cualquier dificultad financiera, si lo desea, también podemos pagar las horas acumuladas de vacaciones de acuerdo a su solicitud durante el proceso regular de nómina, aunque no estamos separando el empleo de nadie en este momento. Al igual que el personal con permiso para ausentarse, los colegas en licencia no acumularan días de vacaciones/PTO durante el periodo de licencia, a menos que y en la medida que utilicen tiempo pagado durante la licencia.

Si ha perdido su trabajo o ha sido despedido temporalmente, puede ser elegible para el seguro de desempleo (UI). Más información sobre la UI y otros recursos disponibles para los trabajadores están disponibles en labor.ca.gov/coronavirus2019. También puede obtener más información del EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o en www.edd.ca.gov.

Además, si no puede trabajar debido a tener o estar expuesto a COVID-19 (según lo certificado por un profesional médico), usted puede ser elegible para los beneficios del Seguro Estatal de Discapacidad (SDI) del EDD. Si no puede trabajar porque está cuidando a un familiar enfermo o en cuarentena con COVID-19 (según lo certificado por un profesional médico), puede ser elegible para beneficios de Licencia Familiar Pagada (PFL, por sus siglas en inglés) con el EDD. Puede encontrar más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Tenga en cuenta también que debido a la crisis COVID-19, el EDD estatal ha removido el período de espera normal de 7 días para el desempleo y las prestaciones de SDI. Por lo tanto, los empleados serán elegibles para tales beneficios inmediatamente sin ningún período de espera.

Desearíamos no haber comunicado esta desafortunada noticia. Aunque, Cal-WARN ha sido suspendido en parte por la Orden Ejecutiva N-31-20 del Gobernador, proporcionamos este aviso de acuerdo con los requisitos de avisos aplicables según la Ley de Notificación de Capacitación para el Ajuste de Trabajadores de California, Código Laboral de California, Secciones 1400 y siguientes. y la ley federal, y le notificamos con la mayor anticipación de tiempo, como se debe para estos casos.

Sabemos que es un momento muy difícil para todos y lamentamos estas medidas drásticas. Nuestra prioridad número uno sigue siendo el bienestar de nuestros colegas y reconocemos el impacto que esto tiene en todos y cada uno de ustedes y en sus seres queridos. Dada la rapidez con la que ocurren las cosas en esta situación, no podemos predecir el curso o el alcance de esta pandemia ni la duración exacta de la suspensión temporal de las operaciones; sin embargo, continuaremos proporcionando actualizaciones a medida que tengamos más información. Si tiene cualquier duda, por favor póngase en contacto con nosotros.

Sinceramente,



REDACTED
Gerente General

**HYATT REGENCY**
**MISSION BAY SPA AND MARINA**

1441 Quivira Road
San Diego, CA 92109
USA

T + 619 224 1234
F + 619 224 0348
missionbay.hyatt.com



March 21, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 22, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in six to 10 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any

applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,

REDACTED
General Manager





June 18, 2020

Dear REDACTED,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  At that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we continue to maintain that relationship today. Unfortunately, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, we must now inform you that your furlough will be extended until July 31, 2020.

This extension of your furlough will not impact your benefits coverage subject to the terms of any applicable benefit plans. You will continue to remain an active employee of Hyatt during the furlough. As you know, Hyatt continued medical and dental benefits during the months of April, May and June. In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. Beginning July 1, 2020, you will be responsible for colleague contributions to the medical and dental plans for which you are eligible in order to maintain continuous coverage.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired. We continue to offer that option during the continuation of your furlough. Further,

1

HYATT000071



we would like to clarify that colleagues continued to accrue vacation time during the initial furlough period and will continue to do so during furlough continuation.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at (949)729-6000 or ██████@hyatt.com if you have any questions about this notice.



General Manager

2

HYATT000072



REDACTED
REDACTED
REDACTED

July 30, 2020

Dear REDACTED,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  At that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we continue to maintain that relationship today. Unfortunately, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, we must now inform you that your furlough will be extended until August 31, 2020.

This extension of your furlough will not impact your benefits coverage subject to the terms of any applicable benefit plans. You will continue to remain an active employee of Hyatt during the furlough. As you know, Hyatt continued medical and dental benefits during the months of April, May and June. In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. Beginning July 1, 2020, you will be responsible for colleague contributions to the medical and dental plans for which you are eligible in order to maintain continuous coverage.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired. We continue to offer that option during the continuation of your furlough. Further,

1

HYATT000073



we would like to clarify that colleagues continued to accrue vacation time during the initial furlough period and will continue to do so during furlough continuation.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at (949)729-6000 or REDACTED hyatt.com if you have any questions about this notice.



REDACTED
General Manager

2



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :         949.729.6084

REDACTED
REDACTED

June 18, 2020

Dear REDACTED

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 26, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less

1

HYATT000075



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :         949.729.6084

hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 26, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 21, 2020, in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000076



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :        949.729.6084

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at (949) 729-6000 or REDACTED hyatt.com if you have any questions about this notice.

HYATT000077



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :         949.729.6084

Jueves 18 de junio de 2020

Estimada/o REDACTED:

Como bien sabe, la pandemia del COVID-19 inicialmente produjo numerosas restricciones en viajes y reuniones de grupos, que causaron bajas en nuestros negocios y su despido temporal. Al ser una empresa que sirve a los viajeros del mundo y organiza eventos grandes en todo el planeta, esta pandemia nos afecta inmensamente. Teníamos la esperanza de que estas restricciones y las pérdidas de ingresos resultantes fueran algo pasajero. Ahora ha quedado claro que el impacto en nuestros ingresos será a largo plazo. El cierre repentino e inesperado de gran parte de nuestros negocios se debe a la propagación continua del virus, la extensión de varios mandatos gubernamentales de "refugio designado" y "congregaciones en grupo", la cancelación de conferencias y eventos, y una reducción considerable en los viajes.

A pesar de que hay señales positivas que indican que nuestra economía puede comenzar a reabrirse en ciertas áreas, ha quedado claro que la demanda de viajes, eventos y servicios de hotelería tomarán mucho más tiempo de lo que anticipábamos anteriormente. Con la alta probabilidad de que el distanciamiento social continúe hasta que aparezca una vacuna o tratamiento confiables contra el COVID-19, no podemos predecir cuándo podrán regresar a la "normalidad" nuestros negocios.

Con una reducción tan alta en nuestros negocios y una situación que va evolucionando con tanta rapidez, tenemos que tomar medidas que parecían inconcebibles hace poco tiempo. La realidad es que tenemos que tomar más medidas para apoyar las operaciones a largo plazo del hotel en un ambiente de operaciones completamente nuevo.

Cuando le notificamos del recorte de su puesto anticipábamos que sería algo temporal. Durante ese tiempo mantuvimos nuestra relación de empleo con usted, por ser un valioso miembro de la familia Hyatt, y hemos hecho todo lo posible por ayudar a nuestros colegas y evitar la situación en la que nos encontramos actualmente. Sin embargo, el repentino, dramático e inesperado impacto adicional de esta pandemia ha afectado nuestros negocios a un punto fuera de nuestro control. Lamentablemente, debemos notificarle que el recorte temporal de su puesto se convertirá en un despido permanente a partir del 26 de junio de 2020 y su empleo con Hyatt terminará en esa fecha.

Como sabe, Hyatt continuó pagando sus beneficios médicos y dentales durante los meses de abril, mayo y junio. Asimismo, Hyatt cubrió con gusto sus contribuciones de colega a los planes médicos y dentales durante esos tres meses, para asistirle económicamente si trabajó 40 horas o menos en cada uno de esos meses. Durante el periodo de recorte temporal, le ofrecimos la opción de recibir las vacaciones y días festivos flotantes que hubiera ganado y acumulado hasta ese

4



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :          949.729.6084

momento, si así lo deseaba. También quisiéramos clarificar que los colegas continuaron acumulando vacaciones durante el periodo de recorte temporal.

Como parte de la transición al estatus de despido permanente se le pagarán todas las vacaciones acumuladas y ganadas, así como todos los días festivos flotantes no utilizados. Las vacaciones que se le pagarán incluirán todo el tiempo acumulado hasta el 26 de junio de 2020. También se le pagará tiempo de reuniones dos veces: una vez por la charla con su supervisor y otra vez por el tiempo que le tomará recoger sus pertenencias personales del hotel. En el caso de que sea necesario que venga a las instalaciones de trabajo por razones adicionales y aparte de estas circunstancias, le pedimos que informe a su Gerente General para que se le pague por su tiempo. Le proporcionaremos información adicional sobre la continuación de su cobertura de salud en una comunicación por separado.

Esta carta también se considerará su aviso bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador (*Worker Adjustment Retraining Notification Act*, "WARN") y, en los casos correspondientes, toda ley estatal similar a la Ley WARN. Lamentamos no poder brindarles más anticipación con este aviso. Le proporcionamos este aviso con la mayor antelación posible, dadas las recientes e imprevistas circunstancias de negocios que se dieron a conocer con respecto a la pandemia del COVID-19, en la forma descrita anteriormente. Asimismo, la Ley WARN nos exige avisarle que no gozará de ningún derecho de antigüedad (es decir, el derecho de usar su antigüedad o duración de empleo para permanecer empleado mediante el desplazamiento de otro empleado de su puesto de trabajo). También se nos exige avisarle que este es un cierre parcial; no todos los empleados del hotel en el que usted trabajaba se verán afectados. Toda información adicional que exige la Ley WARN en su estado aparece en la lista adjunta a este aviso bajo su estado.

A pesar de que Cal-WARN fue suspendido parcialmente por Mandato Ejecutivo del Gobernador N-31-20, le avisamos en nuestra carta del 21 de marzo de 2020, de conformidad con todos los requisitos de notificación correspondientes bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador, las Secciones 1400 del Código Laboral de California *et seq.* y las leyes federales, lo cual cumplimos con la mayor antelación practicable posible.

Si perdió su trabajo o sufrió un recorte temporal podría calificar para recibir Seguro de Desempleo (*Unemployment Insurance*, "UI"). Puede obtener información adicional sobre UI y otros recursos disponibles para trabajadores en: labor.ca.gov/coronavirus2019. También puede obtener información sobre el EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o www.edd.ca.gov. Asimismo, si no puede trabajar por estar contagiado o haber estado expuesto al COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios del Seguro Estatal de Incapacidad (*State Disability Insurance*, "SDI") del EDD. Si no puede trabajar por tener que cuidar a algún pariente enfermo o en cuarentena con COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios de Ausencia Familiar Pagada (*Paid Family Leave*, "PFL") del EDD. Puede

5



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :   949.729.6021
Fax :            949.729.6084

obtener más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Por favor
tome en cuenta que, a raíz de la crisis del COVID-19, el EDD de California ha suspendido el
periodo normal de 7 días de espera para recibir beneficios de desempleo o SDI. Por consiguiente,
los colegas calificarán para recibir estos beneficios inmediatamente, sin tener que pasar por el
periodo de espera.

Quisiéramos expresarle que estamos conscientes y comprendemos lo devastador que es tomar este
tipo de decisiones; no es algo que tomamos a la ligera. También queremos que sepa cuánto
apreciamos su dedicación a Hyatt y el trabajo que realizó en nombre de la compañía.

Por favor contácteme a (949)729-6000 o REDACTED hyatt.com si tiene preguntas acerca de este
aviso.

HYATT000080



Hyatt Regency Newport Beach
1107 Jamboree Road
Newport Beach, CA  92660

Telephone :  949.729.6021
Fax :          949.729.6084

### Notice to Employee of Change in Relationship
*(Termination Notice Pursuant to Provisions of*
*Section 1089 of the California Unemployment Insurance Code)*

Name     REDACTED                    SSN#   REDACTED

Your employment status has been changed for the reason checked below:

| | | |
|---|---|---|
| ☐ | Voluntary Quit Effective: | |
| X | Layoff/Reduction in Hours | 06/26/2020 |
| ☐ | Temporary Position Ended Effective: | |
| ☐ | Leave of Absence Effective: | |
| ☐ | Return Date for Leave of Absence Effective: | |
| ☐ | Discharge Effective: | |
| ☐ | Refusal to Accept Available Work Effective: | |
| ☐ | Change in Status from Employee to Independent Contractor Effective: | |

Comments:
 Layoff due to COVID-19.

_____          _____
        REDACTED
Human Resources Representative                   Human Resources Signature

_____
        06/18/2020
              Date

7

HYATT000081



March 11, 2020


Dear:

Subject:  Notice of proposed furlough days


As you may know, recent changes in the economy as a result of the coronavirus and its impact on the hospitality industry have forced us to make difficult decisions at the Hyatt Regency Orange County.   To deal with the extreme downturn in business and cancellations, and in order for the hotel to succeed in the future, we must streamline certain operating procedures.

Therefore, it is with regret that we are placing all our Event Planning Managers on a furlough for a period of 14 days.  The furlough period will begin on Sunday, March 15, 2020 and last through Saturday, March 28, 2020.  During these furlough days, you are not to perform any work. Unless you choose to use vacation pay during this furlough, the furlough will be unpaid.

You are eligible for apply for unemployment benefits or partial unemployment benefits with the State EDD for this period. Here is a link to an information sheet from the EDD: https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf, and here is another helpful link: https://www.edd.ca.gov/unemployment/partial_claims.htm. You also can obtain further information online at www.edd.ca.gov.

 If you are interested in voluntarily using vacation pay during the furlough, please submit a request in writing to Human Resources who will be responsible to input your time into Kronos.  Please note that using vacation pay is voluntary.

We very much regret having to take these actions, but hope that our colleagues and especially managers understand these are unfortunate and difficult times. Please let us know if you have any questions.


Thank you,


REDACTED
Director of Human Resources

Hyatt Regency Orange County

HYATT000083



«First_Name» «Last»
«Address_1» «Address_2»
«CITY1», «State» «Zip»


June 18, 2020


Dear «First_Name»,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective 6/19/2020 and your employment with Hyatt will be terminated as of that date.

HYATT000084

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify if you only sent the first letter that said "As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough" that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through 6/19/2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 19 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You may also obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment

HYATT000085

and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any
waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are
today; we do not take this lightly.  We also want you to know how much we appreciate your
dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 714.740.6001 or REDACTED hyatt.com if you have any questions about
this notice.


Sincerely,



REDACTED
Area VP and General Manager

HYATT000086

Jueves 18 de junio de 2020


Estimada/o colega:

Como bien sabe, la pandemia del COVID-19 inicialmente produjo numerosas restricciones en viajes y reuniones de grupos, que causaron bajas en nuestros negocios y su despido temporal. Al ser una empresa que sirve a los viajeros del mundo y organiza eventos grandes en todo el planeta, esta pandemia nos afecta inmensamente. Teníamos la esperanza de que estas restricciones y las pérdidas de ingresos resultantes fueran algo pasajero. Ahora ha quedado claro que el impacto en nuestros ingresos será a largo plazo. El cierre repentino e inesperado de gran parte de nuestros negocios se debe a la propagación continua del virus, la extensión de varios mandatos gubernamentales de "refugio designado" y "congregaciones en grupo", la cancelación de conferencias y eventos, y una reducción considerable en los viajes.

A pesar de que hay señales positivas que indican que nuestra economía puede comenzar a reabrirse en ciertas áreas, ha quedado claro que la demanda de viajes, eventos y servicios de hotelería tomarán mucho más tiempo de lo que anticipábamos anteriormente. Con la alta probabilidad de que el distanciamiento social continúe hasta que aparezca una vacuna o tratamiento confiables contra el COVID-19, no podemos predecir cuándo podrán regresar a la "normalidad" nuestros negocios.

Con una reducción tan alta en nuestros negocios y una situación que va evolucionando con tanta rapidez, tenemos que tomar medidas que parecían inconcebibles hace poco tiempo. La realidad es que tenemos que tomar más medidas para apoyar las operaciones a largo plazo del hotel en un ambiente de operaciones completamente nuevo.

Cuando le notificamos del recorte de su puesto anticipábamos que sería algo temporal. Durante ese tiempo mantuvimos nuestra relación de empleo con usted, por ser un valioso miembro de la familia Hyatt, y hemos hecho todo lo posible por ayudar a nuestros colegas y evitar la situación en la que nos encontramos actualmente. Sin embargo, el repentino, dramático e inesperado impacto adicional de esta pandemia ha afectado nuestros negocios a un punto fuera de nuestro control. Lamentablemente, debemos notificarle que el recorte temporal de su puesto se convertirá en un despido permanente a partir del 6/19/2020 y su empleo con Hyatt terminará en esa fecha.

Como sabe, Hyatt continuó pagando sus beneficios médicos y dentales durante los meses de abril, mayo y junio. Asimismo, Hyatt cubrió con gusto sus contribuciones de colega a los planes médicos y dentales durante esos tres meses, para asistirle económicamente si trabajó 40 horas o menos en cada uno de esos meses. Durante el periodo de recorte temporal, le ofrecimos la opción de recibir las vacaciones y días festivos flotantes que hubiera ganado y acumulado hasta ese momento, si así lo deseaba. También quisiéramos clarificar if you only sent the first letter that said "As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough" que los colegas continuaron acumulando vacaciones durante el periodo de recorte temporal.

4

HYATT000087

Como parte de la transición al estatus de despido permanente se le pagarán todas las vacaciones acumuladas y ganadas, así como todos los días festivos flotantes no utilizados. Las vacaciones que se le pagarán incluirán todo el tiempo acumulado hasta el 6/19/2020.  También se le pagará tiempo de reuniones dos veces: una vez por la charla con su supervisor y otra vez por el tiempo que le tomará recoger sus pertenencias personales del hotel. En el caso de que sea necesario que venga a las instalaciones de trabajo por razones adicionales y aparte de estas circunstancias, le pedimos que informe a su Gerente General para que se le pague por su tiempo. Le proporcionaremos información adicional sobre la continuación de su cobertura de salud en una comunicación por separado.

Esta carta también se considerará su aviso bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador (*Worker Adjustment Retraining Notification Act*, "WARN") y, en los casos correspondientes, toda ley estatal similar a la Ley WARN. Lamentamos no poder brindarles más anticipación con este aviso. Le proporcionamos este aviso con la mayor antelación posible, dadas las recientes e imprevistas circunstancias de negocios que se dieron a conocer con respecto a la pandemia del COVID-19, en la forma descrita anteriormente. Asimismo, la Ley WARN nos exige avisarle que no gozará de ningún derecho de antigüedad (es decir, el derecho de usar su antigüedad o duración de empleo para permanecer empleado mediante el desplazamiento de otro empleado de su puesto de trabajo). También se nos exige avisarle que este es un cierre parcial; no todos los empleados del hotel en el que usted trabajaba se verán afectados. Toda información adicional que exige la Ley WARN en su estado aparece en la lista adjunta a este aviso bajo su estado.

A pesar de que Cal-WARN fue suspendido parcialmente por Mandato Ejecutivo del Gobernador N-31-20, le avisamos en nuestra carta del 19 de marzo, de conformidad con todos los requisitos de notificación correspondientes bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador, las Secciones 1400 del Código Laboral de California *et seq.* y las leyes federales, lo cual cumplimos con la mayor antelación practicable posible.

Si perdió su trabajo o sufrió un recorte temporal podría calificar para recibir Seguro de Desempleo (*Unemployment Insurance*, "UI"). Puede obtener información adicional sobre UI y otros recursos disponibles para trabajadores en: labor.ca.gov/coronavirus2019. También puede obtener información sobre el EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o www.edd.ca.gov. Asimismo, si no puede trabajar por estar contagiado o haber estado expuesto al COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios del Seguro Estatal de Incapacidad (*State Disability Insurance*, "SDI") del EDD. Si no puede trabajar por tener que cuidar a algún pariente enfermo o en cuarentena con COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios de Ausencia Familiar Pagada (*Paid Family Leave*, "PFL") del EDD. Puede obtener más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Por favor tome en cuenta que, a raíz de la crisis del COVID-19, el EDD de California ha suspendido el periodo normal de 7 días de espera para recibir beneficios de desempleo o SDI. Por consiguiente, los colegas calificarán para recibir estos beneficios inmediatamente, sin tener que pasar por el periodo de espera.

HYATT000088

Quisiéramos expresarle que estamos conscientes y comprendemos lo devastador que es tomar este tipo de decisiones; no es algo que tomamos a la ligera. También queremos que sepa cuánto apreciamos su dedicación a Hyatt y el trabajo que realizó en nombre de la compañía.

Por favor contácteme a 714.740.6001 or REDACTED hyatt.com si tiene preguntas acerca de este aviso.

Sincerely,



REDACTED
Area VP and General Manager

HYATT000089

**Notice to Employee of Change in Relationship**
*(Termination Notice Pursuant to Provisions of
Section 1089 of the California Unemployment Insurance Code)*

Name        «First_Name» «Last»              SSN#    «SSN»

Your employment status has been changed for the reason checked below:

☐   Voluntary Quit Effective:

☒   Layoff/Reduction in Hours                                    6/19/2020

☐   Temporary Position Ended Effective:

☐   Leave of Absence Effective:

☐   Return Date for Leave of Absence Effective:

☐   Discharge Effective:

☐   Refusal to Accept Available Work Effective:

☐   Change in Status from Employee to
     Independent Contractor Effective:

Comments:
Layoff due to COVID-19.

REDACTED                                     REDACTED
Human Resources Representative               Human Resources Signature

6/19/2020
Date

7

HYATT000090



«First_Name» «Last»
«Address_1» «Address_2»
«CITY1», «State» «Zip»


June 18, 2020


Dear «First_Name»,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. At that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we continue to maintain that relationship today. Unfortunately, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, we must now inform you that your furlough will be extended until July 31, 2020

HYATT000091

This extension of your furlough will not impact your benefits coverage subject to the terms of any applicable benefit plans. You will continue to remain an active employee of Hyatt during the furlough. As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. Beginning July 1, 2020, you will be responsible for colleague contributions to the medical and dental plans for which you are eligible in order to maintain continuous coverage.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired. We continue to offer that option during the continuation of your furlough. Further, we would like to clarify that colleagues continued to accrue vacation time during the initial furlough period and will continue to do so during furlough continuation.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 19 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You may also obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

HYATT000092

Please contact me at 714.740.6001 or REDACTED hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
Area VP and General Manager

3

HYATT000093



March 19, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 21, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to 12 weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act,

HYATT000094

California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



Area VP and General Manager



March 20, 2020

Dear Colleague,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 19, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open May 11th; however, that date is not certain and will depend on the circumstances at that time. In the meantime, your health benefits will continue per the collective bargaining agreement.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation during their furlough period, unless and to the extent, they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act,

California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED
General Manager



March 20, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 19, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open May 11th; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation/PTO pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act,

HYATT000098

California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED
General Manager

HYATT000099



COLLEAGUE NAME
ADDRESS
CITY, STATE ZIP

June 18, 2020

Dear FIRST NAME,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 26, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned PTO. PTO paid to you will include time accrued through June 26, 2020.  You will also be paid meeting pay for a discussion with your supervisor. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.



This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 20th in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 916.321.3636 or REDACTED @Hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
GENERAL MANAGER
Hyatt Regency Sacramento



NAME
Global ID:
Department:

Dear FIRST NAME,

Below is a summary of the transition package you will receive at time of layoff and the impact to your benefits.

| Summary | |
|---|---|
| Current Health Insurance End Date | June 30, 2020 |
| Unused PTO paid on 6.18.2020 paycheck | 12.34 hours |
| Meeting Pay – 2 Hours Non-exempt / 1 day Exempt | See 6/18/2020 paycheck |

Should you have any questions or would like clarification on the information above, please contact REDACTED at 916.321.3588 or REDACTED @Hyatt.com

Thank you.



**HYATT**
REGENCY

### Notice to Employee of Change in Relationship
*(Termination Notice Pursuant to Provisions of*
*Section 1089 of the California Unemployment Insurance Code)*

Name    NAME                        SSN#   xxx-xx-1234

Your employment Status has been changed for the reason checked below:

☐ Voluntary Quit Effective: _____

☒ Layoff/Reduction in Hours _____6/26/2020_____

☐ Temporary Position Ended Effective: _____

☐ Leave of Absence Effective: _____

☐ Return Date for Leave of Absence Effective: _____

☐ Discharge Effective: _____

☐ Refusal to Accept Available Work Effective: _____

☐ Change in Status from Employee to
Independent Contractor Effective: _____

Comments:
Layoff due to COVID-19.
_____
_____
_____

_____REDACTED_____        **REDACTED**
Human Resources Representative        Human Resources Signature



March 21, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 22, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to twelve weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000104

We wish we did not have to communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,

Colleague Experience Director

HYATT000105



March 21 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 22, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to twelve weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue per their collective bargaining agreement.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000106

We wish we did not have to communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,


Colleague Experience Director

HYATT000107



REDACTED
REDACTED
[REDACTED]

June 18, 2020

Dear [REDACTED],

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 19, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through June 19, 2020. You will also be paid meeting pay for a discussion with your supervisor. In the event that you

1



are required to come to the work, premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 23 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 650-347-1234 ext. 2653 or REDACTED hyatt.com if you have any questions about this notice.



REDACTED
General Manager
Hyatt Regency San Francisco Airport

2



Full Name: ▮REDACTED▮
Global ID:   1317003

Dear Alex,

Below is a summary of the transition package you will receive at time of layoff and the impact to your benefits.

| Summary | |
|---|---|
| Current Health Insurance End Date | June 30, 2020 |
| Unused Vacation (earned/accrued/float) | See 6/18/2020 paycheck |
| Metlife Supplemental Insurance - Apr/May/Jun | $14.67 |
| Metlife Dependent Life Insurance - Apr/May/Jun | $2.07 |
| Pre-tax Vison – Vision PRE – Apr/May/June | $24.00 |
| Short Term Disability Buy Up – Apr/May/Jun | N/A |
| FSA - Flexible Spending – Apr/May/Jun | N/A |
| Tobacco Use – Apr/May/Jun | $120.00 |
| Meeting Pay | See 6/18/2020 paycheck |

Should you have any questions or would like clarification on the information above, please contact ▮REDACTED▮, 650.696.2606 or ▮REDACTED▮@Hyatt.com.

3



**Notice to Employee of Change in Relationship**
*(Termination Notice Pursuant to Provisions of*
*Section 1089 of the California Unemployment Insurance Code*)

Name    REDACTED                    SSN#   XXX-XX-1180

Your employment Status has been changed for the reason checked below:

| | | |
|---|---|---|
| ☐ | Voluntary Quit Effective: | |
| ☒ | Layoff/Reduction in Hours | 6/19/2020 |
| ☐ | Temporary Position Ended Effective: | |
| ☐ | Leave of Absence Effective: | |
| ☐ | Return Date for Leave of Absence Effective: | |
| ☐ | Discharge Effective: | |
| ☐ | Refusal to Accept Available Work Effective: | |
| ☐ | Change in Status from Employee to Independent Contractor Effective: | |

Comments:
Layoff due to COVID-19.

REDACTED
Human Resources Representative

REDACTED
Human Resources Signature

_____          _____
Employee Signature                              Date

4



TO:          **REDACTED**

FROM:        REDACTED   General Manager

DATE:        September 11, 2020

VIA:         Electronic Mail

SUBJECT:     WARN Act Notice

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary layoff.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus and recent surge of confirmed infections, extensions of various government mandates and "mass gathering" orders, cancellation of conferences and events, and the prolonged decline in domestic and international travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there have been encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your layoff which was anticipated to be temporary. Due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your employment with Hyatt will be terminated, effective September 11, 2020.

This memo shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  Any bumping rights available to union members will be governed by the applicable collective bargaining agreement provisions.  There are no bumping rights for non-union members.  We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted.

1



Additional Notice to California employees: If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You may be eligible for UI benefits and we encourage you to apply for those benefits as soon as possible. Additional information on applying for UI and other resources available for workers is available at the website of the California Employment Development Department: https://edd.ca.gov/Unemployment/ and https://www.edd.ca.gov/unemployment/File_an_Unemployment_Insurance_Claim.htm.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly. We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 650-696-2653 or REDACTED hyatt.com if you have any questions about this notice.



REDACTED
General Manager
Hyatt Regency San Francisco Airport

2

HYATT000113



REDACTED

1317003

Dear REDACTED,

Below is a summary of the transition package you will receive at time of separation.

| Summary | |
| --- | --- |
| Average Weekly Wage | $1,278.85 |
| Week(s) of Severance Pay | 3 |
| Amount of Severance Pay | $3,836.54 |
| Separation Date | 9/11/2020 |
| Final Payroll Date | 9/11/2020 |

Should you have any questions or would like clarification on the information above, please
contact REDACTED 650.696.2606 or REDACTED Hyatt.com.

HYATT000114



## Notice to Employee of Change in Relationship
### *(Termination Notice Pursuant to Provisions of*
### *Section 1089 of the California Unemployment Insurance Code)*

Name    REDACTED      SSN#   XXX-XX-1180

Your employment Status has been changed for the reason checked below:

| | | |
|---|---|---|
| ☐ | Voluntary Quit Effective: | |
| ☐ | Layoff/Reduction in Hours | |
| ☐ | Temporary Position Ended Effective: | |
| ☐ | Leave of Absence Effective: | |
| ☐ | Return Date for Leave of Absence Effective: | |
| X | Discharge Effective: | 9/11/2020 |
| ☐ | Refusal to Accept Available Work Effective: | |
| ☐ | Change in Status from Employee to Independent Contractor Effective: | |

Comments:
Job Elimination due to COVID-19.

REDACTED

Human Resources Representative

REDACTED

Human Resources Signature

Employee Signature

Date

4



March 23, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We will continue to monitor our day-to-day and week-to-week business, and colleagues will continue to be scheduled based on business needs. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on 3/23/2020. We regret this short notice, which was necessitated by the events described above. We hope that the Hyatt Regency San Francisco Airport's business returns to normal in eight to twelve weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time. As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have to communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act,

California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of furlough/temporary layoff, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



General Manager



March 23, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We will continue to monitor our day-to-day and week-to-week business, and colleagues will continue to be scheduled based on business needs. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on March 23, 2020. We regret this short notice, which was necessitated by the events described above. We hope that the Hyatt Regency San Francisco Airport's business returns to normal in eight to twelve weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue per the collective bargaining agreement.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at  https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.   Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have to communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 et seq. and federal law, and are providing you with as much notice as practicable.

HYATT000118

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of furlough/temporary layoff, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED
General Manager
HYATT REGENCY San Francisco AIRPORT

HYATT000119



## Notice to Employee of Change in Relationship
### *(Termination Notice Pursuant to Provisions of Section 1089 of the California Unemployment Insurance Code)*

Name  REDACTED                          SSN#  REDACTED

Your employment Status has been changed for the reason checked below:

| | Voluntary Quit Effective: | |
|---|---|---|
| [ ] | Voluntary Quit Effective: | |
| [X] | Layoff/Reduction in Hours | 6/19/2020 |
| [ ] | Temporary Position Ended Effective: | |
| [ ] | Leave of Absence Effective: | |
| [ ] | Return Date for Leave of Absence Effective: | |
| [ ] | Discharge Effective: | |
| [ ] | Refusal to Accept Available Work Effective: | |
| [ ] | Change in Status from Employee to Independent Contractor Effective: | |

Comments:
Layoff due to COVID-19.

REDACTED Colleague Experience Director

REDACTED

_____          _____
Human Resources Representative          Human Resources Signature

_____          _____
Employee Signature                      Date





June 19, 2020

Dear REDACTED

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective June 19, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less

1

HYATT000121

hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through July 19, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform REDACTED your Colleague Experience Director or REDACTED your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 25 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

HYATT000122

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 408.510.6405 or REDACTED Hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
General Manager
Hyatt Regency Santa Clara

3

HYATT000123



REDACTED

Global ID: 1351528

Dear REDACTED,

Below is a summary of the transition package you will receive at time of layoff and the impact to your benefits.

| Summary | |
|---|---|
| Current Health Insurance End Date | June 30, 2020 |
| Unused PTO hours to be paid on next payroll | PTO Hours: 12:56      Amount: $ 415.23 |

Should you have any questions or would like clarification on the information above, please contact REDACTED your Colleague Experience Director via phone (408) 510-6375 or email REDACTED hyatt.com.

HYATT000124



March 25, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants. These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 25, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in eight to twelve weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of April and May.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019. You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have to communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable

2

notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,



REDACTED
General Manager
HYATT REGENCY SANTA CLARA

HYATT000126



March 20, 2020

Dear Colleagues,

 As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, the World Health Organization declared COVID-19 to be a pandemic, and on March 13, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to temporarily suspend services and operations effective March 22, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that the Hotel will re-open in six to eight weeks; however, that date is not certain and will depend on the circumstances at that time. In the meantime, everyone's health benefits will continue as is through the month of May.  To ease any financial hardships, if you would like, we also can pay out accrued vacation on that date pay at your request, although we are not separating anyone's employment at this time.  As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

Manchester Grand Hyatt San Diego
1 Market Place
San Diego, CA 92101

+1 619 232 1234   TELEPHONE
+1 619 239 5678   FAX

manchestergrandhyattsandiego.com
grand.hyatt.com

HYATT000127

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the temporary suspension of operations, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.

Sincerely,



REDACTED
Area Vice President and General Manager

*Manchester Grand Hyatt San Diego*
1 Market Place
San Diego, CA 92101

+1 619 232 1234   TELEPHONE
+1 619 239 5678   FAX

manchestergrandhyattsandiego.com
grand.hyatt.com

HYATT000128



Marzo 20, 2020

Estimados colegas,

Como saben, los acontecimientos recientes que rodean la pandemia del Coronavirus (COVID-19) están teniendo un significativo imprevisto impacto en todo el país y el mundo. El 11 de marzo, la Organización Mundial de la Salud declaró que COVID-19 es una pandemia, y el 13 de marzo, el Presidente declaró una emergencia nacional. Adicional a esto, muchos condados y ciudades están emitiendo órdenes de quedarse en casa e igualmente el cierre de restaurantes. Desafortunadamente, estos eventos han reducido drásticamente nuestros niveles de negocio y con cancelaciones sin precedentes el impacto de esta calamidad física está resultando catastrófico para nuestro negocio.

Lamentamos informarle que como resultado de estos eventos, el Hotel ha determinado que tendrá que suspender temporalmente las operaciones a partir del 22 de marzo de 2020. Como resultado, todos los empleados (excepto un equipo principal que serán notificados por aparte) serán separados temporalmente de su empleo en esa fecha o al final de la semana. Lamentamos este breve aviso, que fue necesario por los eventos descritos anteriormente. Esperamos que el hotel reabra alrededor de 6 a 8 semanas; sin embargo, la fecha no es segura y dependerá de las circunstancias en ese momento. Mientras tanto, el Hotel cubrirá los beneficios de salud de todos durante el mes de mayo. Para apoyar cualquier dificultad financiera, si lo desea, también podemos pagar las horas acumuladas de vacaciones de acuerdo a su solicitud durante el proceso regular de nómina, aunque no estamos separando el empleo de nadie en este momento.  Al igual que el personal con permiso para ausentarse, los colegas en licencia no acumularan días de vacaciones/PTO durante el periodo de licencia, a menos que y en la medida que utilicen tiempo pagado durante la licencia.

Si ha perdido su trabajo o ha sido despedido temporalmente, puede ser elegible para el seguro de desempleo (UI). Más información sobre la UI y otros recursos disponibles para los trabajadores están disponibles en labor.ca.gov/coronavirus2019. También puede obtener más información del EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o en www.edd.ca.gov. Además, si no puede trabajar debido a tener o estar expuesto a COVID-19 (según lo certificado por un profesional médico), usted puede ser elegible para los beneficios del Seguro Estatal de Discapacidad (SDI) del EDD. Si no puede trabajar porque está cuidando a un familiar enfermo o en cuarentena con COVID-19 (según lo certificado por un profesional médico), puede ser elegible para beneficios de Licencia Familiar Pagada (PFL, por sus siglas en inglés) con el EDD. Puede encontrar más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Tenga en cuenta también que debido a la crisis COVID-19, el EDD estatal ha removido el período de espera normal de 7 días para el desempleo y las prestaciones de SDI. Por lo tanto, los empleados serán elegibles para tales beneficios inmediatamente sin ningún período de espera.

Desearíamos no haber comunicado esta desafortunada noticia. Aunque, Cal-WARN ha sido suspendido en parte por la Orden Ejecutiva N-31-20 del Gobernador, proporcionamos este aviso de acuerdo con los requisitos de avisos aplicables según la Ley de Notificación de Capacitación para el Ajuste de Trabajadores de California, Código Laboral de California, Secciones 1400 y siguientes. y la ley federal, y le notificamos con la mayor anticipación de tiempo, como se debe para estos casos.

Manchester Grand Hyatt San Diego
1 Market Place
San Diego, CA 92101

+1 619 232 1234   TELEPHONE
+1 619 239 5678   FAX

manchestergrandhyattsandiego.com
grand.hyatt.com

HYATT000129

Sabemos que es un momento muy difícil para todos y lamentamos estas medidas drásticas. Nuestra prioridad número uno sigue siendo el bienestar de nuestros colegas y reconocemos el impacto que esto tiene en todos y cada uno de ustedes y en sus seres queridos. Dada la rapidez con la que ocurren las cosas en esta situación, no podemos predecir el curso o el alcance de esta pandemia ni la duración exacta de la suspensión temporal de las operaciones; sin embargo, continuaremos proporcionando actualizaciones a medida que tengamos más información. Si tiene cualquier duda, por favor póngase en contacto con nosotros.

Sinceramente,



REDACTED
Area Vice President and General Manager

*Manchester Grand Hyatt San Diego*
1 Market Place
San Diego, CA 92101

+1 619 232 1234   TELEPHONE
+1 619 239 5678   FAX

*manchestergrandhyattsandiego.com*
*grand.hyatt.com*

HYATT000130

TO:         REDACTED

FROM:       REDACTED   General Manager

DATE:       June 12, 2020

VIA:        In Person

SUBJECT:    WARN Act Notice

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough which was anticipated to be temporary. Due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your employment with Hyatt will be terminated on June 19, 2020.

You will be paid all earned PTO in accordance with law.  You will be provided information about continued health coverage under separate cover.

You may be eligible for unemployment insurance benefits (UI) and we encourage you to apply for those benefits as soon as possible.  More information on applying for UI and other resources available for workers is available at the link to the applicable state unemployment insurance

department in the state where you work which can be found on the listing appended to this notice.

This memo shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 760-603-6860 or REDACTED hyatt.com if you have any questions about this notice.

REDACTED
General Manager
Park Hyatt Aviara Resort, Golf Club & Spa

## UNEMPLOYMENT INSURANCE AND STATE WARN ACT APPENDIX

You may be eligible for unemployment insurance benefits (UI) if you are not already receiving them.  More information on UI and other resources available for workers is available at the links below, based on the state where you work.

**Alabama**
Department of Labor
https://labor.alabama.gov/unemployment.aspx

**Alaska**
Department of Labor and Workforce Development
https://labor.alaska.gov/unemployment/

**Arkansas**
Division of Workforce Services
https://www.dws.arkansas.gov/unemployment/
https://www.dws.arkansas.gov/unemployment/how-to-file-a-ui-claim/

**Arizona**
Department of Economic Security
https://des.az.gov/services/employment/unemployment-individual/apply-ui-benefits

**California**
Employment Development Department
https://edd.ca.gov/Unemployment/
https://www.edd.ca.gov/unemployment/File_an_Unemployment_Insurance_Claim.htm

Additional Notice to California employees: If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.

**Colorado**
Department of Labor and Employment
https://www.colorado.gov/pacific/cdle/unemployment
https://www.colorado.gov/pacific/cdle/file-claim

**Connecticut**
Department of Labor
http://www.ctdol.state.ct.us/ui-online/

**Washington, DC**
Department of Employment Services
https://does.dc.gov/page/unemployment-compensation

**Delaware**

Department of Labor
https://ui.delawareworks.com/

**Florida**
Department of Economic Opportunity
http://www.floridajobs.org/Reemployment-Assistance-Service-Center/reemployment-assistance/claimants
http://www.floridajobs.org/Reemployment-Assistance-Service-Center/reemployment-assistance/general-information

**Georgia**
Department of Labor
https://dol.georgia.gov/unemployment-benefits
https://dol.georgia.gov/file-unemployment-insurance-claim

**Hawaii**
Department of Labor and Industrial Relations
https://labor.hawaii.gov/ui/

**Idaho**
Department of Labor
https://www.labor.idaho.gov/dnn/Unemployment-Benefits

**Iowa**
Workforce Development
https://www.iowaworkforcedevelopment.gov/file-claim-unemployment-insurance-benefits

**Illinois**
Department of Economic Security
https://www2.illinois.gov/ides/individuals/UnemploymentInsurance/Pages/default.aspx

**Indiana**
Department of Workforce Development
https://www.in.gov/dwd/3474.htm

**Kansas**
Department of Labor
https://www.getkansasbenefits.gov/Home.aspx

**Kentucky**
Department of Workforce Investment (Kentucky Career Center)
https://kcc.ky.gov/career/Pages/default.aspx

**Louisiana**
Department of Labor - Louisiana Workforce Commission
http://www.laworks.net/UnemploymentInsurance/UI_MainMenu.asp

http://www.laworks.net/UnemploymentInsurance/UI_Claimants.asp

**Maine**
Department of Labor, Bureau of Unemployment Compensation
https://www.maine.gov/unemployment/

**Massachusetts**
Labor and Workforce Development, Department of Unemployment Assistance
https://www.mass.gov/how-to/apply-for-unemployment-benefits

**Maryland**
Department of Labor, Division of Unemployment Insurance
https://www.dllr.state.md.us/employment/unemployment.shtml

**Michigan**
Department of Labor and Economic Opportunity, Unemployment Insurance Agency
https://www.michigan.gov/leo/0,5863,7-336-78421_97241---,00.html

**Minnesota**
Department of Employment and Economic Development
https://www.uimn.org/
https://www.uimn.org/applicants/howapply/index.jsp

**Missouri**
Department of Labor and Industrial Relations
https://labor.mo.gov/unemployed-workers

**Montana**
Department of Labor and Industry
http://uid.dli.mt.gov/claimants

**North Carolina**
Department of Commerce, Division of Employment Security
https://des.nc.gov/apply-unemployment

**North Dakota**
Job Service North Dakota
https://www.jobsnd.com/unemployment-individuals
https://apps.nd.gov/jsnd/uiiaclaims/login.htm

**Nebraska**
Department of Labor
https://www.dol.nebraska.gov/UIBenefits

**New Hampshire**
Department of Employment Security

https://www.nhes.nh.gov/services/claimants/index.htm

**New Jersey**
Department of Labor and Workforce Development, Division of Unemployment Insurance
https://myunemployment.nj.gov/labor/myunemployment/

**New Mexico**
Department of Workplace Solutions
https://www.dws.state.nm.us/en-us/Unemployment

**Nevada**
Department of Employment, Training and Rehabilitation
http://ui.nv.gov/css.html

**New York**
Department of Labor
https://dol.ny.gov/unemployment/file-your-first-claim-benefits

Additional Notice to New York employees: You are also hereby notified that, as a result of your employment loss, you may be eligible to receive job retraining, re-employment services, or other assistance with obtaining new employment from the New York State Department of Labor or its workforce partners upon your termination. You may also be eligible for unemployment insurance benefits after your last day of employment. Whenever possible, the New York State Department of Labor will contact your employer to arrange to provide additional information regarding these benefits and services to you through workshops, interviews, and other activities that will be scheduled prior to the time your employment ends. If your job has already ended, you can also access reemployment information and apply for unemployment insurance benefits on the Department's website or you may use the contact information provided on the website or visit one of the Department's local offices for further information and assistance.

**Ohio**
Department of Job and Family Services
https://unemploymenthelp.ohio.gov/

**Oklahoma**
Employment Security Commission
https://oesc.ok.gov/
https://www.ok.gov/oesc/Claimants/index.html

**Oregon**
Employment Department
https://www.oregon.gov/employ/Unemployment/Pages/default.aspx

**Pennsylvania**
Department of Labor and Industry, Office of Unemployment Compensation
https://www.uc.pa.gov/unemployment-benefits/file/Pages/Filing%20Instructions.aspx

HYATT000136

**Rhode Island**
Department of Labor and Training
http://www.dlt.ri.gov/ui/

**South Carolina**
Department of Employment and Workforce
https://dew.sc.gov/individuals/apply-for-benefits

**South Dakota**
Department of Labor & Regulation, Reemployment Assistance Division
https://dlr.sd.gov/ra/individuals/default.aspx

**Tennessee**
Department of Labor and Workforce Development
https://www.tn.gov/workforce/unemployment.html
https://www.tn.gov/workforce/unemployment/apply-for-benefits.html

**Texas**
Workforce Commission
https://www.twc.texas.gov/jobseekers/unemployment-benefits-services

**Utah**
Department of Workforce Services
https://jobs.utah.gov/ui/home

**Virginia**
Employment Commission
https://www.vec.virginia.gov/unemployed

**Vermont**
Department of Labor
https://labor.vermont.gov/unemployment-insurance

**Washington**
Employment Security Department
https://esd.wa.gov/unemployment

**Wisconsin**
Department of Workforce Development
https://dwd.wisconsin.gov/uiben/

Additional Notice to Wisconsin Employees: As a resource, we are providing the following
contact information for the state workforce development board:

      Wisconsin Department of Workforce Development

HYATT000137

Dislocated Worker Unit
201 E. Washington Avenue, Room E100
P.O. Box 7972
Madison, WI 53707-7972
Tel: 608-266-7406

The Department of Workforce Development provides additional resources related to career planning, job search, job skills training, and other support services, which is available at: https://jobcenterofwisconsin.com/presentation/Employers/Default.aspx.

Contact information for the local workforce development board serving the area in which your worksite is located, as well as any resources provided by the local board, is available here: https://dwd.wisconsin.gov/dislocatedworker/wda/wda-map.htm#1.


**West Virginia**
Workforce WV
https://workforcewv.org/unemployment
https://www.workforcewv.org/unemployment/claimants/filing-an-initial-claim

**Wyoming**
Department of Workforce Services
http://wyomingworkforce.org/workers/ui/
https://wyui.wyo.gov/benefits/home.do

4815-2134-0348, v. 1

HYATT000138



«First_Name» «Last_Name»
«Address_1» «Address_2»
«CITY1», «State» «Zip»


June 18, 2020


Dear «First_Name»,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  At that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we continue to maintain that relationship today. Unfortunately, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, we must now inform you that your furlough will be extended until **September 1, 2020**.

This extension of your furlough will not impact your benefits coverage subject to the terms of any applicable benefit plans. You will continue to remain an active employee of Hyatt during the furlough. As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months. Beginning July 1, 2020, you will be responsible for colleague contributions to the medical and dental plans for which you are eligible in order to maintain

HYATT000139

continuous coverage.  During your furlough, we offered the option of receiving your earned PTO as well as floating holidays at any time, if you desired. We continue to offer that option during the continuation of your furlough. Further, we would like to clarify that colleagues continued to accrue PTO during the initial furlough period and will continue to do so during furlough continuation.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov.  In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact me at 760-603-6835 or REDACTED hyatt.com if you have any questions about this notice.

Sincerely,



REDACTED
General Manager
Park Hyatt Aviara Resort, Golf Club & Spa

HYATT000140



June 18, 2020

Dear

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough on March 25, 2020, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today. However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective **June 19, 2020** and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned PTO as well as floating holidays at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue PTO time during the furlough period.

As part of the transition to layoff status, you will be paid all earned PTO as well as unused floating holidays. PTO paid to you will include time accrued through **June 19, 2020.**  You will also be paid meeting pay twice, once for a

discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 24 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact us at 760-603-6835 or PH.Aviara@hyatt.com if you have any questions about this notice.



REDACTED
General Manager
Park Hyatt Aviara Resort, Golf Club & Spa

HYATT000142



August 5, 2020



Dear REDACTED,

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that your position as **Manager Executive Meetings** at **Resort at Squaw Creek** is being temporarily furloughed due to COVID-19. Furloughs are a company-initiated short-term temporary unpaid leave of absence.  Your furlough will begin on **Sunday, August 9th , 2020** and your return date will depend on business level demand and lead volume.

During this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

During the furlough, it is important that we are able to communicate with you regarding any changes to your furlough or hotel activities. Please contact REDACTED **Managing Director at 530-581-6603 //** REDACTED@Destinationhotels.com should you have any questions or concerns.

REDACTED, please know that we appreciate your understanding during this challenging time. You are a valued member of our **Resort at Squaw Creek** family and we are hopeful that the impact of COVID-19 on our business passes quickly.

Warm regards,



Managing Director, Resort at Squaw Creek

HYATT000143



**Furlough Frequently Asked Questions:**

*How will this impact my pay?*
As you will not work during your furloughed time period you will not receive any compensation from the hotel unless you elect to use your eligible benefit time.

*I have benefit time, may I use this while on furlough?*
Yes. You may apply your benefit time available to you during the time in which you are furloughed. Please inform **Resort at Squaw Creek** to further discuss your use of benefit time.

*Does my health insurance continue? Will I have to pay my portion of health insurance while furloughed?*
Yes, you will remain eligible for health insurance while on furlough. You will be required to continue your portion of your premium contributions.  Because your furlough is unpaid, should you miss or have an incomplete benefit contribution, we will work together to discuss payment options.

*Can I use my Hyatt Employee Rate or Comp rooms that I have booked? Am I able to book rooms to use while I am on furlough?*
Yes. You will remain eligible for these benefits. We encourage you to be mindful of travel restrictions and ask that you follow the Centers for Disease Control guidance on travel as it may impact your return to work.

*Can I taskforce at other hotels?*
If you are interested in assisting hotels that may have need for temporary assistance, please contact your director of Human Resources.

*Can I apply for Unemployment Benefits while I'm furloughed?*
Yes.  You can apply for unemployment benefits when furloughed.  Please visit **www.edd.ca.gov** for further and specific guidance on applying for unemployment benefits (including specifically as it pertains to COVID-19, if available).  Please note your state ultimately determines eligibility and award of unemployment benefits.

*Am I able to work for another employer while I'm furloughed?*
Yes. We understand that this unexpected loss of wages may cause hardship for you and your family. Please consider that working for another employer may impact your potential unemployment benefits.

HYATT000144



June 19, 2020

Dear REDACTED _____,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary.  During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective Sunday, June 21 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical, vision and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your

1

HYATT000145

earned and accrued PTO at any time, if you desired.  Further, we would like to clarify that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all earned PTO. PTO paid to you will include time accrued through 6/20/2020.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of [date you sent furlough letter in March] in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI). More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

Please contact REDACTED  Managing Director or REDACTED Human Resources Director at REDACTED@destinationhotels.com  or  REDACTED@destinationhotels.com  if you have any questions about this notice.

HYATT000146

Sincerely,

REDACTED Managing Director
**Resort at Squaw Creek** | Box 3333 | 400 Squaw Creek Road | Olympic Valley, CA 96146
O: 530-581-6603 || E: REDACTED@destinationhotels.com

3



# RESORT AT SQUAW CREEK™
## LAKE TAHOE

**Notice to Employee of Change in Relationship**
*(Termination Notice Pursuant to Provisions of*
*Section 1089 of the California Unemployment Insurance Code)*

Name **REDACTED**          SSN# _XXX - XX - 4205_

Your employment status has been changed for the reason checked below:

| | | |
|---|---|---|
| [ ] | Voluntary Quit Effective: | _____ |
| [X] | Layoff/Reduction in Hours | 6/21/2020 |
| [ ] | Temporary Position Ended Effective: | _____ |
| [ ] | Leave of Absence Effective: | _____ |
| [ ] | Return Date for Leave of Absence Effective: | _____ |
| [ ] | Discharge Effective: | _____ |
| [ ] | Refusal to Accept Available Work Effective: | _____ |
| [ ] | Change in Status from Employee to Independent Contractor Effective: | _____ |

Comments:
Layoff due to COVID-19.

_____          _____

**REDACTED**                      **REDACTED**

Human Resources Representative          Human Resources Signature


_____
6/19/2020
Date

1

HYATT000148



June 30, 2020

Dear REDACTED,

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective July 10, 2020 and your employment with Hyatt will be terminated as of that date.

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we

HYATT000149

would like to reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through July 10, 2020.  You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

Although Cal-WARN was suspended in part by the Governor's Executive Order N-31-20, we provided notice to you in our letter of March 18, 2020 in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and did so with as much notice as practicable.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

HYATT000150

Please contact me at 831-601-7176 or REDACTED @ventanabigsur.com if you have any questions about this notice.

HYATT000151

==Jueves 18== de junio de 2020

Estimada/o colega:

Como bien sabe, la pandemia del COVID-19 inicialmente produjo numerosas restricciones en viajes y reuniones de grupos, que causaron bajas en nuestros negocios y su despido temporal. Al ser una empresa que sirve a los viajeros del mundo y organiza eventos grandes en todo el planeta, esta pandemia nos afecta inmensamente. Teníamos la esperanza de que estas restricciones y las pérdidas de ingresos resultantes fueran algo pasajero. Ahora ha quedado claro que el impacto en nuestros ingresos será a largo plazo. El cierre repentino e inesperado de gran parte de nuestros negocios se debe a la propagación continua del virus, la extensión de varios mandatos gubernamentales de "refugio designado" y "congregaciones en grupo", la cancelación de conferencias y eventos, y una reducción considerable en los viajes.

A pesar de que hay señales positivas que indican que nuestra economía puede comenzar a reabrirse en ciertas áreas, ha quedado claro que la demanda de viajes, eventos y servicios de hotelería tomarán mucho más tiempo de lo que anticipábamos anteriormente. Con la alta probabilidad de que el distanciamiento social continúe hasta que aparezca una vacuna o tratamiento confiables contra el COVID-19, no podemos predecir cuándo podrán regresar a la "normalidad" nuestros negocios.

Con una reducción tan alta en nuestros negocios y una situación que va evolucionando con tanta rapidez, tenemos que tomar medidas que parecían inconcebibles hace poco tiempo. La realidad es que tenemos que tomar más medidas para apoyar las operaciones a largo plazo del hotel en un ambiente de operaciones completamente nuevo.

Cuando le notificamos del recorte de su puesto anticipábamos que sería algo temporal. Durante ese tiempo mantuvimos nuestra relación de empleo con usted, por ser un valioso miembro de la familia Hyatt, y hemos hecho todo lo posible por ayudar a nuestros colegas y evitar la situación en la que nos encontramos actualmente. Sin embargo, el repentino, dramático e inesperado impacto adicional de esta pandemia ha afectado nuestros negocios a un punto fuera de nuestro control. Lamentablemente, debemos notificarle que el recorte temporal de su puesto se convertirá en un despido permanente a partir del ==[last date of vacation accrual]== y su empleo con Hyatt terminará en esa fecha.

Como sabe, Hyatt continuó pagando sus beneficios médicos y dentales durante los meses de abril, mayo y junio. Asimismo, Hyatt cubrió con gusto sus contribuciones de colega a los planes médicos y dentales durante esos tres meses, para asistirle económicamente si trabajó 40 horas o menos en cada uno de esos meses. Durante el periodo de recorte temporal, le ofrecimos la opción de recibir las vacaciones y días festivos flotantes que hubiera ganado y acumulado hasta ese momento, si así lo deseaba. También quisiéramos ==clarificar [if you only sent the first letter that said "As with personal leaves of absence, colleagues on furlough will not accrue vacation/PTO during their furlough period, unless and to the extent they use paid time during the furlough]== /

4

reiterar [if you have previously informed colleagues that vacation/PTO is accruing] que los colegas continuaron acumulando vacaciones durante el periodo de recorte temporal.

Como parte de la transición al estatus de despido permanente se le pagarán todas las vacaciones acumuladas y ganadas, así como todos los días festivos flotantes no utilizados. Las vacaciones que se le pagarán incluirán todo el tiempo acumulado hasta el [last date of vacation accrual]. También se le pagará tiempo de reuniones dos veces: una vez por la charla con su supervisor y otra vez por el tiempo que le tomará recoger sus pertenencias personales del hotel. En el caso de que sea necesario que venga a las instalaciones de trabajo por razones adicionales y aparte de estas circunstancias, le pedimos que informe a su Gerente General para que se le pague por su tiempo. Le proporcionaremos información adicional sobre la continuación de su cobertura de salud en una comunicación por separado.

Esta carta también se considerará su aviso bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador (*Worker Adjustment Retraining Notification Act*, "WARN") y, en los casos correspondientes, toda ley estatal similar a la Ley WARN. Lamentamos no poder brindarles más anticipación con este aviso. Le proporcionamos este aviso con la mayor antelación posible, dadas las recientes e imprevistas circunstancias de negocios que se dieron a conocer con respecto a la pandemia del COVID-19, en la forma descrita anteriormente. Asimismo, la Ley WARN nos exige avisarle que no gozará de ningún derecho de antigüedad (es decir, el derecho de usar su antigüedad o duración de empleo para permanecer empleado mediante el desplazamiento de otro empleado de su puesto de trabajo). También se nos exige avisarle que este es un cierre parcial; no todos los empleados del hotel en el que usted trabajaba se verán afectados. Toda información adicional que exige la Ley WARN en su estado aparece en la lista adjunta a este aviso bajo su estado.

A pesar de que Cal-WARN fue suspendido parcialmente por Mandato Ejecutivo del Gobernador N-31-20, le avisamos en nuestra carta del [date of furlough letter XX de marzo], de conformidad con todos los requisitos de notificación correspondientes bajo la Ley de Notificación de Ajustes y Reentrenamiento del Trabajador, las Secciones 1400 del Código Laboral de California *et seq.* y las leyes federales, lo cual cumplimos con la mayor antelación practicable posible.

Si perdió su trabajo o sufrió un recorte temporal podría calificar para recibir Seguro de Desempleo (*Unemployment Insurance*, "UI"). Puede obtener información adicional sobre UI y otros recursos disponibles para trabajadores en: labor.ca.gov/coronavirus2019. También puede obtener información sobre el EDD en https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf o www.edd.ca.gov. Asimismo, si no puede trabajar por estar contagiado o haber estado expuesto al COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios del Seguro Estatal de Incapacidad (*State Disability Insurance*, "SDI") del EDD. Si no puede trabajar por tener que cuidar a algún pariente enfermo o en cuarentena con COVID-19 (con la certificación correspondiente de un profesional médico), podría calificar para recibir beneficios de Ausencia Familiar Pagada (*Paid Family Leave*, "PFL") del EDD. Puede obtener más información en https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm. Por favor tome en cuenta que, a raíz de la crisis del COVID-19, el EDD de California ha suspendido el periodo normal de 7 días de espera para recibir beneficios de desempleo o SDI. Por consiguiente,

HYATT000153

los colegas calificarán para recibir estos beneficios inmediatamente, sin tener que pasar por el periodo de espera.

Quisiéramos expresarle que estamos conscientes y comprendemos lo devastador que es tomar este tipo de decisiones; no es algo que tomamos a la ligera. También queremos que sepa cuánto apreciamos su dedicación a Hyatt y el trabajo que realizó en nombre de la compañía.

Por favor contácteme a [INSERT GM PHONE NUMBER] o [INSERT GM EMAIL ADDRESS] si tiene preguntas acerca de este aviso.

[Insert signature block for hotel general manager]

HYATT000154

**Notice to Employee of Change in Relationship**
*(Termination Notice Pursuant to Provisions of*
*Section 1089 of the California Unemployment Insurance Code*)

Name        «First_Name» «Last»          SSN#    «SSN»

Your employment status has been changed for the reason checked below:

☐   Voluntary Quit Effective:                    _____

☒   Layoff/Reduction in Hours                    [final date of vacation accrual]

☐   Temporary Position Ended Effective:          _____

☐   Leave of Absence Effective:                  _____

☐   Return Date for Leave of Absence Effective:  _____

☐   Discharge Effective:                         _____

☐   Refusal to Accept Available Work Effective:  _____

☐   Change in Status from Employee to            _____
    Independent Contractor Effective:

Comments:
  Layoff due to COVID-19.
_____

_____

_____

HRD NAME                                 [insert signature image]
_____          _____
Human Resources Representative           Human Resources Signature


[final date of vacation accrual]
_____
Date

7

HYATT000155

# VENTANA

## BIG SUR

March 18, 2020

Dear Colleagues,

As you know, recent events surrounding the Coronavirus (COVID-19) pandemic are having a significant impact across the country and the world that was not reasonably foreseeable. On March 11, 2020, the World Health Organization declared COVID-19 to be a pandemic, and on March 13,2020, the President declared a national emergency.  In addition, many counties and cities are issuing stay-at-home orders or closure of restaurants.  These events have drastically reduced our business levels, and with unprecedented cancellations, the impact of this physical calamity has been catastrophic to our business.

We regret to advise you that as a result of these events, the Hotel has determined that it will need to suspend operations and temporarily close the Hotel effective March 19, 2020. As a result, all colleagues (except a core team who will be notified separately) will be furloughed/temporarily laid off from their employment on that date or by the end of the week. We regret this short notice, which was necessitated by the events described above. We hope that that the Hotel will re-open around Mid-May 2020; however, that date is not certain and will depend on the circumstances at that time. In the meantime, the Hotel will be covering everyone's health benefits until April 30,2020.  To ease any financial hardships, if you would like, we also can pay out accrued vacation pay on that date at your request, although we are not separating anyone's employment at this time.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.  You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL) benefits with the EDD. You can find more information at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.  Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

We wish we did not have communicate this unfortunate news. Although Cal-WARN has been suspended in part by the Governor's Executive Order N-31-20, we are providing this notice in accordance with any applicable notice requirements under the California Worker Adjustment Retraining Notification Act, California Labor Code Sections 1400 *et seq.* and federal law, and are providing you with as much notice as practicable.

We know that this is a very difficult time for everyone and regret these drastic steps. Our number one priority remains the well-being of our colleagues, and we recognize the impact this has on each and every one of you and your loved ones. Given the fluidity of the situation, we cannot predict the course or extent of this pandemic or the exact length of the closure, but we will continue to provide you with updates as we learn more. If you have any questions, please let us know.  Thank you.

Sincerely,

REDACTED
General Manager



Sunday, March 15, 2020

REDACTED



Dear REDACTED

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that effective immediately we are implementing reduce workweek schedules and reduction of hours for all our employees due to the impact of COVID-19 in our industry and the lack of work. As of today, we can't provide a specific date as to when this measure will end.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

Please contact REDACTED at 408-328-6507 or REDACTED idvhotels.com should you have any questions or concerns. We will provide a weekly update via email.

REDACTED, please know that we appreciate your understanding during this challenging time. You are a valued member of our Wild Palms family and we are hopeful that the impact of COVID-19 on our business passes quickly.


Warm regards,


REDACTED
General Manager, Wild Palms Hotel





July 03, 2020

Dear 

As you know, the COVID-19 pandemic initially prompted numerous restrictions on travel and group meetings that resulted in a drop in our business and your temporary furlough.  As a business that caters to global travelers and hosts large events around the world, this pandemic impacts us immensely.  We were hopeful that these restrictions and associated loss in revenue would be temporary. Since that time, it has recently become apparent that there will be longer-term revenue impacts as a result of the continued spread of the virus, extensions of various government-mandated "shelter-in-place" and "mass gathering" orders, cancellation of conferences and events, and significant decline in travel, all of which have resulted in the sudden and unexpected effective shutdown of much of our business.

While there are encouraging signs that our economy can begin to reopen in some areas, it has now become clear that the demand for travel, events, and hospitality services will take substantially longer to resume than previously anticipated.  With likely on-going social distancing until a reliable COVID-19 vaccine or treatment becomes available, we cannot predict when our way of doing business will return to "normal."

With such a significant reduction in our business in a rapidly evolving situation, we have to make painful choices that would have seemed unthinkable just a short time ago.  The reality is we need to take further action to support the long-term operation of the hotel in a completely new operating environment.

You were previously provided notice of your furlough, which was anticipated to be temporary. During that time, we maintained our employment relationship with you as a valued member of the Hyatt family and we have done everything we can to support our colleagues and avoid the situation we find ourselves in today.  However, due to the sudden, dramatic, and unforeseeable additional impact of this pandemic on our business that is outside of our control, unfortunately, we must now inform you that your furlough will become a layoff effective July 03, 2020 and your employment with Hyatt will be terminated as of that date.

HYATT000158

As you know, Hyatt continued medical and dental benefits during the months of April, May and June.  In addition, Hyatt was pleased to cover your colleague contributions to the medical and dental plans for those three months in order to assist you financially if you worked 40 or less hours in each of the months.  During your furlough, we offered the option of receiving your earned and accrued vacation as well as floating holidays at any time, if you desired.  Further, we would like to reiterate that colleagues continued to accrue vacation time during the furlough period.

As part of the transition to layoff status, you will be paid all unused accrued and earned vacation as well as unused floating holidays. Vacation paid to you will include time accrued through July 03, 2020. You will also be paid meeting pay twice, once for a discussion with your supervisor and once for you to collect any personal belongings here at the property. In the event that you are required to come to the work premises for additional reasons separate and apart from these instances, please inform your General Manager so that we can ensure that you are paid for this time. You will be provided information about continued health coverage under separate cover.

This letter shall serve as notice to you under the Worker Adjustment Retraining Notification Act ("WARN") and if applicable, any similar state WARN Act.  We regret that we were not able to provide more advance notice. We are providing this notice at the earliest practicable time in light of the recent unforeseen business circumstances that have just become known related to the spread of the COVID-19 pandemic, as described above.  In addition, we are required under WARN to notify you that you will not have any "bumping" rights (that is, the ability to use your seniority or length of service to remain employed by displacing another employee from their job). We are also required to notify you that this was a partial closure; not all employees at the hotel where you work have been impacted. Additional information required by the WARN Act in your state is included in the listing appended to this notice under your state.

If you have lost your job or been laid off temporarily, you may be eligible for Unemployment Insurance (UI).  More information on UI and other resources available for workers is available at labor.ca.gov/coronavirus2019.   You also may obtain information from the EDD at https://www.edd.ca.gov/pdf_pub_ctr/de2320m.pdf or at www.edd.ca.gov. In addition, if you are unable to work due to having or being exposed to COVID-19 (as certified by a medical professional), you may be eligible for State Disability Insurance (SDI) benefits from the EDD. If you are unable to work because you are caring for an ill or quarantined family member with COVID-19 (as certified by a medical professional), you may be eligible for Paid Family Leave (PFL)     benefits     with     the     EDD.     You     can     find     more     information     at https://edd.ca.gov/about_edd/coronavirus-2019/faqs.htm.   Please also note that because of the COVID-19 crisis, the State EDD has waived the normal 7-day waiting period for unemployment and SDI benefits. Thus, colleagues will be eligible for such benefits immediately without any waiting-period.

Please know that we understand and appreciate how devastating it is to take actions like we are today; we do not take this lightly.  We also want you to know how much we appreciate your dedication to Hyatt and the work you have done on behalf of the company.

HYATT000159

Please contact me at 408-328-6501 or REDACTEDjdvhotels.com or REDACTED at 408-328-6507 or REDACTED jdvhotels.com if you have any questions about this notice.

REDACTED
General Manager

3

HYATT000160



03/20/20

REDACTED
Department of Sales  - Wild Palms/Avante Hotels

DEAR REDACTED:

This is a challenging time for our industry as the coronavirus (COVID-19) is taking an unforeseeable toll on global travel, and impacting the business of hospitality companies around the world. Over the past weeks, we have seen the COVID-19 outbreak evolve into a global pandemic, with many companies imposing travel restrictions for their employees, bringing down transient and group bookings. As a result, we need to temporarily adjust resources in some Hyatt locations. Our actions are grounded in our purpose of care, which includes protecting the health of our business so we can emerge from this crisis strongly.

The purpose of this letter is to notify you that during this furlough period, you will not be required to report to work, including any type of remote work. During the furlough, you also may not engage in email, business decisions or any other type of activities that constitute work on behalf of the hotel. Beginning on 03/22/20 your email will be paused, and will reactive upon your return to work.

Please be assured that this action is not a reflection of your current job performance and it does not have any implications on future employment decisions.

During the furlough, it is important that we are able to communicate with you regarding any changes to your furlough or hotel activities. Please contact REDACTED at 408-328-6507 or REDACTED jdvhotels.com should you have any questions or concerns. We will provide a bi-weekly update via email.

Please know that we appreciate your understanding during this challenging time. You are a valued member of our WILD PALMS HOTEL and we are hopeful that the impact of COVID-19 on our business passes quickly.

Warm regards,

REDACTED
General Manager –
Wild Palms Hotel and Hotel Avante

HYATT000161



**Furlough Frequently Asked Questions:**

*How will this impact my pay?*
As you will not work during your furloughed time period you will not receive any compensation from the hotel unless you elect to use your eligible benefit time.

*I have benefit time, may I use this while on furlough?*
Yes. You may apply your benefit time available to you during the time in which you are furloughed. Please inform Human Resources to further discuss your use of benefit time.

*Does my health insurance continue? Will I have to pay my portion of health insurance while furloughed?*
Yes, you will remain eligible for health insurance while on furlough. You will be required to continue your portion of your premium contributions.  Because your furlough is unpaid, should you miss or have an incomplete benefit contribution, we will work together to discuss payment options.

*Can I use my Hyatt Employee Rate or Comp rooms that I have booked? Am I able to book rooms to use while I am on furlough?*
Yes. You will remain eligible for these benefits. We encourage you to be mindful of travel restrictions and ask that you follow the Centers for Disease Control guidance on travel as it may impact your return to work.

*Can I taskforce at other hotels?*
If you are interested in assisting hotels that may have need for temporary assistance, please contact your director of Human Resources.

*Can I apply for Unemployment Benefits while I'm furloughed?*
Yes.  You can apply for unemployment benefits when furloughed.  Please visit https://covid19.ca.gov/ and https://www.edd.ca.gov/about_edd/coronavirus-2019.htm for further and specific guidance on applying for unemployment benefits.  Please note your state ultimately determines eligibility and award of unemployment benefits.

*Am I able to work for another employer while I'm furloughed?*
Yes. We understand that this unexpected loss of wages may cause hardship for you and your family. Please consider that working for another employer may impact your potential unemployment benefits.

HYATT000162

# EXHIBIT B

THE COLLEAGUE EXPERIENCE



**HUNTINGTON BEACH RESORT & SPA**

COLLEAGUE HANDBOOK

AMERICAS

HYATT000335

## HOLIDAYS

Hyatt takes great care ensuring colleagues have appropriate time off, when possible, to enjoy holidays throughout the year.  Full-time colleagues are eligible for holiday pay on their first day of employment.  If a colleague is scheduled to work on a holiday, they must work their scheduled shift to receive holiday pay.

Hyatt Regency Huntington Beach Resort and Spa's recognized holidays are:
- New Year's Day (January 1st)
- Memorial Day (last Monday of May)
- Independence Day (July 4th)
- Labor Day (first Monday of September)
- Thanksgiving Day (4th Thursday of November)
- Christmas Day (December 25th)

In addition to the resort's recognized holidays, two Floating Holidays are provided.  Floating Holidays may be taken on any date throughout the calendar year, as approved in advance by the colleague's supervisor.  Requests for Floating Holidays shall have scheduling preference over requests for unpaid days off.

Floating Holidays are earned on January 1st of each calendar year.  New colleagues hired after January 1st of any given calendar year will earn two Floating Holidays on their first day of employment if hired between January 1 and June 30th, and will earn one Floating Holiday on their first day of employment if hired between July 1 and December 31st.  They subsequently will earn two Floating Holidays each January 1st thereafter.

At separation colleagues will be paid out all earned, but unused, floating holidays.

26

## VACATION

Regular full-time colleagues are entitled to time off with pay according to the following schedule:

| Completed Years of Service | Paid Time Off |
|:---:|:---:|
| 1 – 4 | 10 days |
| 5 – 9 | 15 days |
| 10+ | 20 days |

Regular part-time colleagues are entitled to pro-rated vacation benefits based on their average weekly hours worked during the previous 12 months of employment.

Temporary, casual, extra, and on-call colleagues are not eligible for vacation pay.

Because we feel it is important for all colleagues to enjoy time off for rest and relaxation, pay is not given in lieu of vacation during employment.  Colleagues are encouraged to take each year's earned vacation time before their next anniversary date.

Vacation may be carried over from one anniversary year to the next.  However, if colleagues fail to take vacation time, the resort also reserves the right to schedule vacation time for the colleague.

A colleague who is leaving the company will be paid out all accrued unused vacation at separation.

Click HERE for additional details.

48

HYATT000337

# EXHIBIT C

Colleague Complimentary Rooms Rate Policy

# Colleague Complimentary Rooms Rate Policy

## POLICY STATEMENT



All regular full-time, part-time colleagues of managed Hyatt properties, GOC, and GCC office locations are eligible to book complimentary room nights on a space available basis after one year of service.

Some office locations may have additional location-specific policies.  Please refer to your local HR for any questions.

## LOCATIONS NOT OFFERING THE COMPLIMENTARY ROOM BENEFIT

The following locations are not able to offer the Complimentary Room Rate, but do offer Colleague Discount and Friends & Family room rates:

Grand Hyatt Hong Kong

Park Hyatt New York

Park Hyatt Milan

Park Hyatt Paris - Vendome

Park Hyatt Sydney

Park Hyatt Tokyo

Park Hyatt Shanghai

Park Hyatt Maldives Hadahaa

Park Hyatt Jeddah

Alila Wuzhen

Alila Fort Bishangarh

Alila Koh Russey

Alila Yangshuo

Alila Jabal Akhdar

Hyatt Ziva Resorts

Hyatt Zilara Resorts

Destination Residences Snowmass

Destination Residences Vail

Destination Residences Wailea

Destination Residences Hawaii

1/4

HYATT001195

Colleague Complimentary Rooms Rate Policy

Mauna Lani Point

The Lodge at Kukui'ula

Kaanapali Alii

Lahaina Shores Beach Resort

Christiania Lodge

The Lodge at Spruce Peak

Wild Dunes Resort

Sunriver Resort

Resort at Squaw Creek

Suncadia Resort

Ventana Big Sur, An Alila Resort

Franchised Hyatt Place & HYATT house locations

Franchised Full Service Hotels & Resorts

MGM Resorts

Hyatt Residence Clubs

## DESCRIPTION OF BENEFITS

Full-time colleagues are eligible for twelve complimentary room nights per calendar year.

Part-time colleagues are eligible for six complimentary room nights per calendar year; a part-time colleague is defined as a colleague working less than the standard full-time number of hours as defined by your location.

## TERMS AND CONDITIONS

Colleagues must be actively employed by Hyatt at the time of the stay to be eligible for this benefit.

Discount availability is accessed and booked via the Colleague Discount Room Availability tool located in "my apps" on the *hyattconnect* homepage.

The colleague must be the person checking into the hotel where the reservation is booked.

All reservations require a credit card guarantee.

Changes and cancellations are made through Hyatt.com.

Failure to cancel colleague complimentary reservations will result in cancellation fees based on hotel standard or special event polices.

Reservations made with the colleague complimentary benefit are not eligible for World of Hyatt points/benefits.

Colleagues may only reserve one complimentary rate room per night. Additional rooms (up to 2) may be reserved at the Colleague Discount Rate, if available. The maximum number of rooms total under an colleague's name for any one hotel/date is three (either 1 Comp and 2 Discount/Friends & Family or 3 Discount/Friends & Family).

2/4

HYATT001196

Colleague Complimentary Rooms Rate Policy

Colleagues may stay a maximum of three nights per calendar year at any single hotel using the complimentary room rate.

Colleagues may not book complimentary rooms for the same stay dates at more than one Hyatt property simultaneously.

Complimentary room reservations can be booked a maximum of twelve months and a minimum of ten days prior to the arrival date.

Colleagues may only book a maximum of 12 complimentary room nights per calendar year.  This includes completed stays and future reservations in that year.

Colleagues may not book a complimentary room in their own hotel, or a hotel in the city where they work (unless otherwise communicated per individual hotel).

A colleague holding a complimentary room reservation will not be relocated or "walked". If this does occur, the relocating hotel is required to pay for accommodations at the hotel to which the colleague has been relocated.

Once a reservation is confirmed as a complimentary room reservation, the rate cannot be changed, even if the hotel later sells out.

A complimentary room may not be given to a different colleague by changing the name on the reservation. If a colleague is holding a complimentary room reservation, that colleague must cancel it completely and another colleague may book when it becomes available (minimum ten days prior to arrival date).

Complimentary rooms may not be accrued from year to year.

Complimentary rooms may not be used for business travel.

1% of each participating hotel's room inventory will be reserved for Colleague Complimentary Rooms, subject to projected occupancy. The remaining rooms that have not been booked will be released automatically ten days prior to arrival date.

If a hotel accepts or encourages direct bookings (not through Reserve), these will be added to the complimentary room allotment. This means that the actual number of rooms occupied at this rate might be above the 1% allotment.

Resort fees will not be charged on complimentary room reservations.

There is no reservation fee for complimentary room reservations.

In locations where a complimentary room rate causes the hotel to incur local taxes or other fees (including destination fees), those taxes and fees may need to be paid by the colleague. In China, for example, all colleague complimentary rooms are subject to a daily tax based on an amount equal to 6% of the average colleague rate amount for the preceding 12 months plus a 10% service charge.

In some countries complimentary rooms may be considered a taxable benefit, and therefore could be subject to personal income tax.

# ADDITIONAL DESCRIPTION OF BENEFITS

In the US, Canada, Caribbean, and other locations when booking the Colleague Rate only:

A 50% discount on food and beverage purchases will be extended in selected outlets (excluding alcohol, brunch and banquets) for reservations with up to a maximum of 8 people in the party. The discount does not apply toward tips or gratuities. Colleagues are encouraged to inquire about the availability of the F&B discount at check-in.

Colleagues will also receive a 20% discount on all spa services and spa retail products at spas which are managed by Hyatt, subject to availability.

3/4

HYATT001197

Colleague Complimentary Rooms Rate Policy

# ADMINISTRATION

Human Resources will receive a daily report containing a summary of all transactions from the previous day including individual hotel confirmations for Colleague Complimentary Rate rooms, which they may use to verify the employment status and eligibility of the colleague listed and monitor the report for abuse of the benefit.

When a colleague leaves Hyatt, Human Resources will cancel any confirmed Colleague Complimentary room reservation(s) online at Hyatt.com or directly in Reserve.

*Please refer to your local or Regional HR teams for any questions regarding this policy.*

# RELATED DOCUMENTS

Quick Reference Guide (QRG) - Colleague Complimentary Booking Procedure

Quick Reference Guide (QRG) - Colleague Complimentary Booking Procedures (Spanish)

Information may be confidential and/or proprietary.

HYATT001198

# EXHIBIT D

1    SEYFARTH SHAW LLP
Holger Besch (SBN 193362)
2    hbesch@seyfarth.com
Brian Long (SBN 232746)
3    bplong@seyfarth.com
601 South Figueroa Street, Suite 3300
4    Los Angeles, California 90017-5793
Telephone:  (213) 270-9600
5    Facsimile:  (213) 270-9601

6    SEYFARTH SHAW LLP
Michael Afar (SBN 298990)
7    mafar@seyfarth.com
Francesca L. Hunter (SBN 327571)
8    fhunter@seyfarth.com
2029 Century Park East, Suite 3500
9    Los Angeles, California 90067
Telephone:  (310) 277-7200
10    Facsimile:  (310) 201-5219

11    Attorneys for Defendant
HYATT CORPORATION

12

13

14                 UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16

17    KAREN HARTSTEIN, in her        Case No. 2:20-cv-04874-DSF-JPR
representative capacity and on behalf of
18    herself and all others similarly situated,    **DEFENDANT HYATT**
                                       **CORPORATION'S RESPONSE TO**
19              Plaintiff,           **PLAINTIFF'S REQUESTS FOR**
                                       **ADMISSIONS, SET THREE**
20             v.
                                       [Los Angeles Superior Court,
21    HYATT CORPORATION, a Delaware     Case No. 20STCV15895]
corporation doing business in California;
22    and DOES 1 through 100, inclusive,       Complaint Filed:     April 24, 2020
                                       FAC Filed:         January 4, 2021
23            Defendants.

24

25

26

27

28

their particular practices were regarding the payment of wages. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter. On that basis, Defendant denies the request.

**REQUEST FOR ADMISSIONS NO. 116:**

Admit that YOU did not pay health insurance benefits for every single member of the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 116:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

To the extent that there are employees who do not qualify for health insurance benefits as part of their particular job position or work status, or who made a personal

72094490v.2

1    choice to not enroll in any Hyatt-provided medical insurance programs, Hyatt admits that

2    it does not pay health insurance benefits for these individuals.

3    **REQUEST FOR ADMISSIONS NO. 117:**

4         Admit that the law regarding the payment of vested vacation wages to employees

5    that are INDEFINITELY LAID OFF was not uncertain at the time YOU

6    INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

7    **RESPONSE TO NO. 117:**

8         Defendant objects to this request on the grounds that the definition and use of the

9    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

10   sufficient particularity to allow for Defendant to understand and respond to the request.

11        Defendant objects to this request on the grounds that the term "INDEFINITELY

12   LAID OFF" assumes facts not in evidence and further objects to the extent the request

13   requires a legal conclusion or requires the adoption of an assumption which is improper,

14   lacks foundation, and is an improper hypothetical.  Employees in California were

15   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

16        Defendant objects to this request on the grounds that "the law regarding the

17   payment of vested vacation wages to employees" calls for a legal conclusion.

18        Subject to and without waiving the foregoing objections, Defendant responds as

19   follows:

20        Deny.

21   **REQUEST FOR ADMISSIONS NO. 118:**

22        Admit that there were not any representations by an authority that YOU were not

23   required to pay out vested vacation wages pursuant to California Labor Code section

24   227.3 at the time YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

25   **RESPONSE TO NO. 118:**

26        Defendant objects to this request on the grounds that the definition and use of the

27   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

28   sufficient particularity to allow for Defendant to understand and respond to the request.

1  lacks foundation, and is an improper hypothetical.  Employees in California were

2  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

3      Defendant objects to this request on the grounds that the term "good faith belief"

4  calls for a legal conclusion.

5      Subject to and without waiving the foregoing objections, Defendant responds as

6  follows:

7      Deny.

8  **REQUEST FOR ADMISSIONS NO. 123:**

9      Admit that YOU did not have a good faith belief that paid time off wages were not

10 due when YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

11 **RESPONSE TO NO. 123:**

12     Defendant objects to this request on the grounds that the definition and use of the

13 term "YOU" is overbroad, improperly defined, unintelligible, and not described with

14 sufficient particularity to allow for Defendant to understand and respond to the request.

15     Defendant objects to this request on the grounds that the term "INDEFINITELY

16 LAID OFF" assumes facts not in evidence and further objects to the extent the request

17 requires a legal conclusion or requires the adoption of an assumption which is improper,

18 lacks foundation, and is an improper hypothetical.  Employees in California were

19 furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

20     Defendant objects to this request on the grounds that the term "good faith belief"

21 calls for a legal conclusion.

22     Subject to and without waiving the foregoing objections, Defendant responds as

23 follows:

24     Deny.

25 **REQUEST FOR ADMISSIONS NO. 124:**

26     Admit that the law requiring payment of vested vacation wages upon termination

27 did not change between the date YOU INDEFINITELY LAID OFF the VACATION

28 PAY SUBCLASS and now.

**RESPONSE TO NO. 124:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Defendant objects to this request on the grounds that "the law requiring payment of vested vacation wages upon termination" calls for a legal conclusion.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Hyatt admits that there is still no binding case law or statutory authority that requires an employer to pay "vested vacation wages" when employees are furloughed. Hyatt admits that California Labor Code § 227.3, which applies to the payment of "vested vacation time upon termination," has not changed during the time from March 2020 (when Hyatt conducted furloughs) to the date of this response. To the extent this request calls for additional admissions, Defendant denies the request.

**REQUEST FOR ADMISSIONS NO. 125:**

Admit that YOU did not have a reasonable belief that no wages were due at the time YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 125:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request

51

1    DATED: July 23, 2021                        Respectfully submitted,

2                                                SEYFARTH SHAW LLP

3

4                                                By:

5                                                    Holger Besch
                                                     Brian Long
6                                                    Michael Afar
                                                     Francesca L. Hunter
7                                                Attorneys for Defendant
                                                 HYATT CORPORATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE

72094490v.2

DocuSign Envelope ID: 3678964A-D053-4DF1-A177-8G42DA39DD3C

## VERIFICATION

I, Nikki Massey, declare:

I am currently employed by Hyatt Hotels Corporation as Senior Vice President of Human Resources, Americas.  I have read the foregoing Defendant Hyatt Corporation's Responses to Plaintiff Karen Hartstein's Requests for Admission, Set Three ("Responses"), and know or familiarized myself with the contents thereof.

I am informed and believe that the information set forth in the Responses was obtained and assembled by employees of Hyatt, and others, from the appropriate sources of information, including Hyatt's records, files and personnel; and on those grounds, reserving the right to make changes if it appears at any time that omissions or errors have been made therein or that more accurate information becomes available, I declare under penalty of perjury under the laws of the United States and laws of the State of California that the foregoing is true and accurate.

Executed at Chicago, Illinois, on July 23, 2021.


_____
Nikki Massey

1

**PROOF OF SERVICE**

STATE OF CALIFORNIA                )
                                   )   SS
COUNTY OF LOS ANGELES              )

     I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen and not a party to the within action; my business address is 2029 Century Park East, Suite 3500, Los Angeles, California  90067.  On July 23, 2021, I served the within document(s):

**DEFENDANT HYATT CORPORATION'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE**

☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    by placing the document(s) listed above in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at Los Angeles, California, addressed as set forth below.

☒    by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

Jonathan M. Genish          Tel:  (310) 622-4278
Matthew W. Dietz           Email:  jgenish@blackstonepc.com
Jill J. Parker              Email:  mdietz@blackstonepc.com
BLACKSTONE LAW, APC     Email:  jparker@blackstonepc.com
8383 Wilshire Blvd., Suite 745
Beverly Hills, California 90211    ***Attorneys for Plaintiff***

     I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on July 23, 2021, at Los Angeles, California.

*Fern Jenkins*
_____
Fern Jenkins

64156516v.1

# EXHIBIT E

1 | SEYFARTH SHAW LLP
Holger Besch (SBN 193362)
2 | hbesch@seyfarth.com
Brian Long (SBN 232746)
3 | bplong@seyfarth.com
601 South Figueroa Street, Suite 3300
4 | Los Angeles, California 90017-5793
Telephone:  (213) 270-9600
5 | Facsimile:  (213) 270-9601

6 | SEYFARTH SHAW LLP
Michael Afar (SBN 298990)
7 | mafar@seyfarth.com
Francesca L. Hunter (SBN 327571)
8 | fhunter@seyfarth.com
2029 Century Park East, Suite 3500
9 | Los Angeles, California 90067
Telephone:  (310) 277-7200
10 | Facsimile:  (310) 201-5219

11 | Attorneys for Defendant
HYATT CORPORATION

12

13

14 | UNITED STATES DISTRICT COURT

15 | CENTRAL DISTRICT OF CALIFORNIA

16

17 | KAREN HARTSTEIN, in her representative capacity and on behalf of herself and all others similarly situated,

Case No. 2:20-cv-04874-DSF-JPR

18 |

19 | Plaintiff,

**DEFENDANT HYATT CORPORATION'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, SET THREE**

20 | v.

21 | HYATT CORPORATION, a Delaware corporation doing business in California; and DOES 1 through 100, inclusive,

[Los Angeles Superior Court, Case No. 20STCV15895]

22 |

23 | Defendants.

Complaint Filed:      April 24, 2020
FAC Filed:              January 4, 2021

24

25

26

27

28

**PROPOUNDING PARTY:     PLAINTIFF KAREN HARTSTEIN**

**RESPONDING PARTY:       DEFENDANT HYATT CORPORATION**

**SET NUMBER:                THREE**

Defendant Hyatt Corporation ("Defendant" or "Hyatt"), by and through its attorneys, Seyfarth Shaw LLP, hereby submits its Supplemental Responses to Request for Admissions, Set Three, to Plaintiff Karen Hartstein ("Plaintiff").

## PRELIMINARY STATEMENT

The information contained in each response is based only on the information currently available to Defendant.  These responses are made solely for purposes of this action and on behalf of Defendant alone and no other entity or person.  Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and any and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court.  All said objections and grounds are expressly reserved and may be interposed at the time of trial.

Defendant has not completed its investigation of this action, has not completed discovery, and has not completed its trial preparation.  The results hereinafter are based on Defendant's knowledge, information and belief at this time, and are made without prejudice to the foregoing objections.  Defendant specifically reserves the right to amend or supplement these responses at any time.

The fact that Defendant has responded to all, or part, of any request is not intended to be, and shall not be construed to be, a waiver of all, or any part, of any objection to any request made herein, nor an admission of any fact stated or assumed in the request.

## REQUEST FOR ADMISSION NO. 82:

Admit that prior to the date YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS YOU did not investigate whether YOU were required to immediately pay out vested vacation wages on the date YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

1

**RESPONSE TO NO. 82:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "investigate whether YOU were required to immediately pay out vested vacation wages on the date [of furloughs]," Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this

2

1    request as the information known or readily obtainable is insufficient to enable Defendant

2    to admit or deny the matter.  On that basis, Defendant denies the request.

3    **SUPPLEMENTAL RESPONSE TO NO. 82:**

4           Defendant objects to this request on the grounds that the definition and use of the

5    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

6    sufficient particularity to allow for Defendant to understand and respond to the request.

7    Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

8    definition encompasses thousands of potential individuals who work for Defendant,

9    including employees in various high-level executive departments (e.g., Legal, Operations,

10   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

11   employees, managers, supervisors, and hourly employees, as well as third-party hotel

12   ownership groups and individuals within those groups.  In order to respond to this

13   request, Defendant would need to speak with each and every individual person who

14   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

15   would be an extremely overbroad and burdensome request that violates the

16   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

17          Accordingly, Defendant responds to this request as it understands it and pursuant

18   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

19   encompassing the following individuals who were part of Defendant's leadership team

20   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

21   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

22          Defendant objects to this request on the grounds that the term "INDEFINITELY

23   LAID OFF" assumes facts not in evidence and further objects to the extent the request

24   requires a legal conclusion or requires the adoption of an assumption which is improper,

25   lacks foundation, and is an improper hypothetical.  Employees in California were

26   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27          Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

3

1    Admit.

2    **REQUEST FOR ADMISSION NO. 83:**

3    Admit that prior to the date YOU INDEFINITELY LAID OFF the VACATION

4    PAY SUBCLASS YOU did not investigate whether YOU were required to immediately

5    pay out vested floating holiday wages on the date YOU INDEFINITELY LAID OFF the

6    VACATION PAY SUBCLASS.

7    **RESPONSE TO NO. 83:**

8    Defendant objects to this request on the grounds that the definition and use of the

9    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

10   sufficient particularity to allow for Defendant to understand and respond to the request.

11   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

12   definition encompasses thousands of potential individuals who work for Defendant,

13   including employees in various high-level executive departments (e.g., Legal, Operations,

14   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

15   employees, managers, supervisors, and hourly employees, as well as third-party hotel

16   ownership groups and individuals within those groups.  In order to respond to this

17   request, Defendant would need to speak with each and every individual person who

18   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

19   would be an extremely overbroad and burdensome request that violates the

20   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

21   Defendant objects to this request on the grounds that the term "INDEFINITELY

22   LAID OFF" assumes facts not in evidence and further objects to the extent the request

23   requires a legal conclusion or requires the adoption of an assumption which is improper,

24   lacks foundation, and is an improper hypothetical.  Employees in California were

25   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

26   Subject to and without waiving the foregoing objections, Defendant responds as

27   follows:

28

4

1    In order to determine whether any Hyatt employee ever did or did not "investigate

2    whether YOU were required to immediately pay out vested floating holiday wages on the

3    date [of furloughs]," Defendant would need to speak with potentially thousands of

4    individuals who could fall under the unintelligible and overbroad definition of "YOU"

5    stated by Plaintiff.  Based on this inability to conduct the thousands of individualized

6    inquiries needed to answer this request, and after making a reasonable and good faith

7    effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

8    this request as the information known or readily obtainable is insufficient to enable

9    Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

10   **SUPPLEMENTAL RESPONSE TO NO. 83:**

11   Defendant objects to this request on the grounds that the definition and use of the

12   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

13   sufficient particularity to allow for Defendant to understand and respond to the request.

14   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

15   definition encompasses thousands of potential individuals who work for Defendant,

16   including employees in various high-level executive departments (e.g., Legal, Operations,

17   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

18   employees, managers, supervisors, and hourly employees, as well as third-party hotel

19   ownership groups and individuals within those groups.  In order to respond to this

20   request, Defendant would need to speak with each and every individual person who

21   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

22   would be an extremely overbroad and burdensome request that violates the

23   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

24   Accordingly, Defendant responds to this request as it understands it and pursuant

25   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

26   encompassing the following individuals who were part of Defendant's leadership team

27   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

28   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

1    Defendant objects to this request on the grounds that the term "INDEFINITELY

2  LAID OFF" assumes facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Employees in California were

5  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

6    Subject to and without waiving the foregoing objections, Defendant responds as

7  follows:

8    Admit.

9  **REQUEST FOR ADMISSION NO. 84:**

10    Admit that prior to the date YOU INDEFINITELY LAID OFF the VACATION

11  PAY SUBCLASS YOU did not investigate whether YOU were required to immediately

12  pay out vested paid time off wages on the date YOU INDEFINITELY LAID OFF the

13  VACATION PAY SUBCLASS.

14  **RESPONSE TO NO. 84:**

15    Defendant objects to this request on the grounds that the definition and use of the

16  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

17  sufficient particularity to allow for Defendant to understand and respond to the request.

18  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

19  definition encompasses thousands of potential individuals who work for Defendant,

20  including employees in various high-level executive departments (e.g., Legal, Operations,

21  Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

22  employees, managers, supervisors, and hourly employees, as well as third-party hotel

23  ownership groups and individuals within those groups.  In order to respond to this

24  request, Defendant would need to speak with each and every individual person who

25  potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

26  would be an extremely overbroad and burdensome request that violates the

27  "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

28

6

1    Defendant objects to this request on the grounds that the term "INDEFINITELY

2  LAID OFF" assumes facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Employees in California were

5  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

6    Subject to and without waiving the foregoing objections, Defendant responds as

7  follows:

8    In order to determine whether any Hyatt employee ever did or did not "investigate

9  whether YOU were required to immediately pay out vested paid time off wages on the

10  date [of furloughs]," Defendant would need to speak with potentially thousands of

11  individuals who could fall under the unintelligible and overbroad definition of "YOU"

12  stated by Plaintiff.  Based on this inability to conduct the thousands of individualized

13  inquiries needed to answer this request, and after making a reasonable and good faith

14  effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

15  this request as the information known or readily obtainable is insufficient to enable

16  Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

17  **SUPPLEMENTAL RESPONSE TO NO. 84:**

18    Defendant objects to this request on the grounds that the definition and use of the

19  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

20  sufficient particularity to allow for Defendant to understand and respond to the request.

21  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

22  definition encompasses thousands of potential individuals who work for Defendant,

23  including employees in various high-level executive departments (e.g., Legal, Operations,

24  Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

25  employees, managers, supervisors, and hourly employees, as well as third-party hotel

26  ownership groups and individuals within those groups.  In order to respond to this

27  request, Defendant would need to speak with each and every individual person who

28  potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

7

would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 85:**

Admit that YOU did not consult The 2002 Update of The DLSE Enforcement Policies and Interpretations Manual to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 85:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

8

employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult The 2002 Update of The DLSE Enforcement Policies and Interpretations Manual to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 85:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

9

Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

## REQUEST FOR ADMISSION NO. 86:

Admit that YOU did not consult The 2002 Update of The DLSE Enforcement Policies and Interpretations Manual to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

10

**RESPONSE TO NO. 86:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult The 2002 Update of The DLSE Enforcement Policies and Interpretations Manual to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a

11

reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 86:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

12

1   Subject to and without waiving the foregoing objections, Defendant responds as

2   follows:

3   Admit.

4   **REQUEST FOR ADMISSION NO. 87:**

5   Admit that YOU did not consult The 2002 Update of The DLSE Enforcement

6   Policies and Interpretations Manual to determine whether YOU were required to

7   immediately pay out vested paid time off wages when YOU were making the decision to

8   INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

9   **RESPONSE TO NO. 87:**

10   Defendant objects to this request on the grounds that the definition and use of the

11   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

12   sufficient particularity to allow for Defendant to understand and respond to the request.

13   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

14   definition encompasses thousands of potential individuals who work for Defendant,

15   including employees in various high-level executive departments (e.g., Legal, Operations,

16   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

17   employees, managers, supervisors, and hourly employees, as well as third-party hotel

18   ownership groups and individuals within those groups.  In order to respond to this

19   request, Defendant would need to speak with each and every individual person who

20   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

21   would be an extremely overbroad and burdensome request that violates the

22   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

23   Defendant objects to this request on the grounds that the term "INDEFINITELY

24   LAY OFF" assumes facts not in evidence and further objects to the extent the request

25   requires a legal conclusion or requires the adoption of an assumption which is improper,

26   lacks foundation, and is an improper hypothetical.  Employees in California were

27   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

28

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

1          Subject to and without waiving the foregoing objections, Defendant responds as

2    follows:

3          In order to determine whether any Hyatt employee ever did or did not "consult The

4    2002 Update of The DLSE Enforcement Policies and Interpretations Manual to determine

5    whether YOU were required to immediately pay out vested paid time off wages when

6    YOU were making the decision" to furlough employees, Defendant would need to speak

7    with potentially thousands of individuals who could fall under the unintelligible and

8    overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the

9    thousands of individualized inquiries needed to answer this request, and after making a

10   reasonable and good faith effort to otherwise obtain sufficient information, Defendant can

11   neither admit nor deny this request as the information known or readily obtainable is

12   insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant

13   denies the request.

14   **SUPPLEMENTAL RESPONSE TO NO. 87:**

15         Defendant objects to this request on the grounds that the definition and use of the

16   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

17   sufficient particularity to allow for Defendant to understand and respond to the request.

18   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

19   definition encompasses thousands of potential individuals who work for Defendant,

20   including employees in various high-level executive departments (e.g., Legal, Operations,

21   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

22   employees, managers, supervisors, and hourly employees, as well as third-party hotel

23   ownership groups and individuals within those groups.  In order to respond to this

24   request, Defendant would need to speak with each and every individual person who

25   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

26   would be an extremely overbroad and burdensome request that violates the

27   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

28

1    Accordingly, Defendant responds to this request as it understands it and pursuant

2    to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

3    encompassing the following individuals who were part of Defendant's leadership team

4    regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

5    Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

6    Defendant objects to this request on the grounds that the term "INDEFINITELY

7    LAY OFF" assumes facts not in evidence and further objects to the extent the request

8    requires a legal conclusion or requires the adoption of an assumption which is improper,

9    lacks foundation, and is an improper hypothetical.  Employees in California were

10   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

11   Subject to and without waiving the foregoing objections, Defendant responds as

12   follows:

13   Admit.

14   **REQUEST FOR ADMISSION NO. 88:**

15   Admit that YOU did not consult the Division of Labor Standards Enforcement's

16   May 30, 1996 Opinion Letter from H. Thomas Cadell, Jr. to Mark Vegh to determine

17   whether YOU were required to immediately pay out vested vacation wages when YOU

18   were making the decision to INDEFINITELY LAY OFF the VACATION PAY

19   SUBCLASS.

20   **RESPONSE TO NO. 88:**

21   Defendant objects to this request on the grounds that the definition and use of the

22   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

23   sufficient particularity to allow for Defendant to understand and respond to the request.

24   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

25   definition encompasses thousands of potential individuals who work for Defendant,

26   including employees in various high-level executive departments (e.g., Legal, Operations,

27   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

28   employees, managers, supervisors, and hourly employees, as well as third-party hotel

15

ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the Division of Labor Standards Enforcement's May 30, 1996 Opinion Letter from H. Thomas Cadell, Jr. to Mark Vegh to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 88:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

16

definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 89:**

Admit that YOU did not consult the Division of Labor Standards Enforcement's May 30, 1996 Opinion Letter from H. Thomas Cadell, Jr. to Mark Vegh to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

17

**RESPONSE TO NO. 89:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the Division of Labor Standards Enforcement's May 30, 1996 Opinion Letter from H. Thomas Cadell, Jr. to Mark Vegh to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff. Based on this inability to conduct the thousands of

18

1  individualized inquiries needed to answer this request, and after making a reasonable and

2  good faith effort to otherwise obtain sufficient information, Defendant can neither admit

3  nor deny this request as the information known or readily obtainable is insufficient to

4  enable Defendant to admit or deny the matter.  On that basis, Defendant denies the

5  request.

6  **SUPPLEMENTAL RESPONSE TO NO. 89:**

7  Defendant objects to this request on the grounds that the definition and use of the

8  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

9  sufficient particularity to allow for Defendant to understand and respond to the request.

10  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

11  definition encompasses thousands of potential individuals who work for Defendant,

12  including employees in various high-level executive departments (e.g., Legal, Operations,

13  Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

14  employees, managers, supervisors, and hourly employees, as well as third-party hotel

15  ownership groups and individuals within those groups.  In order to respond to this

16  request, Defendant would need to speak with each and every individual person who

17  potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

18  would be an extremely overbroad and burdensome request that violates the

19  "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

20  Accordingly, Defendant responds to this request as it understands it and pursuant

21  to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

22  encompassing the following individuals who were part of Defendant's leadership team

23  regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

24  Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

25  Defendant objects to this request on the grounds that the term "INDEFINITELY

26  LAY OFF" assumes facts not in evidence and further objects to the extent the request

27  requires a legal conclusion or requires the adoption of an assumption which is improper,

28

lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 90:**

Admit that YOU did not consult the Division of Labor Standards Enforcement's May 30, 1996 Opinion Letter from H. Thomas Cadell, Jr. to Mark Vegh to determine whether YOU were required to immediately pay out vested paid time off wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 90:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper,

20

1  lacks foundation, and is an improper hypothetical.  Employees in California were

2  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

3          Subject to and without waiving the foregoing objections, Defendant responds as

4  follows:

5          In order to determine whether any Hyatt employee ever did or did not "consult the

6  Division of Labor Standards Enforcement's May 30, 1996 Opinion Letter from H.

7  Thomas Cadell, Jr. to Mark Vegh to determine whether YOU were required to

8  immediately pay out vested paid time off wages when YOU were making the decision" to

9  furlough employees, Defendant would need to speak with potentially thousands of

10 individuals who could fall under the unintelligible and overbroad definition of "YOU"

11 stated by Plaintiff.  Based on this inability to conduct the thousands of individualized

12 inquiries needed to answer this request, and after making a reasonable and good faith

13 effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

14 this request as the information known or readily obtainable is insufficient to enable

15 Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

16 **SUPPLEMENTAL RESPONSE TO NO. 90:**

17         Defendant objects to this request on the grounds that the definition and use of the

18 term "YOU" is overbroad, improperly defined, unintelligible, and not described with

19 sufficient particularity to allow for Defendant to understand and respond to the request.

20 Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

21 definition encompasses thousands of potential individuals who work for Defendant,

22 including employees in various high-level executive departments (e.g., Legal, Operations,

23 Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

24 employees, managers, supervisors, and hourly employees, as well as third-party hotel

25 ownership groups and individuals within those groups.  In order to respond to this

26 request, Defendant would need to speak with each and every individual person who

27 potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

28

would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 91:**

Admit that YOU did not consult the Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 91:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations,

22

Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 91:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with

23

sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 92:**

Admit that YOU did not consult the Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately pay out vested floating holiday wages when

24

1    YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY

2    SUBCLASS.

3    **RESPONSE TO NO. 92:**

4          Defendant objects to this request on the grounds that the definition and use of the

5    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

6    sufficient particularity to allow for Defendant to understand and respond to the request.

7    Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

8    definition encompasses thousands of potential individuals who work for Defendant,

9    including employees in various high-level executive departments (e.g., Legal, Operations,

10   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

11   employees, managers, supervisors, and hourly employees, as well as third-party hotel

12   ownership groups and individuals within those groups.  In order to respond to this

13   request, Defendant would need to speak with each and every individual person who

14   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

15   would be an extremely overbroad and burdensome request that violates the

16   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

17         Defendant objects to this request on the grounds that the term "INDEFINITELY

18   LAY OFF" assumes facts not in evidence and further objects to the extent the request

19   requires a legal conclusion or requires the adoption of an assumption which is improper,

20   lacks foundation, and is an improper hypothetical.  Employees in California were

21   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

22         Subject to and without waiving the foregoing objections, Defendant responds as

23   follows:

24         In order to determine whether any Hyatt employee ever did or did not "consult the

25   Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas

26   Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately

27   pay out vested floating holiday wages when YOU were making the decision" to furlough

28   employees, Defendant would need to speak with potentially thousands of individuals who

25

1    could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.

2    Based on this inability to conduct the thousands of individualized inquiries needed to

3    answer this request, and after making a reasonable and good faith effort to otherwise

4    obtain sufficient information, Defendant can neither admit nor deny this request as the

5    information known or readily obtainable is insufficient to enable Defendant to admit or

6    deny the matter.  On that basis, Defendant denies the request.

7    **SUPPLEMENTAL RESPONSE TO NO. 92:**

8        Defendant objects to this request on the grounds that the definition and use of the

9    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

10   sufficient particularity to allow for Defendant to understand and respond to the request.

11   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

12   definition encompasses thousands of potential individuals who work for Defendant,

13   including employees in various high-level executive departments (e.g., Legal, Operations,

14   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

15   employees, managers, supervisors, and hourly employees, as well as third-party hotel

16   ownership groups and individuals within those groups.  In order to respond to this

17   request, Defendant would need to speak with each and every individual person who

18   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

19   would be an extremely overbroad and burdensome request that violates the

20   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

21       Accordingly, Defendant responds to this request as it understands it and pursuant

22   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

23   encompassing the following individuals who were part of Defendant's leadership team

24   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

25   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

26       Defendant objects to this request on the grounds that the term "INDEFINITELY

27   LAY OFF" assumes facts not in evidence and further objects to the extent the request

28   requires a legal conclusion or requires the adoption of an assumption which is improper,

26

lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 93:**

Admit that YOU did not consult the Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately pay out vested paid time off wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 93:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper,

27

1 lacks foundation, and is an improper hypothetical.  Employees in California were
2 furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

3      Subject to and without waiving the foregoing objections, Defendant responds as
4 follows:

5      In order to determine whether any Hyatt employee ever did or did not "consult the
6 Division of Labor Standards Enforcement's May 4, 1993 Opinion Letter from H. Thomas
7 Cadell, Jr. to James N. Adler to determine whether YOU were required to immediately
8 pay out vested paid time off wages when YOU were making the decision" to furlough
9 employees, Defendant would need to speak with potentially thousands of individuals who
10 could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.
11 Based on this inability to conduct the thousands of individualized inquiries needed to
12 answer this request, and after making a reasonable and good faith effort to otherwise
13 obtain sufficient information, Defendant can neither admit nor deny this request as the
14 information known or readily obtainable is insufficient to enable Defendant to admit or
15 deny the matter.  On that basis, Defendant denies the request.

16 **SUPPLEMENTAL RESPONSE TO NO. 93:**

17      Defendant objects to this request on the grounds that the definition and use of the
18 term "YOU" is overbroad, improperly defined, unintelligible, and not described with
19 sufficient particularity to allow for Defendant to understand and respond to the request.
20 Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This
21 definition encompasses thousands of potential individuals who work for Defendant,
22 including employees in various high-level executive departments (e.g., Legal, Operations,
23 Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level
24 employees, managers, supervisors, and hourly employees, as well as third-party hotel
25 ownership groups and individuals within those groups.  In order to respond to this
26 request, Defendant would need to speak with each and every individual person who
27 potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

28

would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 94:**

Admit that YOU did not consult the California Chamber of Commerce Labor Law Digest to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 94:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

29

employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the California Chamber of Commerce Labor Law Digest to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 94:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

30

Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

## REQUEST FOR ADMISSION NO. 95:

Admit that YOU did not consult the California Chamber of Commerce Labor Law Digest to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

31

**RESPONSE TO NO. 95:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the California Chamber of Commerce Labor Law Digest to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and

32

good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 95:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

1   Subject to and without waiving the foregoing objections, Defendant responds as

2   follows:

3   Admit.

4   **REQUEST FOR ADMISSION NO. 96:**

5   Admit that YOU did not consult the California Chamber of Commerce Labor Law

6   Digest to determine whether YOU were required to immediately pay out vested paid time

7   off wages when YOU were making the decision to INDEFINITELY LAY OFF the

8   VACATION PAY SUBCLASS.

9   **RESPONSE TO NO. 96:**

10   Defendant objects to this request on the grounds that the definition and use of the

11   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

12   sufficient particularity to allow for Defendant to understand and respond to the request.

13   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This

14   definition encompasses thousands of potential individuals who work for Defendant,

15   including employees in various high-level executive departments (e.g., Legal, Operations,

16   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

17   employees, managers, supervisors, and hourly employees, as well as third-party hotel

18   ownership groups and individuals within those groups. In order to respond to this

19   request, Defendant would need to speak with each and every individual person who

20   potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This

21   would be an extremely overbroad and burdensome request that violates the

22   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

23   Defendant objects to this request on the grounds that the term "INDEFINITELY

24   LAY OFF" assumes facts not in evidence and further objects to the extent the request

25   requires a legal conclusion or requires the adoption of an assumption which is improper,

26   lacks foundation, and is an improper hypothetical. Employees in California were

27   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

28

34

1    Subject to and without waiving the foregoing objections, Defendant responds as

2    follows:

3    In order to determine whether any Hyatt employee ever did or did not "consult the

4    California Chamber of Commerce Labor Law Digest to determine whether YOU were

5    required to immediately pay out vested paid time off wages when YOU were making the

6    decision" to furlough employees, Defendant would need to speak with potentially

7    thousands of individuals who could fall under the unintelligible and overbroad definition

8    of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of

9    individualized inquiries needed to answer this request, and after making a reasonable and

10   good faith effort to otherwise obtain sufficient information, Defendant can neither admit

11   nor deny this request as the information known or readily obtainable is insufficient to

12   enable Defendant to admit or deny the matter.  On that basis, Defendant denies the

13   request.

14   **SUPPLEMENTAL RESPONSE TO NO. 96:**

15   Defendant objects to this request on the grounds that the definition and use of the

16   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

17   sufficient particularity to allow for Defendant to understand and respond to the request.

18   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

19   definition encompasses thousands of potential individuals who work for Defendant,

20   including employees in various high-level executive departments (e.g., Legal, Operations,

21   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

22   employees, managers, supervisors, and hourly employees, as well as third-party hotel

23   ownership groups and individuals within those groups.  In order to respond to this

24   request, Defendant would need to speak with each and every individual person who

25   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

26   would be an extremely overbroad and burdensome request that violates the

27   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

28

35

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 97:**

Admit that YOU did not consult the California Chamber of Commerce's website to determine whether YOU were required to immediately pay out vested vacation wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 97:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this

36

1    request, Defendant would need to speak with each and every individual person who

2    potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

3    would be an extremely overbroad and burdensome request that violates the

4    "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

5         Defendant objects to this request on the grounds that the term "INDEFINITELY

6    LAY OFF" assumes facts not in evidence and further objects to the extent the request

7    requires a legal conclusion or requires the adoption of an assumption which is improper,

8    lacks foundation, and is an improper hypothetical.  Employees in California were

9    furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

10        Subject to and without waiving the foregoing objections, Defendant responds as

11   follows:

12        In order to determine whether any Hyatt employee ever did or did not "consult the

13   California Chamber of Commerce's website to determine whether YOU were required to

14   immediately pay out vested vacation wages when YOU were making the decision" to

15   furlough employees, Defendant would need to speak with potentially thousands of

16   individuals who could fall under the unintelligible and overbroad definition of "YOU"

17   stated by Plaintiff.  Based on this inability to conduct the thousands of individualized

18   inquiries needed to answer this request, and after making a reasonable and good faith

19   effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

20   this request as the information known or readily obtainable is insufficient to enable

21   Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

22   **SUPPLEMENTAL RESPONSE TO NO. 97:**

23        Defendant objects to this request on the grounds that the definition and use of the

24   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

25   sufficient particularity to allow for Defendant to understand and respond to the request.

26   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

27   definition encompasses thousands of potential individuals who work for Defendant,

28   including employees in various high-level executive departments (e.g., Legal, Operations,

37

Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 98:**

Admit that YOU did not consult the California Chamber of Commerce's website to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 98:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with

38

sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "consult the California Chamber of Commerce's website to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

1    enable Defendant to admit or deny the matter.  On that basis, Defendant denies the

2    request.

3    **SUPPLEMENTAL RESPONSE TO NO. 98:**

4          Defendant objects to this request on the grounds that the definition and use of the

5    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

6    sufficient particularity to allow for Defendant to understand and respond to the request.

7    Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

8    definition encompasses thousands of potential individuals who work for Defendant,

9    including employees in various high-level executive departments (e.g., Legal, Operations,

10   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

11   employees, managers, supervisors, and hourly employees, as well as third-party hotel

12   ownership groups and individuals within those groups.  In order to respond to this

13   request, Defendant would need to speak with each and every individual person who

14   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

15   would be an extremely overbroad and burdensome request that violates the

16   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

17         Accordingly, Defendant responds to this request as it understands it and pursuant

18   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

19   encompassing the following individuals who were part of Defendant's leadership team

20   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

21   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

22         Defendant objects to this request on the grounds that the term "INDEFINITELY

23   LAY OFF" assumes facts not in evidence and further objects to the extent the request

24   requires a legal conclusion or requires the adoption of an assumption which is improper,

25   lacks foundation, and is an improper hypothetical.  Employees in California were

26   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27         Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

Admit.

**REQUEST FOR ADMISSION NO. 99:**

Admit that YOU did not consult the California Chamber of Commerce's website to determine whether YOU were required to immediately pay out vested paid time off wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 99:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

1    In order to determine whether any Hyatt employee ever did or did not "consult the

2    California Chamber of Commerce's website to determine whether YOU were required to

3    immediately pay out vested paid time off wages when YOU were making the decision" to

4    furlough employees, Defendant would need to speak with potentially thousands of

5    individuals who could fall under the unintelligible and overbroad definition of "YOU"

6    stated by Plaintiff.  Based on this inability to conduct the thousands of individualized

7    inquiries needed to answer this request, and after making a reasonable and good faith

8    effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

9    this request as the information known or readily obtainable is insufficient to enable

10   Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

11   **SUPPLEMENTAL RESPONSE TO NO. 99:**

12   Defendant objects to this request on the grounds that the definition and use of the

13   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

14   sufficient particularity to allow for Defendant to understand and respond to the request.

15   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

16   definition encompasses thousands of potential individuals who work for Defendant,

17   including employees in various high-level executive departments (e.g., Legal, Operations,

18   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

19   employees, managers, supervisors, and hourly employees, as well as third-party hotel

20   ownership groups and individuals within those groups.  In order to respond to this

21   request, Defendant would need to speak with each and every individual person who

22   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

23   would be an extremely overbroad and burdensome request that violates the

24   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

25   Accordingly, Defendant responds to this request as it understands it and pursuant

26   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

27   encompassing the following individuals who were part of Defendant's leadership team

28

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

1   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

2   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

3       Defendant objects to this request on the grounds that the term "INDEFINITELY

4   LAY OFF" assumes facts not in evidence and further objects to the extent the request

5   requires a legal conclusion or requires the adoption of an assumption which is improper,

6   lacks foundation, and is an improper hypothetical.  Employees in California were

7   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

8       Subject to and without waiving the foregoing objections, Defendant responds as

9   follows:

10      Admit.

11  **REQUEST FOR ADMISSION NO. 100:**

12      Admit that YOU did not consult Seyfarth Shaw's California Peculiarities

13  Employment Law Blog article by Eric Suits dated February 20, 2019 to determine

14  whether YOU were required to immediately pay out vested vacation wages when YOU

15  were making the decision to INDEFINITELY LAY OFF the VACATION PAY

16  SUBCLASS.

17  **RESPONSE TO NO. 100:**

18      Defendant objects to this request on the grounds that the definition and use of the

19  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

20  sufficient particularity to allow for Defendant to understand and respond to the request.

21  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

22  definition encompasses thousands of potential individuals who work for Defendant,

23  including employees in various high-level executive departments (e.g., Legal, Operations,

24  Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

25  employees, managers, supervisors, and hourly employees, as well as third-party hotel

26  ownership groups and individuals within those groups.  In order to respond to this

27  request, Defendant would need to speak with each and every individual person who

28  potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

would be an extremely overbroad and burdensome request that violates the
"proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY
LAY OFF" assumes facts not in evidence and further objects to the extent the request
requires a legal conclusion or requires the adoption of an assumption which is improper,
lacks foundation, and is an improper hypothetical.  Employees in California were
furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as
follows:

In order to determine whether any Hyatt employee ever did or did not "consult
Seyfarth Shaw's California Peculiarities Employment Law Blog article by Eric Suits
dated February 20, 2019 to determine whether YOU were required to immediately pay
out vested vacation wages when YOU were making the decision" to furlough employees,
Defendant would need to speak with potentially thousands of individuals who could fall
under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on
this inability to conduct the thousands of individualized inquiries needed to answer this
request, and after making a reasonable and good faith effort to otherwise obtain sufficient
information, Defendant can neither admit nor deny this request as the information known
or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On
that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 100:**

Defendant objects to this request on the grounds that the definition and use of the
term "YOU" is overbroad, improperly defined, unintelligible, and not described with
sufficient particularity to allow for Defendant to understand and respond to the request.
Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This
definition encompasses thousands of potential individuals who work for Defendant,
including employees in various high-level executive departments (e.g., Legal, Operations,
Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

44

employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 101:**

Admit that YOU did not consult Seyfarth Shaw's California Peculiarities Employment Law Blog article by Eric Suits dated February 20, 2019 to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 101:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with

45

sufficient particularity to allow for Defendant to understand and respond to the request.
Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This
definition encompasses thousands of potential individuals who work for Defendant,
including employees in various high-level executive departments (e.g., Legal, Operations,
Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level
employees, managers, supervisors, and hourly employees, as well as third-party hotel
ownership groups and individuals within those groups.  In order to respond to this
request, Defendant would need to speak with each and every individual person who
potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This
would be an extremely overbroad and burdensome request that violates the
"proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY
LAY OFF" assumes facts not in evidence and further objects to the extent the request
requires a legal conclusion or requires the adoption of an assumption which is improper,
lacks foundation, and is an improper hypothetical.  Employees in California were
furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as
follows:

In order to determine whether any Hyatt employee ever did or did not "consult
Seyfarth Shaw's California Peculiarities Employment Law Blog article by Eric Suits
dated February 20, 2019 to determine whether YOU were required to immediately pay
out vested floating holiday wages when YOU were making the decision" to furlough
employees, Defendant would need to speak with potentially thousands of individuals who
could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.
Based on this inability to conduct the thousands of individualized inquiries needed to
answer this request, and after making a reasonable and good faith effort to otherwise
obtain sufficient information, Defendant can neither admit nor deny this request as the

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter. On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 101:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

47

1    Admit.

2    **REQUEST FOR ADMISSION NO. 102**

3    Admit that YOU did not consult Seyfarth Shaw's California Peculiarities

4    Employment Law Blog article by Eric Suits dated February 20, 2019 to determine

5    whether YOU were required to immediately pay out vested paid time off wages when

6    YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY

7    SUBCLASS.

8    **RESPONSE TO NO. 102:**

9    Defendant objects to this request on the grounds that the definition and use of the

10   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

11   sufficient particularity to allow for Defendant to understand and respond to the request.

12   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

13   definition encompasses thousands of potential individuals who work for Defendant,

14   including employees in various high-level executive departments (e.g., Legal, Operations,

15   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

16   employees, managers, supervisors, and hourly employees, as well as third-party hotel

17   ownership groups and individuals within those groups.  In order to respond to this

18   request, Defendant would need to speak with each and every individual person who

19   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

20   would be an extremely overbroad and burdensome request that violates the

21   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

22   Defendant objects to this request on the grounds that the term "INDEFINITELY

23   LAY OFF" assumes facts not in evidence and further objects to the extent the request

24   requires a legal conclusion or requires the adoption of an assumption which is improper,

25   lacks foundation, and is an improper hypothetical.  Employees in California were

26   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27   Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

48

1    In order to determine whether any Hyatt employee ever did or did not "consult

2   Seyfarth Shaw's California Peculiarities Employment Law Blog article by Eric Suits

3   dated February 20, 2019 to determine whether YOU were required to immediately pay

4   out vested paid time off wages when YOU were making the decision" to furlough

5   employees, Defendant would need to speak with potentially thousands of individuals who

6   could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.

7   Based on this inability to conduct the thousands of individualized inquiries needed to

8   answer this request, and after making a reasonable and good faith effort to otherwise

9   obtain sufficient information, Defendant can neither admit nor deny this request as the

10   information known or readily obtainable is insufficient to enable Defendant to admit or

11   deny the matter.  On that basis, Defendant denies the request.

12   **SUPPLEMENTAL RESPONSE TO NO. 102:**

13    Defendant objects to this request on the grounds that the definition and use of the

14   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

15   sufficient particularity to allow for Defendant to understand and respond to the request.

16   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

17   definition encompasses thousands of potential individuals who work for Defendant,

18   including employees in various high-level executive departments (e.g., Legal, Operations,

19   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

20   employees, managers, supervisors, and hourly employees, as well as third-party hotel

21   ownership groups and individuals within those groups.  In order to respond to this

22   request, Defendant would need to speak with each and every individual person who

23   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

24   would be an extremely overbroad and burdensome request that violates the

25   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

26    Accordingly, Defendant responds to this request as it understands it and pursuant

27   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

28   encompassing the following individuals who were part of Defendant's leadership team

49

1  regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete
2  Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

3       Defendant objects to this request on the grounds that the term "INDEFINITELY
4  LAY OFF" assumes facts not in evidence and further objects to the extent the request
5  requires a legal conclusion or requires the adoption of an assumption which is improper,
6  lacks foundation, and is an improper hypothetical. Employees in California were
7  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

8       Subject to and without waiving the foregoing objections, Defendant responds as
9  follows:

10      Admit.

11 **REQUEST FOR ADMISSION NO. 103:**

12      Admit that YOU did not conduct internet research to determine whether YOU
13 were required to immediately pay out vested vacation wages when YOU were making the
14 decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

15 **RESPONSE TO NO. 103:**

16      Defendant objects to this request on the grounds that the definition and use of the
17 term "YOU" is overbroad, improperly defined, unintelligible, and not described with
18 sufficient particularity to allow for Defendant to understand and respond to the request.
19 Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This
20 definition encompasses thousands of potential individuals who work for Defendant,
21 including employees in various high-level executive departments (e.g., Legal, Operations,
22 Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level
23 employees, managers, supervisors, and hourly employees, as well as third-party hotel
24 ownership groups and individuals within those groups. In order to respond to this
25 request, Defendant would need to speak with each and every individual person who
26 potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This
27 would be an extremely overbroad and burdensome request that violates the
28 "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

50

1   Defendant objects to this request on the grounds that the term "INDEFINITELY

2   LAY OFF" assumes facts not in evidence and further objects to the extent the request

3   requires a legal conclusion or requires the adoption of an assumption which is improper,

4   lacks foundation, and is an improper hypothetical.  Employees in California were

5   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

6   Defendant objects to this request on the grounds that the term "internet research" is

7   vague and ambiguous.

8   Subject to and without waiving the foregoing objections, Defendant responds as

9   follows:

10   In order to determine whether any Hyatt employee ever did or did not "conduct

11   internet research to determine whether YOU were required to immediately pay out vested

12   vacation wages when YOU were making the decision" to furlough employees, Defendant

13   would need to speak with potentially thousands of individuals who could fall under the

14   unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this

15   inability to conduct the thousands of individualized inquiries needed to answer this

16   request, and after making a reasonable and good faith effort to otherwise obtain sufficient

17   information, Defendant can neither admit nor deny this request as the information known

18   or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On

19   that basis, Defendant denies the request.

20   **SUPPLEMENTAL RESPONSE TO NO. 103:**

21   Defendant objects to this request on the grounds that the definition and use of the

22   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

23   sufficient particularity to allow for Defendant to understand and respond to the request.

24   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

25   definition encompasses thousands of potential individuals who work for Defendant,

26   including employees in various high-level executive departments (e.g., Legal, Operations,

27   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

28   employees, managers, supervisors, and hourly employees, as well as third-party hotel

51

ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Defendant objects to this request on the grounds that the term "internet research" is vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 104:**

Admit that YOU did not conduct internet research to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 104:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

52

Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Defendant objects to this request on the grounds that the term "INDEFINITELY LAY OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Defendant objects to this request on the grounds that the term "internet research" is vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether any Hyatt employee ever did or did not "conduct internet research to determine whether YOU were required to immediately pay out vested floating holiday wages when YOU were making the decision" to furlough employees, Defendant would need to speak with potentially thousands of individuals who could fall under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information, Defendant can neither admit nor deny this request as the information known

1  or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On

2  that basis, Defendant denies the request.

3  **SUPPLEMENTAL RESPONSE TO NO. 104:**

4        Defendant objects to this request on the grounds that the definition and use of the

5  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

6  sufficient particularity to allow for Defendant to understand and respond to the request.

7  Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

8  definition encompasses thousands of potential individuals who work for Defendant,

9  including employees in various high-level executive departments (e.g., Legal, Operations,

10  Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

11  employees, managers, supervisors, and hourly employees, as well as third-party hotel

12  ownership groups and individuals within those groups.  In order to respond to this

13  request, Defendant would need to speak with each and every individual person who

14  potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

15  would be an extremely overbroad and burdensome request that violates the

16  "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

17        Accordingly, Defendant responds to this request as it understands it and pursuant

18  to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

19  encompassing the following individuals who were part of Defendant's leadership team

20  regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

21  Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

22        Defendant objects to this request on the grounds that the term "INDEFINITELY

23  LAY OFF" assumes facts not in evidence and further objects to the extent the request

24  requires a legal conclusion or requires the adoption of an assumption which is improper,

25  lacks foundation, and is an improper hypothetical.  Employees in California were

26  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27        Defendant objects to this request on the grounds that the term "internet research" is

28  vague and ambiguous.

1       Subject to and without waiving the foregoing objections, Defendant responds as

2   follows:

3       Admit.

4   **REQUEST FOR ADMISSION NO. 105:**

5       Admit that YOU did not conduct internet research to determine whether YOU

6   were required to immediately pay out vested paid time off wages when YOU were

7   making the decision to INDEFINITELY LAY OFF the VACATION PAY SUBCLASS.

8   **RESPONSE TO NO. 105:**

9       Defendant objects to this request on the grounds that the definition and use of the

10   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

11   sufficient particularity to allow for Defendant to understand and respond to the request.

12   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

13   definition encompasses thousands of potential individuals who work for Defendant,

14   including employees in various high-level executive departments (e.g., Legal, Operations,

15   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

16   employees, managers, supervisors, and hourly employees, as well as third-party hotel

17   ownership groups and individuals within those groups.  In order to respond to this

18   request, Defendant would need to speak with each and every individual person who

19   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

20   would be an extremely overbroad and burdensome request that violates the

21   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

22       Defendant objects to this request on the grounds that the term "INDEFINITELY

23   LAY OFF" assumes facts not in evidence and further objects to the extent the request

24   requires a legal conclusion or requires the adoption of an assumption which is improper,

25   lacks foundation, and is an improper hypothetical.  Employees in California were

26   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27       Defendant objects to this request on the grounds that the term "internet research" is

28   vague and ambiguous.

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

1    Subject to and without waiving the foregoing objections, Defendant responds as
2    follows:
3    In order to determine whether any Hyatt employee ever did or did not "conduct
4    internet research to determine whether YOU were required to immediately pay out vested
5    paid time off wages when YOU were making the decision" to furlough employees,
6    Defendant would need to speak with potentially thousands of individuals who could fall
7    under the unintelligible and overbroad definition of "YOU" stated by Plaintiff.  Based on
8    this inability to conduct the thousands of individualized inquiries needed to answer this
9    request, and after making a reasonable and good faith effort to otherwise obtain sufficient
10   information, Defendant can neither admit nor deny this request as the information known
11   or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On
12   that basis, Defendant denies the request.
13   **SUPPLEMENTAL RESPONSE TO NO. 105:**
14   Defendant objects to this request on the grounds that the definition and use of the
15   term "YOU" is overbroad, improperly defined, unintelligible, and not described with
16   sufficient particularity to allow for Defendant to understand and respond to the request.
17   Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This
18   definition encompasses thousands of potential individuals who work for Defendant,
19   including employees in various high-level executive departments (e.g., Legal, Operations,
20   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level
21   employees, managers, supervisors, and hourly employees, as well as third-party hotel
22   ownership groups and individuals within those groups.  In order to respond to this
23   request, Defendant would need to speak with each and every individual person who
24   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This
25   would be an extremely overbroad and burdensome request that violates the
26   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).
27   Accordingly, Defendant responds to this request as it understands it and pursuant
28   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

56

1  encompassing the following individuals who were part of Defendant's leadership team

2  regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

3  Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

4       Defendant objects to this request on the grounds that the term "INDEFINITELY

5  LAY OFF" assumes facts not in evidence and further objects to the extent the request

6  requires a legal conclusion or requires the adoption of an assumption which is improper,

7  lacks foundation, and is an improper hypothetical.  Employees in California were

8  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

9       Defendant objects to this request on the grounds that the term "internet research" is

10  vague and ambiguous.

11       Subject to and without waiving the foregoing objections, Defendant responds as

12  follows:

13       Admit.

14  **REQUEST FOR ADMISSION NO. 109:**

15       Admit that YOU will not rely on COMMUNICATIONS with YOUR attorney(s) as

16  evidence of whether you had a reasonable belief that no wages were due at the time YOU

17  INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

18  **RESPONSE TO NO. 109:**

19       Defendant objects to this request on the grounds that the definition and use of the

20  term "YOU" is overbroad, improperly defined, unintelligible, and not described with

21  sufficient particularity to allow for Defendant to understand and respond to the request.

22       Defendant objects to this request on the grounds that the term "INDEFINITELY

23  LAID OFF" assumes facts not in evidence and further objects to the extent the request

24  requires a legal conclusion or requires the adoption of an assumption which is improper,

25  lacks foundation, and is an improper hypothetical.  Employees in California were

26  furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

27       Defendant objects to this request on the grounds that the term "reasonable belief"

28  calls for a legal conclusion.

1    Defendant objects to this request on the grounds that the term "communications" is

2    vague and ambiguous.

3    Subject to and without waiving the foregoing objections, Defendant responds as

4    follows:

5    Defendant has not yet determined whether any "communications" will be used or

6    relied upon, or are otherwise appropriate for use or reliance in this case.  Trial in this

7    matter is set for September 6, 2022, and Defendant has not yet developed or finalized all

8    of the evidence it may use in support of its defenses in this case.  At this point, Plaintiff's

9    request is premature and improperly requests that Defendant identify with certainty all of

10   the evidence it may or may not rely upon in connection with this lawsuit.

11   Based on the premature nature of this request and Defendant's inability to answer

12   this request, and after making a reasonable and good faith effort to otherwise respond,

13   Defendant can neither admit nor deny this request as the information known or readily

14   obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis,

15   Defendant denies the request.

16   **SUPPLEMENTAL RESPONSE TO NO. 109:**

17   Defendant objects to this request on the grounds that the definition and use of the

18   term "YOU" is overbroad, improperly defined, unintelligible, and not described with

19   sufficient particularity to allow for Defendant to understand and respond to the request.

20   Defendant objects to this request on the grounds that the term "INDEFINITELY

21   LAID OFF" assumes facts not in evidence and further objects to the extent the request

22   requires a legal conclusion or requires the adoption of an assumption which is improper,

23   lacks foundation, and is an improper hypothetical.  Employees in California were

24   furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

25   Defendant objects to this request on the grounds that the term "reasonable belief"

26   calls for a legal conclusion.

27   Defendant objects to this request on the grounds that the term "communications" is

28   vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

As of the date of these responses, Defendant admits that it will not be relying on any "communications" with its internal or external legal counsel as evidence of whether Defendant had a reasonable, good-faith belief that no wages were due at the time employees were furloughed due to the COVID-19 pandemic.

**REQUEST FOR ADMISSION NO. 110:**

Admit that YOU will not rely on COMMUNICATIONS with YOUR attorney(s) as evidence of whether you had a good faith belief that no wages were due at the time YOU INDEFINITELY LAID OFF the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 110:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Defendant objects to this request on the grounds that the term "good faith belief" calls for a legal conclusion.

Defendant objects to this request on the grounds that the term "communications" is vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Defendant has not yet determined whether any "communications" will be used or relied upon, or are otherwise appropriate for use or reliance in this case.  Trial in this matter is set for September 6, 2022, and Defendant has not yet developed or finalized all

59

of the evidence it may use in support of its defenses in this case. At this point, Plaintiff's request is premature and improperly requests that Defendant identify with certainty all of the evidence it may or may not rely upon in connection with this lawsuit.

Based on the premature nature of this request and Defendant's inability to answer this request, and after making a reasonable and good faith effort to otherwise respond, Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter. On that basis, Defendant denies the request.

## SUPPLEMENTAL RESPONSE TO NO. 110:

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request.

Defendant objects to this request on the grounds that the term "INDEFINITELY LAID OFF" assumes facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Employees in California were furloughed by Hyatt, not "indefinitely laid off," as Plaintiff contends.

Defendant objects to this request on the grounds that the term "good faith belief" calls for a legal conclusion.

Defendant objects to this request on the grounds that the term "communications" is vague and ambiguous.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

As of the date of these responses, Defendant admits that it will not be relying on any "communications" with its internal or external legal counsel as evidence of whether Defendant had a reasonable, good-faith belief that no wages were due at the time employees were furloughed due to the COVID-19 pandemic.

60

**REQUEST FOR ADMISSION NO. 113:**

Admit that YOU do not know of any other employers in the State of California that failed to pay out vested vacation wages when they "furloughed" employees in response to the COVID-19 pandemic.

**RESPONSE TO NO. 113:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether "any other employers in the State of California [] failed to pay out vested vacation wages when they 'furloughed' employees in response to the COVID-19 pandemic," Defendant would need to speak with thousands of employers who operate or operated in the State of California during the COVID-19 pandemic, to determine what actions they took with respect to their employees and what their particular practices were regarding the payment of wages. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information,

Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 113:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE

76560369v.1

**REQUEST FOR ADMISSION NO. 114:**

Admit that YOU do not know of any other employers in the State of California that failed to pay out vested floating holiday wages when they "furloughed" employees in response to the COVID-19 pandemic.

**RESPONSE TO NO. 114:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether "any other employers in the State of California [] failed to pay out vested floating holiday wages when they 'furloughed' employees in response to the COVID-19 pandemic," Defendant would need to speak with thousands of employers who operate or operated in the State of California during the COVID-19 pandemic, to determine what actions they took with respect to their employees and what their particular practices were regarding the payment of wages. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information,

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE
76560369v.1

1    Defendant can neither admit nor deny this request as the information known or readily

2    obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis,

3    Defendant denies the request.

4    **SUPPLEMENTAL RESPONSE TO NO. 114:**

5         Defendant objects to this request on the grounds that the definition and use of the

6    term "YOU" is overbroad, improperly defined, unintelligible, and not described with

7    sufficient particularity to allow for Defendant to understand and respond to the request.

8    Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This

9    definition encompasses thousands of potential individuals who work for Defendant,

10   including employees in various high-level executive departments (e.g., Legal, Operations,

11   Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

12   employees, managers, supervisors, and hourly employees, as well as third-party hotel

13   ownership groups and individuals within those groups.  In order to respond to this

14   request, Defendant would need to speak with each and every individual person who

15   potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This

16   would be an extremely overbroad and burdensome request that violates the

17   "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

18        Accordingly, Defendant responds to this request as it understands it and pursuant

19   to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as

20   encompassing the following individuals who were part of Defendant's leadership team

21   regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete

22   Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

23        Subject to and without waiving the foregoing objections, Defendant responds as

24   follows:

25        Admit.

26

27

28

DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET THREE

76560369v.1

**REQUEST FOR ADMISSION NO. 115:**

Admit that YOU do not know of any other employers in the State of California that failed to pay out vested paid time off wages when they "furloughed" employees in response to the COVID-19 pandemic.

**RESPONSE TO NO. 115:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

In order to determine whether "any other employers in the State of California [] failed to pay out vested paid time off wages when they 'furloughed' employees in response to the COVID-19 pandemic," Defendant would need to speak with thousands of employers who operate or operated in the State of California during the COVID-19 pandemic, to determine what actions they took with respect to their employees and what their particular practices were regarding the payment of wages. Based on this inability to conduct the thousands of individualized inquiries needed to answer this request, and after making a reasonable and good faith effort to otherwise obtain sufficient information,

65

Defendant can neither admit nor deny this request as the information known or readily obtainable is insufficient to enable Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

**SUPPLEMENTAL RESPONSE TO NO. 115:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation."  This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups.  In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Accordingly, Defendant responds to this request as it understands it and pursuant to meet and confer efforts with Plaintiff, with the limited definition of "YOU" as encompassing the following individuals who were part of Defendant's leadership team regarding furloughs during the COVID-19 pandemic: Nikki Massey, Mark Pardue, Pete Sears, Adam Rohman, Susan Santiago, Mark Jennings, and Jordan Meisner.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit.

**REQUEST FOR ADMISSION NO. 116:**

Admit that YOU did not pay health insurance benefits for every single member of the VACATION PAY SUBCLASS.

**RESPONSE TO NO. 116:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level employees, managers, supervisors, and hourly employees, as well as third-party hotel ownership groups and individuals within those groups. In order to respond to this request, Defendant would need to speak with each and every individual person who potentially falls within the scope of Plaintiff's unilateral definition of "YOU." This would be an extremely overbroad and burdensome request that violates the "proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as follows:

To the extent that there are employees who do not qualify for health insurance benefits as part of their particular job position or work status, or who made a personal choice to not enroll in any Hyatt-provided medical insurance programs, Hyatt admits that it does not pay health insurance benefits for these individuals.

**SUPPLEMENTAL RESPONSE TO NO. 116:**

Defendant objects to this request on the grounds that the definition and use of the term "YOU" is overbroad, improperly defined, unintelligible, and not described with sufficient particularity to allow for Defendant to understand and respond to the request. Plaintiff's definition of "YOU" is stated as "Defendant Hyatt Corporation." This definition encompasses thousands of potential individuals who work for Defendant, including employees in various high-level executive departments (e.g., Legal, Operations, Human Resources, Finance, Sales, etc.), corporate-level employees, hotel-level

67

employees, managers, supervisors, and hourly employees, as well as third-party hotel
ownership groups and individuals within those groups.  In order to respond to this
request, Defendant would need to speak with each and every individual person who
potentially falls within the scope of Plaintiff's unilateral definition of "YOU."  This
would be an extremely overbroad and burdensome request that violates the
"proportionality" principles set forth in Fed. R. Civ. P. 26(b)(1).

Subject to and without waiving the foregoing objections, Defendant responds as
follows:

Admit.  Some employees did not qualify for health insurance benefits as part of
their particular job position or work status, and some employees made a personal choice
to not enroll in any Hyatt-provided medical insurance programs.  Thus, Hyatt admits that
it did not pay health insurance benefits for every single member of the alleged
"VACATION PAY SUBCLASS."

**REQUEST FOR ADMISSION NO. 132:**

Admit that none of the members of the VACATION PAY SUBCLASS who
requested payment of their vested vacation wages were paid their vested vacation wages
on the same date of their request.

**RESPONSE TO NO. 132:**

In order to determine whether any Hyatt employee ever was or was not "paid their
vested vacation wages on the same date of their request," Defendant would need to
investigate into the requests for potentially thousands of employees who fall within the
definition of Plaintiff's "VACATION PAY SUBCLASS," including whether an
employee requested payment, whether an employee requested a certain timing for the
payment and the reasons why, when the payment was issued to the employee, and
whether an employee was able to have a manager or other hotel-specific authority issue a
same-day payment.  Based on this inability to conduct the thousands of individualized
inquiries needed to answer this request, and after making a reasonable and good faith
effort to otherwise obtain sufficient information, Defendant can neither admit nor deny

68

1   this request as the information known or readily obtainable is insufficient to enable

2   Defendant to admit or deny the matter.  On that basis, Defendant denies the request.

3   **SUPPLEMENTAL RESPONSE TO NO. 132:**

4       Admit.

5

6   DATED: October 25, 2021                    Respectfully submitted,

7                                       SEYFARTH SHAW LLP

8

9   By:                            
                  Holger Besch

10                     Brian Long
                  Michael Afar

11                     Francesca L. Hunter
            Attorneys for Defendant

12               HYATT CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I, Nikki Massey, declare:

I am currently employed by Hyatt Hotels Corporation as Senior Vice President of Human Resources, Americas.  I have read the foregoing Defendant Hyatt Corporation's Supplemental Responses to Plaintiff Karen Hartstein's Requests for Admission, Set Three ("Responses"), and know or familiarized myself with the contents thereof.

I am informed and believe that the information set forth in the Responses was obtained and assembled by employees of Hyatt, and others, from the appropriate sources of information, including Hyatt's records, files and personnel; and on those grounds, reserving the right to make changes if it appears at any time that omissions or errors have been made therein or that more accurate information becomes available, I declare under penalty of perjury under the laws of the United States and laws of the State of California that the foregoing is true and accurate.

Executed at <u>Nassau, Bahamas</u>, on October <u>25</u>, 2021.

_Nikki Massey_____
Nikki Massey

---

1

# PROOF OF SERVICE

STATE OF CALIFORNIA )
) SS
COUNTY OF LOS ANGELES )

    I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen and not a party to the within action; my business address is 2029 Century Park East, Suite 3500, Los Angeles, California  90067.  On October 25, 2021, I served the within document(s):

DEFENDANT HYATT CORPORATION'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, SET THREE

☐  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☐  by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒  by placing the document(s) listed above in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at Los Angeles, California, addressed as set forth below.

☒  by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

| | |
|---|---|
| Jonathan M. Genish | Tel:  (310) 622-4278 |
| Matthew W. Dietz | Emails: jgenish@blackstonepc.com |
| Jill J. Parker | MDietz@blackstonepc.com |
| BLACKSTONE LAW, APC | jparker@blackstonepc.com |
| 8383 Wilshire Blvd., Suite 745 | |
| Beverly Hills, California 90211 | ***Attorneys for Plaintiff*** |

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Executed on October 25, 2021, at Los Angeles, California.

_____
Rebecca Garner

1

76560369v.1

# EXHIBIT F

1 | SEYFARTH SHAW LLP
Holger Besch (SBN 193362)
2 | hbesch@seyfarth.com
Brian Long (SBN 232746)
3 | bplong@seyfarth.com
601 South Figueroa Street, Suite 3300
4 | Los Angeles, California 90017-5793
Telephone:  (213) 270-9600
5 | Facsimile:  (213) 270-9601

6 | SEYFARTH SHAW LLP
Michael Afar (SBN 298990)
7 | mafar@seyfarth.com
Francesca L. Hunter (SBN 327571)
8 | fhunter@seyfarth.com
2029 Century Park East, Suite 3500
9 | Los Angeles, California 90067
Telephone:  (310) 277-7200
10 | Facsimile:  (310) 201-5219

11 | Attorneys for Defendant
HYATT CORPORATION

12

13

14 | UNITED STATES DISTRICT COURT

15 | CENTRAL DISTRICT OF CALIFORNIA

16

17 | KAREN HARTSTEIN, in her representative capacity and on behalf of herself and all others similarly situated,

Case No. 2:20-cv-04874-DSF-JPR

18 |

**DEFENDANT HYATT CORPORATION'S RESPONSE TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, SET FOUR**

19 | Plaintiff,

20 | v.

[Los Angeles Superior Court, Case No. 20STCV15895]

21 | HYATT CORPORATION, a Delaware corporation doing business in California; and DOES 1 through 100, inclusive,

22 |

Complaint Filed:      April 24, 2020
FAC Filed:             January 4, 2021

23 | Defendants.

24

25

26

27

28

74696524v.1

**PROPOUNDING PARTY:**     **PLAINTIFF KAREN HARTSTEIN**

**RESPONDING PARTY:**      **DEFENDANT HYATT CORPORATION**

**SET NUMBER:**            **FOUR**

Defendant Hyatt Corporation ("Defendant" or "Hyatt"), by and through its attorneys, Seyfarth Shaw LLP, hereby submits its Responses to Request for Admissions, Set Four, to Plaintiff Karen Hartstein ("Plaintiff").

## PRELIMINARY STATEMENT

The information contained in each response is based only on the information currently available to Defendant. These responses are made solely for purposes of this action and on behalf of Defendant alone and no other entity or person. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and any and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court. All said objections and grounds are expressly reserved and may be interposed at the time of trial.

Defendant has not completed its investigation of this action, has not completed discovery, and has not completed its trial preparation. The results hereinafter are based on Defendant's knowledge, information and belief at this time, and are made without prejudice to the foregoing objections. Defendant specifically reserves the right to amend or supplement these responses at any time.

The fact that Defendant has responded to all, or part, of any request is not intended to be, and shall not be construed to be, a waiver of all, or any part, of any objection to any request made herein, nor an admission of any fact stated or assumed in the request.

## REQUEST FOR ADMISSIONS NO. 136:

Admit that YOU provide COMPLIMENTARY shampoo to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

1

**RESPONSE TO NO. 136:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 137:**

Admit that YOU incur a cost for providing COMPLIMENTARY shampoo to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 137:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

2

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 138:**

Admit that YOU provide COMPLIMENTARY hair conditioner to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 138:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 139:**

Admit that YOU incur a cost for providing COMPLIMENTARY hair conditioner to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 139:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 140:**

Admit that YOU provide COMPLIMENTARY body wash to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 140:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

74696524v.1

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

## REQUEST FOR ADMISSIONS NO. 141:

Admit that YOU incur a cost for providing COMPLIMENTARY body wash to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

## RESPONSE TO NO. 141:

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 142:**

Admit that YOU provide COMPLIMENTARY shower gel to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 142:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 143:**

Admit that YOU incur a cost for providing COMPLIMENTARY shower gel to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

6

**RESPONSE TO NO. 143:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 144:**

Admit that YOU provide COMPLIMENTARY soap to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 144:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

7

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 145:**

Admit that YOU incur a cost for providing COMPLIMENTARY soap to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS

**RESPONSE TO NO. 145:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

1
**REQUEST FOR ADMISSIONS NO. 146:**

2
Admit that YOU provide COMPLIMENTARY cotton swabs to guests at hotels at

3
which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their

4
HOTEL ROOM BONUS.

5
**RESPONSE TO NO. 146:**

6
Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

7
any party's claim or defense and proportional to the needs of the case.  Defendant

8
responds on behalf of Defendant only.

9
Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

10
evidence and further objects to the extent the request requires a legal conclusion or

11
requires the adoption of an assumption which is improper, lacks foundation, and is an

12
improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

13
ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

14
hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

15
remuneration.

16
Subject to and without waiving the foregoing objections, Defendant responds as

17
follows:

18
Admit, to the extent this amenity was provided and used in a particular hotel room

19
by an employee as part of Defendant's complimentary hotel stay program.

20
**REQUEST FOR ADMISSIONS NO. 147:**

21
Admit that YOU incur a cost for providing COMPLIMENTARY cotton swabs to

22
guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were

23
able to utilize their HOTEL ROOM BONUS.

24
**RESPONSE TO NO. 147:**

25
Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

26
any party's claim or defense and proportional to the needs of the case.  Defendant

27
responds on behalf of Defendant only.

28

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 148:**

Admit that YOU provide COMPLIMENTARY shower caps to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 148:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 149:**

Admit that YOU incur a cost for providing COMPLIMENTARY shower caps to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 149:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 150:**

Admit that YOU provide COMPLIMENTARY mouthwash to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

11

**RESPONSE TO NO. 150:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 151:**

Admit that YOU incur a cost for providing COMPLIMENTARY mouthwash to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 151:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

12

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 152:**

Admit that YOU provide COMPLIMENTARY hand lotion to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 152:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

1  **REQUEST FOR ADMISSIONS NO. 153:**

2      Admit that YOU incur a cost for providing COMPLIMENTARY hand lotion to

3  guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were

4  able to utilize their HOTEL ROOM BONUS.

5  **RESPONSE TO NO. 153:**

6      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

7  any party's claim or defense and proportional to the needs of the case.  Defendant

8  responds on behalf of Defendant only.

9      Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

10  evidence and further objects to the extent the request requires a legal conclusion or

11  requires the adoption of an assumption which is improper, lacks foundation, and is an

12  improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

13  ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

14  hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

15  remuneration.

16      Subject to and without waiving the foregoing objections, Defendant responds as

17  follows:

18      Admit, to the extent this amenity was provided and used in a particular hotel room

19  by an employee as part of Defendant's complimentary hotel stay program.

20  **REQUEST FOR ADMISSIONS NO. 154:**

21      Admit that YOU provide COMPLIMENTARY body lotion to guests at hotels at

22  which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their

23  HOTEL ROOM BONUS.

24  **RESPONSE TO NO. 154:**

25      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

26  any party's claim or defense and proportional to the needs of the case.  Defendant

27  responds on behalf of Defendant only.

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1  Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

2  evidence and further objects to the extent the request requires a legal conclusion or

3  requires the adoption of an assumption which is improper, lacks foundation, and is an

4  improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

5  ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

6  hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

7  remuneration.

8  Subject to and without waiving the foregoing objections, Defendant responds as

9  follows:

10  Admit, to the extent this amenity was provided and used in a particular hotel room

11  by an employee as part of Defendant's complimentary hotel stay program.

12  **REQUEST FOR ADMISSIONS NO. 155:**

13  Admit that YOU incur a cost for providing COMPLIMENTARY body lotion to

14  guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were

15  able to utilize their HOTEL ROOM BONUS.

16  **RESPONSE TO NO. 155:**

17  Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18  any party's claim or defense and proportional to the needs of the case.  Defendant

19  responds on behalf of Defendant only.

20  Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

21  evidence and further objects to the extent the request requires a legal conclusion or

22  requires the adoption of an assumption which is improper, lacks foundation, and is an

23  improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

24  ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

25  hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

26  remuneration.

27  Subject to and without waiving the foregoing objections, Defendant responds as

28  follows:

15

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 156:**

Admit that YOU provide COMPLIMENTARY disposable razors to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 156:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 157:**

Admit that YOU incur a cost for providing COMPLIMENTARY disposable razors to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

16

**RESPONSE TO NO. 157:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 158:**

Admit that YOU provide COMPLIMENTARY laundry bags to guests at hotels at which at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 158:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

17

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 159:**

Admit that YOU incur a cost for providing COMPLIMENTARY laundry bags to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 159:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 160:**

Admit that YOU provide COMPLIMENTARY bath crystals to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 160:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 161:**

Admit that YOU incur a cost for providing COMPLIMENTARY bath crystals to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 161:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

19

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 162:**

Admit that YOU provide COMPLIMENTARY bubble bath to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 162:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

20

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 163:**

Admit that YOU incur a cost for providing COMPLIMENTARY bubble bath to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 163:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 164:**

Admit that YOU provide COMPLIMENTARY combs to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 164:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 165:**

Admit that YOU incur a cost for providing COMPLIMENTARY combs to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 165:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

22

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 166:**

Admit that YOU provide COMPLIMENTARY toothpaste to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 166:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 167:**

Admit that YOU incur a cost for providing COMPLIMENTARY toothpaste to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 167:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 168:**

Admit that YOU provide COMPLIMENTARY toothbrushes to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 168:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

74696524v.1

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 169:**

Admit that YOU incur a cost for providing COMPLIMENTARY toothbrushes to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 169:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 170:**

Admit that YOU provide COMPLIMENTARY dental floss to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 170:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 171:**

Admit that YOU incur a cost for providing COMPLIMENTARY dental floss to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

26

74696524v.1

**RESPONSE TO NO. 171:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 172:**

Admit that YOU provide COMPLIMENTARY cotton balls to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 172:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

27

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 173:**

Admit that YOU incur a cost for providing COMPLIMENTARY cotton balls to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 173:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

1

**REQUEST FOR ADMISSIONS NO. 174:**

2      Admit that YOU provide COMPLIMENTARY hand sanitizer to guests at hotels at

3  which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their

4  HOTEL ROOM BONUS during the CLASS PERIOD.

5  **RESPONSE TO NO. 174:**

6      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

7  any party's claim or defense and proportional to the needs of the case.  Defendant

8  responds on behalf of Defendant only.

9      Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

10  evidence and further objects to the extent the request requires a legal conclusion or

11  requires the adoption of an assumption which is improper, lacks foundation, and is an

12  improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

13  ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

14  hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

15  remuneration.

16      Subject to and without waiving the foregoing objections, Defendant responds as

17  follows:

18      Admit, to the extent this amenity was provided and used in a particular hotel room

19  by an employee as part of Defendant's complimentary hotel stay program.

20  **REQUEST FOR ADMISSIONS NO. 175:**

21      Admit that YOU incur a cost for providing COMPLIMENTARY hand sanitizer to

22  guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were

23  able to utilize their HOTEL ROOM BONUS.

24  **RESPONSE TO NO. 175:**

25      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

26  any party's claim or defense and proportional to the needs of the case.  Defendant

27  responds on behalf of Defendant only.

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1   Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in
2   evidence and further objects to the extent the request requires a legal conclusion or
3   requires the adoption of an assumption which is improper, lacks foundation, and is an
4   improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL
5   ROOM BONUS" on the grounds that Defendant's policy of providing complimentary
6   hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of
7   remuneration.
8       Subject to and without waiving the foregoing objections, Defendant responds as
9   follows:
10      Admit, to the extent this amenity was provided and used in a particular hotel room
11  by an employee as part of Defendant's complimentary hotel stay program.
12  **REQUEST FOR ADMISSIONS NO. 176:**
13      Admit that YOU provide COMPLIMENTARY deodorant to guests at hotels at
14  which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their
15  HOTEL ROOM BONUS during the CLASS PERIOD.
16  **RESPONSE TO NO. 176:**
17      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
18  any party's claim or defense and proportional to the needs of the case.  Defendant
19  responds on behalf of Defendant only.
20      Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in
21  evidence and further objects to the extent the request requires a legal conclusion or
22  requires the adoption of an assumption which is improper, lacks foundation, and is an
23  improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL
24  ROOM BONUS" on the grounds that Defendant's policy of providing complimentary
25  hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of
26  remuneration.
27      Subject to and without waiving the foregoing objections, Defendant responds as
28  follows:

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 177:**

Admit that YOU incur a cost for providing COMPLIMENTARY deodorant to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 177:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 178:**

Admit that YOU provide COMPLIMENTARY feminine napkins to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 178:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Defendant objects to the term "feminine napkins" as vague and ambiguous, and not properly described with particularity to allow Defendant to provide a complete response.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 179:**

Admit that YOU incur a cost for providing COMPLIMENTARY feminine napkins to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 179:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an

improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Defendant objects to the term "feminine napkins" as vague and ambiguous, and not properly described with particularity to allow Defendant to provide a complete response.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 180:**

Admit that YOU provide COMPLIMENTARY tampons to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 180:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 181:**

Admit that YOU incur a cost for providing COMPLIMENTARY tampons to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 181:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 182:**

Admit that YOU provide COMPLIMENTARY talcum powder to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

34

**RESPONSE TO NO. 182:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 183:**

Admit that YOU incur a cost for providing COMPLIMENTARY talcum powder to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 183:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 184:**

Admit that YOU provide COMPLIMENTARY make-up remover pads to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 184:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 185:**

Admit that YOU incur a cost for providing COMPLIMENTARY make-up remover pads to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 185:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 186:**

Admit that YOU provide COMPLIMENTARY shaving cream to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 186:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

37

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 187:**

Admit that YOU incur a cost for providing COMPLIMENTARY shaving cream to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 187:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 188:**

Admit that YOU provide COMPLIMENTARY nail files to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 188:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 189:**

Admit that YOU incur a cost for providing COMPLIMENTARY nail files to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

74696524v.1

**RESPONSE TO NO. 189:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 190:**

Admit that YOU provide COMPLIMENTARY sewing kits to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 190:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

40

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 191:**

Admit that YOU incur a cost for providing COMPLIMENTARY sewing kits to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 191:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 192:**

Admit that YOU provide COMPLIMENTARY shoe polish kits to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 192:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 193:**

Admit that YOU incur a cost for providing COMPLIMENTARY shoe polish kits to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 193:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

42

74696524v.1

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 194:**

Admit that YOU provide COMPLIMENTARY laundry detergent to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 194:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

43

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 195:**

Admit that YOU incur a cost for providing COMPLIMENTARY laundry detergent to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 195:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 196:**

Admit that YOU provide COMPLIMENTARY in-room tea to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

44

**RESPONSE TO NO. 196:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 197:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room tea to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 197:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

45

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 198:**

Admit that YOU provide COMPLIMENTARY in-room coffee to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 198:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 199:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room coffee to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 199:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 200:**

Admit that YOU provide COMPLIMENTARY in-room water bottles to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 200:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

74696524v.1

1    Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in
2    evidence and further objects to the extent the request requires a legal conclusion or
3    requires the adoption of an assumption which is improper, lacks foundation, and is an
4    improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL
5    ROOM BONUS" on the grounds that Defendant's policy of providing complimentary
6    hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of
7    remuneration.

8         Subject to and without waiving the foregoing objections, Defendant responds as
9    follows:

10        Admit, to the extent this amenity was provided and used in a particular hotel room
11   by an employee as part of Defendant's complimentary hotel stay program.

12   **REQUEST FOR ADMISSIONS NO. 201:**

13        Admit that YOU incur a cost for providing COMPLIMENTARY in-room water
14   bottles to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS
15   were able to utilize their HOTEL ROOM BONUS.

16   **RESPONSE TO NO. 201:**

17        Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
18   any party's claim or defense and proportional to the needs of the case.  Defendant
19   responds on behalf of Defendant only.

20        Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in
21   evidence and further objects to the extent the request requires a legal conclusion or
22   requires the adoption of an assumption which is improper, lacks foundation, and is an
23   improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL
24   ROOM BONUS" on the grounds that Defendant's policy of providing complimentary
25   hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of
26   remuneration.

27        Subject to and without waiving the foregoing objections, Defendant responds as
28   follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 202:**

Admit that YOU provide COMPLIMENTARY in-room alcoholic beverages to guests at some hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 202:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 203:**

Admit that YOU incur a cost when providing COMPLIMENTARY in-room alcoholic beverages to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

49

74696524v.1

**RESPONSE TO NO. 203:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 204:**

Admit that YOU provide COMPLIMENTARY in-room snack food to guests at some hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 204:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

50

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 205:**

Admit that YOU incur a cost when providing COMPLIMENTARY in-room snack food to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 205:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 206:**

Admit that YOU provide COMPLIMENTARY in-room artificial sweetener to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 206:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 207:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room artificial sweetener to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 207:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

1    Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

2    evidence and further objects to the extent the request requires a legal conclusion or

3    requires the adoption of an assumption which is improper, lacks foundation, and is an

4    improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

5    ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

6    hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

7    remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9    follows:

10    Admit, to the extent this amenity was provided and used in a particular hotel room

11   by an employee as part of Defendant's complimentary hotel stay program.

12   **REQUEST FOR ADMISSIONS NO. 208:**

13    Admit that YOU provide COMPLIMENTARY in-room honey to guests at hotels

14   at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their

15   HOTEL ROOM BONUS.

16   **RESPONSE TO NO. 208:**

17    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18   any party's claim or defense and proportional to the needs of the case.  Defendant

19   responds on behalf of Defendant only.

20    Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in

21   evidence and further objects to the extent the request requires a legal conclusion or

22   requires the adoption of an assumption which is improper, lacks foundation, and is an

23   improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL

24   ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

25   hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of

26   remuneration.

27    Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 209:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room honey to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 209:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 210:**

Admit that YOU provide COMPLIMENTARY in-room swizzle sticks to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

54

**RESPONSE TO NO. 210:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 211:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room swizzle sticks to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 211:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

55

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 212:**

Admit that YOU provide COMPLIMENTARY in-room napkins to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 212:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 213:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room napkins to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 213:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 214:**

Admit that YOU provide COMPLIMENTARY in-room mints to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 214:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 215:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room mints to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 215:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 216:**

Admit that YOU provide COMPLIMENTARY in-room chocolates to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 216:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 217:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room chocolates to guests at hotels at which members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

59

**RESPONSE TO NO. 217:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 218:**

Admit that YOU provide CLEANING SERVICES for hotel rooms at hotels where members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 218:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary

60

hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 219:**

Admit that YOU incur a cost providing CLEANING SERVICES for hotel rooms at hotels where members of the HOTEL ROOM BONUS SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 219:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the term "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 220:**

Admit that YOU provide COMPLIMENTARY shampoo to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 220:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 221:**

Admit that YOU incur a cost for providing COMPLIMENTARY shampoo to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 221:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2  BONUS" as assuming facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Defendant further objects to

5  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7  income, compensation, or other form of remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9  follows:

10    Admit, to the extent this amenity was provided and used in a particular hotel room

11  by an employee as part of Defendant's complimentary hotel stay program.

12  **REQUEST FOR ADMISSIONS NO. 222:**

13    Admit that YOU provide COMPLIMENTARY hair conditioner to guests at hotels

14  at which members of the REGULAR RATE SUBCLASS were/are able to utilize their

15  HOTEL ROOM BONUS.

16  **RESPONSE TO NO. 222:**

17    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18  any party's claim or defense and proportional to the needs of the case.  Defendant

19  responds on behalf of Defendant only.

20    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21  BONUS" as assuming facts not in evidence and further objects to the extent the request

22  requires a legal conclusion or requires the adoption of an assumption which is improper,

23  lacks foundation, and is an improper hypothetical.  Defendant further objects to

24  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26  income, compensation, or other form of remuneration.

27    Subject to and without waiving the foregoing objections, Defendant responds as

28  follows:

63

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 223:**

Admit that YOU incur a cost for providing COMPLIMENTARY hair conditioner to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 223:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 224:**

Admit that YOU provide COMPLIMENTARY body wash to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 224:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 225:**

Admit that YOU incur a cost for providing COMPLIMENTARY body wash to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 225:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

65

1  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
2  income, compensation, or other form of remuneration.

3      Subject to and without waiving the foregoing objections, Defendant responds as
4  follows:

5      Admit, to the extent this amenity was provided and used in a particular hotel room
6  by an employee as part of Defendant's complimentary hotel stay program.

7  **REQUEST FOR ADMISSIONS NO. 226:**

8      Admit that YOU provide COMPLIMENTARY shower gel to guests at hotels at
9  which members of the REGULAR RATE SUBCLASS were/are able to utilize their
10  HOTEL ROOM BONUS.

11  **RESPONSE TO NO. 226:**

12      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
13  any party's claim or defense and proportional to the needs of the case.  Defendant
14  responds on behalf of Defendant only.

15      Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
16  BONUS" as assuming facts not in evidence and further objects to the extent the request
17  requires a legal conclusion or requires the adoption of an assumption which is improper,
18  lacks foundation, and is an improper hypothetical.  Defendant further objects to
19  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
20  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
21  income, compensation, or other form of remuneration.

22      Subject to and without waiving the foregoing objections, Defendant responds as
23  follows:

24      Admit, to the extent this amenity was provided and used in a particular hotel room
25  by an employee as part of Defendant's complimentary hotel stay program.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 227:**

Admit that YOU incur a cost for providing COMPLIMENTARY shower gel to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 227:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 228:**

Admit that YOU provide COMPLIMENTARY soap to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 228:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

67

1   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2   BONUS" as assuming facts not in evidence and further objects to the extent the request

3   requires a legal conclusion or requires the adoption of an assumption which is improper,

4   lacks foundation, and is an improper hypothetical.  Defendant further objects to

5   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7   income, compensation, or other form of remuneration.

8   Subject to and without waiving the foregoing objections, Defendant responds as

9   follows:

10   Admit, to the extent this amenity was provided and used in a particular hotel room

11   by an employee as part of Defendant's complimentary hotel stay program.

12   **REQUEST FOR ADMISSIONS NO. 229:**

13   Admit that YOU incur a cost for providing COMPLIMENTARY soap to guests at

14   hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize

15   their HOTEL ROOM BONUS

16   **RESPONSE TO NO. 229:**

17   Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18   any party's claim or defense and proportional to the needs of the case.  Defendant

19   responds on behalf of Defendant only.

20   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21   BONUS" as assuming facts not in evidence and further objects to the extent the request

22   requires a legal conclusion or requires the adoption of an assumption which is improper,

23   lacks foundation, and is an improper hypothetical.  Defendant further objects to

24   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26   income, compensation, or other form of remuneration.

27   Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 230:**

Admit that YOU provide COMPLIMENTARY cotton swabs to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 230:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 231:**

Admit that YOU incur a cost for providing COMPLIMENTARY cotton swabs to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

69

**RESPONSE TO NO. 231:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 232:**

Admit that YOU provide COMPLIMENTARY shower caps to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 232:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

70

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 233:**

Admit that YOU incur a cost for providing COMPLIMENTARY shower caps to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 233:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 234:**

Admit that YOU provide COMPLIMENTARY mouthwash to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 234:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 235:**

Admit that YOU incur a cost for providing COMPLIMENTARY mouthwash to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 235:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

72

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 236:**

Admit that YOU provide COMPLIMENTARY hand lotion to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 236:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

73

1       Admit, to the extent this amenity was provided and used in a particular hotel room

2   by an employee as part of Defendant's complimentary hotel stay program.

3   **REQUEST FOR ADMISSIONS NO. 237:**

4       Admit that YOU incur a cost for providing COMPLIMENTARY hand lotion to

5   guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able

6   to utilize their HOTEL ROOM BONUS.

7   **RESPONSE TO NO. 237:**

8       Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

9   any party's claim or defense and proportional to the needs of the case.  Defendant

10  responds on behalf of Defendant only.

11      Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

12  BONUS" as assuming facts not in evidence and further objects to the extent the request

13  requires a legal conclusion or requires the adoption of an assumption which is improper,

14  lacks foundation, and is an improper hypothetical.  Defendant further objects to

15  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

16  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

17  income, compensation, or other form of remuneration.

18      Subject to and without waiving the foregoing objections, Defendant responds as

19  follows:

20      Admit, to the extent this amenity was provided and used in a particular hotel room

21  by an employee as part of Defendant's complimentary hotel stay program.

22  **REQUEST FOR ADMISSIONS NO. 238:**

23      Admit that YOU provide COMPLIMENTARY body lotion to guests at hotels at

24  which members of the REGULAR RATE SUBCLASS were/are able to utilize their

25  HOTEL ROOM BONUS.

26

27

28

74696524v.1

**RESPONSE TO NO. 238:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 239:**

Admit that YOU incur a cost for providing COMPLIMENTARY body lotion to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 239:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

75

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 240:**

Admit that YOU provide COMPLIMENTARY disposable razors to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 240:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 241:**

Admit that YOU incur a cost for providing COMPLIMENTARY disposable razors to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 241:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 242:**

Admit that YOU provide COMPLIMENTARY laundry bags to guests at hotels at which at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 242:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

77

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 243:**

Admit that YOU incur a cost for providing COMPLIMENTARY laundry bags to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 243:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 244:**

Admit that YOU provide COMPLIMENTARY bath crystals to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 244:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 245:**

Admit that YOU incur a cost for providing COMPLIMENTARY bath crystals to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

79

74696524v.1

**RESPONSE TO NO. 245:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 246:**

Admit that YOU provide COMPLIMENTARY bubble bath to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 246:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

80

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 247:**

Admit that YOU incur a cost for providing COMPLIMENTARY bubble bath to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 247:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 248:**

Admit that YOU provide COMPLIMENTARY combs to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 248:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 249:**

Admit that YOU incur a cost for providing COMPLIMENTARY combs to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 249:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 250:**

Admit that YOU provide COMPLIMENTARY toothpaste to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 250:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

83

1  Admit, to the extent this amenity was provided and used in a particular hotel room
2  by an employee as part of Defendant's complimentary hotel stay program.

3  **REQUEST FOR ADMISSIONS NO. 251:**

4  Admit that YOU incur a cost for providing COMPLIMENTARY toothpaste to
5  guests at hotels at which members of the REGULAR RATE SUBCLASS were able to
6  utilize their HOTEL ROOM BONUS.

7  **RESPONSE TO NO. 251:**

8  Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
9  any party's claim or defense and proportional to the needs of the case.  Defendant
10  responds on behalf of Defendant only.

11  Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
12  BONUS" as assuming facts not in evidence and further objects to the extent the request
13  requires a legal conclusion or requires the adoption of an assumption which is improper,
14  lacks foundation, and is an improper hypothetical.  Defendant further objects to
15  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
16  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
17  income, compensation, or other form of remuneration.

18  Subject to and without waiving the foregoing objections, Defendant responds as
19  follows:

20  Admit, to the extent this amenity was provided and used in a particular hotel room
21  by an employee as part of Defendant's complimentary hotel stay program.

22  **REQUEST FOR ADMISSIONS NO. 252:**

23  Admit that YOU provide COMPLIMENTARY toothbrushes to guests at hotels at
24  which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL
25  ROOM BONUS during the CLASS PERIOD.

26
27
28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 252:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 253:**

Admit that YOU incur a cost for providing COMPLIMENTARY toothbrushes to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 253:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

85

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 254:**

Admit that YOU provide COMPLIMENTARY floss to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 254:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

74696524v.1

**REQUEST FOR ADMISSIONS NO. 255:**

Admit that YOU incur a cost for providing COMPLIMENTARY floss to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 255:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 256:**

Admit that YOU provide COMPLIMENTARY cotton balls to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 256:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

1    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2  BONUS" as assuming facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Defendant further objects to

5  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7  income, compensation, or other form of remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9  follows:

10    Admit, to the extent this amenity was provided and used in a particular hotel room

11  by an employee as part of Defendant's complimentary hotel stay program.

12  **REQUEST FOR ADMISSIONS NO. 257:**

13    Admit that YOU incur a cost for providing COMPLIMENTARY cotton balls to

14  guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

15  utilize their HOTEL ROOM BONUS.

16  **RESPONSE TO NO. 257:**

17    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18  any party's claim or defense and proportional to the needs of the case.  Defendant

19  responds on behalf of Defendant only.

20    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21  BONUS" as assuming facts not in evidence and further objects to the extent the request

22  requires a legal conclusion or requires the adoption of an assumption which is improper,

23  lacks foundation, and is an improper hypothetical.  Defendant further objects to

24  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26  income, compensation, or other form of remuneration.

27    Subject to and without waiving the foregoing objections, Defendant responds as

28  follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1   Admit, to the extent this amenity was provided and used in a particular hotel room

2   by an employee as part of Defendant's complimentary hotel stay program.

3   **REQUEST FOR ADMISSIONS NO. 258:**

4   Admit that YOU provide COMPLIMENTARY hand sanitizer to guests at hotels at

5   which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL

6   ROOM BONUS during the CLASS PERIOD.

7   **RESPONSE TO NO. 258:**

8   Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

9   any party's claim or defense and proportional to the needs of the case.  Defendant

10  responds on behalf of Defendant only.

11  Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

12  BONUS" as assuming facts not in evidence and further objects to the extent the request

13  requires a legal conclusion or requires the adoption of an assumption which is improper,

14  lacks foundation, and is an improper hypothetical.  Defendant further objects to

15  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

16  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

17  income, compensation, or other form of remuneration.

18  Subject to and without waiving the foregoing objections, Defendant responds as

19  follows:

20  Admit, to the extent this amenity was provided and used in a particular hotel room

21  by an employee as part of Defendant's complimentary hotel stay program.

22  **REQUEST FOR ADMISSIONS NO. 259:**

23  Admit that YOU incur a cost for providing COMPLIMENTARY hand sanitizer to

24  guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

25  utilize their HOTEL ROOM BONUS.

26

27

28

89

**RESPONSE TO NO. 259:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 260:**

Admit that YOU provide COMPLIMENTARY deodorant to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 260:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

90

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 261:**

Admit that YOU incur a cost for providing COMPLIMENTARY deodorant to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 261:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 262:**

Admit that YOU provide COMPLIMENTARY feminine napkins to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 262:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Defendant objects to the term "feminine napkins" as vague and ambiguous, and not properly described with particularity to allow Defendant to provide a complete response.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 263:**

Admit that YOU incur a cost for providing COMPLIMENTARY feminine napkins to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 263:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Defendant objects to the term "feminine napkins" as vague and ambiguous, and not properly described with particularity to allow Defendant to provide a complete response.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 264:**

Admit that YOU provide COMPLIMENTARY tampons to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 264:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper,

93

1   lacks foundation, and is an improper hypothetical.  Defendant further objects to

2   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

3   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

4   income, compensation, or other form of remuneration.

5       Subject to and without waiving the foregoing objections, Defendant responds as

6   follows:

7       Admit, to the extent this amenity was provided and used in a particular hotel room

8   by an employee as part of Defendant's complimentary hotel stay program.

9   **REQUEST FOR ADMISSIONS NO. 265:**

10      Admit that YOU incur a cost for providing COMPLIMENTARY tampons to

11  guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

12  utilize their HOTEL ROOM BONUS.

13  **RESPONSE TO NO. 265:**

14      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

15  any party's claim or defense and proportional to the needs of the case.  Defendant

16  responds on behalf of Defendant only.

17      Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

18  BONUS" as assuming facts not in evidence and further objects to the extent the request

19  requires a legal conclusion or requires the adoption of an assumption which is improper,

20  lacks foundation, and is an improper hypothetical.  Defendant further objects to

21  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

22  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

23  income, compensation, or other form of remuneration.

24      Subject to and without waiving the foregoing objections, Defendant responds as

25  follows:

26      Admit, to the extent this amenity was provided and used in a particular hotel room

27  by an employee as part of Defendant's complimentary hotel stay program.

28

94

74696524v.1

**REQUEST FOR ADMISSIONS NO. 266:**

Admit that YOU provide COMPLIMENTARY talcum powder to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 266:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 267:**

Admit that YOU incur a cost for providing COMPLIMENTARY talcum powder to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 267:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

95

74696524v.1

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 268:**

Admit that YOU provide COMPLIMENTARY make-up remover pads to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 268:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

96

1    Admit, to the extent this amenity was provided and used in a particular hotel room

2    by an employee as part of Defendant's complimentary hotel stay program.

3    **REQUEST FOR ADMISSIONS NO. 269:**

4    Admit that YOU incur a cost for providing COMPLIMENTARY make-up

5    remover pads to guests at hotels at which members of the REGULAR RATE

6    SUBCLASS were able to utilize their HOTEL ROOM BONUS.

7    **RESPONSE TO NO. 269:**

8    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

9    any party's claim or defense and proportional to the needs of the case.  Defendant

10   responds on behalf of Defendant only.

11   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

12   BONUS" as assuming facts not in evidence and further objects to the extent the request

13   requires a legal conclusion or requires the adoption of an assumption which is improper,

14   lacks foundation, and is an improper hypothetical.  Defendant further objects to

15   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

16   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

17   income, compensation, or other form of remuneration.

18   Subject to and without waiving the foregoing objections, Defendant responds as

19   follows:

20   Admit, to the extent this amenity was provided and used in a particular hotel room

21   by an employee as part of Defendant's complimentary hotel stay program.

22   **REQUEST FOR ADMISSIONS NO. 270:**

23   Admit that YOU provide COMPLIMENTARY shaving cream to guests at hotels at

24   which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL

25   ROOM BONUS during the CLASS PERIOD.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 270:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 271:**

Admit that YOU incur a cost for providing COMPLIMENTARY shaving cream to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 271:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

98

1  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

2  income, compensation, or other form of remuneration.

3  Subject to and without waiving the foregoing objections, Defendant responds as

4  follows:

5  Admit, to the extent this amenity was provided and used in a particular hotel room

6  by an employee as part of Defendant's complimentary hotel stay program.

7  **REQUEST FOR ADMISSIONS NO. 272:**

8  Admit that YOU provide COMPLIMENTARY nail files to guests at hotels at

9  which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL

10  ROOM BONUS during the CLASS PERIOD.

11  **RESPONSE TO NO. 272:**

12  Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

13  any party's claim or defense and proportional to the needs of the case.  Defendant

14  responds on behalf of Defendant only.

15  Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

16  BONUS" as assuming facts not in evidence and further objects to the extent the request

17  requires a legal conclusion or requires the adoption of an assumption which is improper,

18  lacks foundation, and is an improper hypothetical.  Defendant further objects to

19  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

20  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

21  income, compensation, or other form of remuneration.

22  Subject to and without waiving the foregoing objections, Defendant responds as

23  follows:

24  Admit, to the extent this amenity was provided and used in a particular hotel room

25  by an employee as part of Defendant's complimentary hotel stay program.

26

27

28

74696524v.1

**REQUEST FOR ADMISSIONS NO. 273:**

Admit that YOU incur a cost for providing COMPLIMENTARY nail files to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 273:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 274:**

Admit that YOU provide COMPLIMENTARY sewing kits to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 274:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

1    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2  BONUS" as assuming facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Defendant further objects to

5  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7  income, compensation, or other form of remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9  follows:

10    Admit, to the extent this amenity was provided and used in a particular hotel room

11 by an employee as part of Defendant's complimentary hotel stay program.

12 **REQUEST FOR ADMISSIONS NO. 275:**

13    Admit that YOU incur a cost for providing COMPLIMENTARY sewing kits to

14 guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

15 utilize their HOTEL ROOM BONUS.

16 **RESPONSE TO NO. 275:**

17    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18 any party's claim or defense and proportional to the needs of the case.  Defendant

19 responds on behalf of Defendant only.

20    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21 BONUS" as assuming facts not in evidence and further objects to the extent the request

22 requires a legal conclusion or requires the adoption of an assumption which is improper,

23 lacks foundation, and is an improper hypothetical.  Defendant further objects to

24 Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25 policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26 income, compensation, or other form of remuneration.

27    Subject to and without waiving the foregoing objections, Defendant responds as

28 follows:

101

1  Admit, to the extent this amenity was provided and used in a particular hotel room
2  by an employee as part of Defendant's complimentary hotel stay program.

3  **REQUEST FOR ADMISSIONS NO. 276:**

4  Admit that YOU provide COMPLIMENTARY shoe polish kits to guests at hotels
5  at which members of the REGULAR RATE SUBCLASS were able to utilize their
6  HOTEL ROOM BONUS during the CLASS PERIOD.

7  **RESPONSE TO NO. 276:**

8  Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
9  any party's claim or defense and proportional to the needs of the case.  Defendant
10  responds on behalf of Defendant only.

11  Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
12  BONUS" as assuming facts not in evidence and further objects to the extent the request
13  requires a legal conclusion or requires the adoption of an assumption which is improper,
14  lacks foundation, and is an improper hypothetical.  Defendant further objects to
15  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
16  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
17  income, compensation, or other form of remuneration.

18  Subject to and without waiving the foregoing objections, Defendant responds as
19  follows:

20  Admit, to the extent this amenity was provided and used in a particular hotel room
21  by an employee as part of Defendant's complimentary hotel stay program.

22  **REQUEST FOR ADMISSIONS NO. 277:**

23  Admit that YOU incur a cost for providing COMPLIMENTARY shoe polish kits
24  to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to
25  utilize their HOTEL ROOM BONUS.

26
27
28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 277:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 278:**

Admit that YOU provide COMPLIMENTARY laundry detergent to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS during the CLASS PERIOD.

**RESPONSE TO NO. 278:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

103

74696524v.1

1   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

2   income, compensation, or other form of remuneration.

3       Subject to and without waiving the foregoing objections, Defendant responds as

4   follows:

5       Admit, to the extent this amenity was provided and used in a particular hotel room

6   by an employee as part of Defendant's complimentary hotel stay program.

7   **REQUEST FOR ADMISSIONS NO. 279:**

8       Admit that YOU incur a cost for providing COMPLIMENTARY laundry detergent

9   to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

10  utilize their HOTEL ROOM BONUS.

11  **RESPONSE TO NO. 279:**

12      Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

13  any party's claim or defense and proportional to the needs of the case.  Defendant

14  responds on behalf of Defendant only.

15      Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

16  BONUS" as assuming facts not in evidence and further objects to the extent the request

17  requires a legal conclusion or requires the adoption of an assumption which is improper,

18  lacks foundation, and is an improper hypothetical.  Defendant further objects to

19  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

20  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

21  income, compensation, or other form of remuneration.

22      Subject to and without waiving the foregoing objections, Defendant responds as

23  follows:

24      Admit, to the extent this amenity was provided and used in a particular hotel room

25  by an employee as part of Defendant's complimentary hotel stay program.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 280:**

Admit that YOU provide COMPLIMENTARY tea to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 280:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 281:**

Admit that YOU incur a cost for providing COMPLIMENTARY tea to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 281:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2    BONUS" as assuming facts not in evidence and further objects to the extent the request

3    requires a legal conclusion or requires the adoption of an assumption which is improper,

4    lacks foundation, and is an improper hypothetical.  Defendant further objects to

5    Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6    policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7    income, compensation, or other form of remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9    follows:

10   Admit, to the extent this amenity was provided and used in a particular hotel room

11   by an employee as part of Defendant's complimentary hotel stay program.

12   **REQUEST FOR ADMISSIONS NO. 282:**

13   Admit that YOU provide COMPLIMENTARY coffee to guests at hotels at which

14   members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL

15   ROOM BONUS.

16   **RESPONSE TO NO. 282:**

17   Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18   any party's claim or defense and proportional to the needs of the case.  Defendant

19   responds on behalf of Defendant only.

20   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21   BONUS" as assuming facts not in evidence and further objects to the extent the request

22   requires a legal conclusion or requires the adoption of an assumption which is improper,

23   lacks foundation, and is an improper hypothetical.  Defendant further objects to

24   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26   income, compensation, or other form of remuneration.

27   Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

106

74696524v.1

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 283:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room coffee to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 283:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 284:**

Admit that YOU provide COMPLIMENTARY in-room water bottles to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

107

**RESPONSE TO NO. 284:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 285:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room water bottles to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 285:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

108

1  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
2  income, compensation, or other form of remuneration.

3    Subject to and without waiving the foregoing objections, Defendant responds as
4  follows:

5    Admit, to the extent this amenity was provided and used in a particular hotel room
6  by an employee as part of Defendant's complimentary hotel stay program.

7  **REQUEST FOR ADMISSIONS NO. 286:**

8    Admit that YOU provide COMPLIMENTARY in-room alcoholic beverages to
9  guests at some hotels at which members of the REGULAR RATE SUBCLASS were/are
10  able to utilize their HOTEL ROOM BONUS.

11  **RESPONSE TO NO. 286:**

12    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
13  any party's claim or defense and proportional to the needs of the case.  Defendant
14  responds on behalf of Defendant only.

15    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
16  BONUS" as assuming facts not in evidence and further objects to the extent the request
17  requires a legal conclusion or requires the adoption of an assumption which is improper,
18  lacks foundation, and is an improper hypothetical.  Defendant further objects to
19  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
20  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
21  income, compensation, or other form of remuneration.

22    Subject to and without waiving the foregoing objections, Defendant responds as
23  follows:

24    Admit, to the extent this amenity was provided and used in a particular hotel room
25  by an employee as part of Defendant's complimentary hotel stay program.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 287:**

Admit that YOU incur a cost when providing COMPLIMENTARY in-room alcoholic beverages to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 287:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 288:**

Admit that YOU provide COMPLIMENTARY in-room snack food to guests at some hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 288:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

74696524v.1

1    Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2  BONUS" as assuming facts not in evidence and further objects to the extent the request

3  requires a legal conclusion or requires the adoption of an assumption which is improper,

4  lacks foundation, and is an improper hypothetical.  Defendant further objects to

5  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7  income, compensation, or other form of remuneration.

8    Subject to and without waiving the foregoing objections, Defendant responds as

9  follows:

10   Admit, to the extent this amenity was provided and used in a particular hotel room

11  by an employee as part of Defendant's complimentary hotel stay program.

12  **REQUEST FOR ADMISSIONS NO. 289:**

13   Admit that YOU incur a cost when providing COMPLIMENTARY in-room snack

14  food to guests at hotels at which members of the REGULAR RATE SUBCLASS

15  were/are able to utilize their HOTEL ROOM BONUS.

16  **RESPONSE TO NO. 289:**

17   Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18  any party's claim or defense and proportional to the needs of the case.  Defendant

19  responds on behalf of Defendant only.

20   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21  BONUS" as assuming facts not in evidence and further objects to the extent the request

22  requires a legal conclusion or requires the adoption of an assumption which is improper,

23  lacks foundation, and is an improper hypothetical.  Defendant further objects to

24  Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25  policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26  income, compensation, or other form of remuneration.

27   Subject to and without waiving the foregoing objections, Defendant responds as

28  follows:

1    Admit, to the extent this amenity was provided and used in a particular hotel room
2    by an employee as part of Defendant's complimentary hotel stay program.

3    **REQUEST FOR ADMISSIONS NO. 290:**

4    Admit that YOU provide CLEANING SERVICES for hotel rooms at hotels where
5    members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL
6    ROOM BONUS.

7    **RESPONSE TO NO. 290:**

8    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
9    any party's claim or defense and proportional to the needs of the case.  Defendant
10   responds on behalf of Defendant only.

11   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
12   BONUS" as assuming facts not in evidence and further objects to the extent the request
13   requires a legal conclusion or requires the adoption of an assumption which is improper,
14   lacks foundation, and is an improper hypothetical.  Defendant further objects to
15   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
16   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
17   income, compensation, or other form of remuneration.

18   Subject to and without waiving the foregoing objections, Defendant responds as
19   follows:

20   Admit, to the extent this amenity was provided and used in a particular hotel room
21   by an employee as part of Defendant's complimentary hotel stay program.

22   **REQUEST FOR ADMISSIONS NO. 291:**

23   Admit that YOU incur a cost providing CLEANING SERVICES for hotel rooms
24   at hotels where members of the REGULAR RATE SUBCLASS were/are able to utilize
25   their HOTEL ROOM BONUS.

26

27

28

112

74696524v.1

**RESPONSE TO NO. 291:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 292:**

Admit that YOU provide COMPLIMENTARY in-room soft-drinks to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 292:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

113

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 293:**

Admit that YOU incur a cost when providing COMPLIMENTARY in-room soft drinks to guests at hotels at which members of the REGULAR RATE SUBCLASS were/are able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 293:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 294:**

Admit that YOU provide COMPLIMENTARY in-room artificial sweetener to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 294:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 295:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room artificial sweetener to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 295:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 296:**

Admit that YOU provide COMPLIMENTARY in-room honey to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 296:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

116

1    Admit, to the extent this amenity was provided and used in a particular hotel room
2    by an employee as part of Defendant's complimentary hotel stay program.

3    **REQUEST FOR ADMISSIONS NO. 297:**

4    Admit that YOU incur a cost for providing COMPLIMENTARY in-room honey to
5    guests at hotels at which members of the REGULAR RATE

6    SUBCLASS were able to utilize their HOTEL ROOM BONUS.

7    **RESPONSE TO NO. 297:**

8    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to
9    any party's claim or defense and proportional to the needs of the case. Defendant
10   responds on behalf of Defendant only.

11   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM
12   BONUS" as assuming facts not in evidence and further objects to the extent the request
13   requires a legal conclusion or requires the adoption of an assumption which is improper,
14   lacks foundation, and is an improper hypothetical. Defendant further objects to
15   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's
16   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,
17   income, compensation, or other form of remuneration.

18   Subject to and without waiving the foregoing objections, Defendant responds as
19   follows:

20   Admit, to the extent this amenity was provided and used in a particular hotel room
21   by an employee as part of Defendant's complimentary hotel stay program.

22   **REQUEST FOR ADMISSIONS NO. 298:**

23   Admit that YOU provide COMPLIMENTARY in-room swizzle sticks to guests at
24   hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their
25   HOTEL ROOM BONUS.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 298:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 299:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room swizzle sticks to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 299:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

118

policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 300:**

Admit that YOU provide COMPLIMENTARY in-room napkins to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 300:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**REQUEST FOR ADMISSIONS NO. 301:**

Admit that YOU incur a cost for providing COMPLIMENTARY in-room napkins to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 301:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical.  Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

**REQUEST FOR ADMISSIONS NO. 302:**

Admit that YOU provide COMPLIMENTARY in-room mints to guests at hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their HOTEL ROOM BONUS.

**RESPONSE TO NO. 302:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case.  Defendant responds on behalf of Defendant only.

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

2   BONUS" as assuming facts not in evidence and further objects to the extent the request

3   requires a legal conclusion or requires the adoption of an assumption which is improper,

4   lacks foundation, and is an improper hypothetical.  Defendant further objects to

5   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

6   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

7   income, compensation, or other form of remuneration.

8   Subject to and without waiving the foregoing objections, Defendant responds as

9   follows:

10   Admit, to the extent this amenity was provided and used in a particular hotel room

11   by an employee as part of Defendant's complimentary hotel stay program.

12   **REQUEST FOR ADMISSIONS NO. 303:**

13   Admit that YOU incur a cost for providing COMPLIMENTARY in-room mints to

14   guests at hotels at which members of the REGULAR RATE SUBCLASS were able to

15   utilize their HOTEL ROOM BONUS.

16   **RESPONSE TO NO. 303:**

17   Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

18   any party's claim or defense and proportional to the needs of the case.  Defendant

19   responds on behalf of Defendant only.

20   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

21   BONUS" as assuming facts not in evidence and further objects to the extent the request

22   requires a legal conclusion or requires the adoption of an assumption which is improper,

23   lacks foundation, and is an improper hypothetical.  Defendant further objects to

24   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

25   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

26   income, compensation, or other form of remuneration.

27   Subject to and without waiving the foregoing objections, Defendant responds as

28   follows:

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

1    Admit, to the extent this amenity was provided and used in a particular hotel room

2    by an employee as part of Defendant's complimentary hotel stay program.

3    **REQUEST FOR ADMISSIONS NO. 304:**

4    Admit that YOU provide COMPLIMENTARY in-room chocolates to guests at

5    hotels at which members of the REGULAR RATE SUBCLASS were able to utilize their

6    HOTEL ROOM BONUS.

7    **RESPONSE TO NO. 304:**

8    Defendant objects to the terms "YOU" as overbroad in scope and not relevant to

9    any party's claim or defense and proportional to the needs of the case.  Defendant

10   responds on behalf of Defendant only.

11   Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM

12   BONUS" as assuming facts not in evidence and further objects to the extent the request

13   requires a legal conclusion or requires the adoption of an assumption which is improper,

14   lacks foundation, and is an improper hypothetical.  Defendant further objects to

15   Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's

16   policy of providing complimentary hotel rooms is not a "bonus" and is not wages,

17   income, compensation, or other form of remuneration.

18   Subject to and without waiving the foregoing objections, Defendant responds as

19   follows:

20   Admit, to the extent this amenity was provided and used in a particular hotel room

21   by an employee as part of Defendant's complimentary hotel stay program.

22   **REQUEST FOR ADMISSIONS NO. 305:**

23   Admit that YOU incur a cost for providing COMPLIMENTARY in-room

24   chocolates to guests at hotels at which members of the REGULAR RATE SUBCLASS

25   were able to utilize their HOTEL ROOM BONUS.

26

27

28

DEFENDANT'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET FOUR

74696524v.1

**RESPONSE TO NO. 305:**

Defendant objects to the terms "YOU" as overbroad in scope and not relevant to any party's claim or defense and proportional to the needs of the case. Defendant responds on behalf of Defendant only.

Defendant objects to the terms "REGULAR RATE" and "HOTEL ROOM BONUS" as assuming facts not in evidence and further objects to the extent the request requires a legal conclusion or requires the adoption of an assumption which is improper, lacks foundation, and is an improper hypothetical. Defendant further objects to Plaintiff's use of the term "HOTEL ROOM BONUS" on the grounds that Defendant's policy of providing complimentary hotel rooms is not a "bonus" and is not wages, income, compensation, or other form of remuneration.

Subject to and without waiving the foregoing objections, Defendant responds as follows:

Admit, to the extent this amenity was provided and used in a particular hotel room by an employee as part of Defendant's complimentary hotel stay program.

DATED: October 4, 2021

Respectfully submitted,

SEYFARTH SHAW LLP

By: _____

Holger Besch
Brian Long
Michael Afar
Francesca L. Hunter
Attorneys for Defendant
HYATT CORPORATION

123

1

## **VERIFICATION**

2    I, Nikki Massey, declare:

3    I am currently employed by Hyatt Hotels Corporation as Senior Vice President of

4    Human Resources, Americas.  I have read the foregoing Defendant Hyatt Corporation's

5    Responses to Plaintiff Karen Hartstein's Requests for Admission, Set Four

6    ("Responses"), and know or familiarized myself with the contents thereof.

7    I am informed and believe that the information set forth in the Responses was

8    obtained and assembled by employees of Hyatt, and others, from the appropriate sources

9    of information, including Hyatt's records, files and personnel; and on those grounds,

10   reserving the right to make changes if it appears at any time that omissions or errors have

11   been made therein or that more accurate information becomes available, I declare under

12   penalty of perjury under the laws of the United States and laws of the State of California

13   that the foregoing is true and accurate.

14   Executed at ___Chicago_____, Illinois, on October 4, 2021.

15

16   _ *Nikki Massey* _____

17                     Nikki Massey

18

19

20

21

22

23

24

25

26

27

28

1

1

## PROOF OF SERVICE

2  STATE OF CALIFORNIA                    )
                                          )   SS
3  COUNTY OF LOS ANGELES                  )

4      I am employed in the County of Los Angeles, State of California.  I am over the
   age of eighteen and not a party to the within action; my business address is 2029 Century
5  Park East, Suite 3500, Los Angeles, California  90067.  On October 4, 2021, I served the
   within document(s):

6
7      DEFENDANT HYATT CORPORATION'S RESPONSE TO PLAINTIFF'S
           REQUESTS FOR ADMISSIONS, SET FOUR

8  ☐  by placing the document(s) listed above in a sealed envelope with postage thereon
      fully prepaid, in the United States mail at Los Angeles, California, addressed as set
9     forth below.

10 ☐  by placing the document(s) listed above in a sealed envelope or package provided
      by Federal Express with postage paid on account and deposited for collection with
11    the overnight carrier at Los Angeles, California, addressed as set forth below.

12 ☒  by transmitting the document(s) listed above, electronically, via the e-mail
      addresses set forth below.
13

14 Jonathan M. Genish            Tel:  (310) 622-4278
   Matthew W. Dietz              Emails: jgenish@blackstonepc.com
15 Jill J. Parker                        mdietz@blackstonepc.com
   BLACKSTONE LAW, APC                   jparker@blackstonepc.com
16 8383 Wilshire Blvd., Suite 745
17 Beverly Hills, California 90211   *Attorneys for Plaintiff*

18     I am readily familiar with the firm's practice of collection and processing
   correspondence for mailing.  Under that practice it would be deposited with the U.S.
19 Postal Service on that same day with postage thereon fully prepaid in the ordinary course
   of business.  I am aware that on motion of the party served, service is presumed invalid if
20 postal cancellation date or postage meter date is more than one day after date of deposit
   for mailing in affidavit.
21
22     I declare that I am employed in the office of a member of the bar of this court at
   whose direction the service was made.

23     Executed on October 4, 2021, at Los Angeles, California.

24
25 _____
26 Rebecca Garner
27
28

1

74696524v.1

# EXHIBIT G

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


KAREN HARTSTEIN, IN HER          )
REPRESENTATIVE CAPACITY AND      )
ON BEHALF OF HERSELF AND ALL     )
OTHERS SIMILARLY SITUATED,       )
                                 )
          Plaintiff,             )
                                 )
                                 ) CASE NO.
                                 ) 2:20-CV-04874-DSF-JPR
     VS.                         )
                                 )
                                 )
HYATT CORPORATION, A DELAWARE    )
CORPORATION DOING BUSINESS IN    )
CALIFORNIA AND DOES 1 THROUGH    )
100, INCLUSIVE,                  )
                                 )
                                 )
          Defendants.            )
_____ )


DEPOSITION OF PERSON MOST KNOWLEDGEABLE ON

BEHALF OF HYATT CORPORATION

GREGORY CORNWELL

VOLUME I

APPEARING REMOTELY FROM

IRVINE, CALIFORNIA

TUESDAY, NOVEMBER, 10, 2020

9:58 a.m.

REPORTED BY:

BARBARA A. STAUFFER

CSR NO. 12282

```
 1   APPEARANCES:

 2   FOR PLAINTIFF:

 3            BLACKSTONE LAW, APC
              BY:  JONATHAN M. GENISH
 4               Attorney at Law
                     and
 5               MATTHEW DIETZ
                 Attorney at Law
 6                   and
                 JILL PARKER
 7               Attorney at Law
              8383 Wilshire Boulevard
 8            Suite 745
              Beverly Hills, California  90211
 9            310.622.4278
              jgenish@blackstonepc.com
10

11   FOR THE DEFENDANTS:

12            SEYFARTH SHAW, LLP
              BY:  BRIAN P. LONG
13               Attorney at Law
              601 south figueroa Street
14            Suite 3300
              Los Angeles, California  90017-5793
15            213.270.9600
              bplong@seyfarth.com
16

17   ALSO PRESENT:  MICHAEL SEGALL, Attorney at Law
                    NATHAN CHENG, Videographer
18

19

20

21

22

23

24

25
```

 1  travel administration mean?

 2       A.   I'm not sure I understand the question.

 3       Q.   What is sort of the focus of that type of

 4  degree?

 5       A.   Oh.  It is the focus of hotel management --

 6  all aspects of it, from operations to finance to hotel

 7  law to personnel, administration, marketing, management.

 8       Q.   You touched on hotel law.  What does that

 9  mean?

10       A.   Innkeeper law.  Things that have to do with

11  the relationship between an innkeeper and a guest.

12       Q.   Got it.

13            Were you born and raised in California?

14       A.   No, I wasn't.

15       Q.   Massachusetts?

16       A.   I spent I'd call my formative years in

17  Massachusetts.

18       Q.   When did you move to California?

19       A.   1989.

20       Q.   Is that after --

21            When did you graduate college?

22       A.   1982.

23       Q.   And have you been in the hotel industry since

24  '89?

25       A.   No.

```
 1              Probably 1980.

 2         Q.   Okay.

 3              So from 1980 until today, you've been employed

 4    in the hotel industry; correct?

 5         A.   Yes.

 6         Q.   When were you first hired by the Hyatt

 7    Corporation?  More than 15 years ago?

 8         A.   Actually, it was 34 years ago.  I've been in

 9    the Huntington Beach location for 15.  And I started in

10    September of 1986 with Hyatt.

11         Q.   In working at hotels in California, do you --

12    have you taken any courses to stay up to speed with

13    California law?

14         A.   I've taken -- I've participated in all sorts

15    of workshops and seminars over the years.  I haven't --

16    I haven't gone back for an advanced degree or anything

17    of that nature.

18         Q.   But you're regularly staying up to speed on

19    California law as it relates to wage and hour laws,

20    H.R.-related issues in California?

21         A.   Yes.

22         Q.   Would you say you're an expert in that

23    department?

24              MR. LONG:  Calls for a legal conclusion.

25    BY MR. GENISH:
```

1      Q.    In your opinion.

2            You've been here -- you've been working in --

3            Well, strike that.

4            How long have you been working in California

5    for the Hyatt?

6      A.    Since 1989, with an absence of about a year

7    when I moved to Canada with Hyatt.

8      Q.    Okay.

9            So you've been in California working for the

10   Hyatt for roughly 30 years; correct?

11     A.    Yes.

12     Q.    Most of that --

13           Or strike that.

14           All of that in some H.R. capacity?

15     A.    Correct.

16     Q.    Would you say that, having worked in

17   California for roughly 30 years in an H.R. capacity, you

18   are now an expert in that department?

19           MR. LONG:  Same objection.

20           THE WITNESS:  I think I'm -- I'm very familiar

21   with it.  And I feel comfortable that I have a good

22   understanding of it.  Yes.

23   BY MR. GENISH:

24     Q.    Do you feel you have a good understanding of

25   the laws in California as they relate to wage-and-hour

1   and H.R.-related issues?

2       A.   Yes.

3       Q.   Hypothetically, if an issue presents itself in

4   California that you're not familiar with, what do you

5   do?

6       A.   I would consult with counsel -- both internal

7   and counsel within California.

8       Q.   Do you do some independent research as well?

9       A.   Yes.

10      Q.   Google it, for example?

11      A.   I might Google it.

12           I rely on the California Chamber of Commerce

13  Labor Law Digest, websites of various California

14  agencies.  And I'm trying to think what else.

15           Those are pretty much the things that -- my

16  go-to's if you will.

17      Q.   Would you rely on the Division of -- the

18  California Division of Labor?

19      A.   Yeah.

20           Are you talking about the Division of Labor

21  Standards Enforcement.

22      Q.   Yeah.

23      A.   Yes.

24      Q.   That's important to comply with; right?

25      A.   Absolutely.

```
 1       Q.   Are you familiar with the Division of Labor

 2   Enforcement -- Labor Standards Enforcement policies in

 3   the interpretations manual?

 4            MR. LONG:  Calls for speculation.

 5            THE WITNESS:  I'm familiar with the website,

 6   the opinion letters.  I can't speak to a specific

 7   hardcover manual.  But I -- I -- I know how to access

 8   information from the Division of Labor Standards

 9   Enforcement on the Internet.

10   BY MR. GENISH:

11       Q.   And you wouldn't want to implement a policy on

12   Hyatt's behalf that was contrary to the Division of

13   Labor Standards Enforcement; correct?

14            MR. LONG:  Assumes facts not in evidence.  And

15   incomplete hypothetical.

16            THE WITNESS:  I didn't understand -- I didn't

17   hear the first part of that question.

18   BY MR. GENISH:

19       Q.   You wouldn't want to implement a policy on

20   Hyatt's behalf that was contrary to an opinion letter

21   issued by the Division of Labor Standards Enforcement;

22   correct?

23            MR. LONG:  Calls for a legal conclusion.

24   Assumes facts not in evidence.

25            MR. GENISH:  You can answer, sir.
```

```
 1              THE WITNESS:  No, I wouldn't.
 2   BY MR. GENISH:
 3        Q.    And the name of your employer is Hyatt
 4   Corporation; correct?
 5        A.    Yes.
 6        Q.    That's the name of the entity that's on your
 7   pay stubs?
 8        A.    Yes.
 9        Q.    If I refer to the Hyatt, you understand I mean
10   the Hyatt Corporation; right?
11              Let me rephrase it.
12              And fair enough.  See?  That's one of those.
13              If --
14              Throughout this deposition, unless I clarify
15   and say "the hotel," if I use the word "Hyatt," I'm
16   going to be referring to the Hyatt Corporation.
17              Is that okay?
18        A.    (No audible response.)
19        Q.    Have you ever been employed by any other
20   entity other than the -- well, strike that.
21              During your tenure with the Hyatt, have you
22   ever been employed by any other entity other than the
23   Hyatt Corporation?
24        A.    Over a period of a very long time --
25   34 years -- there were -- there were different entities
```

```
 1          Do you report to anyone?

 2     A.   Yeah.  I report to our General Manager in

 3  Huntington Beach.

 4     Q.   What's his name?

 5     A.   Peter Rice.

 6     Q.   Anyone else?

 7     A.   Indirectly to our Vice President of Human

 8  Resources.

 9     Q.   Who is that?

10     A.   Her name is Nicki Massy.

11     Q.   And where is she located?

12     A.   Chicago.

13     Q.   And does anyone report to you?

14     A.   Yes.  I have two people --

15          It's a reduced team, given the pandemic.

16          I have two people that work in the office with

17  me in Huntington Beach.

18     Q.   What are their names?

19     A.   The court reporter's probably going to need a

20  little help with this one.

21          The assistant --

22          My Assistant Director of Human Resources is

23  Ghazeleh Nakhjavani, G-h-a-z-e-l-e-h

24  N-a-k-h-j-a-v-a-n-i.

25          And I have a Human Resources Manager in the
```

 1   office with me.  And her name is -- it's said "Cindy,"

 2   but it's Sendy, S-e-n-d-y; Carrillo, C-a-r-r-i-l-l-o.

 3       Q.   And they're both out of Huntington Beach;

 4   correct?

 5       A.   Correct.

 6       Q.   Prior to the pandemic, how many people worked

 7   with you?

 8       A.   There were five of us in the office.

 9       Q.   And what happened to the other three?

10       A.   They were furloughed.  And then they were laid

11   off.

12       Q.   When you say they were furloughed, what do you

13   mean?

14       A.   They were -- they were put off work.

15       Q.   For a period of time?

16       A.   Let me clarify.

17            They actually --

18            Now that I recall, they were furloughed.  And

19   then they -- they came back in another capacity in the

20   hotel.  They were not, in fact, laid off.  They came

21   back and went to work in the Operations part of the

22   hotel but not in H.R.

23       Q.   So they're currently employed by the Hyatt

24   Corporation?

25       A.   Yes.

1    Q.   All three of them?

2    A.   Two.

3    Q.   There were --

4    A.   Well, there were four that were furloughed.

5  Two of them came back to work.  And two of them --

6        They came back to work in Human Resources.

7  And then two of them went to work, one in Recreation and

8  one in Food and Beverage.

9    Q.   When were those four individuals brought back?

10   A.   I'm sorry.  The four individuals what?

11   Q.   When were they brought back?

12   A.   When?

13       When the hotel reopened in early June of this

14 year.

15   Q.   So they were -- quote, unquote -- furloughed

16 from March of 2020 until June of 2020?

17   A.   Correct.

18   Q.   When you say they were furloughed, what do you

19 mean by that?

20   A.   They were just not scheduled to work.  They

21 were put off work.

22       And during part of that time, the hotel was

23 actually closed to the public.

24   Q.   What period of time was the hotel closed?

25   A.   It was approximately the middle of April until

1    the 4th of June.

2         Q.   The hotel in Huntington Beach -- was it open

3    from mid March through mid April?

4         A.   It was open with practically no occupancy.

5         Q.   So what was the purpose of keeping it open?

6         A.   It was a decision based on our ownership

7    wanting to remain open and capture what small amount of

8    business there was out there -- very small.

9         Q.   I want to show you an exhibit.

10             I'm going to drop it into the chat.

11             Bear with me.

12             Okay.  I just dropped it in -- the document

13   into the chat.

14             And we'll mark it as Exhibit 1.

15             (Exhibit 1 marked.)

16             MR. GENISH:  Okay.

17             This is Plaintiff's Re-Notice of the

18   Deposition of Defendant Hyatt Corporation Under FRCP

19   Rule 30B6; Request for Production of Documents.

20        Q.   Do you see that?

21        A.   I see the chat box.

22             Okay.  Now it's open.

23             Yes.

24        Q.   Okay.

25             Have you seen a copy of this document before?

```
 1        A.   Yes.

 2        Q.   By the way, have you seen a copy of the

 3   Complaint that's been filed in this action?

 4        A.   Yes.

 5        Q.   And you read it cover to cover?

 6        A.   Yes.

 7        Q.   When did you first see that Complaint?

 8        A.   When it came out.  It was sometime earlier

 9   this year.  I don't remember exactly when it was.

10        Q.   It was filed --

11             I'll represent to you it was filed April 24th

12   and served right around then.

13        A.   That sounds -- that sounds about right.

14        Q.   Other than lawyers, did you speak to anyone

15   about it when you saw it?

16        A.   Just our General Manager.

17        Q.   What did you discuss with Mr. Rice?

18        A.   I informed him that we had a lawsuit that has

19   been filed and that I was going to consult with our

20   corporate counsel about it.

21        Q.   What did he say?

22        A.   He said that's -- you know, "Please do."

23        Q.   Did he ask you what it was about?

24        A.   Yeah.  The basics of it.

25        Q.   And what did you tell him?
```

1    the areas within the template handbook for California

2    employees that hotels can modify.

3         Any other areas that would apply to that

4    category?

5         A.   That's not a complete lift.  There are

6    numerous options in the handbook.  Those are the ones

7    that come to mind.  But there are -- there are other

8    options.  I don't -- I can't -- I can't tell you all of

9    them off the top of my head.

10        Q.   None of them are payroll policies; correct?

11        A.   I don't believe so.

12        Q.   Payroll policies all apply uniformly across

13   all of California employees; correct?

14        A.   I believe that is true.

15        Q.   And within each hotel, to the extent there is

16   a unique --

17             Well, strike that.

18             Which department within each hotel determines

19   what the P.T.O. policy should be for that hotel?

20        A.   I wouldn't say that there is a department that

21   determines it.  I would say that there's a human

22   resources function in the hotel that would partner with

23   the leadership of the hotel and people outside of the

24   hotel, determine if a deviation from the standard policy

25   is appropriate in that market and that it was -- it was

1  a reasonable policy that met the needs of the hotel and

2  that it would be implemented.

3       Q.   It's not the standard for a California hotel

4  to deviate from the P.T.O. policy that's provided in the

5  template handbook; correct?

6       A.   It's not the standard?

7       Q.   Yes.

8       A.   I would say we provide the template.  And many

9  hotels used it.  People are free to deviate from that if

10 they make a business case for it, if it's appropriate

11 for a particular hotel in a particular market.

12      Q.   Okay.

13           So the default is to use the template P.T.O.

14 program.  And, if I particular hotel wants to deviate

15 from it, they need to present a business reason; and

16 perhaps the answer's yes; perhaps's the answer's no?  Is

17 that correct?

18      A.   I think that's a fair statement.

19      Q.   The Hyatt Huntington Beach, does it have -- is

20 it's P.T.O. Policy the standard policy that's applied

21 through the template?

22      A.   Our vacation policy?  Yes, it is.

23      Q.   Same with the floating-holiday policy?

24      A.   The floating-holiday policy is customizable by

25 every hotel.  Huntington Beach follows the -- the

1    suggested -- suggested customization rules.

2        Q.    What do you mean by that?

3        A.    So floating holidays, each hotel has the

4    ability to designate how many floating holidays they are

5    going to provide as part of their package.  And in

6    Huntington Beach, we are within those suggested

7    guidelines.

8        Q.    What is the suggested guidelines?

9        A.    I don't know the absolute range of them.  I

10   know that it could be anywhere from none to several.  In

11   Huntington Beach, it's two.

12       Q.    So Hyatt Corporation provides a suggested

13   template for the number of floating holidays that

14   employees should receive somewhere between zero and

15   several.  And each hotel can decide how many it's going

16   to provide to its employees within California; correct?

17       A.    Yes.

18       Q.    Is it the policy of Hyatt to pay out floating

19   holidays upon termination of its employees?

20       A.    In California, it is.

21       Q.    Does Hyatt Corporation have an organizational

22   chart depicting its various departments?

23       A.    I've never seen one.

24       Q.    You don't know, one way or the other, whether

25   one exists?

```
 1        A.   I don't know one way or the other.  No.

 2        Q.   Do you know whether the Huntington Beach

 3   location has an organizational chart?

 4        A.   Not a standing one, no.  It's not one that

 5   we -- we keep up to date.

 6        Q.   So it does have one, but it's not up to date?

 7        A.   We put one together periodically as we're

 8   reviewing the organization.  But it's not something

 9   that -- that's available all the time.  And I know

10   because I would be the person who puts it together.

11        Q.   Got it.

12             And you said you're not aware of whether

13   there's one on a corporate level?

14        A.   I don't know in terms of an organizational

15   chart that exists on the corporate level.  I don't know

16   whether such a document exists.  That would be at some

17   other level of H.R.  Or somebody at corporate might

18   know.  But I don't.

19             MR. GENISH:  Brian, those organizational

20   charts were something that was requested as part of this

21   depo notice.  So if they exist I just ask that they be

22   produced.

23             MR. LONG:  We're happy to meet and confer.

24             MR. GENISH:  Does that mean you're not

25   agreeing necessarily to produce it?
```

```
 1          MR. LONG:  I suppose it depends on the scope

 2   and -- and what we discuss in our meet and confer.

 3   Whether you need an organizational chart, if one exists,

 4   for corporate outside counsel -- I'm not sure of the

 5   basis for that.  But I'm happy to further look at it and

 6   discuss it with you.

 7          MR. GENISH:  I'm going to mark, as Exhibit 2,

 8   an Excel spreadsheet produced by the Hyatt Corporation

 9   in connection with this action.

10          (Exhibit 2 marked.)

11   BY MR. GENISH:

12      Q.   Do you see that sir?

13      A.   It's somewhere along the way.  My Zoom app did

14   an update, and something changed here.  Hold on just a

15   moment.

16          MR. LONG:  And, Counsel, just I haven't seen

17   it yet on my end either.

18          THE WITNESS:  Okay.

19          Now I think I've found it.  Now I think it's

20   on the screen.  I could -- It kind of went away when

21   Zoom did an update.

22          Yeah.  So --

23          Yeah.  The chat box is back.  Is that what

24   you're referring to?

25          MR. GENISH:  Yeah.  In the chat box we just
```

1   populated it with an Excel spreadsheet called Data

2   Production.

3           THE WITNESS:  Yes.  Okay.  I see that.

4           MR. GENISH:  Okay.

5           THE WITNESS:  Let me -- I need to open it

6   first, though, please.

7           MR. GENISH:  Of course.

8           For purposes of the record, we're marking, as

9   Exhibit 2 -- this is an Excel spreadsheet produced by

10  the Hyatt Corporation in connection with this action.

11          THE WITNESS:  It's thinking right at the

12  moment.

13          MR. GENISH:  Let me know when you've had a

14  chance to open it.

15          THE WITNESS:  If you've ever used a Mac -- I

16  was getting the beach ball for a moment while it was

17  downloading.

18          Okay.

19          Yeah.  I had to bring the spreadsheet forward.

20          Okay.

21  BY MR. GENISH:

22      Q.   Have you seen this document before?

23      A.   I'm seeing the very end of it.  Let me scroll

24  up.

25      Q.   I'm sorry.  Did you say you have?

1    nondiscretionary pay to the employees.

2              MR. LONG:  Calls for a legal conclusion.

3              THE WITNESS:  The commission that is paid to

4    spa employees in Huntington Beach is nondiscretionary.

5    It is a percentage of the cost of the treatment that is

6    paid to them without exception.

7    BY MR. GENISH:

8        Q.   And is that commission calculated in their

9    regular rate of pay for purposes of calculating it?

10       A.   Yes, it is.

11       Q.   And has it been included in the regular rate

12   of pay for purposes of calculating it for the last four

13   years?

14       A.   Yes.

15       Q.   And the same for the services charges for the

16   last four years?

17       A.   Yes.

18       Q.   Speaking generally about California employees,

19   they get whatever their pay is, albeit salary or hourly;

20   correct?

21       A.   Yes.

22       Q.   They may or may not get commissions or service

23   charges; correct?

24       A.   That's correct.

25       Q.   They get floating holidays; is that correct?

November 10, 2020

```
 1        A.    Depending on the location, yes.  Not every
 2   location uses floating holidays.
 3        Q.    Do most of the locations include floating
 4   holidays?
 5        A.    I couldn't say if it's the majority or not.  I
 6   know the nonunion hotels that have been managed by Hyatt
 7   for some years, that is typical.  The union hotels are a
 8   different story.  And the hotels that joined our family
 9   a couple of years ago that we refer to as the "Lifestyle
10   Hotels" --
11              It's part of an acquisition that we made.
12              It's my understanding that most of them do not
13   do floating holidays.  But I could not say with
14   certainty.
15        Q.    Okay.
16              Is there a difference between a floating
17   holiday and accrued vacation?
18        A.    Could you be specific about what the
19   difference -- what difference?
20              They're -- they're two different benefits.
21   Yes.  They're two different benefits.
22        Q.    Okay.
23              That's actually what I --
24              Floating holidays and accrued vacation are two
25   different benefits; correct?
```

```
 1        A.    Yes.
 2        Q.    Are there any hotels that don't -- in
 3   California that don't provide vacation pay?
 4              Or strike that.
 5              Are there any hotels in California that don't
 6   provide vacation days to its employees?
 7        A.    Yes.
 8        Q.    Which hotel?
 9        A.    The ones that offer P.T.O. programs.  I think
10   I gave a list of those earlier.
11        Q.    Maybe I didn't phrase it correctly.
12              Are there any hotels in California that don't
13   provide any paid time off to its employees?
14        A.    I'm not aware of any.
15        Q.    All right.
16              So we have paid time off -- of the benefits
17   that an employee receives, they get paid time off, and
18   they might also get floating holidays; correct?
19        A.    Yes.  They could.
20        Q.    And what is the difference between paid time
21   off and floating holidays?
22        A.    Paid time off --
23              It varies by the hotel.
24              There are certain rules with respect to the
25   scheduling of those different benefits where a request
```

1   for one might trump the other.

2        Q.   Well, let me take a step back.

3             What is paid time off?

4        A.   Paid time off is --

5             It's exactly what it says.  It's time that

6   people can take off, and they are not physically at

7   work, but they're being paid that day.

8        Q.   Great.

9             MR. LONG:  I'm just raising an issue.

10            You can continue on.

11            But at some point I think we'll probably want

12  to take a short meal period.  I'm not saying it's right

13  now.  But I want to see what your thoughts on timing is.

14            MR. GENISH:  Sure.  We'll take a meal break

15  when I'm done with this line of questioning.

16       Q.   That paid time off, is that different than

17  vacation time in the Hyatt's policy?

18            MR. LONG:  Counsel, just real quick.  Do you

19  have an estimate as to time?  Because, otherwise, I

20  think we will take a short break in the near future.

21  But if -- if you're saying that you're done in 10,

22  15 minutes, that's fine.  We'll wait.

23            MR. GENISH:  At some point before 1:00 we'll

24  take lunch.

25            MR. LONG:  If that works for the witness,

```
 1   that's fine.

 2              THE WITNESS:  That's fine.

 3              Can you repeat the question, please.

 4              MR. GENISH:  Of course.

 5        Q.   You described for me what paid time off was.

 6   Is that any different than accrued vacation?

 7        A.   Yes.

 8        Q.   How is it different?

 9        A.   Well, paid -- paid time off in --

10              It may be sort of a semantic difference.

11              Typically in our organization, a paid time-off

12   program is some combination of different benefits that a

13   colleague can use at their discretion essentially with,

14   you know, no questions asked.  And it can be a

15   combination of what one would think of as vacation, what

16   one might think of as certain types of sick leave -- not

17   necessarily California sick leave -- and then it might

18   include holidays.  There are some hotels that that's all

19   thrown into one pot, and the colleagues can take that.

20              The principal difference is the way that one

21   is able to use P.T.O., or paid time off, versus

22   vacation.

23              The typical scenario for paid time off -- if

24   you want to put quotes around it -- is that you can take

25   the paid time off as you accrue it -- take it, as you
```

```
 1    go, so to speak.  And that is the principal difference

 2    between paid time off and vacation in our -- in our

 3    organization.

 4         Q.   And how is that different than vacation?

 5         A.   Vacation -- the typical set up is that it is

 6    accrued as colleagues work or some function of time and

 7    that, once it gets to a certain date --

 8              -- typically the colleagues' anniversary date

 9    or their service date --

10              -- which could be slightly different depending

11    on if they were rehired at some point in time --

12              But it's a date.  It's a particular date.

13              And then on that particular date, the accrued

14    vacation moves to earned vacation.  And the earned

15    vacation can then be taken pretty much at the

16    colleague's discretion as long as it fits within the

17    work schedule of the department.

18         Q.   Okay.

19              Now, there's a difference between vacation pay

20    and floating holidays; correct?

21         A.   Yes.

22         Q.   What are the differences?

23         A.   I think I mentioned before, there are --

24              There can be --

25              Not in every hotel.
```

```
 1            There can be some differences in the priority

 2  for scheduling in terms of the floating holiday

 3  typically is associated with a particular day that a

 4  colleague wants to take off.  And they often take them

 5  for, you know, their birthday or their anniversary or

 6  something -- religious holiday that's meaningful to

 7  them.

 8            Once those are locked in, at least in

 9  Huntington Beach, seniority cannot trump those.

10            So the holiday's locked in, and the person --

11  they get that, and that's their day.

12            And the other difference is there is not an

13  accrual of floating holidays.  There's -- they are

14  earned.  And they --

15            Depending on the hotel and how many some --

16  how many a hotel offered, they are earned in the first

17  year of employment on a graduated basis.  And then, in

18  subsequent years, on the calendar year -- they are

19  earned on the first day of the calendar year and are

20  available to be used by the colleague.

21            That's how it works in Huntington Beach for

22  sure and the typical way that it works.

23            And I think that is the way that it's stated

24  in the Hyatt California Handbook template.

25       Q.   Okay.
```

1              So when Hyatt describes accrued vacation, they

2    are not encompassing floating holidays; correct?  Those

3    are --

4         A.   That is true.

5         Q.   Other incentives that are provided to

6    employees' or bonuses or however you want to call it --

7    part of their compensation package includes free nights'

8    stay at Hyatt hotels; correct?

9         A.   It's not part of their compensation package.

10   It is -- I would consider it part of their benefit

11   package.

12        Q.   Okay.  Fair enough.

13             So part of their benefit package includes free

14   days at Hyatt hotels; correct?

15        A.   For certain groups of colleagues?  Yes.

16        Q.   Which groups?

17        A.   Full time and part time.

18        Q.   What is that meant to include?

19        A.   I'm sorry.  What did you say?

20        Q.   If it applies to full time and part time

21   colleagues, who is excluded from that?

22        A.   Oh.  Who is excluded?

23             People who are classified as on call.

24        Q.   So aside from on call employees, all other

25   employees within California have, within their benefit

 1   package, the right to stay at Hyatt Hotels for some time

 2   free of charge; correct?

 3        A.   Yes.  The full-time colleagues are provided

 4   one benefit.  And then part time colleagues are provided

 5   another benefit.

 6        Q.   What is the benefit provided to full time?

 7        A.   It's 12 nights per year for full time and

 8   6 nights per year for part time.

 9        Q.   And that applies uniformly across all of

10   California; correct?

11        A.   Yes.

12             And my hesitation was only because of the

13   hotels that were part of the acquisition --

14             But --

15             -- a couple years ago.

16             But, to my knowledge, they are all on the

17   program now.

18        Q.   Why -- why --

19             Strike that.

20             Do you know why the Hyatt Corporation provides

21   that benefit?

22             MR. LONG:  Calls for speculation.

23             THE WITNESS:  I --

24             We're in the hotel business.  One of the

25   reasons we're in the hotel business is we love to --

1  love to travel, and we love to -- that whole experience.

2  And I think that that's part of it.

3         The other part of it is it's a benefit that we

4  can offer because that is our line of business.

5  BY MR. GENISH:

6     Q.   How does the policy work with respect to

7  earning or accruing the free nights of stay at hotels --

8         At hotels.

9     A.   That is based on the -- the calendar year.

10        So the first of each year people have the

11 12 nights afforded to them.  And there are certain

12 restrictions on where you can stay and how long you can

13 stay.  But the 12 nights are basically available at the

14 beginning of the year -- or the six nights if that

15 applies to you.  And that's pretty much it.

16        All colleagues are available --

17        There's three different types of benefits.

18 One is comp rooms; one is employee rate, which is a

19 discounted rate; and then one is a friends and family

20 rate that's offered to friends and family members of

21 colleagues.  Those two are discounted rates.  And

22 colleagues are eligible for friends and family and

23 employee rate immediately upon hire.  And that applies

24 to all of the three main groups if you -- the full time,

25 part time, and on call.  In some locations they refer to

1  those as extra or casual.  But -- the on-call people.

2  But --

3         Everybody gets employee rate and family rate.

4  Only full time and part time get the complimentary

5  rooms.  And that's based on a January 1st cycle.  They

6  don't carry over from year to year.  And so whatever --

7         If you use all of them the first part of the

8  year, then you don't have any left for the rest of the

9  year.  But then you get 12 more on January 1st -- or 6

10 more.

11    Q.   What happens if an employee starts -- is hired

12 mid year?  Do they immediately receive any complimentary

13 nights?  Or do they have to wait until January 1st?

14    A.   They have to wait till January 1st.  They are

15 eligible for employee rate, though -- the discount but

16 not complimentary.

17    Q.   Is this meant to be a retention incentive?

18    A.   Did you say a retention incentive?

19    Q.   Yes.

20         MR. LONG:  Calls for speculation.

21         THE WITNESS:  I don't know that it's a --

22 specifically a retention incentive.  It -- it --

23         That could be one component of it.

24 BY MR. GENISH:

25    Q.   And the award each year of complimentary

1  rooms, that's not discretionary?

2          MR. LONG:  I'm sorry.  The what of the

3  complimentary rooms?

4          MR. GENISH:  The award of complimentary rooms

5  each year, that's not discretionary; correct?

6          THE WITNESS:  No.  No.

7  BY MR. GENISH:

8      Q.  The complimentary rooms, that is not

9  calculated in the regular rate of pay for purposes of

10 calculating overtime; correct?

11     A.  No.

12         MR. LONG:  Calls for speculation.

13         THE WITNESS:  No.  To my knowledge, it is not.

14 BY MR. GENISH:

15     Q.  Why not?

16         MR. LONG:  Calls for a legal conclusion.

17 Calls for speculation.

18         THE WITNESS:  Not everybody uses them.  We

19 have many colleagues who don't use them.  Different

20 people, you know, enjoy the benefit.  Some people don't

21 use the benefit.  It's --

22         The awarding of them and the usage of them are

23 two different things.  And they could all be used at one

24 time, or they could be spread out through the year.  And

25 it's not anything that we have to provide people.

```
 1              I guess that's my best answer.
 2    BY MR. GENISH:
 3         Q.   If somebody -- if an employee earns the
 4    12 nights, for example, of complimentary rooms and is
 5    terminated before they're able to use it, that is not
 6    paid out at the time of their termination; correct?
 7         A.   There's no cash value to it.  So of course
 8    not.
 9         Q.   Is there some sort of internal value that's
10    assigned to that benefit within the Hyatt Corporate?
11         A.   No.
12         Q.   How are handbooks provided to employees?
13         A.   When people are hired, they get a -- an
14    abbreviated version of -- it's sort of a four-panel
15    handout --
16              It's four panels at Huntington Beach.  It
17    could be -- it could be -- depending on the -- on the
18    way it's presented in an individual hotel.
19              -- that gives a summary of the things that's
20    kind of they need to know immediately.
21              And then --
22              And this is --
23              I'm speaking for Huntington Beach.
24              Then they are given access to our intranet
25    immediately upon hire.  That's based on their global
```

```
 1   I.D. that they -- they also use to clock -- punching in
 2   their global I.D.
 3            And the colleague handbook is available there.
 4   The --
 5            They also can and do request a copy of it from
 6   Human Resources.
 7       Q.   Wouldn't that also apply to all employees in
 8   California?
 9       A.   Some -- some hotels actually give the paper
10   copy.
11       Q.   All employees in California have this intranet
12   via the Hyatt; correct?
13       A.   Well, the intranet is --
14            There's two parts -- there's two parts to it.
15   There's the company portal.  And then the intranet is
16   based on each hotel.
17            So if the hotel chooses to put their handbook
18   on the intranet in the hotel, they do that and then give
19   access to that part of the intranet to the colleagues.
20       Q.   The company portal, as you described it, is
21   that Hyatt's own?
22       A.   Yes.
23       Q.   Is that nationwide?
24       A.   Yes.  Global.
25            (Technical interruption in proceedings.)
```

1          MR. GENISH:  I asked if it's nationwide.

2          THE WITNESS:  And I answered that it is

3  actually global.

4          So it's --

5          Yes, it is nationwide.

6  BY MR. GENISH:

7     Q.   Who determines the rates of pay for each

8  employee in California?

9     A.   That is done on a hotel-by-hotel basis.  And

10  it's the leadership team of the hotel generally

11  shepherded by the H.R. leader in that particular

12  property.

13          The titles can vary.  But we generally have an

14  H.R. leader in the hotel or responsible for the hotel

15  that works with the General Manager and then key leaders

16  at the property to determine what the rates of pay are

17  based on competitive analysis.

18     Q.   And who determines what types of wages are

19  provided to any particular employee?

20          MR. LONG:  Vague and ambiguous.

21          THE WITNESS:  I -- I'm not --

22          I don't really understand the question.

23          MR. GENISH:  Sure.

24          Let me -- let me take a step back.

25     Q.   Who makes the determination of what wages are

```
 1            THE VIDEOGRAPHER:  Okay.  We are now back on

 2  the record.  The time is 1:40 P.M.

 3  BY MR. GENISH:

 4      Q.   I'm not seeing the witness in the main screen.

 5  Is there a way to shoot that?

 6            THE VIDEOGRAPHER:  Yeah.  Hold on.

 7            MR. GENISH:  Okay.

 8            Much better.

 9      Q.   How was your lunch?

10      A.   Good.  How about you?

11      Q.   It was good.  Quick one.

12      A.   It was easy.

13      Q.   Yeah.  It was easy.

14            Did you -- did you speak to anyone during

15  lunch?

16      A.   I caught up with Mr. Long during lunch, just

17  checked in.

18      Q.   Anyone else?

19      A.   No.

20      Q.   In preparation for this deposition, did you

21  speak to anyone other than your lawyers?

22      A.   No.

23      Q.   Did you speak with your lawyers in preparation

24  for this deposition?

25      A.   Yes.
```

```
 1              THE VIDEOGRAPHER:  Okay.  We are now back on

 2   the record.  The time is 1:40 P.M.

 3   BY MR. GENISH:

 4      Q.   I'm not seeing the witness in the main screen.

 5   Is there a way to shoot that?

 6              THE VIDEOGRAPHER:  Yeah.  Hold on.

 7              MR. GENISH:  Okay.

 8              Much better.

 9      Q.   How was your lunch?

10      A.   Good.  How about you?

11      Q.   It was good.  Quick one.

12      A.   It was easy.

13      Q.   Yeah.  It was easy.

14              Did you -- did you speak to anyone during

15   lunch?

16      A.   I caught up with Mr. Long during lunch, just

17   checked in.

18      Q.   Anyone else?

19      A.   No.

20      Q.   In preparation for this deposition, did you

21   speak to anyone other than your lawyers?

22      A.   No.

23      Q.   Did you speak with your lawyers in preparation

24   for this deposition?

25      A.   Yes.
```

```
 1        Q.    How many different conversations?

 2        A.    How many different what?

 3        Q.    How many different conversations?

 4        A.    Well, we've had conversations over the last

 5   couple of months.  But in preparation for the

 6   deposition?  Just one.

 7        Q.    How long did that last?

 8        A.    A few hours.

 9        Q.    Did you say a few hours?

10        A.    Yes.

11        Q.    Over three?

12        A.    Yeah.

13        Q.    If you take a look at the chat, there is what

14   I'm going to mark as Exhibit 3, the handbook policies.

15   Okay?

16              Do you see that?

17              (Discussion off the record.)

18              THE REPORTER:  Counsel, you have three

19   documents already up there.

20              MR. GENISH:  Yeah.  We never introduced the

21   third one.

22              THE REPORTER:  Okay.

23              MR. GENISH:  So we're just going to leave that

24   in there.  I don't know how to remove it.

25              THE REPORTER:  Okay.
```

```
 1              MR. GENISH:   The handbook will be Exhibit 3.

 2              THE REPORTER:  Okay.

 3              MR. GENISH:  Okay.  So, yeah.  I see the

 4    Huntington Beach Handbook.  Three -- three of three

 5    pages.

 6              (Exhibit 3 marked.)

 7    BY MR. GENISH:

 8         Q.    Have you seen this document?

 9         A.    Yes.

10         Q.    And you'll note that it's Bates stamped

11    Hyatt 335 through 337; correct?

12         A.    Yes, I do.

13         Q.    And it is an accurate depiction of the

14    Huntington Beach Hyatt Handbook Policy with respect to

15    holidays and vacations; correct?

16         A.    That is correct.

17         Q.    I notice on the front page it says, "Hyatt

18    Regency Huntington Beach Resort."  But then at the

19    bottom it says "Americas."

20              Why does it say that?

21         A.    It's because the handbook is a template.  And

22    the shell of it -- the art work, the general layout of

23    it, the subjects that are covered -- is put together by

24    our Americas' H.R. team.  And I believe I mentioned

25    before, there's two versions of it -- one for the rest
```

1   of the Americas and then one for California.

2           And I honestly don't know why they put

3   "Americas" down there other than it's for the Americas

4   region -- this handbook -- as opposed to other regions

5   around the world.

6       Q.    And the Americas --

7           Strike that.

8           The California version of this template, aside

9   from the policies you described, it also contains

10  content; correct?

11      A.    It also contains content?

12      Q.    Yeah.  Words.  Not just art and layout, things

13  of that nature.  It --

14      A.    Yes, it does.

15      Q.    Language as well; correct?

16      A.    Of course.

17      Q.    So the template, does it include all of the

18  language that's contained here and then the hotel can

19  amend it if they have a desire to?

20      A.    There --

21          The template has options that are outlined in

22  it and then, you know, what's optional that people can

23  sort of customize to the hotel.  And then some hotels

24  add things to it because they'd like to have the

25  documents all be in one place -- different things that

1    are pertinent to the hotel.  And that way it's easy for

2    colleagues to get it in one sitting or one location.

3         Q.    Okay.

4               Go to the second page of Exhibit 3.

5         A.    Okay.

6         Q.    The second-to-last paragraph quoting,

7               [Reading:]  Holidays are earned

8    January 1st of each calendar year and so forth.

9               Do you see that?

10        A.    Yes, I do.

11        Q.    Is that part of the -- did that come from the

12   template that's sent to all California hotels?

13        A.    I believe so.  I believe so.

14        Q.    The last sentence of page 2 -- does that come

15   from the template that's sent to all California hotels?

16        A.    I believe so.

17        Q.    On the third page of Exhibit 3, is everything

18   in that page contained within the template that's sent

19   to all California hotels?

20        A.    Yes.  This appears to be exactly my

21   understanding of the template.

22              And I know Huntington Beach follows the -- the

23   standard policy on this.

24        Q.    And most hotels follow the standard policy on

25   vacation; correct?  In California.

1    A.   I would say most of the hotels that were not

2   part of the acquisition that we made a couple of years

3   ago, yes, we do follow that.

4    Q.   Which hotels were part of the acquisition a

5   couple years ago?

6    A.   There's a -- there's a list of them.  There

7   was a Company that we purchased called Two Roads

8   Hospitality.  We now refer those to -- generically we

9   sort of refer those -- to those as our Lifestyle hotels.

10  Some of them have different vacation policies because

11  they made sense in the locations where they operate.

12   Q.   Aside from the Two Roads Hotel, what do you --

13  what do you internally refer to that acquisition as?

14   A.   The acquisition?

15   Q.   Uh-huh.  The ones that fall within the group

16  that would reflect?

17   A.   We either refer to it as Two Roads, or now we,

18  you know, we sort of -- you know, we get past Two Roads

19  because they're part of Hyatt.  We refer to that as the

20  Lifestyle hotels.

21   Q.   So aside from the Two Roads Hotels, do all of

22  the hotels in California have the same vacation policy?

23   A.   I think I stated earlier that some of the

24  hotels have P.T.O.

25   Q.   I'm just referring to vacation at the moment?

1        A.   I understand that.  But if the hotels have

2   P.T.O., then they wouldn't -- they wouldn't follow this

3   vacation policy.

4        Q.   I don't -- I don't follow.  Can you explain

5   that?

6        A.   I think I stated earlier that vacation -- the

7   P.T.O. may include vacation.  And it may be commingled

8   with other benefits.  So if one had a P.T.O. policy, it

9   would be unlikely that a hotel would also have a

10  vacation policy.

11       Q.   Doesn't P.T.O. policy encompass the vacation

12  policy?

13       A.   It -- it can.  Yes.  It can encompass other

14  things as well.

15       Q.   In other words, isn't the vacation one

16  component of the P.T.O. policy?

17       A.   Depending on the hotel, yes.

18       Q.   Okay.

19            Well, what do you mean?

20       A.   You know what?  No.

21            Generally speaking, yes.

22            Generally speaking, P.T.O. will in --

23  non-union locations will include the vacation.  That is

24  not true in some of the union hotels.

25       Q.   Okay.

```
 1              So just to be clear, vacation is one component

 2   of the P.T.O.; correct?

 3       A.   Vacation is one component of P.T.O. in the

 4   non-union hotels.  Yes.

 5       Q.   And whether if there's a stand-alone benefit

 6   of vacation or it's within the rubric of P.T.O., the

 7   vacation policies are the same among all California's

 8   hotels that are not from the Two Roads acquisition; is

 9   that correct?

10       A.   No.

11              There -- the -- the --

12              The policies are not the same.  Where there

13   are P.T.O. policies, it's very different than vacation.

14              Now, they wouldn't offer vacation as well.

15   But the policy could be very different.

16       Q.   Is it different in the way it is earned or

17   accrued?

18       A.   Yes.  I think I stated that earlier.

19       Q.   So the only difference between the varying

20   hotels in California perhaps is the way in which the

21   vacation or P.T.O. is earned or accrued; correct?

22              MR. LONG:  Misstates the witness's previous

23   testimony.

24              THE WITNESS:  Can you repeat the question?

25   I'm sorry.
```

```
 1            MR. GENISH:  Sure.

 2       Q.   The only way in which California's hotel

 3  policy regarding P.T.O. or vacation -- the only way in

 4  which they may differ is the way they are earned or

 5  accrued; correct?

 6       A.   No.  I don't think that's -- that's not

 7  completely correct.

 8       Q.   Tell me all the ways in which the California

 9  hotels' vacation or P.T.O. policies are different?

10       A.   It could be the rate at which it accrues.  It

11  could be whether you're allowed to take that time off as

12  it accrues.  It could be how full-time colleagues are

13  treated, how part-time colleagues are treated, how on

14  colleagues - on call colleagues are treated.  It could

15  be scheduling of it.  It could be the increments in

16  which it could be taken.  It could be --

17            Those are the ones that come to mind.  But

18  there are differences.

19       Q.   Okay.

20            And each hotel has its own policy correct --

21  some of which maybe identical to others?

22       A.   Yes.  Each hotel could have its own policy.

23  Yes.

24       Q.   It would be -- strike that.

25            The Hyatt Corporation has its centralized
```

```
 1            Have you seen this document before?

 2       A.   I don't believe I have.

 3       Q.   Okay.

 4            Do you know --

 5            The Daniel Strittmatter --

 6            How do you pronounce the name?

 7       A.   "Stritmire."

 8       Q.   "Stritmire."

 9            That's the individual you were referring to

10   earlier; correct?

11       A.   Correct.

12            Yeah.  It says "Strittmatter."  I believe it's

13   "Stritmire."  But I'm not positive of that.

14       Q.   I won't tell him that.

15            Take a look at paragraph 6 on page 1.  Or it's

16   page 3 of the -- page 2 of the PDF.

17       A.   Okay.

18            Page 2 of the PDF.

19       Q.   At the very bottom.

20       A.   Roman numeral III, then Item 6.

21       Q.   Yeah.

22            If you could just read that paragraph.

23       A.   Yes.

24            Okay.  I see it.

25       Q.   It says,
```

```
 1            [Reading:]  Based on my review of

 2       public records, due to the COVID-19

 3       pandemic, defendant furloughed

 4       approximately 7,031 nonexempt hourly

 5       employees who work at defendant's hotel

 6       properties in California.

 7            Do you see that?

 8       A.   Yes, I do.

 9       Q.   Do you have any reason to believe that that is

10  not an accurate statement?

11       A.   No, I don't.

12       Q.   Do you know how many exempt employees were

13  furloughed as a result of the COVID-19 pandemic?

14       A.   No.  I don't have access to that information

15  for all hotels.  So I couldn't speak to it.

16       Q.   So were you involved in the decision to

17  furlough/temporarily lay off these seven-thousand-plus

18  Hyatt employees in California?

19       A.   No.  No.

20       Q.   Do you know who was?

21       A.   I -- I will --

22            I believe that it is the same process that we

23  used in Huntington Beach, where the General Manager and

24  the leadership teams of the hotels looked at the

25  business situation and determined that we needed to do
```

1    something because of the precipitous decline in our

2    business and we needed to reduce our labor costs because

3    of the decline in business.  So we did the furlough.

4            I believe that's the process that occurred in

5    the rest of the hotels.

6        Q.   When you say the G.M. and leadership, who are

7    you referring to when you say "leadership"?

8        A.   So --

9            So each hotel has a group of senior leaders

10   that report to the General Manager.  And they're

11   generally referred to as the Leadership Committee.  And

12   they're the division heads of the hotels -- of the

13   hotels but of a particular hotel in most cases.  And

14   sometimes they'll be over more than one hotel but

15   usually just one hotel.  They operate and oversee the

16   respective divisions within that hotel, and then they

17   report to the General Manager.

18           And, for example, in Huntington Beach, I'm one

19   of those people.  But so is the Director of Food and

20   Beverage.  So is the Director of Rooms.

21       Q.   So you were involved in the decision to

22   furlough/temporarily lay off employees at Huntington

23   Beach; correct?

24       A.   Yes.

25       Q.   Now, there were seven-thousand-plus employees

1  that were furloughed/temporarily laid off in March

2  throughout California all within a few weeks of each

3  other; right?

4       A.   Yes.

5       Q.   Did that come -- was that missive brought down

6  by Corporate?

7       A.   I don't believe so.

8            I think, you know, every -- every hotel is

9  responsible for managing the finances of that hotel.

10 The decision to reduce staff was made by the hotel.  And

11 some of the processes and -- and supporting

12 procedures -- got guidance from corporate on that.

13      Q.   When you say the guidance of procedures,

14 you're talking about how to implement the furloughs and

15 layoffs?

16      A.   You know, information about, you know,

17 communications -- what was going to be -- you know, we

18 would have access to, we wouldn't have access to,

19 anything that had to do with implications of health

20 insurance and things of that nature -- we got -- we got

21 guidance from Corporate on that.

22           But in terms of, you know, who -- what

23 positions were going to be furloughed and to the extent

24 they needed -- that we needed to do furloughs, that was

25 a hotel-by-hotel decision based on the business that --

1    or the lack of business that was applicable to a given

2    hotel.

3        Q.   So the furlough/layoff was implemented because

4    of the lack of business?

5        A.   Oh, yes.  Yes.

6        Q.   And the --

7        A.   We had a dramatic lack of business.

8        Q.   Yeah.  I'm sure.

9             And the lack of funds as well?

10       A.   I don't understand what you mean.

11       Q.   Well, income had dramatically gone down.  So,

12   therefore, there was less funds available to pay

13   employees.  And, therefore, you know, the

14   furlough/layoff was partially a result of a lack of

15   funds.

16       A.   Lack of revenue.  Yeah.  I understand now.

17            We would refer to that as revenue.

18       Q.   Certainly.  Lack of revenue.  Thank you.

19            Okay.

20            So each hotel would make the decision of which

21   employees to furlough/lay off.  And then it would go to

22   Corporate to say, okay.  Here's who we need to lay off.

23   How do we implement it?

24            Is that a fair characterization of what

25   happened?

November 10, 2020

```
1      A.   I think it was not so much how to implement it
2  but --
3           We knew how to implement it.  But there were
4  certain tools that were provided to us, you know, in
5  terms of, you know, letters, in terms of, you know,
6  discussing questions that colleagues might ask and --
7  and, you know, what the answers to those would be.  You
8  know, "How does this impact my health benefits?"
9  et cetera, et cetera.  Those kinds of things.
10          In terms of the actual on-the-ground
11 implementation of the furlough, the hotels carried that
12 out themselves.
13     Q.   So Corporate -- did Corporate tell the hotels
14 whether or not to continue paying for employees' health
15 care?
16     A.   At the -- at the initial part of the furlough,
17 it was in the middle of a month.  So that wasn't really
18 discussed.  Later there was discussion about that.
19     Q.   When was that discussion?
20          MR. LONG:  To the extent that any discussions
21 involve in-house counsel or attorneys, I'm going to
22 instruct you not to answer.
23          But if it was not with attorneys, you can
24 certainly answer.
25          THE WITNESS:  I believe that came up in
```

1   April -- what was going to happen with April's health

2   insurance and so on.

3           MR. GENISH:  Okay.

4       Q.   So that was never a discussion in March --

5   about what would happen with health insurance with the

6   employees that were furloughed/laid off?

7       A.   I think the discussion was that health

8   insurance goes to the end of any month and that we would

9   have further information about what happens if the -- if

10  the furlough were to continue past the end of March,

11  then we would get more information about it.

12      Q.   Okay.

13           Do you know when the decision was made to pay

14  for health insurance for the month of April?

15      A.   I don't know the exact date.  I know we

16  were -- we were informed that it was going to be

17  continued.  I don't know the exact date of that.

18      Q.   Was that in March or April?

19      A.   I believe it was in April.

20      Q.   And the decision to pay for health insurance

21  for employees that had been furloughed/laid off in the

22  month of May -- do you know if that decision was made in

23  April or May?

24      A.   I don't recall.  I don't recall when that was.

25  I believe April and May --

```
 1              No.  I don't recall.  I can't say for sure.

 2         Q.   Okay.

 3              The decision to pay for the employees health

 4    care for May was definitely not made in March, though;

 5    correct?

 6              MR. LONG:  Calls for speculation.

 7              THE WITNESS:  There were -- there were so many

 8    things going on at that time, I don't exactly remember

 9    when any of those things were announced.  I would have

10    to go back and look.

11    BY MR. GENISH:

12         Q.   So you said that you received letters and

13    communications from Corporate.  You're referring to the

14    notice of furloughs/temporary layoffs that was sent to

15    the employees notifying them that they would be

16    furloughed or laid off; is that correct?

17         A.   There was the letter that announced the

18    furlough.  Yes.  That came from Corporate.  And then,

19    obviously we filled in the hotel's address and put it on

20    the respective letterhead.

21         Q.   And that template letter -- do you know if

22    that template letter was sent to all California hotels

23    that implemented furloughs/layoffs?

24         A.   I believe it was.

25         Q.   And there was a Frequently Asked Questions
```

November 10, 2020

1  Form that was also sent by Corporate to all California

2  employees to provide to the employees that were

3  furloughed/laid off; is that correct?

4      A.   I believe that is true.

5      Q.   And that was uniform across all of California

6  employees that were furloughed/laid off; correct?

7      A.   To the best of my knowledge, yes.

8      Q.   Do you know when Hyatt first became aware of

9  the COVID-19 pandemic?

10     A.   Hyatt as a -- as a company?  No, I don't.

11     Q.   When did Hyatt --

12          Do you know when Hyatt, as in the Huntington

13  Beach, did?

14     A.   I'm trying to think of -- of --

15          We had a possible --

16          We were notified of a possible exposure by a

17  group that stayed with us.  And I don't remember exactly

18  when it happened.  It was -- I think it was early March.

19  But I don't recall exactly when it happened.

20     Q.   I'll represent to you that --

21          Well, let me take a step back.  What you just

22  described was a possible outbreak in Hyatt Huntington

23  Beach; right?

24     A.   No.

25          What it was was we had a group who returned

1  from a visit to the resort.  And the meeting planner

2  informed them -- informed us that one of their attendees

3  had tested positive for COVID, and they wanted us to --

4  they wanted us to know about it.

5      Q.   You're aware that --

6           Well, strike that.

7           Hyatt Corporation has hotels in China;

8  correct?

9      A.   Yes.

10     Q.   Do you know whether any of the China locations

11  were impacted by the pandemic?

12     A.   Yes.  They were.

13     Q.   Do you know how early on that transpired?

14     A.   I don't know the exact time of that.  I do

15  know that they were impacted.

16     Q.   Were any of the Hyatt hotels in China shut

17  down as a result of COVID?

18     A.   Yes.

19     Q.   Do you know if that took place in December of

20  2019?

21     A.   When in 2019?  December?

22          I'm not aware of that.

23     Q.   What about January of 2019?

24     A.   I couldn't tell you the dates of it.

25     Q.   To your knowledge, did the China locations

```
 1   specifically put in there because of E.D.D.

 2   requirements.  And that's why it's there.

 3       Q.   And the E.D.D. doesn't talk about furloughs.

 4   It only talks about temporary layoffs?

 5       A.   I don't know what the E.D.D. talks about or

 6   doesn't talk about.  But I know that that was the

 7   purpose of that paragraph and that it was pointed out to

 8   us to make sure that that remained exactly as is because

 9   it was language that E.D.D. used for E.D.D. purposes.

10       Q.   Fair enough.

11            But when you put that language into the letter

12   that you signed, you didn't think to yourself, Wait a

13   second.  This says "laid off."  We've got to include

14   "furlough" in there.  Right?

15       A.   No, I did not.

16       Q.   Okay.

17       A.   All I put in the letter was the date.

18       Q.   Great.

19            If we go to the last paragraph of the

20   letter.

21            [Reading:]  Given the fluidity of the

22        situation, we cannot predict the course or

23        extent of this pandemic or exact length of

24        the furlough/temporary layoff.

25            Again, we go back to the original language,
```

1    furlough/temporary layoff; correct?

2         A.   Yes.

3         Q.   Does it seem like "furlough/temporary layoff"

4    and "furlough" are being used interchangeably throughout

5    the letter?

6         A.   I think it was used in E.D.D. language as sort

7    of boiler plate language.

8         Q.   Well, the second sentence of the first --

9              The second sentence of the second paragraph

10   says, "furloughed/temporarily laid off."

11        A.   I see that.

12        Q.   That's not E.D.D. language, is it?

13        A.   No.  I didn't say that that paragraph was.

14             I said that the sentence that, if you've lost

15   your job, et cetera, that is language that -- if it

16   wasn't from the E.D.D., it was put in for that purpose.

17        Q.   So we can leave that paragraph aside for the

18   moment.

19             Paragraphs 2 --

20             Paragraph 2 uses the verbiage

21   "furloughed/temporarily laid off."  Later in the

22   paragraph it uses just the word "furlough."  The last

23   paragraph of the letter it says "furlough/temporary

24   layoff."

25             Are you using the terms "temporarily laid

```
 1   off/furlough" interchangeably with the word "furlough"?

 2        A.   Say that again, please.

 3        Q.   Are you using the language

 4   "furloughed/temporarily laid off" interchangeably with

 5   the word "furlough" in this letter?

 6        A.   I didn't -- I didn't write the letter.  I --

 7   Again, I didn't -- I didn't write the letter.  That's

 8   what it says on the page.

 9        Q.   Okay.  Well, you signed it.  So it's safe to

10   say that the letter, itself, uses the terminology

11   "furloughed/temporarily laid off" interchangeably with

12   the term "furlough"; correct?

13        A.   Yes.  Yes.  It does state that.

14             And in -- I think, in our mind that, you know,

15   "furlough" being that they were still employed,

16   "temporary layoff," being that they were still employed,

17   I agree with you that there is some inconsistency of it

18   being used the same in every paragraph.

19             I believe that the intent of the communication

20   is the same.  And is it the best written letter?  No.

21   Was it a boiler plate that was delivered to us to send

22   out to colleagues as is and not be changed?  Yes.

23        Q.   There's no distinction between a furlough and

24   a temporary layoff, is there?

25        A.   No, not --
```

```
 1              In our mind, a furlough and a temporary layoff
 2     is pretty much the same.  It is the same thing as
 3     opposed to a layoff, which is a termination.  For us,
 4     the furlough/temporary layoff is that you're still
 5     employed by Hyatt.  The employment relationship is
 6     there.  We're continuing your benefits, continuing
 7     communication with you, as opposed to the action that we
 8     took later in the year.
 9              MR. LONG:  Counsel, at this pause, we've been
10     going for about another hour; so do you mind if we take
11     a quick five-minute bathroom break?
12              MR. GENISH:  If I could just finish this last
13     couple questions and then we can take that break?  Is
14     that okay, Brian?
15              MR. LONG:  That's fine.
16              MR. GENISH:  Thank you.
17        Q.   Now, you'll note about halfway through the
18     second paragraph it says, "we hope."
19              Do you see that?
20        A.   Second paragraph.
21              Yes.
22        Q.   [Reading:]  We hope that the Hyatt
23        Regency Huntington Beach Resort, as far as
24        business, returns to normal in 8 to 12 weeks.
25              Do you see that?
```

```
1        A.   I do.

2        Q.   And this letter was sent to some employees on

3   March 18, 2020, and to some approximately one week

4   later; right?

5        A.   Yes.

6        Q.   So as of March 18, 2020, the expectation was

7   that the hotel's business would not return to normal for

8   at least 8 to 12 weeks; right?

9        A.   I think the hope was that it would be returned

10  by then.  And it -- I think --

11            It goes on to state the date is not certain

12  and depends on the circumstances at the time.

13       Q.   Okay.

14            So the furlough/temporary layoff was

15  indefinite?

16       A.   We did not know when all of the business would

17  return.  We anticipated that some of it would return.

18  But I -- as I stated earlier, it was constantly

19  changing.

20       Q.   Sure.

21       A.   Especially at that time.

22       Q.   So the --

23            At the time that the furlough/temporary layoff

24  was implemented, it was indefinite; correct?

25       A.   Yes.  We had not given them a return-to-work
```

1    date.  That is correct.

2        Q.   And that applied to all California's

3    employees; correct?

4        A.   I can't say that for sure.

5        Q.   That applied to all Huntington Beach

6    employees; correct?

7        A.   As stated in the letter, 8 to 12 weeks is not

8    a definite time.  Yes.

9        Q.   Well, it says,

10            [Reading:]  We hope we'll return back to

11        normal in 8 to 12 weeks.  However, that date is

12        not certain.

13            So --

14       A.   I just -- that's what I was agreeing to.  It

15   is not a certain date.

16       Q.   Okay.

17            So employees, at the time they were

18   furloughed/laid off, had no idea when they would be

19   returned to work or if they would be returned to work;

20   isn't that true?

21       A.   I don't -- I don't think that's a fair

22   statement.

23            I think we all expected everybody to come back

24   to work.  When that was going to happen was uncertain.

25       Q.   There was no guarantee that was provided to

```
 1   employees that they would be brought back to work

 2   following the furlough/layoff; correct?

 3       A.    There wasn't one in writing, no.  No.  We're

 4   all at-will employees.  But, given the fact that we

 5   generally are very busy in the summertime, it was our

 6   hope that everybody would be back to work and working

 7   hopefully within a short period of time.  But we didn't

 8   know when that was going to be.

 9       Q.    Well, hope's a bit different, obviously, than

10   a guarantee.  But --

11            Hyatt guaranteed these employees that were

12   furlough or laid off -- did they guarantee that they

13   would be returned back to work?

14       A.    The letter does not state that.  No.

15       Q.    Okay.

16            And were they told in any other capacity --

17   via letter or verbal or otherwise -- that we promise, we

18   guarantee you will be brought back to work?

19       A.    No.  It was not.  They were not told that.

20       Q.    And there was no contractual obligation on

21   Hyatt's part to bring those employees back; right?

22       A.    No.

23       Q.    And there was no contractual right, on behalf

24   of the employee, to demand to be brought back to work;

25   right?
```

 1       A.   No.

 2            There was an expectation, given the typical

 3  business that we enjoy in the summertime, that they

 4  would be back to work.  But there was not a written

 5  guarantee of it.

 6       Q.   Well, I think you used the word "hope"; right?

 7  Not so much of an expectation, but a hope?

 8       A.   The letter expresses a hope.  I didn't choose

 9  that word.  But the letter expresses a hope.  Yes.

10       Q.   It was safe to assume that, at the time this

11  letter was issued to employees, it says, "We hope to

12  return back to normal in 8 to 12 weeks" --

13            It was safe to assume that, at the time this

14  letter was issued, you did not expect to bring back the

15  furloughed/laid off employees until at least 8 to

16  12 weeks; right?

17       A.   I don't --

18            MR. LONG:  Misstates the document.

19            THE WITNESS:  I don't think that applied to

20  all employees.  I think there could have --

21            You know, we were hoping that some significant

22  number of people would be back to work as we went into

23  what is usually an extremely busy period of time.  But

24  we didn't know how many and when.

25  BY MR. GENISH:

    1        Q.   Well, nothing was typical about 2020 and

    2    COVID-19; isn't that right?

    3        A.   That is true.

    4        Q.   When does that season typically start?

    5        A.   It starts in waves, beginning as early as

    6    March.  Typically, we have two waves of spring break and

    7    then usually a very healthy business in May with groups.

    8    And then, beginning Memorial Day, we have a transient

    9    leisure season that goes on through Labor Day.

   10        Q.   Okay.

   11             Well the letter was issued in March saying

   12    8 to 12 weeks.  So the spring break version -- that was

   13    not expected to materialize; correct?

   14        A.   You asked the question, and I answered it.

   15             Obviously, spring break, at that point, at

   16    least the first wave of it, had already passed.

   17        Q.   Okay.

   18             So 8 weeks to 12 weeks from March 18th puts

   19    you right around the end of May, early June; right?

   20        A.   Yes.

   21        Q.   Right when the season was hoping to pick up;

   22    right?

   23        A.   Yes.

   24        Q.   Okay.

   25             So there was not an expectation, from

1    March 18th through mid May, that business would pick up;

2    correct?

3        A.    I think it could have picked up some.  It

4    wouldn't have been normal.

5        Q.    Okay.

6              And there was not an expectation, from mid

7    March to mid May, that you were going to bring back

8    these furloughed/laid off employees; right?

9        A.    I think what I just said a moment ago is, if

10   the group business had come to fruition, a significant

11   number of them would have come back if we had groups to

12   service.

13       Q.    Okay.

14             Even if you had groups to service, a

15   significant number of furloughed/laid off employees

16   still would not be brought back; right?

17       A.    No.  With the exception of people --

18             Back up.

19             We --

20             The people who were furloughed, if we had good

21   group business, they would all be working.  The people

22   that join us in the summertime in Recreation -- those

23   are seasonal employees who weren't brought on board at

24   that point in large measure.  If we had had business in

25   May, we would have had very healthy employment.

1    Q.   Okay.

2         Just to make sure the record's a hundred

3    percent clear -- and then we can take a bathroom

4    break -- the employees that were furloughed/temporarily

5    laid off in March of 2020, that furlough/layoff was for

6    an indefinite period of time; correct?

7    A.   Yes.

8         MR. GENISH:  We can go ahead and take that

9    bathroom break.  Five minutes?

10        MR. LONG:  That works.

11        THE VIDEOGRAPHER:  Going off the record.  The

12   time is 3:52.

13        (Brief recess.)

14        THE VIDEOGRAPHER:  We are now back on the

15   record.  The time is 4:05.

16   BY MR. GENISH:

17   Q.   Back to Exhibit 11, sir.

18   A.   Let me go back.

19        All right.

20   Q.   Second -- second paragraph, it says,

21        [Reading:]  As a result, all colleagues,

22   except a core team who will be notified

23   separately, will be furloughed/temporarily laid

24   off from their employment on March 18, 2020.

25        Do you see that?

 1      A.    Uh-huh.

 2      Q.    Then moving to the last -- second-to-last

 3 sentence of that paragraph,

 4           [Reading:]  To ease any financial hardships,

 5      if you would like, we can pay out accrued

 6      vacation pay on that date.

 7           Do you see that?

 8      A.    Yes.

 9      Q.    Now, "on that date" refers to March 18, 2020;

10 correct?

11      A.    March 18th for the Spa employees and then

12 approximately one week later -- I don't remember the

13 exact date -- for the balance of the people who were

14 furloughed.

15      Q.    Whatever date is indicated on that first

16 sentence is the date that's being referred to with the

17 language "on that date"; right?

18      A.    Yes.

19      Q.    So the offer is, if you'd like -- to the

20 employee is, if they'd like, they can have their accrued

21 vacation paid on that date; right?

22      A.    They could have it paid whenever they want it.

23           And we did.  We paid out -- oh, in about a

24 month's time -- about $365,000 worth of vacation.  I was

25 processing it as fast as the requests came in.

```
 1              And we had many people who asked us for part

 2    of it.  Some people wanted to save it for vacations and

 3    so on that they had planned later in the year.

 4              One unique thing that we did is we provided

 5    them access to access to their accrued, which as an

 6    active colleague, they wouldn't normally have access to

 7    that.  They would only have access to the earned.

 8              But I had --

 9              I had everything from people, you know,

10    e-mailing me saying, hey, Greg, can you pay me an hour,

11    a day, a week; can you pay me out a week; or, you know,

12    can you pay me out everything I have.  And I processed

13    it.

14       Q.   Well, the letter doesn't say you can request

15    your accrued vacation at any time; right?  It only says

16    on that date; right?

17       A.   It says --

18              I know that they could have had all of it as

19    of the 18th.  Not everybody wanted it.  And some of

20    them --

21              I don't remember how many.  Some of them I

22    think did want it on that date.  But I know, because I

23    was the sole person in H.R. after the furlough began,

24    the requests were coming to me; and I was processing,

25    you know, numerous requests.  And they were all a little
```

 1  different based on what people wanted.

 2         And, you know, I did -- I did a tally at one

 3  point to sort of, you know, understand, you know, the

 4  volume.  And there was a period of about a month's time

 5  when, like I said, we paid out, you know, close to

 6  $400,000.  And --

 7         The other thing is that, we learned --

 8         The letter -- that last sentence of the letter

 9  was -- it was correct at the time the letter was

10  written.  But we learned shortly after it went out to

11  colleagues that they did, in fact, continue to accrue

12  vacation during that time.  The system did accrue it all

13  the way up until the point that they were laid off.

14  So -- and I would tell people that as they were calling.

15  You know, you're still accruing vacation.  That didn't

16  get turned off.  The letter said that.  You're still

17  accruing vacation.

18         You know, well, what does that look like if

19  I -- you know, I took a week now but I still want to

20  take my, you know, vacation to wherever in the fall?

21         We would do that.  But they could have all of

22  it if they wanted, including their floating holidays, as

23  many of them did.

24      Q.   All right.

25         In the interest of time, if you could just try

```
 1   to listen to the question.  I'm asking kind of specific

 2   questions.  And we could -- we'll get through this,

 3   hopefully, relatively quickly.

 4        The letter, itself, only offers to pay

 5   employees for accrued vacation on that date; correct?

 6     A.   That is what the letter says.

 7     Q.   Okay.

 8        So employees, having read this letter, would

 9   have been under the impression that they had only that

10   date to request their accrued vacation; correct?

11        MR. LONG:  Misstates the document.  Calls for

12   speculation.

13        MR. GENISH:  You can answer.

14        THE WITNESS:  I can -- I can see what that --

15   what the sentence reads.  I can tell you that wasn't how

16   it worked.

17        MR. GENISH:  Okay.

18        And it says,

19        [Reading:]  Although we are not separating

20      anyone's employment at that time.

21     Q.   What does that mean?

22     A.   It means what it says.  We didn't fire anybody

23   as of the 18th of March.  We furloughed them.

24     Q.   Well, you stopped paying them their wages;

25   right?
```

1          A.    Yes.

2          Q.    And you stopped bringing them into the hotel

3    to work; right?

4          A.    Yes.

5          Q.    So in some ways you are separating your

6    employment with them; isn't that true?

7                MR. LONG:  Calls for a legal conclusion.

8    Argumentative.

9                THE WITNESS:  That is not the way we viewed

10   it.

11   BY MR. GENISH:

12         Q.    And you did not --

13               Strike that.

14               The Hyatt Corporation did not pay out anyone's

15   accrued vacation unless they specifically requested it;

16   correct?

17         A.    No.  We did not unilaterally pay it out.

18         Q.    And this says,

19               [Reading:]  We can also pay out your

20         accrued vacation pay on that date.

21               This does not mention floating holidays;

22   correct?

23         A.    No.  The letter does not.  But that is always

24   our practice in California.

25         Q.    It's always your practice to offer employees

```
 1   who have been laid off their floating holidays and

 2   vacation pay to be paid up?

 3              MR. LONG:  Misstates the witness's testimony.

 4              THE WITNESS:  For the purposes of vacation --

 5   anything that we would pay out in terms of vacation we

 6   would treat floating holidays the same way.

 7              So if we were paying out people's vacation on

 8   their request, we would pay out floating holidays on

 9   their request.

10   BY MR. GENISH:

11       Q.   How would the seven-thousand-plus employees

12   know that?

13       A.   I'm sorry?

14       Q.   How would the seven-thousand-plus employees

15   that were furloughed/laid off know that?

16       A.   I couldn't say.

17       Q.   The letter, however, does not mention floating

18   holidays; correct?

19       A.   I don't believe it does.

20              Yeah.  I don't believe it does.

21       Q.   And, to your knowledge, there were no

22   subsequent notifications to the laid-off employees

23   saying, hey, by the way, if you'd like, we can also pay

24   out your floating holidays; right?

25       A.   I can't say for sure about that.  There may
```

1    have been some subsequent updates that were posted or

2    shared with people on portals and Frequently Asked

3    Questions and things that happened in the hotels.

4              But it is not mentioned in this letter.  That

5    is true.

6         Q.   You, as the Person Most Knowledgeable on

7    behalf of the Hyatt Corporation, are not aware of any

8    such letter notifying employees that they can have their

9    floating holidays paid up; correct?

10        A.   I'm thinking about a document --

11             I can't say for sure.

12        Q.   You're not aware of any such document;

13   correct?

14        A.   I'm not for sure --

15             I'm not sure that there wasn't a document, but

16   I'm not sure that there was.  It's possible that there

17   was one.

18        Q.   As you sit here today, you don't recall seeing

19   any?

20        A.   I want to say there may be one.  I can't say

21   for sure.

22        Q.   As you sit here today, do you recall a

23   specific document providing that information to the

24   employees?

25        A.   I dot not recall a specific document stating

```
 1    date.  You're right.

 2         Q.   Okay.

 3              Let's go to the next letter, page 2 of the

 4    exhibit.

 5              This is a -- this is another --

 6              This is a furlough letter?

 7              [Reading:]  The purpose of this letter

 8         is to notify you that, during this furlough

 9         period, you will not be required to report to

10         work --

11              And so forth.

12              Do you see that?

13         A.   I --

14              Again, it's the first time I've seen this

15    letter.

16         Q.   Now, this furlough letter is for an indefinite

17    period of time as well; right?

18         A.   What --

19              What I believe this to be is a furlough letter

20    that is for people who may be on an alternating

21    furlough, as in a Manager.

22              I -- I don't know what it -- I don't

23    understand it.

24              But you're right.  It does not have an

25    "indefinite" end date.
```

```
 1      Q.    Let's go to page 10 of this exhibit.

 2            This is a letter dated March 25, 2020, from

 3  the Andaz San Diego?

 4      A.    Okay.

 5      Q.    This letter appears to be very similar, if not

 6  identical, to the one for the Huntington Beach; right?

 7      A.    Yes.

 8      Q.    And it says, similar to the Huntington Beach

 9  letter, midway through the second paragraph,

10            [Reading:  We hope that the hotel will

11      reopen in six to eight weeks.  However, that

12      date is not certain.

13            Right?  Do you see that?

14      A.    Yes.

15      Q.    And this language, "However, that date is not

16  certain," indicates that this is another indefinite

17  furlough/layoff; correct?

18      A.    I would -- I wouldn't -- I would say that it

19  says that the date is not certain.  I couldn't say that

20  it's indefinite.  But that -- it does say that it is not

21  definite, that it is not certain and will depend on

22  circumstances at the time.  Yes.

23      Q.    Your understanding of the word "indefinite" is

24  to not be definite, to not be certain, to not provide a

25  specific return-to-work date; right?
```

```
 1        A.    Yes.

 2        Q.    Okay.

 3              So if it says -- if the letter says that date

 4   is not certain, by definition, the letter is indicating

 5   that the layoff is for an indefinite period of time;

 6   right?

 7        A.    That's reasonable.

 8        Q.    Okay.

 9              So can we agree that --

10              Well, strike that.

11              To your knowledge as the Person Most

12   Knowledgeable for the Hyatt Corporation, are you aware

13   of any hotels that provided a notice of layoff/furlough

14   that provided an actual return-to-work date?

15        A.    I can't say for certain because I have not

16   read all the letters for all the hotels.  But I'm not

17   aware of one.

18        Q.    So at least to your knowledge as the P.M.K.

19   for the Hyatt Corporation, all hotels within California

20   that furloughed/laid off employees did so for an

21   indefinite period of time?

22              MR. LONG:  Misstates the witness's testimony.

23              THE WITNESS:  I don't think that's what I

24   said.

25              I said I am not aware of a letter that
```

 1   doesn't.  But I have not read all the letters.  So I

 2   cannot vouch for every single one of them.

 3          MR. GENISH:  Okay.  All right.

 4      Q.   How many of the approximately 30 hotels within

 5   California shut down as a result of the pandemic?

 6      A.   I don't know the exact number.  I know some of

 7   them.  And I don't know the exact number of all of

 8   those.  I would say a significant number of them shut

 9   down.  Some did not.

10      Q.   The vast majority shut down?

11      A.   I wouldn't say it was the vast majority.  But

12   I would say it was a significant number.  It was -- it

13   was a majority for sure.  I don't know about the exact

14   number.

15          I know some of our airport locations and some

16   of the -- the hotels that had very -- you know, pretty

17   strong transient business -- they never shut down.  I

18   don't know the exact number of them.  I'm just aware of

19   a few that did.

20      Q.   To your knowledge, did every hotel lay off at

21   least some employees as a result of COVID?

22      A.   No.  I think there are hotels that did not.

23      Q.   Which ones?

24      A.   I think that are -- some of our union hotels

25   and some of our airport hotels and a couple of hotels

```
 1   that tend to have pretty strong transient business and

 2   primarily just transient business, they did not shut

 3   down.

 4        Q.   Okay.

 5             Do you know how many there were?

 6        A.   Well, I think you asked me whether people were

 7   laid off or versus shut down.  So it's two different

 8   things.

 9        Q.   I'm asking, do you know how many hotels never

10   shut down?

11        A.   How many hotels never shut down?  I would say

12   between a half a dozen and eight.

13        Q.   Okay.

14             When did those hotels that were shut down

15   reopen?

16        A.   They -- the times varied.  Some of them are

17   still not open.  So I don't --

18             Huntington Beach was one of the first to

19   reopen.  And then others opened as time went on.

20             I know we have one hotel that's not open.

21        Q.   Which one is that?

22        A.   Long Beach.

23        Q.   When did the Huntington Beach hotel reopen?

24        A.   June 4th.

25        Q.   Pardon me?
```

```
 1       A.    June 4th.

 2       Q.    June 4th.

 3             And that was one of the first to reopen;

 4   right?

 5       A.    Yes.  Yes.

 6       Q.    Did the majority of those hotels that reopened

 7   reopen in June?

 8       A.    I wouldn't say the majority.  I think there

 9   were some others.  But I don't know about -- I can't say

10   that it was a majority.

11       Q.    Can you give me a range of when those that

12   reopened reopened?  Let's say -- it sounds like it

13   started right around early June.  Do you know when those

14   reopenings lasted until?

15       A.    September.

16       Q.    And at some point Hyatt Corporation decided to

17   convert those that were furloughed/temporarily laid off

18   to laid off; correct?

19       A.    Yes.

20             MR. LONG:  Misstates the witness's testimony.

21   BY MR. GENISH:

22       Q.    Is that correct?

23       A.    Well, I don't know that it was Hyatt

24   Corporation.  But some of the hotels did convert from

25   furlough to layoff.
```

```
1              Now, this is precisely the circumstance that

2    we have in this case -- where the employees were

3    temporarily laid off; right?

4              MR. LONG:  Mischaracterizes the document.

5    Misstates the facts regarding the furlough and layoff at

6    Hyatt.

7              MR. GENISH:  We've already touched on this

8    ad nauseam.

9         Q.   The employees that are the subject of this

10   case were temporarily laid off; correct?

11        A.   I'm sorry.  Can you repeat that.  I was trying

12   to read the letter.

13        Q.   Sure.

14             The seven-thousand-plus employees that are the

15   subject of this case were temporarily laid off; right?

16        A.   Yes.  We've said that furlough and temporary

17   layoff, for these purposes, are -- are the same.

18        Q.   Okay.

19             So this letter touches on our situation.

20             The second paragraph says,

21             [Reading:]  However, the Division's position

22   is that, if an employee is laid off without a specific

23   return date within the normal pay period, the wages

24   earned, to and including the lay off date, are due and

25   payable in accordance with Section 201.
```

```
 1              Do you see that?

 2         A.    I do.

 3         Q.    You don't disagree with the Division's

 4    position; correct?

 5              MR. LONG:  Calls for a legal conclusion.

 6              THE WITNESS:  All I can do is read what this

 7    opinion letter says.

 8    BY MR. GENISH:

 9         Q.    You don't, in any way, disagree with the

10    Division of Labor in California; right?

11              MR. LONG:  Again, calls for a legal

12    conclusion.

13              MR. GENISH:  This is an easy one.

14              The Division of labor in California has an

15    opinion.  States it's position here.

16              MR. LONG:  Counsel, you know very well what

17    that the letter is persuasive at best counsel if you're

18    representing it one way that's inaccurate as to the law

19    this is this letter is not the law, and you know that.

20              MR. GENISH:  I sure question so practicing

21    along enough to know let me finish my question you can

22    object and say whatever it is you like.

23              I'll rephrase my question.

24         Q.    The Division's position -- this sentence here

25    starting with, "However, the division's position,"
```

1  you've read that sentence now; correct?

2       A.   Yes.

3       Q.   You don't disagree with the California

4  Division of Labor Standards Enforcement, do you?

5            MR. LONG:  Calls for a legal conclusion.

6  Incomplete hypothetical.

7            THE WITNESS:  I can read what the sentence

8  says.  I don't have a legal opinion on it.

9  BY MR. GENISH:

10      Q.   You wouldn't want to do something that's

11  contrary to a position issued by the California Division

12  of Labor Standards Enforcement, would you?

13            MR. LONG:  Calls for a legal conclusion.

14  Argumentative.

15            MR. GENISH:  You may answer.

16            THE WITNESS:  I would not knowingly do that

17  no.

18  BY MR. GENISH:

19      Q.   Would you agree that the Hyatt Corporation's

20  seven-thousand-plus employees at issued in this case

21  were laid off without a specific return date within the

22  normal pay period?

23      A.   I think they were furloughed and temporarily

24  laid off.  Yes.

25      Q.   Without a specific return date within the

1  normal pay period; correct?

2       A.   I would agree with that.  Yes.

3       Q.   So the wages earned, to and including the

4  layoff date, would have been due and payable in

5  accordance with section 201; right?

6            MR. LONG:  Calls for a legal conclusion.

7  Argumentative.

8            MR. GENISH:  You may answer.

9            THE WITNESS:  I can read the letter.  I see

10 what the letter says.

11           I also know that the colleagues were not

12 terminated and, you know, continued to accrue vacation

13 and so on.  So I can't -- I --

14           Like I said, I can read the letter.  But I

15 don't have an opinion otherwise.

16 BY MR. GENISH:

17      Q.   Well, the letter doesn't talk about

18 termination.  It talks about temporary layoffs, as we

19 have in this case.

20           So this letter seems to suggest that the

21 seven-thousand-plus employees that are the subject of

22 this case should have had their wages earned, to and

23 including the layoff date, paid at the time of the

24 layoff; isn't that true?

25           MR. LONG:  Calls for a legal conclusion.

```
 1              THE WITNESS:  Like I said, I can read -- I can
 2   read the letter, and I know what it says.  I am not an
 3   attorney.  I could see what the letter says.
 4   BY MR. GENISH:
 5      Q.   You've been practicing in H.R. for over
 6   30 years.
 7      A.   Yes.
 8      Q.   And you testified earlier that you find it
 9   important to adhere to the California Division of Labor
10   Standards Enforcement opinions; right?
11      A.   Yes.
12      Q.   So it would be important for you --
13           Well, strike that.
14           It would be important for the Hyatt
15   Corporation to follow guidance provided by the
16   California Division of Labor Standards Enforcement on
17   May 30, 1996; right?
18           MR. LONG:  Calls for a legal conclusion.
19   Argumentative.
20           MR. GENISH:  You may answer.
21           THE WITNESS:  I know that you presented me a
22   letter that is dated from 1996.  I don't know what other
23   opinion letters are out there.  I don't know any of the
24   other things that I would ask my counsel to look at if I
25   had a question about this.
```

```
 1              I can read the letter.

 2              MR. GENISH:  Okay.  Fair enough.

 3              I'm going to populate into the chat Division

 4  of Labor Standards Enforcement Policies and

 5  Interpretations Manual, dated April 2017.

 6              Let me know when you've --

 7              We're going to mark that as Exhibit 15.

 8              (Exhibit 15 marked.)

 9              THE WITNESS:  Okay.

10              MR. GENISH:  Look at Section 3.2.2 of the

11  California Division of Labor Standards Enforcement

12  Policies and Interpretations Manual.

13              3.2.2 states,

14              [Reading:]  Layoff.  If an employee is

15      laid off without a specific return date

16      within the normal pay period, the wages

17      earned up to and including the layoff date

18      are due and payable in accordance with

19      Section 201.

20      Q.   Do you see that?

21      A.   No.  I'm trying to get there.

22      Q.   Let me know when you do.

23              It's page 17.

24      A.   3.2.2?

25      Q.   Yes, sir.
```

```
 1              THE WITNESS:  I think the C.E.O. of our
 2   company stated that he believed it was unfair to
 3   continue the furloughs that were -- that involved
 4   offices -- employees in our corporate offices around the
 5   world.  He believed that was unfair to continue to do
 6   that.
 7              As it relates to those corporate office
 8   employees, I don't disagree with him, but solely with
 9   respect to the corporate office employees who were on
10   extended and rotating furloughs.
11   BY MR. GENISH:
12       Q.   Why do you believe corporate-level
13   employees -- it applies differently to them than it does
14   to the hotel level person?
15       A.   Because they had jobs that they were sharing
16   with people.  There was work that needed to be done in
17   the corporate offices but not enough for everybody to --
18   to do that work.
19              In the field, there was no work to be done in
20   that situation.
21       Q.   The furloughs that were implemented on the
22   corporate level, they were also implemented in or around
23   March of 2020; right?
24       A.   I couldn't say the exact date.  But probably
25   in that -- in that window of time.  It might have been
```

 1   April.  I don't remember.

 2       Q.   Okay.

 3            So this -- this video is from June 10th, 2020.

 4            He's saying that extended furloughs were an

 5   unfairness to the corporate level of employees.

 6            So basically he's saying that a two-month-long

 7   furlough is an extended furlough; right?

 8            MR. LONG:  Misstates the video.  And misstates

 9   the witness's testimony.

10            THE WITNESS:  I believe he stated that

11   extended furloughs, in the context of continuing to

12   extend them, would be unfair to people.

13            MR. GENISH:  Okay.

14            You agree that?

15            I'm sorry.  You were speaking.

16            THE WITNESS:  That -- he was stating that

17   extended furloughs and continuing to extend those

18   furloughs would be unfair to the people that it was

19   impacting in our corporate offices around the world.

20   BY MR. GENISH:

21       Q.   And do you agree with his statement that

22   furloughs leave employees --

23            Strike that.

24            Do you agree with his statement that extended

25   furloughs leave employees in a financially disadvantaged

```
 1   state?
 2       A.    I think any furlough leaves employees in a
 3   financially disadvantaged state.  I was in one when I
 4   was furloughed.
 5       Q.    Do you agree with his statement that extended
 6   furloughs are not an expression of Hyatt's principle of
 7   care?
 8       A.    I think extended furloughs, in the context
 9   that he was describing, where we had highly talented
10   corporate-office level people that were job sharing and
11   rotating in and out of the office by the month --
12   continue to do that for an extended period -- it was his
13   opinion that it was unfair.  And I -- I can't disagree
14   with that.
15           But I wasn't there.  I don't know all the
16   circumstances behind it.  And I know some of them.
17           I don't think --
18           The furloughs that he was describing are
19   different than the furloughs that were occurring in the
20   field.
21       Q.    And that's because they were to the
22   corporate-level employees rather than the hotel-level
23   employees; right?
24       A.    Because they were in and out.
25       Q.    So had the hotel-level employees been in and
```

1    out, it would have been unfair to them to continue

2    leaving them on furlough?

3        A.   It would depend --

4            MR. LONG:  Calls for speculation.  Assumes

5    facts not in evidence.

6            THE WITNESS:  It would depend on the

7    circumstances.  It would depend on the circumstances.

8            But for the lion's share of the employees in

9    the field, there was no work.  There was still work to

10   be done in the corporate office, just not enough.

11   BY MR. GENISH:

12       Q.   Do you agree with his position that, "It's

13   particularly unfair to furlough employees when there's

14   uncertainty of not knowing whether they'd have jobs on

15   the other side of that period of time"?

16       A.   And I will state again that those are for

17   furloughed employees in our corporate offices around the

18   world that were not on a continuous furlough.  They were

19   rotating in and out for something that corporate office

20   realized, like we realized, the business was not going

21   to come back to a level that we expected before.

22       Q.   All right.

23           In whatever context he meant it, do you agree

24   with his statement?

25           MR. LONG:  Vague and ambiguous.  Calls for

1   speculation.

2          THE WITNESS:  The furloughs to the employees

3   that he was referring to -- not the field employees, but

4   the employees that he was referring to -- I don't

5   disagree with him on that.

6          But I don't work there.  I don't know all the

7   circumstances.  I don't disagree with it.  But I can't

8   say that I wholly agree with it either because I don't

9   know everything that -- that's involved with it.

10         MR. LONG:  All right, Counsel.  We've gone

11  ten -- or six minutes past 6:00, more than an hour from

12  the break.  Are you ready to conclude for the day?

13         THE WITNESS:  Yeah.  If not, I'm going to need

14  a bathroom break.

15         MR. GENISH:  I just have one last question and

16  then we can conclude for the day until the next session.

17      Q.   The employees that requested to be paid out

18  their accrued vacation in or around March of 2020, those

19  individuals still accrued vacation time from the time

20  that they were paid out until they were converted to

21  permanent layoffs; correct?

22      A.   Yes.

23      Q.   Were they then paid out again the accrued

24  vacation that had accrued from the initial payout until

25  the transition to a permanent layoff?

```
 1 | UNITED STATES DISTRICT COURT           )
   |                                        )
 2 | FOR THE CENTRAL DISTRICT OF CALIFORNIA )
   |
 3 |
   |
 4 |        I, BARBARA A. STAUFFER, a Certified Shorthand
   |
 5 | Reporter, do hereby certify:
   |
 6 |        That the foregoing proceedings were taken
   |
 7 | before me at the time and place therein set forth, at
   |
 8 | which time the witness was put under oath by me;
   |
 9 |        That the testimony of the witness, the
   |
10 | questions propounded, and all objections and statements
   |
11 | made at the time of the examination were recorded
   |
12 | stenographically by me and were thereafter transcribed;
   |
13 |         That a review of the transcript by the
   |
14 | deponent was requested;
   |
15 |         That the foregoing is a true and correct
   |
16 | transcript of my shorthand notes so taken.
   |
17 |         I further certify that I am not a relative or
   |
18 | employee of any attorney of the parties, nor
   |
19 | financially interested in the action.
   |
20 |         I declare under penalty of perjury under the
   |
21 | laws of California that the foregoing is true and
   |
22 | correct.
   |
23 |         Dated this 4th day of December, 2020.
   |
24 | Barbara A Stauffer
   |
25 | _____
   | BARBARA A. STAUFFER, CSR 12282
```

# EXHIBIT H

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

```
KAREN HARTSTEIN, in her         )
representative capacity and     )
on behalf of herself and all    ) Case No.
others similarly situated,      ) 2:20-CV-04874-DSF-
                                ) JPR
         Plaintiff,             )
     vs.                        )
                                )
HYATT CORPORATION, a            )
Delaware corporation doing      )
business in California; and     )
DOES 1-100, inclusive,          )
                                )
         Defendants.            )
                                )
```

DEPOSITION OF GREG CORNWELL

VOLUME II

APPEARING REMOTELY FROM

ORANGE COUNTY, CALIFORNIA

APRIL 7, 2021

10:00 A.M.

REPORTED BY:

Mary E. Collins

CSR No. 12763

APPEARING REMOTELY FROM KOOTENAI COUNTY, IDAHO

Greg Conwell Volume II
April 07, 2021

```
 1   REMOTE APPEARANCES:

 2

 3          For Plaintiff:

 4          BLACKSTONE LAW

 5            JOHN M. GENISH

 6          8383 Wilshire Boulevard, Suite 745

 7          Beverly Hills, California 90211

 8          jgenish@blackstonepc.com

 9

10          For Defendant:

11          SEYFARTH SHAW

12            BRIAN P. LONG

13          601 South Figueroa Street, Suite 3300

14          Los Angeles, California 90017

15          bplong@seyfarth.com

16

17          Also present:

18          MATTHEW W. DIETZ, Blackstone Law

19          JILL J. PARKER, Blackstone Law

20

21

22

23

24

25
```

Greg Conwell Volume II
April 07, 2021

1    couldn't get all their attendees to rebook into a date

2    that was future out.  And they just -- and they also

3    experienced their own financial, you know, drops in

4    sales, revenue and so forth.  They said, you know,

5    we're just canceling altogether.

6            Once people starting canceling altogether and

7    also canceling further out -- so they weren't

8    canceling just for next week, next month or the month

9    after, but they were canceling even for fall -- that

10   presented a very different landscape for us.  And it

11   became clearer that the drop in business was going to

12   be greater than we thought, and it was going to go on

13   for much longer than we thought.  That started to

14   crystalize when we had that second round of

15   cancelations, third round even, and then cancellations

16   without rebooking.  When that started to happen, we

17   knew things were different.

18           That was more of a June -- that's when it

19   started to become clearer.

20     Q.   As of June when it started to become clearer,

21   what was the -- how long did you anticipate the

22   furlough would last at that point?

23     A.   In June, we realized that it might not be a

24   furlough anymore, that it might go on for a long time.

25   Like a really long time.  So at that point we moved to

Greg Conwell Volume II
April 07, 2021

1    a layoff.

2         Q.   When you say a "long time," what do you --

3    what do you mean?

4         A.   Months and months.

5         Q.   So --

6         A.   Because that -- that group business had left

7    and did not have a possibility of returning in 2020 or

8    beyond.

9         Q.   Just, for clarity, you said you realized it

10   might go on for a long time.  When you say it might go

11   on for a long time, how long is a long time?

12        A.   I think I just stated that it would go on,

13   you know, through the balance of 2020 and maybe

14   beyond.

15        Q.   So roughly six months or more?

16        A.   I wouldn't put a date on it.  But, you know,

17   we have a -- like any business, we have, you know,

18   a -- a forecast, and we know what's going to happen,

19   you know, in certain windows of time.

20             It became clearer when the group business

21   went away and we couldn't rebook that business that

22   it -- you know, we needed to shift from, you know,

23   desperately trying to recapture that business to the

24   fact that it was gone, and we needed to more

25   permanently rightsize our staffing levels and move

Greg Conwell Volume II
April 07, 2021

1    into a layoff versus a furlough.

2         Q.    In your mind, is there a distinction between

3    a layoff and a temporary layoff?

4         A.    Yes.

5         Q.    Is there a difference between a temporary

6    layoff and a furlough?

7         A.    I think those two -- the latter are more

8    similar to one another.

9         Q.    Are they identical?

10        A.    I think it is the semantic difference.  I

11   honestly don't know the difference between the two.

12   But in my mind, the temporary layoff and the furlough

13   are very similar to one another.

14        Q.    What's the difference?

15        A.    I couldn't tell you.  It could even be

16   identical.  I think it is -- I think there are

17   semantic differences.

18        Q.    Sitting here in your capacity as Hyatt

19   Corporation's person most knowledgeable, what is the

20   semantic difference between a temporary layoff and a

21   furlough?

22        A.    I think "furlough" sounds better and is more

23   palatable to people who are experiencing it.

24        Q.    Anything else?

25        A.    Not that I can think of.

Greg Conwell Volume II
April 07, 2021

1    Q.   You just testified a moment ago that you
2  started to realize in June that the impact on the
3  business would last longer than you thought.
4         Do you recall that testimony just a moment
5  ago?
6    A.   Yes.  Yes.
7    Q.   What did you think previously about how long
8  the impact on the business would last?
9    A.   I think we thought it would be similar to
10 previous viruses that we've experienced over the
11 years -- SARS, MERS, avian flus, swine flu -- and that
12 we would get through that.  There might have been a
13 loss of business that, you know, went on for a certain
14 period of time.  But at the rate we were rebooking
15 things, we were optimistic that, you know, we could
16 get back on track and salvage the business and, you
17 know, not have to temporarily suspend operations and
18 all that comes with that.  That was our hope.
19   Q.   How long did it last with those other
20 viruses?
21   A.   Oh, it is years ago.  I can't remember, you
22 know, what it was across a group of hotels.  I know
23 that it was of short duration in this facility.  It
24 didn't -- didn't have a huge impact.  I honestly don't
25 remember.  I know -- I know -- I know it wasn't as

Greg Conwell Volume II
April 07, 2021

```
 1    long as this.  That's for sure.  And then --

 2        Q.   Did it last months?

 3        A.   I am sorry?

 4        Q.   Did it last months?

 5        A.   Maybe.  Honestly, I don't recall.  It is

 6    years and years ago.

 7        Q.   Give me one moment.

 8             MR. LONG:  Counsel, is now a good time for

 9    just a short bathroom break?

10             MR. GENISH:  Sure.  We can do that.

11             MR. LONG:  Okay.

12             THE VIDEOGRAPHER:  Going off the video

13    record.  Time is now 17:56 UTC.

14             (Off the record.)

15             THE VIDEOGRAPHER:  Back on the video record.

16    Time is now 18:07 UTC.  Go ahead.

17    BY MR. GENISH:

18        Q.   We were discussing previously that group

19    bookings helped indicate to the Hyatt that the

20    pandemic would have a longer-term impact on its

21    business, right?

22        A.   Yes.

23        Q.   How far in advance typically do group

24    bookings and conventions -- strike that.

25             How far in advance are groups and conventions
```

Greg Conwell Volume II
April 07, 2021

1    furloughed, do you know if included within those --

2    within that production were the letters, if they were

3    sent, to any franchise employees?

4         A.   Not to my knowledge.

5         Q.   Okay.  Those hotels that do not have a group

6    booking component, did they have a better idea of how

7    long the pandemic would impact their business in

8    March, April or May of 2020?

9         A.   I -- not working in those hotels and being

10   responsible for their sales and marketing and

11   operations aspects, I couldn't say for sure.  That

12   would be speculation on my part.

13        Q.   Let's go back to the spreadsheet.

14        A.   Okay.

15        Q.   What does column B indicate?

16        A.   It appears to be the date -- let me scroll

17   down really quick.

18             It appears to be a date that some job action

19   was taken that required an entry into our system.  And

20   based on the date, it appears to be the date that the

21   furlough began in that particular location with that

22   particular colleague.

23        Q.   What do you mean when you say "some job

24   action" began?

25        A.   I didn't create the report, but I know that

Greg Conwell Volume II
April 07, 2021

1   the ADP Enterprise system creates a record or a row

2   when somebody does -- an historical row when somebody

3   does a job action.  Could be anything.  Could be hire,

4   transfer, furlough, layoff, et cetera, and

5   termination, promotion.  And that appears to be what

6   this is.

7       Q.   And so this particular column -- perhaps you

8   testified already, but I didn't catch it.  What does

9   this particular column indicate?

10      A.   Column B?

11      Q.   Yeah.

12      A.   I believe it indicates when the -- a furlough

13  began.

14      Q.   And when you say "a furlough," you are

15  referring to the furlough that -- slash temporary

16  layoff we've been discussing in this matter, correct?

17      A.   I believe that's correct.

18      Q.   I'll represent to you that 5,680 of the

19  employees listed in this spreadsheet were furloughed

20  on March 22nd, 2020.

21      A.   Okay.

22      Q.   Was that a coordinated effort amongst all of

23  the -- strike that.

24           Was that a coordinated effort throughout

25  Hyatt Corporation?

Greg Conwell Volume II
April 07, 2021

```
 1              MR. LONG:  Counsel, asked and answered.  This
 2    has been dealt with for 20, 30 pages worth of
 3    testimony in the last deposition.
 4              MR. GENISH:  Okay.
 5              MR. LONG:  I'll give you some leeway.  But if
 6    your intent is to re-ask every question from the first
 7    deposition, then I would like to meet and confer about
 8    that.
 9              MR. GENISH:  I assure you, that's not my
10    intent.
11              You can answer.
12              THE WITNESS:  What my understanding of this
13    is that each of the hotels was examining their
14    business, what was happening with their business.  And
15    just prior to this date, some approved template
16    letters were provided by our Americas H.R. team to the
17    hotels.  And they -- once those were provided, the
18    hotels went ahead and determined which date made the
19    most sense for them and went ahead to begin the
20    furlough.
21              So it wasn't -- there wasn't one date on
22    which everybody had to start job action, furloughs.
23    But there was -- the letters needed to be produced
24    that had the appropriate language in it, particularly
25    from a WARN and CalWARN perspective.  And once those
```

Greg Cornwell Volume II
April 07, 2021

```
1    letters were available to us, then we were able to

2    determine what date we needed to begin furloughs in

3    the particular location.

4         Q.   Is it merely a coincidence that 5,680 of the

5    6,188 employees were furloughed on the exact same day?

6         A.   I don't think it is a coincidence.  I

7    think -- trying to -- yeah, I don't know why it -- why

8    it is that date.  Maybe that's the day after we got

9    the letter.  I am not really sure.

10        Q.   What does column C indicate?

11        A.   It appears to be the date that somebody came

12   back from furlough or there was some entry made in the

13   system maybe they were brought back to work for a

14   short period of time.

15        Q.   You don't know one way or the other?

16        A.   No, I don't.  I don't.

17             I mean, it appears -- it appears that when

18   the furlough ended, but -- because that's what it

19   says, but I don't know exactly what that means.  I

20   mean, I could read across the spreadsheet and see it

21   says return from furlough in column N.  I think it

22   would depend on the individual hotel.

23        Q.   What does column D indicate?  D like dog.

24        A.   It appears that they were on a furlough,

25   returned to work for a short period of time, and then
```

Greg Cornwell Volume II
April 07, 2021

1    they went back out on furlough.  Perhaps there was

2    some short-term business that came into the property,

3    and they needed to be reactivated on the schedule, and

4    then they went back on furlough.

5              That's what it appears to be.  I don't know

6    that for a fact, but --

7        Q.    Column C indicates it is the last day that

8    they were furloughed, true?

9        A.    It is the last day of a continuous period

10   that started on the prior date.  So these appear to be

11   historical records from the system where a certain

12   status in the system began in column B, and then it

13   came to an end in column C.

14       Q.    If you take a look at line 2, it appears this

15   employee was furloughed/temporarily laid off from

16   March 22nd through June 19 and then immediately

17   furloughed the next day.  Is that your understanding?

18       A.    Yeah.  I don't -- I can't explain that one

19   exactly.  I don't know that that actually happened.

20             One -- there are occasions in the system

21   where one will enter -- make an entry in the system

22   and it becomes a record in the system, but it could

23   have been put in in error.  And yet you are not able

24   to overwrite that without going through a whole

25   process to have somebody in corporate change it.

Greg Cornwell Volume II
April 07, 2021

```
 1          Greg, do you have a preference?

 2          MR. GENISH:  Why don't we -- why don't we run

 3   through a little bit longer, and then we will take our

 4   lunch break?

 5          Just take a short bathroom break for a few

 6   minutes.

 7          MR. LONG:  Okay.  That works.

 8          MR. GENISH:  Okay.

 9          THE VIDEOGRAPHER:  Going off the video

10   record.  The time is now 18:59 UTC.

11          (Off the record.)

12          THE VIDEOGRAPHER:  Back on the video record.

13   The time is now 19:09 UTC.  Go ahead.

14   BY MR. GENISH:

15     Q.   Have any of Hyatt -- Hyatt's California

16   employees whose employment has been terminated from

17   April 24, 2016, to the present signed an agreement

18   releasing their right to participate in a lawsuit?

19     A.   Not that I am aware of.

20     Q.   And to your knowledge, none of the employees

21   that would be within the putative class in this case

22   has signed a release; is that correct?

23     A.   That is correct.

24     Q.   To your knowledge, none of the employees that

25   would be part of the putative class in this case have
```

Greg Cornwell Volume II
April 07, 2021

 1    signed settlement agreements, correct?

 2        A.   I don't believe they have.

 3        Q.   Are there, to your knowledge, any employees

 4    that would be part of the putative class in this case

 5    that have signed severance agreements?

 6        A.   I don't believe they have.

 7        Q.   To your knowledge, has Hyatt obtained any

 8    declarations from any members of the proposed class?

 9        A.   Not to my knowledge.

10        Q.   Has Hyatt asked any members of the proposed

11    class to provide a declaration in this case?

12        A.   Not to my knowledge.

13        Q.   Has Hyatt presented any members of the

14    proposed class with a declaration asking for their

15    signature?

16        A.   Not to my knowledge.

17        Q.   Would you come to learn that information if

18    it happened?

19        A.   I believe I would.

20        Q.   Has Hyatt obtained any expert declarations in

21    this case?

22        A.   Not to my knowledge.

23        Q.   Do you know if Hyatt's retained any experts

24    in this case?

25        A.   Not to my knowledge.

Greg Cornwell Volume II
April 07, 2021

```
 1        Q.    Do you believe you would have found out if

 2   that had happened?

 3        A.    I do.

 4        Q.    Did Hyatt receive any PPP money?

 5        A.    Not to my knowledge.

 6        Q.    Would you have found out if they had?

 7        A.    I think so.  I think I would.

 8              MR. GENISH:  All right.  Give me just one

 9   moment.

10              MR. LONG:  Sure.

11   BY MR. GENISH:

12        Q.    Full-time employees in California earned 12

13   hotel room nights after one year with the company,

14   correct?

15        A.    They received 12 comp nights per year.

16        Q.    You are making a distinction between earned

17   and received?

18        A.    Well, it is not compensation.  It is -- they

19   receive it as a -- a fringe benefit of working for

20   Hyatt.  There is --

21        Q.    Okay.

22        A.    Yeah.

23        Q.    And they receive 12 nights after working for

24   the Hyatt for one year, correct?

25        A.    Yes.
```

Greg Cornwell Volume II
April 07, 2021

1      Q.   If an employee gets hired on -- strike that.

2           If -- the hotel room benefit replenishes on

3    January 1 of each year; is that correct?

4      A.   Yes.

5      Q.   Let's say an employee is hired on December

6    31st, the following day do they receive 12 hotel room

7    nights?

8      A.   No.  Because they haven't been employed a

9    year.

10     Q.   Okay.  So the hotel room bonus only -- strike

11   that.

12          So in the hypothetical I just described where

13   an employee is hired on December 31st, when do they

14   receive their 12 nights?

15     A.   They would receive them after they've been

16   employed a year.

17     Q.   So let's -- let's try a different

18   hypothetical.

19          If someone is hired on September 1st of a

20   particular year, do they then receive 12 nights on

21   September 1st of the following year?

22     A.   Correct.

23     Q.   And if they utilize three of those nights in

24   that year, on January 1st it gets replenished to 12;

25   is that correct?

Greg Cornwell Volume II
April 07, 2021

1      A.    And only to 12.  They don't carry over from
2  year to year.
3      Q.    Being employed with Hyatt for one year is a
4  condition to an employee receiving the hotel room
5  bonus; is that correct?
6            MR. LONG:  Vague and ambiguous as to the
7  question, also argumentative as to the term "bonus."
8            THE WITNESS:  You have to be employed a year
9  before you are able to use comp rooms.
10  BY MR. GENISH:
11     Q.    Why is it the policy that you have to be
12  employed for a year before being able to use the comp
13  rooms?
14     A.    It's just always been that way.  In the
15  35 years I've worked for Hyatt, that's the rule.  You
16  have to be employed a year before you can use comp
17  rooms.
18     Q.    So the comp rooms is --
19     A.    Typically, it coincides with one's vacation.
20  They sort of -- it makes sense that, you know, okay,
21  I've got my earned vacation now.  Now I can travel and
22  take my comp rooms.  That was sort of the -- the old
23  way in terms of the timing.
24            Many years ago, they switched the usage
25  period to calendar year because it was just easier to

Greg Cornwell Volume II
April 07, 2021

1    keep track of, made more sense to people, and it would

2    provide a consistency across the globe where there

3    were multiple systems going on in terms of how they

4    were determining the -- the window that you could use

5    them, and the decision was made to go calendar year.

6            So that's what it has been for, I don't know,

7    15 years or so probably.

8        Q.   Does an employee have to work for Hyatt

9    Corporation for a year before they start earning

10   vacation?

11       A.   No.  Well, they have to -- they have to

12   start -- they have to be employed a year before they

13   can use the vacation.  They accrue the vacation from

14   day one.

15       Q.   Just -- just to be clear on the policy, it is

16   a condition that the employee work for Hyatt for one

17   year before they can receive the hotel room benefit,

18   correct?

19       A.   Before they can use it, yes.

20       Q.   Before they even receive it, correct?

21       A.   They -- they can't stay on comp rooms until

22   they have been employed one year.

23       Q.   Is the one-year period meant to incentivize

24   employees to stay with the company for over a year?

25            MR. LONG:  Calls for a legal conclusion,

Greg Cornwell Volume II
April 07, 2021

1    calls for speculation.

2         THE WITNESS:  I don't -- I don't think it is

3    a particular -- it has a particular aim other than the

4    overall aim of being a great place to work.

5         We're one of the few of the major hotel

6    companies that still offers that benefit.  It is

7    something that is, you know, very -- it is very much a

8    part of our -- of our culture especially -- it is an

9    exciting thing to use.  But I think it is part of the

10   total package of why we're a great place to work.

11       Q.   You think employees value that benefit?

12            MR. LONG:  Calls for speculation.

13            THE WITNESS:  I think certain employees do,

14   yes.

15   BY MR. GENISH:

16       Q.   Why doesn't Hyatt allow employees who work

17   for Hyatt for less than a year to use comped rooms?

18       A.   I -- I couldn't say for sure.  As I said, it

19   has just always been that way.

20       Q.   I mean, you are here as Hyatt's person most

21   knowledgeable.  What's your understanding as to why

22   employees need to be there a year before they can

23   start using that?

24            MR. LONG:  Counsel, as to what noticed topic

25   does this relate?

Greg Cornwell Volume II
April 07, 2021

```
 1            MR. GENISH:  14.

 2            MR. LONG:  I am sorry.  Say it again.

 3            MR. GENISH:  14.

 4            MR. LONG:  Okay.  And --

 5            MR. GENISH:  You can answer, sir.

 6            MR. LONG:  So the record is clear, and -- you

 7   are asking for someone to explain all forms of

 8   remuneration that benefited class members received

 9   during the relevant period, including vacation

10   accrual?

11            MR. GENISH:  Yes.

12            Go ahead, sir.  You can answer.

13            THE WITNESS:  Can you repeat the question?

14            MR. GENISH:  Court Reporter, would you mind

15   repeating the question?

16            (Whereupon the reporter read back as

17   requested.)

18            MR. LONG:  I would just object that that's

19   outside the scope of the notice.

20            THE WITNESS:  I believe that there are

21   certain perks and privileges that come with a person's

22   employment that many companies, they sort of gradually

23   introduce those over time, and I think comp rooms

24   happens to be one of them.

25   BY MR. GENISH:
```

Greg Cornwell Volume II
April 07, 2021

1      Q.    Why gradually over time rather than
2    immediately upon hiring?
3      A.    I think it is something for people to look
4    forward to.  And, you know, we do have turnover in our
5    industry and, you know, turnover in earlier periods of
6    employment.  You know, you wouldn't want somebody to
7    come to work for us just for the purposes of taking a
8    vacation to Hawaii and then just leave.  Something
9    along those lines.
10           So, you know, it is like, look, you've been
11    successful in your first year, and, you know, you've
12    been able to look forward to this, and so now you are
13    going to go enjoy the benefit.  Just one of those
14    things that happens.
15           I can't say why -- why it is one year in
16    particular.  Like I said, it has just always been that
17    way.
18      Q.    The hotel room benefit is not premised on
19    performance, though; is that correct?
20      A.    No.
21      Q.    And it is not nondiscretionary, correct?
22           MR. LONG:  Calls for a legal conclusion.
23    BY MR. GENISH:
24      Q.    The hotel room bonus or benefit is
25    nondiscretionary, correct?

Greg Cornwell Volume II
April 07, 2021

```
 1            MR. LONG:  Calls for a legal conclusion,

 2   argumentative.

 3            THE WITNESS:  I think that -- I mean, if you

 4   meet the eligibility requirement, you get the benefit.

 5   BY MR. GENISH:

 6       Q.   Hyatt doesn't pick and choose which employees

 7   are going to get the benefit.  Anyone who meets the

 8   one-year requirement receives the benefit, correct?

 9       A.   If they are eligible based on their -- their

10   status, yes.

11       Q.   What do you mean by that?

12       A.   On-call employees don't participate in the

13   benefit.

14       Q.   Okay.  All full-time and part-time employees

15   receive this benefit, and it is nondiscretionary,

16   correct?

17            MR. LONG:  Argumentative, calls for legal

18   conclusion, asked and answered.

19            THE WITNESS:  Full-time and part-time

20   employees are eligible for comp rooms based on their

21   status after one year of employment.  Yes.

22   BY MR. GENISH:

23       Q.   Fair to say that this is a benefit that

24   employees appreciate from the Hyatt?

25       A.   I think some do.  There are people that enjoy
```

Greg Cornwell Volume II
April 07, 2021

1    the benefit, and then there are some that never use

2    it.

3        Q.   And would you say -- is it fair to say that

4    the benefit has value to the employees?

5             MR. LONG:  Calls for a legal conclusion,

6    argumentative, calls for speculation.

7             THE WITNESS:  I think it is something that

8    they enjoy, and they appreciate it, yes.

9    BY MR. GENISH:

10       Q.   An employee was going to go on vacation and

11   stay at a hotel that they would then have to pay for,

12   they get to use those comp rooms and they get to stay

13   for free.  So is it fair to say that this benefit has

14   a value to the employees?

15            MR. LONG:  Same objections.  Asked and

16   answered.

17            THE WITNESS:  I think they enjoy it and

18   appreciate it.  Yes.

19   BY MR. GENISH:

20       Q.   Right.

21       A.   I know I do.

22       Q.   My question is about value.

23            Is it fair to say these employees, that this

24   benefit has a value to the employees?

25            MR. LONG:  Asked and answered, argumentative.

Greg Cornwell Volume II
April 07, 2021

```
 1    want a specific answer.  It is a yes-or-no question.

 2            And I get that --

 3            (Simultaneous speech.)

 4            MR. LONG:  Counsel --

 5            (Simultaneous speech.)

 6            MR. GENISH:  You still have to answer it.

 7    You are here under oath, and you have agreed to

 8    testify here.

 9            (Simultaneous speech.)

10            MR. GENISH:  Again, sir, I'm going to ask you

11    the same question.

12            (Simultaneous speech.)

13            MR. LONG:  Counsel, argumentative.

14            MR. GENISH:  And can you answer it directly.

15            MR. LONG:  Please don't raise your voice at

16    the witness.

17            (Simultaneous speech.)

18            MR. LONG:  He has answered the question

19    multiple times.  And whether or not you want a

20    yes-or-no answer, he is giving you his best answer

21    numerous times now.

22            MR. GENISH:  I am not raising my voice.

23            MR. LONG:  I am going to object again --

24            (Simultaneous speech.)

25            MR. LONG:  I'm going to object again that
```

Greg Cornwell Volume II
April 07, 2021

```
 1   it's asked and answered.  The witness can answer the

 2   question again I think for the 10th time.

 3   BY MR. GENISH:

 4       Q.   Just yes or no, sir.

 5            Can you say whether or not the hotel room

 6   benefit has a value to employees?

 7       A.   No.

 8       Q.   Thank you.

 9            Is the policy meant to incentivize employee

10   retention?

11       A.   That's not what it is designed to do.

12       Q.   Where is the colleague

13   complimentary-room-rate policy located?

14       A.   It is referenced in the colleague handbook,

15   but there is a link to that in a place on our company

16   portal that that benefit is outlined, the details of

17   it.  So anybody can access to, but that's where it is

18   contained.

19       Q.   And it is the same policy across all Hyatt

20   hotels in California, right?

21       A.   Yes.  Actually, a global policy.

22       Q.   You said you've utilized the hotel room

23   benefit, correct?

24       A.   Yes.

25       Q.   Do you frequently utilize it?
```

Greg Cornwell Volume II
April 07, 2021

```
1        A.   I occasionally use it, yes.

2        Q.   At least once a year, would you say?

3        A.   Not once a year, but it varies from year to

4   year.  Obviously, I haven't use it much during the

5   pandemic.  I haven't used it at all during the

6   pandemic.

7        Q.   Prior to the pandemic --

8        A.   I have used it in the past.

9        Q.   Had you not had this benefit, you would have

10  paid for a hotel, would you not?

11       A.   I probably wouldn't have traveled.

12       Q.   Is there -- have you ever had occasion where

13  you were going to travel anyway, and you utilized this

14  benefit rather than paying for a hotel?

15       A.   I can't think of one.

16            MR. GENISH:  I've marked as Exhibit 19 a

17  document Bates-stamped Hyatt 1195 and 1196 and 1197

18  and 1198.

19            (Exhibit 19 was marked for identification.)

20  BY MR. GENISH:

21       Q.   It is the colleague complimentary rooms

22  policy.

23            Have you seen this document before?

24       A.   I am pulling it up.  The way it works, at

25  least on my computer, is it has to download first, and
```

Greg Cornwell Volume II
April 07, 2021

1    then you open it.

2        Q.    Okay.

3        A.    Yes, I have.

4        Q.    Is this the complete policy for the hotel

5    room benefit?

6        A.    Let me scroll down.  Yes, it appears to be.

7        Q.    And this is the uniform policy that applies

8    to all employees in California, right?

9        A.    Correct.

10        Q.    The hotels listed on pages 1 and 2 of this

11    exhibit are hotels that employees cannot stay in,

12    correct?

13        A.    That's correct.  Not -- they don't offer the

14    complimentary room program is what it says there up at

15    the top.  They are not prohibited from staying there,

16    in other words, but they do not offer the

17    complimentary colleague dis -- the colleague rate.

18        Q.    Do you know if it means that employees at

19    these hotels don't receive the benefit, or they can't

20    use utilize the benefit at these hotels?

21        A.    Colleagues cannot use the benefit at these

22    hotels.

23        Q.    And this is the same policy that's been in

24    existence since April of 2016, right?

25        A.    There may have been some minor modifications

Greg Cornwell Volume II
April 07, 2021

1   to it, but it is essentially the same policy.

2       Q.   Do you know what those modifications might

3   have been?

4       A.   There was a modification that popped up

5   because there was some unintended issue of holding too

6   many rooms at one time.  So there was a clause that

7   said that you could only have up to whatever your

8   limit is, the 6 or the 12, in play at any one time.

9   So you couldn't be multiply booking multiple -- you

10  couldn't be booked in multiple locations at the same

11  time.

12           Other than that, it is the same policy.

13      Q.   When was that modification implemented?

14      A.   I don't know for sure when that went into

15  effect.  It is in the last couple of years.

16           It didn't really have a meaningful change in

17  the -- in the benefit.  It actually -- it actually

18  helped the benefit because it didn't allow people to

19  lock the rooms up and -- so people could actually have

20  access to book them.

21           That's the only -- the only change that I am

22  aware of.

23      Q.   Do you know if plaintiff tried to utilize the

24  complimentary room benefit during her

25  furlough/temporary layoff?

Greg Cornwell Volume II
April 07, 2021

1    Collective Bargaining Agreement.

2         Q.    Was the methodology -- strike that.

3              Was the method of calculating the vacation

4    pay communicated to the employees in any way?

5         A.    The methodology?  I don't believe so.  The --

6    you know, the hours and the amount, I do believe so.

7    And that's transparent to them in Kronos.  They can

8    see what their balances are.

9              But the methodology, I don't believe that was

10   articulated to them.  It is the same methodology that

11   they receive when they -- when they take vacation, so

12   it would have -- it would have added up to anybody

13   that chose to check it.

14        Q.    Okay.  We -- we discussed previously that in

15   the furlough/temporary layoff letter that was sent in

16   March 2020, employees were offered to have -- to

17   request -- were invited to request to have their

18   accrued vacation paid out, correct?

19        A.    Accrued and earned.

20        Q.    Accrued and earned; is that correct?

21        A.    Yes.

22        Q.    Did -- and I think you testified that some

23   employees actually exercised that option, correct?

24        A.    Yes.

25        Q.    Do you recall how many?

Greg Cornwell Volume II
April 07, 2021

1      A.   I don't remember the number.  It was quite a

2   few.  Although, some -- some didn't want the vacation

3   because they wanted to use it for other things, and

4   some were under the misconception that it would affect

5   their unemployment.  Which we were asked about it, and

6   we told them obviously no.

7           But I -- it was -- in Huntington Beach, it

8   was -- it was quite a number of -- sort of took place

9   in different ways and over time.  And some people

10   said, you know, hey, I want to -- you to pay me X

11   hours this week and X hours next week, and we'll see

12   how it goes.  Some people said I want you to cash me

13   out everything that I've got.  And then, you know, it

14   changed over time in terms of the number and frequency

15   and it went up and it went down.

16           But there were definitely people who -- who

17   requested that.  And they would e-mail the shared

18   mailbox that we looked at before.  And I would put it

19   into their time card, and we paid them the payroll.

20      Q.   So if somebody requested to have all of their

21   accrued and earned vacation paid out, they typically

22   did so via e-mail, you said?

23      A.   Yeah.  There were a few people that called me

24   because they happened to have my cell phone.  But for

25   the most part, that communication was, they would

1    e-mail one or more mailboxes.  The preferred one was

2    the -- was the shared mailbox.  But I was also picking

3    up my e-mail and my -- the rest of my H.R. team was as

4    well, and they would forward that to the shared

5    mailbox.

6              And -- but there was a period when I was the

7    only one that was working, and then I would put those

8    into the time card.  And our -- our goal -- actually,

9    it wasn't a goal.  We achieved it -- is that any

10   requests that came into the shared mailbox, we would

11   turn around -- turn that around within 24 hours.  We'd

12   just get it into their time card and get it paid.

13       Q.   Okay.  So you were -- you were trying to --

14   you said your goal was to -- if someone requested to

15   have their earned or accrued vacation paid out, you

16   tried to institute it in that payroll; is that right?

17       A.   Yes.  Yes.

18       Q.   And so then they would -- that employee would

19   then receive their earned and accrued vacation on the

20   next payroll cycle; is that correct?

21       A.   That's correct.

22       Q.   So unless that payroll cycle ended the

23   following day, they would not receive payment the

24   following day, right?

25       A.   That is correct.

Greg Cornwell Volume II
April 07, 2021

1    Q.   In the letter, it indicates that if an

2    employee were to request their vacation, it would be

3    immediately paid out.  The word immediate is meant to

4    reference it would be on the next payroll cycle; is

5    that correct?

6    A.   I don't know what it was meant to reference.

7    I know that when we communicated with people as they

8    were requesting it, we asked them, you know, could --

9    can we put this on to your time card and pay it on the

10   next paycheck?  There may have been one or two say,

11   hey, I've got an issue where I really need the -- the

12   money right now.  And there were a few -- a few

13   off-cycle checks that were cut.

14        But for the most part, the understanding that

15   we had with the colleagues is that we would put it

16   in -- and they would sometimes tell me, you know,

17   okay, put me in for, you know, two days this week and

18   two days that week.  And then there were some that

19   would say, as I mentioned before, you know, just go

20   ahead and pay me out whatever it is that I have,

21   floating holidays, earned and accrued vacation.  We

22   would do that as well.

23        But for the most part, it did go on the next

24   pay cycle or the upcoming pay cycle.

25   Q.   I am going to try to avoid putting all the

Greg Cornwell Volume II
April 07, 2021

1    Collective Bargaining Agreements in front of you.

2        A.    I've seen most of them.  I've administered a

3    few, too, over the years.  Some of the really funky

4    ones, too, in San Francisco.

5        Q.    Let's work together on these.

6              All right.  You are not aware of any

7    provision within any of the Collective Bargaining

8    Agreements that apply in California that states that

9    Hyatt does not have to pay out accrued or earned

10   vacation upon termination, correct?

11       A.    I am not aware of any that state that.

12             I am aware of clauses that say that we -- in

13   the general principle, that we have a duty to bargain

14   over any of these things.  And I know there were lots

15   of -- there is lots of dialogue about what was

16   happening with the dramatic decline in business and

17   the status of some of those employees covered by

18   Collective Bargaining Agreements.

19             But I don't know -- but to answer your

20   question directly, I don't -- I am not aware of one

21   that says that we don't have a duty to pay that on

22   termination, no.

23       Q.    And when you say that, you mean accrued and

24   earned vacation and floating holidays, right?

25       A.    Yes.

Greg Cornwell Volume II
April 07, 2021

1      Q.    And similarly, you are not aware of any

2   Collective Bargaining Agreements that obviates Hyatt's

3   obligation to pay out earned or accrued vacation or

4   floating holidays upon a layoff, correct?

5      A.    That, I couldn't say for sure.

6            I know that -- that any layoff or any change

7   of that nature, that's a subject of bargaining that we

8   need to have a dialogue with the union over.

9      Q.    Again, I am trying to avoid putting them all

10  in front of you.

11           But I -- I reviewed them, and I didn't see

12  anything indicating that, you know, a layoff -- if

13  there is a layoff, you don't have to pay out accrued

14  vacation.

15     A.    I don't think that that is called out in the

16  Collective Bargaining Agreements specifically, but as

17  a matter of practice, when you are administering

18  Collective Bargaining Agreement, not necessarily in

19  negotiating one or reading one, but there is a

20  practice where there is certain things that we are

21  obligated to bargain over.  And staff reductions,

22  layoffs and so forth, I don't know if this is

23  specifically called out in the National Labor

24  Relations Act, but the practice is we are obligated to

25  bargain over it.  And I know that there has been

Greg Cornwell Volume II
April 07, 2021

1   bargaining over that with more than one of our unions.

2      Q.   Okay.  I understand this concept of

3   bargaining.

4          So let me -- let me again try to avoid

5   putting them all in front of you.

6          Are you aware of any provision within any of

7   the Collective Bargaining Agreements that apply to

8   Hyatt's California employees that eliminates Hyatt's

9   obligation to pay out earned or accrued vacation or

10  floating holidays upon a layoff?

11     A.   Not specifically written in the agreement,

12  no.  But I haven't seen all of the agreements, but a

13  number of them I have.

14     Q.   To your knowledge, do any of the Collective

15  Bargaining Agreements discuss the distinction between

16  furlough, temporary layoff or layoff?

17     A.   I couldn't say for sure.  I -- I don't know

18  them to that detail.

19     Q.   As you sit here today, you don't -- you are

20  not aware of any, correct?

21     A.   I am not aware of any.

22          I do know that some of the Collective

23  Bargaining Agreements have some layoff language and

24  some things that refer to anything other than a

25  40-hour workweek, but I don't think it calls out the

Greg Cornwell Volume II
April 07, 2021

1    what the first sentence says.  It is the hotel

2    revenues divided by the total number of rooms.

3            We learned that in hotel school.

4        Q.    And the third sentence here says, "ADR is a

5    commonly-used performance measure in our industry."

6            Do you see that?

7        A.    Yes.

8        Q.    Any reason to dispute anything that's

9    reflected in this definition of average daily rate

10   before you?

11       A.    No.

12       Q.    Do you know -- strike that.

13           So ADR is relatively simple to calculate,

14   correct?

15       A.    There is some variations to it.  But for the

16   most part, it is a generally accepted -- everybody

17   does it the same way.  And it is -- it is one of the

18   ways that -- we have third parties that sort of

19   measure our performance in a completely legitimate way

20   against our competitors, and so they look at those

21   things.  And it is also how we measure how we're doing

22   within an individual property in selling.  So, yeah.

23       Q.    Okay.  So ADR is calculated on an individual

24   property level, on a territory level, state level or

25   globally?

Greg Cornwell Volume II
April 07, 2021

1        A.   I couldn't speak to all of those.  I know

2   that -- that properties do it, and, you know, Hyatt

3   may do it as a company.

4             It is not something that I really am involved

5   in.  But again, it is a pretty -- it is a pretty

6   simple calculation for what it is.  It does -- it

7   tells you something, but it doesn't tell you

8   everything.

9        Q.   What does it tell you?

10       A.   Well, it doesn't -- it doesn't tell you --

11  one of the things that -- above there is revenue per

12  available room.  A lot of times we look at revenue per

13  available room to see how we are doing competitively

14  versus the average daily rate.  It just tells us

15  one -- it is one of many factors we look at.  Average

16  daily rate, occupancy and rev PAR is a measure of how

17  we are selling and how we are maximizing our revenue.

18       Q.   What does average daily rate tell you?

19       A.    It tells us the sum of -- of all the

20  different rooms we sold at all the different rates

21  that we sold them at.  And whether there is suites,

22  whether there is upgraded rooms, better views, larger

23  rooms, smaller rooms, divided by the number of keys to

24  those rooms.

25       Q.   And what does revenue per available room tell

Greg Cornwell Volume II
April 07, 2021

1    you?

2        A.    Revenue per available room is the revenue

3    that we could have gotten -- so it is the revenue

4    versus the -- the revenue compared to the number of

5    rooms in the hotel.  Not necessarily the ones that are

6    sold.  So our -- it is -- it blends in the rate and

7    the occupancy, very simply put.

8        Q.    Do you know if Hyatt keeps track of the

9    average daily rate for all of its properties globally?

10       A.    Somebody does.  Maybe the -- the hotel does.

11   I don't know -- I don't know what Hyatt does with

12   respect to the individual hotels, but I know -- I am

13   confident that the hotels keep track of it.

14       Q.    You are not confident that the Hyatt

15   Corporation keeps track of it on a global level?

16       A.    I don't know -- I don't know what they do.

17   You know, I know more about the finances for an

18   individual property as opposed to how that is rolled

19   up, and whether it is in an aggregate or whether it is

20   by individual hotels.  I don't know all of that stuff.

21       Q.    If I could direct you to page 78 of the

22   document -- strike that.

23           If I could direct you to the exhibit where it

24   states 78 at the bottom.

25       A.    Yep.

Greg Cornwell Volume II
April 07, 2021

1      Q.   At the top of that page, it uses the ADR

2   calculation here.

3      A.   Okay.  Let me get to that.

4      Q.   Okay.  Yes.  Okay.

5           Does this help you understand whether or not

6   Hyatt Corporation keeps track of the ADR for all of

7   its properties?

8      A.   Oh, I believe Hyatt keeps track of its -- its

9   ADR for all of its properties in the aggregate.

10     Q.   Okay.

11     A.   That would be the sum of all of the rooms

12  revenue divided by the occupied rooms.

13          I don't know what it does with each

14  individual hotel.  I am not aware of that.

15          I understand what's presented here.

16     Q.   Is there a centralized database where this

17  information lies?

18          MR. LONG:  Calls for speculation.

19          THE WITNESS:  Yeah.  I am sure it is in our

20  financial system is where this stuff rolls up to.

21  Yeah.

22  BY MR. GENISH:

23     Q.   Do you know if Hyatt Huntington Beach has a

24  central database where its ADR calculations lie?

25     A.   Yes.

Greg Cornwell Volume II
April 07, 2021

1    Q.   It does have such a database?

2    A.   Yes.

3    Q.   Where is that?

4    A.   It is in -- let me remember the name of that.

5  Actually, the name of the system is escaping me right

6  now.  It has another name, but it is basically Oracle.

7    Q.   It is an Oracle-based software?

8    A.   Yes.  Yes.

9    Q.   Okay.  To your knowledge, do all of the Hyatt

10 properties have that or a similar, centralized

11 database that -- through which it tracks the ADR for

12 that particular hotel?

13   A.   I -- I believe that to be the case.  In this

14 day and age, that makes sense to me.

15   Q.   The number reflected on page 78 before you,

16 do you have an understanding as to what that means

17 where it says $238?

18   A.   Yes.

19   Q.   What does it mean?

20   A.   My understanding of it is the ADR for

21 whatever group of hotels this is talking about was

22 $238.

23   Q.   Let me direct your attention to the following

24 page.

25        MR. LONG:  Again, what page of the PDF are we

Greg Cornwell Volume II
April 07, 2021

1          You know, there are -- there are -- a lot of
2    it has to do with the demand in the marketplace and
3    what competitors are doing.  But there is at least
4    dozens of variables, and I don't know them all.
5       Q.   Is there a minimum room rate for every hotel
6    irrespective of occupancy?
7       A.   No.
8       Q.   Well, if a hotel is completely unoccupied,
9    are they giving away their rooms for a dollar a night?
10      A.   No.  No, we wouldn't do that.
11      Q.   Okay.  So there is a minimum room rate for
12   every hotel, irrespective of occupancy; is that right?
13      A.   There is not a stated number.  There is
14   not -- there is no stated number as to what the
15   minimum is.
16          There is a value proposition associated with,
17   you know, maintaining rate integrity.  If you give
18   rooms away for $25, then it is pretty hard to charge
19   $325 two weeks later.  But there is no stated minimum.
20          The hotels are free to price that at what
21   they choose to price it at.  And, you know, bring
22   occupancy to the hotel if it makes sense.
23      Q.   Well, wouldn't you agree then, that if we
24   took the lowest rate a hotel has ever offered its
25   rooms, its worse rooms -- strike that.

Greg Cornwell Volume II
April 07, 2021

1          If you took the lowest rate that a property

2     had offered its worst room across all Hyatt

3     properties, that would be the minimum value -- average

4     value of the comped rooms?

5         A.    Just doesn't work that way.  It doesn't --

6     it -- again, it -- a room is a perishable commodity.

7     You can only sell it once, and it -- it is different

8     every time you sell it.  So to put a value on a room

9     based on some sort of promotional thing, that doesn't

10    make any sense.

11         And the other thing is it is a comped room.

12    It is a free room.  It's not -- it doesn't have a

13    rate.  It doesn't have a number assigned to it.

14        Q.    If I wanted to assess a value to the comped

15    rooms, couldn't I just take the lowest rate that has

16    ever been offered by that hotel?

17         MR. LONG:  Calls for -- argumentative, calls

18    for legal conclusion, calls for speculation.

19    BY MR. GENISH:

20        Q.    I didn't finish my question.

21         If I wanted to assess the value of a comped

22    room, couldn't I take the minimum dollar amount ever

23    offered for the worst room in a hotel, and that would

24    be the minimum of the value of that comped hotel?

25         MR. LONG:  Calls for legal conclusion,

Greg Cornwell Volume II
April 07, 2021

```
1   argumentative, calls for speculation.

2           THE WITNESS:  I -- I think you could take any

3   rate you wanted to take, but it is still trying to put

4   a value on something that's free.  And it is not -- it

5   is not like a store where there are a bunch of things

6   on a shelf that if you don't sell today, you can sell

7   it tomorrow.

8           A hotel room and an airline seat are the two

9   most perishable commodities on earth.  They disappear,

10  and you can't sell it again.  And we are only offering

11  the room when we can as a free room.

12     Q.   Are there circumstances where one can use a

13  comped room when a hotel is fully occupied?

14     A.   Yes.

15     Q.   What are those circumstances?

16     A.   If somebody booked the room early on in its

17  availability.  So they are availability one year out.

18  And somebody booked that room, and the hotel didn't

19  expect to be particularly busy so the rate category

20  was open, and that colleague was able to book a comp

21  for that night or nights and then the hotel later got

22  busy, let's say they contracted a group, it is

23  possible that a colleague could be staying in the

24  hotel on a night when it was at capacity.  It is

25  possible.  That would have had to have been booked
```

Greg Cornwell Volume II
April 07, 2021

1    pretty early on, and then circumstances would have had

2    to have changed that we didn't foresee at the time

3    that the person booked the room.

4         Q.   In such a scenario, the colleague is not

5    removed from the room?  They are not -- their

6    reservation is not canceled, correct?

7         A.   No.  That's sort of a Hyatt taboo.  You

8    don't -- we don't treat our employees that way.

9         Q.   And an employee can use the comp room for any

10   room category; is that right?

11        A.   No.  The rooms are assigned -- well, I take

12   it back.  There are -- there is the ability to select

13   bed type.  So whether it is two beds, one bed, that is

14   pretty common.

15          There are some hotels that offer different

16   types of rooms in terms of a view or larger room or

17   not a larger room.  Those are subject to availability.

18          And then as the day draws nearer to that

19   colleague's arrival, then somebody at the hotel

20   assigns a particular room to the colleague, or, if it

21   is a partly slow time, they will just leave it in the

22   system, and then the person that checks the colleague

23   in will assign the room to them.  It happens different

24   ways.

25        Q.   And they could be assigned a regular room or

Greg Cornwell Volume II
April 07, 2021

```
 1   a suite, correct?

 2        A.   Could be.  Could be.

 3             In some cases we might rather have a

 4   colleague in a suite than someone that we don't know

 5   that comes in off the street, or it could be that all

 6   the suites are contracted and the colleague is in a

 7   parlor that has a bed that folds down out of the wall.

 8        Q.   Okay.

 9        A.   I've been in that situation.

10        Q.   Where you are sleeping on the fold-out bed?

11        A.   Oh, yeah.

12             MR. GENISH:  Give me just a second.

13             So why don't we take that restroom break for

14   a few minutes and hopefully finish up on the next

15   round?

16             MR. LONG:  Okay.

17             THE VIDEOGRAPHER:  Going off the video

18   record.  The time is now 21:50 UTC.

19             (Off the record.)

20             THE VIDEOGRAPHER:  Back on the video record.

21   Time is now 22:09 UTC.  Go ahead.

22   BY MR. GENISH:

23        Q.   Of the people that requested to have their

24   earned and accrued vacation paid out, did any of them

25   request it on the day that they were notified of the
```

Greg Conwell Volume II
April 07, 2021

```
1   furlough/temporary layoff?

2       A.   No.

3       Q.   Anybody request it on the following day?

4       A.   I can't think of anybody that requested it

5   early on.

6       Q.   It was at least a couple weeks before anybody

7   requested it, correct?

8       A.   I don't know if it was a couple weeks, but I

9   know it was no more than a week or two.  Yes.

10           And I am saying that for Huntington Beach.  I

11  can't say for the other hotels.  But I don't think --

12  I don't think -- I think it is pretty representative

13  that people did not request it and -- early on, and I

14  think they needed to sort of get their bearings as to

15  what their personal situation was going to be.

16      Q.   So you are not aware of any California

17  employee that was paid their earned or accrued

18  vacation or floating holidays within one week of being

19  notified of the furlough/temporary layoff, correct?

20      A.   I couldn't say one way or the other.  I don't

21  have access to those records.  And I -- honestly, I've

22  never had any conversations about it with the other

23  hotels either.

24      Q.   You are not aware of anyone that would fall

25  into that category?
```

Greg Cornwell Volume II
April 07, 2021

1      A.    No.   I am not aware of anybody.

2      Q.    Okay.  And you are not aware of anyone --

3   well, strike that.  That answered the question.

4           So we previously talked about the June 18,

5   2020, letter that was sent to the employees notifying

6   them that their temporary layoff was being converted

7   to a permanent layoff; is that correct?

8      A.    I think it was that their furlough was being

9   converted to a layoff.

10     Q.    Oh, it was originally categorized as a

11  furlough/temporary layoff.  Do you recall that?

12     A.    It could be.  I couldn't say without looking

13  at the document in front of me.

14     Q.    I'll represent to you that the March letter

15  that was sent to everyone called it a furrow/temporary

16  layoff.

17     A.    Okay.

18     Q.    June 18, 2020, Hyatt sent a letter indicating

19  that that status was being converted to a permanent

20  layoff.

21          Do you recall that?

22     A.    Yes.

23     Q.    And in connection with that layoff, the

24  employees were paid out their accrued/earned vacation

25  and their floating holidays, correct?

Greg Cornwell Volume II
April 07, 2021

```
 1       A.    That is correct.

 2       Q.    Now, the letter is dated June 18, but the --

 3   they were notifying the employees that their status

 4   was going to be changed as of June 27th, 2020.

 5             Do you recall that?

 6       A.    Correct.

 7       Q.    So the employees were still in this

 8   furlough/temporary layoff category from June 18

 9   through June 27, 2020, correct?

10       A.    That is correct.

11       Q.    And they were still accruing vacation during

12   that time, correct?

13       A.    That is correct.

14       Q.    But they were paid on June 18 for their

15   earned and accrued vacation, weren't they?

16       A.    No.  No.  They were paid as of -- well, hold

17   on.  They were paid -- they may have -- I don't

18   recall.  But I think they may have been paid on more

19   than one date.  But their vacation accrued -- they

20   were prepaid the accrued vacation through the 27th.

21             I don't -- I don't recall -- I am confusing

22   it with another situation possibly.

23             I do know that we loaded their vacation into

24   the system to pay them accrued vacation through the

25   27th.  I don't remember the specific date that was
```

Greg Cornwell Volume II
April 07, 2021

1    the -- the pay date when all of that happened.  It was

2    a -- it was quite a process to do that and have --

3    work with our payroll department to get that to

4    happen.

5        Q.   Do you recall if people were paid first or

6    notified of the new status first?

7        A.   I believe it happened at the same time from

8    the -- in terms of the written communication, I

9    believe it happened at the same time.

10            MR. GENISH:  I've uploaded to the chat --

11   Matt has uploaded to the chat a wage statement that I

12   am going to mark as Exhibit 23 --

13            THE REPORTER:  I believe we are on 24.  Let

14   me look real quick.

15            MR. LONG:  That's correct.

16            THE REPORTER:  24?

17            MR. GENISH:  24 is correct?

18            THE WITNESS:  And this is which one?

19            MR. GENISH:  Okay.  So we're going to mark

20   this wage statement as Exhibit 24.

21            (Exhibit 24 was marked for identification.)

22            THE WITNESS:  Okay.  So we are looking at the

23   wage statement.  Okay.

24   BY MR. GENISH:

25        Q.   Yeah.  This is the plaintiff's final wage

Greg Cornwell Volume II
April 07, 2021

```
1   STATE OF IDAHO       )
                         )
2   COUNTY OF KOOTENAI   )

3

4           I, MARY E. COLLINS, CSR No. 12763 for the

5   State of California, do hereby certify:

6           That prior to being examined, the witness in

7   the foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth;

10          That said proceedings were taken remotely

11  before me at the time and places therein set forth and

12  were taken down by me in shorthand and thereafter

13  transcribed into typewriting under my direction and

14  supervision;

15          I further certify that I am neither counsel

16  for, nor related to, any party to said proceedings,

17  not in anywise interested in the outcome thereof.

18          In witness whereof, I have hereunto

19  subscribed my name this day, April 15, 2021.

20

21

22

23

24          MARY E. COLLINS

25          Certified Shorthand Reporter #12763
```

# EXHIBIT I

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


KAREN HARTSTEIN, in her      )
representative capacity and  )
on behalf of herself and all )
others similarly situated,   )
                             )
                Plaintiff,   )
                             )
        vs.                  )   Case No. 2:20-cv-04874-
                             )            DSF-JPR
HYATT CORPORATION, a Delaware)
corporation doing business in)
California and DOES 1 through )
100, inclusive,              )
                             )
                Defendants.  )


-oOo-


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

NIKKI MASSEY

Chicago, Illinois

Thursday, August 19, 2021


-oOo-


Reported by:
Diana Bryant, CSR No. 5056

NIKKI MASSEY

August 19, 2021

```
 1              APPEARANCES OF COUNSEL:

 2  For the Plaintiff:

 3  BLACKSTONE LAW, APC
    BY:  JONATHAN M. GENISH
 4       jgenish@blackstonepc.com
         JILL J. PARKER
 5       jparker@blackstonepc.com
         MATTHEW W. DIETZ
 6       mdeitz@blackstonepc.com
    8383 Wilshire Boulevard, Suite 745
 7  Beverly Hills, California  90211
    (310) 622-4278
 8

 9  For the Defendants:

10  SEYFARTH SHAW, LLP
    BY:  HOLGER BESCH
11       hbesch@seyfarth.com
    601 South Figueroa Street, Suite 3300
12  Los Angeles, California  90017
    (213) 270-9600
13

14  -and-

15  HYATT HOTELS CORPORATION
    BY: MICHAEL SEGALL
16      Associate General Counsel

17
    Also present: Norma Anderson, videographer
18

19              The videotaped deposition of NIKKI

20  MASSEY, was taken in the above-entitled matter under all

21  of the provisions of law pertaining to the taking and

22  use of depositions, via videoconference from Chicago,

23  Illinois, on Thursday, August 19, 2021, at 9:08 a.m.

24  before Diana Bryant, a Certified Shorthand Reporter in

25  and for the State of California.
```

NIKKI MASSEY

August 19, 2021

1  who to furlough/temporarily lay off on a hotel

2  level; right?

3      A.    Correct.

4      Q.    Was there a discussion between corporate and

5  the general managers describing that furloughs/temporary

6  layoffs are needed?

7          MR. BESCH:  Objection, calls for speculation

8  and vague and ambiguous as to, "corporate."

9          THE WITNESS:  Yeah, I mean certainly our

10  general managers were in ongoing discussions with their

11  senior vice presidents of field operations about local

12  market conditions.  Certainly we had an aggregate view

13  of what was happening in the U.S. as a whole, so there

14  were discussions about the business climate.  But there

15  wasn't a scenario where someone from our office would

16  call general managers and say here's the list of

17  colleagues that you need to furlough.  In many cases our

18  hotels temporarily suspended operations and the

19  buildings weren't even open.  In those cases it wasn't

20  as though the general managers were picking and

21  choosing, there was no business.  And from a public

22  health standpoint it wasn't safe for our colleagues to

23  be coming to work.

24      Q.    Who made the decision not to pay out accrued

25  PTO, vacation and floating holidays at the time of the

NIKKI MASSEY

August 19, 2021

 1  furlough/temporary layoff?

 2        MR. BESCH:  Objection, assumes facts not in

 3  evidence.

 4        **THE WITNESS:  We never did make that decision.**

 5  **When we furloughed colleagues we offered them all of**

 6  **their -- all of the benefit time to which they were**

 7  **eligible.**

 8        MR. GENISH:

 9    Q.   I'm asking who made the decision not to

10  affirmatively pay it out.

11        MR. BESCH:  Same objection.

12        **THE WITNESS:  Well, that decision wouldn't have**

13  **been necessary, because we weren't separating their**

14  **employment, we were only putting them on a temporary**

15  **furlough.**

16        **MR. "GENISH.**

17    Q.   What gives you the impression that that is the

18  state of the law?

19    **A.   I don't understand the question.**

20    Q.   It's your belief, based on your response, that

21  Hyatt doesn't have an obligation, or didn't have an

22  obligation to pay out accrued vacation, PTO and floating

23  holidays when it implemented the furlough/temporary

24  layoff; right?

25        MR. BESCH:  Objection, calls for a legal

NIKKI MASSEY

August 19, 2021

```
 1  conclusion.  You can answer.
 2           THE WITNESS:  That's our practice.  That's our
 3  practice when we put people on furlough it isn't an
 4  automatic payout.  That's not necessarily something our
 5  colleagues even want.  So we offered them the option to
 6  take the payout, but they weren't required to take it,
 7  because in many cases they wouldn't have wanted to.
 8           MR. GENISH:
 9   Q.   Do you have an impression of what the law is in
10  California with respect to that issue?
11           MR. BESCH:  Objection, calls for a legal
12  conclusion.
13           THE WITNESS:  Well, my understanding,
14  particularly in preparing for this case, is that if we
15  were separating their employment we would be required to
16  pay all that out, but when we put our colleagues on
17  furlough our intent was to bring them back, and the
18  letter reflects that.
19           MR. GENISH:
20   Q.   Where did you come to learn that is the state
21  of the law in California?
22           MR. BESCH:  Objection, calls for a legal
23  conclusion.  To the extent the question asks for a
24  communication between attorney and client I instruct the
25  witness not to answer.  If you can answer that question
```

NIKKI MASSEY

August 19, 2021

 1  outside the scope of that relationship, you can answer.

 2         **THE WITNESS:  I guess I'm going to decline to**

 3  **answer.**

 4         MR. GENISH:

 5     Q.   Okay.  So you didn't conduct any independent

 6  research yourself; right?

 7     **A.   No.**

 8     Q.   Before or after the furlough/temporary layoff

 9  was implemented you conducted no research on that

10  issue; right?

11     **A.   Correct.**

12     Q.   And you had no conversations with Greg Cornwell

13  about that issue; right?

14         MR. BESCH:  Objection, to the extent it calls

15  for communication within the scope of the attorney-

16  client privilege, I instruct the witness not to answer.

17  If you can answer that question outside that scope, you

18  may do so.

19         **THE WITNESS:  I decline to answer.**

20         MR. GENISH:

21     Q.   Outside of communications that involved your

22  lawyers, did you have any communications with Greg

23  Cornwell about whether Hyatt had an obligation to pay

24  out accrued vacation, PTO or floating holidays, when it

25  implemented the furlough/temporary layoff in California?

NIKKI MASSEY

August 19, 2021

```
1      A.   I don't recall.

2      Q.   You don't recall having any?

3      A.   Correct.  I don't recall having any

4  conversations with Greg Cornwell outside of the

5  conversations we had with legal counsel.

6      Q.   Do you know if Greg Cornwell conducted any

7  research prior to the implementation of the

8  furlough/temporary layoff on this issue of payment of

9  accrued vacation and PTO?

10     A.   I do not.

11     Q.   Do you know if anybody, other than your

12 lawyers, conducted such research within Hyatt?

13     A.   I do not.

14     Q.   You're not aware of any; right?

15     A.   I'm not aware of any, no.

16     Q.   It's Hyatt's belief that it did not have an

17 obligation to affirmatively pay out the accrued

18 vacation, PTO and floating holidays when it implemented

19 the furlough/temporary layoff in March of 2020; right?

20     A.   Correct.

21     Q.   Aside from communications with counsel, what is

22 the basis for that belief?

23     A.   I decline to answer.  I don't recall that there

24 would be any communications outside of our

25 communications with counsel, about that topic.
```

NIKKI MASSEY

August 19, 2021

```
 1     Q.   Does Hyatt have a basis for that belief, other
 2  than its communications with counsel?
 3     A.   I don't know.
 4     Q.   Not to your knowledge?
 5     A.   Not to my knowledge.
 6     Q.   You're not aware of any basis, other than
 7  communications with lawyers, to support --
 8     A.   I am not.
 9     Q.   -- to Support Hyatt's understanding that it did
10  not have to pay out accrued vacation, floating holidays
11  and PTO when it implemented the furlough/temporary
12  layoff in March of 2020; right?
13     A.   Correct.  I'm not aware.
14     Q.   And you're not aware of any independent
15  research that Hyatt conducted, outside of communications
16  with counsel, on this issue; right?
17     A.   I am not aware, correct.
18     Q.   When learning about the -- this case, did you
19  Google the state of law -- of the law in this issue --
20  on this issue?
21     A.   I did not.
22     Q.   And as you sit here today is it still your
23  belief that Hyatt did not have to pay out the accrued
24  vacation, PTO and floating holidays when it implemented
25  the furlough/temporary layoff?
```

NIKKI MASSEY

August 19, 2021

 1          MR. BESCH:   Objection, calls for a legal

 2     conclusion.

 3          **THE WITNESS:  That is my belief, based on the**

 4     **fact that it was not a permanent layoff.**

 5          MR. GENISH:

 6     Q.   What's your understanding of a temporary

 7     layoff?

 8     **A.   Well --**

 9          MR. BESCH:  Objection, calls for a legal

10     conclusion.  But the witness can answer.

11          **THE WITNESS:  Yeah, I won't speak to it from a**

12     **legal stand point, but I can tell you in our**

13     **organization a temporary layoff is a layoff where we**

14     **have intent to return the colleague to work at some**

15     **point in time in the future.**

16          MR. GENISH:

17     Q.   Doesn't matter how far in the future the intent

18     to bring them back is; correct, it would still be

19     described as a temporary layoff?

20          MR. BESCH:  Same objection.

21          **THE WITNESS:  Yeah, that's just too broad of a**

22     **question for me to answer.  In some circumstances the**

23     **temporary -- like a seasonal circumstance, the temporary**

24     **layoff period could be longer.  In most cases it's a lot**

25     **shorter.  ==In this case we didn't have a view in to how==**

NIKKI MASSEY

August 19, 2021

 1   long it would be, but based on what we knew at the time

 2   we anticipated that within a few months we'd be bringing

 3   colleagues back, and we did not want to lose them.  So

 4   the temporary nature was very important to us.  These

 5   are colleagues that have worked, some of them, for 30

 6   years with us, so there wasn't an intent that we

 7   wouldn't be bringing them back.

 8           MR. GENISH:

 9      Q.   Describing it as temporary was important

10   because it would keep them tethered to the company;

11   right?

12      A.   Correct.  Should they choose.  I mean anybody

13   can walk away any time they want.

14      Q.   But they're less likely to leave if they're

15   under the impression that it's temporary; correct?

16      A.   That's --

17           MR. BESCH:  Objection, calls for speculation.

18           THE WITNESS:  I mean that's what we would hope.

19   We wanted to maintain a relationship with them.  This

20   was our way of doing that.  They could choose to accept

21   that or not.

22           MR. GENISH:

23      Q.   If Hyatt had expected the temporary layoff to

24   last six months, do you think then it would have had to

25   pay out accrued vacation?

NIKKI MASSEY

August 19, 2021

```
 1            MR. BESCH:  Objection, calls for speculation.
 2            THE WITNESS:  From my perspective, as long as
 3   we had intent to bring the colleagues back, and the
 4   layoff was temporary, then we wouldn't have had that
 5   obligation.
 6            MR. GENISH:
 7       Q.   And if Hyatt had expected the layoff to last
 8   one year, with the expectation that they were eventually
 9   going to bring them back, would it then have had to pay
10   out accrued vacation?
11            MR. BESCH:  Objection, calls for a legal
12   conclusion, calls for speculation, incomplete
13   hypothetical.  Go ahead.
14            THE WITNESS:  Again you can keep adding time
15   onto it and adding time onto it, but really we were just
16   trying to stay close to our colleagues, and we did not
17   have a sense of how long it would be.  We believed it
18   would be several months.
19            MR. GENISH:
20       Q.   Was that --
21       A.   Turned out to be a little more.
22       Q.   I'm sorry, please finish your answer.
23       A.   We believed it would be several months, every
24   month we had a little bit more information, but we
25   weren't in a position to make a decision of a long-term
```

August 19, 2021

 1  estimate of how long we would have been in that layoff

 2  status.

 3     Q.   Was it a significant concern for Hyatt that the

 4  colleagues that were temporarily laid off would go find

 5  jobs with different companies?

 6     A.   I mean insofar as they had anywhere to go, I

 7  suppose it was a concern.  But again, that -- part of

 8  the reason why we crafted the layoffs the way that we

 9  did was to reassure the colleagues when the business

10  comes back, which we anticipate it will shortly, our

11  intent is to bring you back.  So I don't know there was

12  anywhere for them to go at that point.  But of course

13  they need to feed their families, so if someone was able

14  to find a job somewhere else and feed their family, then

15  they could choose whether or not to come back, we

16  certainly wouldn't stop them from doing that.  But a big

17  part of the temporary layoffs was our ability to stay

18  close to them and also leave them on our benefit plan.

19  It was a global pandemic, so if we had laid them all

20  off, we would have cut off their insurance in the middle

21  of a pandemic, and that's not a caring thing to do with

22  a company, it's not right.

23     Q.   So the way Hyatt crafted the temporary layoff

24  was intended to maximize the chances that these

25  employees would return when all of this was over; right?

NIKKI MASSEY

August 19, 2021

```
 1   Nothing comes immediately to mind.

 2       Q.   Anything in Mammoth, perhaps?

 3       A.   I just don't know.  We took on a new company

 4   right before COVID, so there's a resort called Squaw

 5   Creek that I believe is on the California side of Tahoe,

 6   but I don't -- I'm not super familiar with the resort or

 7   their practices.

 8       Q.   There are occasions where seasonal employees

 9   are no longer providing services for Hyatt for longer

10   than a month; correct?

11       A.   Sure.

12       Q.   Do you know whether or not those individuals

13   are paid out their accrued vacation at the time that

14   they stop providing services?

15           MR. BESCH:  Objection, it's overbroad, calls

16   for speculation.

17           THE WITNESS:  I don't know the answer.

18           MR. GENISH:

19       Q.   Who would know?

20       A.   Each individual HR director at our seasonal

21   properties would know.  And it's because there are some

22   scenarios where our seasonal employees are there on a

23   visa, and when their time is over they leave and they're

24   no longer employed by us.  There's some employees that

25   come in and work seasonally, and then they resign from
```

NIKKI MASSEY

August 19, 2021

```
 1   Hyatt and they go somewhere else, but we offer them the
 2   option to come back, so they come back again.  There's
 3   some scenarios where we have seasonal employees that
 4   float from property to property and coble together year
 5   long living that way, but I don't have direct visibility
 6   into each of those circumstance that I would be able to
 7   answer that with any specificity.
 8       Q.   Hyatt does offer its seasonal employees health
 9   insurance all year-round, even when they're not
10   providing services?
11           MR. BESCH:  Again, it's overbroad, calls for
12   speculation.
13           THE WITNESS:  Yeah, and I don't know the
14   answer.  A lot of it would depend on the circumstances
15   of each individual location, and how they hired those
16   employees on.
17           MR. GENISH:
18       Q.   Do you know if seasonal employees continue to
19   accrue vacation time when they're not providing services
20   to the Hyatt in the off season?
21           MR. BESCH:  Same objection.
22           THE WITNESS:  I don't know.  I don't imagine
23   they would, because they're not working during that
24   period of time.
25           MR. GENISH:
```

NIKKI MASSEY

August 19, 2021

1     Q.   One of the reasons you testified Hyatt decided
2  to keep the employees tethered to the company during the
3  temporary layoff was to provide them with health
4  insurance; right?
5     A.   Correct.
6          MR. BESCH:  Objection, it's argumentative.  But
7  go ahead.
8          MR. GENISH:
9     Q.   Did all of the employees that were temporarily
10  laid off receive health insurance from Hyatt?
11     A.   Of those that were on our plan -- everybody
12  that was on our plan at the time was able to continue on
13  the plan.
14     Q.   Was everybody on the plan?
15     A.   I have no way to know.  I'm sure not everybody
16  was on the plan.  Not every colleague selects our plan,
17  some of them have insurance through other sources, or
18  they might decide it's too expensive, but anybody who
19  had selected the plan and was depending on that plan for
20  their insurance was able to continue their insurance.
21     Q.   So those individuals, the ones that were not on
22  the plan, they did not receive health insurance from
23  Hyatt during the temporary layoff period; right?
24     A.   Correct.
25     Q.   What's the advantage to those employees keeping

1  them tethered to the company?

2          MR. BESCH:  Objection, it's argumentative.

3          THE WITNESS:  Well, we didn't -- we didn't make

4  the decision to just keep the employees tethered to the

5  company that had health insurance, they're all our

6  colleagues, so whether they elect insurance through us

7  or they elect insurance through their spouse, that's not

8  the determining factor in whether or not we want to

9  bring them back.  So it was -- I mean the goal was to

10  keep close to our colleagues because it was a pandemic

11  and we didn't know when it would be over.

12          MR. GENISH:

13      Q.   What's the downside to Hyatt to just laying

14  everybody off, paying out their accrued vacation and if

15  and when business stabilizes or normalizes you could

16  just bring them back?

17      A.   Well, for one thing it's a terrible way to

18  treat your colleagues.  So anybody could see that at the

19  end of the pandemic when business came back, there was

20  going to be a battle over talent.  And you can see it

21  now, you can open any paper and see that there's a war

22  out there to get talent back.  So the advantage to Hyatt

23  was these were people that had, in many cases, dedicated

24  a significant portion of their adult lives to working

25  for us.  So the benefit is we give them the reassurance

NIKKI MASSEY

August 19, 2021

1  that we're still their Hyatt family, that there's going

2  to be employment for them when they return.  From a

3  public facing standpoint as an employer in any city or

4  town you have a reputation.  So I can't imagine what the

5  reputation would be of any employer that saw the global

6  pandemic, had no idea how it was going to last, but

7  immediately terminated everybody.  That would just be --

8  that's just bad practice.

9      Q.   Is there a significant cost to onboarding new

10 employees?

11     A.   I mean, listen, is there a cost to onboarding

12 new employees?  Of course.  Is it significant?  Not

13 necessarily.  The reality of it is even the colleagues

14 that we laid off had to be reonboarded, post pandemic,

15 because they weren't coming back into the same hotel

16 operation that they left.  So insofar as onboarding is

17 an inconvenience or has a cost associated with it, that

18 was a cost we were going to have to bear regardless.

19     Q.   Sorry, give me one second, I'm just going

20 through my stuff.

21     A.   Okay.

22     Q.   You testified that ultimately those -- the

23 onboarding costs were incurred anyway, because the

24 employees were coming back to a restructured

25 environment; is that accurate?

NIKKI MASSEY

August 19, 2021

1  process, because we wanted to make sure that everybody

2  that was brought back felt safe and wanted to come back.

3  And that wasn't always the case.

4      Q.   Did Hyatt guarantee any of the employees that

5  were temporarily laid off that they would be returned to

6  work eventually?

7      A.   You know it wasn't as -- it wasn't as

8  intentional as all of that.  Again, when we laid them

9  off we were operating under the assumption as a business

10 that business was going to come back and we were just

11 going to bring them back.  It wasn't a scenario where we

12 guaranteed or didn't guarantee.  Our intent was to bring

13 them back.

14     Q.   I totally understand what the intent was.  My

15 question though is was there an affirmative statement to

16 any of these employees we guarantee you will be brought

17 back?

18     A.   I don't know that any business would make a

19 statement like that in the middle of a global pandemic,

20 but what we said in the letter was as soon as business

21 returns, we're going to bring people back based on

22 business.

23     Q.   So Hyatt did not guarantee any of the

24 temporarily laid off employees that they would be

25 brought back to work; correct?

NIKKI MASSEY

August 19, 2021

```
1              MR. BESCH:  Objection, argumentative, misstates
2     the witness' testimony.  And assumes facts not in
3     evidence.
4              THE WITNESS:  Yeah, again, we did everything
5     we could to give them an indication that they would be
6     brought back, and that was our intent.
7              MR. GENISH:
8        Q.   I need to have just a very clear record on
9     this.  So I don't mean to reask the same question, but I
10    just want an answer to this specific question, if you
11    don't mind.
12             Did Hyatt guarantee any of the employees that
13    were temporarily laid off, that they would be returned
14    to work?
15             MR. BESCH:  Same objections.
16             THE WITNESS:  Yeah, and so I'll say the same
17    answer.  Again, our intent, which was directly stated in
18    the letter, was to bring colleagues back when business
19    improved.
20             MR. GENISH:  I totally understand your intent.
21    But that's not my question.  My question is about
22    whether an affirmative statement was made, and it's a
23    yes or no question.
24       Q.   So one more time.  Did Hyatt guarantee any of
25    its employees that were temporarily laid off that they
```

NIKKI MASSEY

August 19, 2021

1   would be brought back to work eventually?

2      A.   What would a guarantee like that look like?

3   Like what kind of -- what kind of statement would you

4   consider to be an appropriate guarantee?

5      Q.   I guarantee you will be brought back, is one

6   form of it.  A promise, here is a contract that says I'm

7   going to bring you back.  I mean there's a million ways

8   to accomplish it.  So the question is did Hyatt

9   guarantee any of its employees that they would be

10  brought back after the temporary layoff?

11     A.   Yeah, there is -- there is no scenario where

12  any business would utilize language like that.  The

13  letter was intended to provide a reasonable level of

14  assurance that Hyatt would call you back when the

15  business came back.  There was nothing in that letter

16  that said and I personally guarantee you will be brought

17  back by this date.  We were not in a position to do that

18  at that time.

19     Q.   Fair enough, I agree with you, it's not a good

20  business decision, I'm just asking if it happened.  So

21  to be clear, Hyatt did not guarantee any of its

22  employees that were temporarily laid off that they would

23  be brought back; correct?

24     A.   We did not.  And I think what you're getting at

25  is how did they know that the layoffs were temporary if

NIKKI MASSEY

August 19, 2021

1  we didn't make a specific guarantee?  But there are many

2  other ways we can offer reassurance that their jobs are

3  secure without making that specific guarantee.

4      Q.   Such as?

5      A.   Such as letting them know that we were going to

6  be watching the business, letting them know that we

7  would be in contact with them regularly.  Letting them

8  know as soon as we understood the trajectory of business

9  we would start bringing them back.  I mean I don't -- I

10 think it's unreasonable to ask any business in a global

11 pandemic to guarantee anything.  Nobody was in a

12 position to do that at that time.

13     Q.   You didn't know one way or the other whether

14 you were going to -- be able to bring them back or

15 when; right?

16     A.   Did any business know one way or the other in

17 March of 2020?

18     Q.   Hyatt was one of those -- please.

19     A.   Go ahead.

20     Q.   You, please.

21     A.   Did any business have a sense of what the

22 trajectory of this once in a generation global pandemic

23 was going to be?  I mean we acted in what I considered

24 to be good faith.

25     Q.   Hyatt was one of those companies that didn't

August 19, 2021

1  know what was going to happen; right?

2  **A.   Hyatt was one of those companies that didn't**

3  **know what was going to happen.  But I think that what**

4  **you're getting at is short of a guarantee the preferred**

5  **option would have been to fire all of our employees and**

6  **cast them out into the global pandemic with no insurance**

7  **and no tether to our organization, and no sense of**

8  **having employment of any kind.**

9  Q.   So Hyatt's -- instead, Hyatt decided to give

10 employees the impression that eventually they would be

11 brought back; right?

12 **A.   That's correct.  But it wasn't for a nefarious**

13 **reason, it was because that was our genuine intent.**

14 Q.   And in June of 2020, three months later, most

15 of the individuals who had been laid off were not

16 brought back; right?

17 **A.   I mean most of the individuals --**

18       MR. BESCH:  Objection, hang on, objection,

19 assumes facts not in evidence.  Again you used the term

20 laid off, but you can answer the question.

21       **THE WITNESS:  I mean most of the individuals is**

22 **tough to quantify.  But certainly many individuals that**

23 **were furloughed were not brought back, unfortunately.**

24       MR. GENISH:

25 Q.   The word most insinuates more than 50 percent.

NIKKI MASSEY

August 19, 2021

1     Q.   In other words, they didn't have to temporarily

2 lay them off in order to be able to provide them health

3 care coverage; right?

4     A.   Well, they would go on COBRA, so they would no

5 longer be on our health plan.  They'd go on COBRA and

6 then the clock starts ticking and then they only have a

7 certain number of months on COBRA.  So by keeping them

8 on our plan we don't start the clock for the 18 months

9 of COBRA until we actually separate their employment.

10 So it's more beneficial to them to stay on our plan than

11 to go on COBRA and have that clock run down.

12     Q.   One of the reasons why you felt it was

13 beneficial to employees to put them on temporary layoff

14 instead of permanent layoff is so that Hyatt could

15 provide them health coverage for that three-month

16 period; right?

17     A.   That's correct.

18     Q.   Hyatt could have permanently laid them off in

19 March of 2020, and then just paid for their health care

20 coverage for those three months; isn't that right?

21     A.   Well again --

22         MR. BESCH:  Objection, it's been asked and

23 answered.

24         THE WITNESS:  I mean that's correct, but again,

25 that doesn't benefit the colleague because once their

NIKKI MASSEY

August 19, 2021

```
 1  COBRA coverage starts, they're only allowed to be on
 2  COBRA for a limited period of time.  So it's still
 3  beneficial for them to be actively on our health care
 4  plan for three months.
 5          MR. GENISH:
 6      Q.  How long is the COBRA period of time; do you
 7  know?
 8      A.  It's typically 18 months.  I believe due to the
 9  pandemic it was extended, but I don't recall.
10      Q.  So we're talking about an extra year and a
11  half, so far that three-month period doesn't really move
12  the needle for employees; does it?
13          MR. BESCH:  Objection, argumentative.
14          THE WITNESS:  Yeah, I guess I'll say the
15  benefits was a factor in our consideration.  But again,
16  we had no desire to separate with our colleagues.  Our
17  intent was to bring them back, we didn't know how long
18  it was going to last.  So yes, we considered benefits as
19  a factor, and certainly sure, we could have laid them
20  off in the middle of a pandemic, cash out all their
21  vacation, paid a couple of months of insurance and been
22  done.  But that wasn't -- it didn't negatively impact
23  the colleagues to continue being on our benefit plan.
24  They had access to all of their eligible benefit pay,
25  they were able to collect unemployment, there was no
```

NIKKI MASSEY

August 19, 2021

1   reason to do it the other way.  And in fact it could

2   have also created some reputational issues to us.  So

3   it's just -- it was a factor, but sure, we could have

4   laid them off, said goodbye to all of them the day we

5   found out that we were in a global pandemic with no

6   information, and we could have taken them off our

7   benefit plan and paid COBRA for them.  Sure, we could

8   have done that.

9        Q.   Why not, rather than giving them the option to

10  opt in to have their vacation paid out, why not in the

11  letter say we are going to pay out your accrued vacation

12  and PTO unless you tell us otherwise?

13       A.   Well, for one, we knew that we weren't required

14  to do it because we weren't separating employment with

15  them.  Second, many of our employees wouldn't want that

16  vacation paid out.  So for some of them they use that

17  vacation and they go home to their country for a month.

18  Like many of them really really jealously guard those

19  vacation balances.  So we didn't want to create a

20  scenario where somebody maybe accidentally got a payout

21  that didn't request it.  Since we had no obligation to

22  pay it out, we just merely wanted to offer it to them as

23  a choice.  And I'm sure many of them did have it paid

24  out, in fact I heard many of them did have it paid out.

25  And then many of them I'm sure just actually kept their

NIKKI MASSEY

August 19, 2021

```
 1  vacation time because they believed we'll be coming back
 2  in a month or two and then I'm going to want that
 3  vacation time to go home over the holidays to wherever
 4  I'm from; right?  So we just felt it gave the colleagues
 5  more agency to be able to request it if the wanted it.
 6  For many of the colleagues they were getting
 7  unemployment with the additional amount, they had their
 8  insurance, so they didn't necessarily want that
 9  additional payout.
10      Q.   Those employees that didn't want to have it
11  paid out could have just notified you, hey, I choose not
12  to have it paid out; so wouldn't that resolve that
13  concern?
14      A.   Sure, but that's just not how we did it.
15      Q.   Why?
16      A.   Because again --
17          MR. BESCH:  Objection, it's been asked and
18  answered.
19          THE WITNESS:  Because again, not all of our
20  colleagues wanted that, and in order to avoid any kind
21  of mistake, and because we were under no obligation to
22  pay it out, we just offered it up as an option.
23          MR. GENISH:
24      Q.   You're suggesting, and I'm sure this is
25  accurate, is that those that were temporarily laid off,
```

NIKKI MASSEY

August 19, 2021

1  they didn't have a unanimous vote about whether or not

2  they would want accrued vacation paid out.  Some would

3  want it, some wouldn't want it; correct?

4      A.   Correct.

5      Q.   Why not indicate to them we are going to pay it

6  out, but we're giving you the option to have it not paid

7  out and keeping it on the books?  Why not make that

8  choice?

9           MR. BESCH:  Objection, argumentative, and it's

10  been asked and answered.

11          THE WITNESS:  Yeah, I mean again, we felt it

12  gave the colleagues more agency to request what they

13  wanted.  They might have wanted some of it, they might

14  not have wanted all of it, they might not have wanted

15  any of it.  We wanted to give our colleagues the agency.

16  So that's the only reason why.

17          MR. GENISH:

18      Q.   Don't they have the agency if you give them the

19  option to opt out of it?

20      A.   Again, they have more agency if it's proactive,

21  because some of them would want some of the vacation,

22  not all of the vacation, and some of them wanted none of

23  the vacation.

24      Q.   Okay.  So those that wanted some of it and some

25  that didn't, I mean all they had to do was notify you

NIKKI MASSEY

August 19, 2021

1  hey, I know you intended to pay it out, I'd like you to

2  keep some of it on the books, I'd like to be paid on

3  some of it.  I mean why shift the onus to them, is my

4  question.

5      A.   Again --

6          MR. BESCH:  Same objections.

7          THE WITNESS:  We didn't have the -- we didn't

8  have a legal reason why we had to pay it out, and we

9  offered our colleagues an option.

10          MR. GENISH:

11      Q.   Was there any discussion about whether or not

12  to structure it as PTO being paid out, with them having

13  the option to opt out of that payment?

14      A.   No.

15      Q.   Hyatt never considered that?

16      A.   Not that I'm aware of.

17      Q.   Do you have any idea whether more of the

18  employees preferred to have it paid out versus not have

19  it paid out?

20      A.   I have no idea.

21          MR. GENISH:  Give me just one moment.

22      Q.   We talked about what drove Hyatt to make the

23  decision how to structure the temporary layoff and

24  eventually the permanent layoff.  One of the factors you

25  said were reputational concerns; what were those

NIKKI MASSEY

August 19, 2021

1  concerns?

2     A.   We didn't want to be viewed as a company that

3  immediately upon learning that we were in a global

4  pandemic just fired everybody that had worked there,

5  with no real view into what was happening with business

6  in the middle of a global pandemic.

7     Q.   And the terminology temporary layoff sounds

8  better; is that why?

9     A.   Well, no, there is a big difference between a

10  temporary layoff and what you're suggesting, which

11  should be a permanent layoff.  So reputationally it was

12  understandable that in the global pandemic with most of

13  our hotels shuttered and nonoperational, that colleagues

14  would be on layoff.  Permanently laying them off just

15  made no sense.

16     Q.   Is there a difference between a furlough and a

17  temporary layoff?

18     A.   It's all --

19          MR. BESCH:  Objection, calls for a legal

20  conclusion.

21          THE WITNESS:  Yeah, it's all semantics.  In our

22  world furlough and temporary layoffs, you can call it

23  what you want, but there is something that's temporary

24  and something that's permanent.  So furlough, temporary

25  layoff, same thing; permanent layoff is different.

NIKKI MASSEY

August 19, 2021

```
 1          MR. GENISH:

 2     Q.   What's the difference between a temporary

 3  layoff and a permanent layoff?

 4     A.   A temporary layoff is temporary, and a

 5  permanent layoff is forever.

 6     Q.   Maybe you can elaborate.

 7     A.   A temporary layoff is temporary, in that we

 8  anticipate that at some point they'll return.  A

 9  permanent layoff is when we know that we don't have any

10  anticipated return date.

11     Q.   Is a permanent layoff a layoff where you have

12  no intention of bringing them back, or you don't have a

13  date certain by which you intend to bring them back?

14     A.   It could be either.  So in a normal environment

15  maybe we close a restuarant permanently, and we turn

16  that restaurant into banquet space, and we permanently

17  lay off everybody that works there, because the

18  restaurant is no longer operational, and it's not ever

19  going to be a restaurant again.  Maybe we place some

20  people, maybe we lay them off.  In a temporary layoff

21  scenario it's typically due to a reduction in business,

22  or maybe the hotel is going through a renovation.  Like

23  there's some -- there's some relatively short term, or

24  at least an impact that we believe to be short term, but

25  we anticipate a return to some form of full business.
```

1  language temporarily laid off and only refers to it as a

2  furlough; do you see that?

**3     A.   Yes.**

4     Q.   Do you know why it changed the terminology in

5  this paragraph?

6          MR. BESCH:  Calls for speculation.

**7          THE WITNESS:  Yeah, I don't know why.**

8          MR. GENISH:

9     Q.   The next sentence, which is the first sentence

10  on the third paragraph, Hyatt resorts back to laid off

11  temporarily; do you see that?

**12     A.   Yes.**

13     Q.   Any rhyme or reason for Hyatt's use of the word

14  furlough versus temporary layoff in this letter?

15          MR. BESCH:  Calls for speculation.

**16          THE WITNESS:  Yeah, if I were to speculate, I**

**17  would speculate that in the paragraph where it starts to**

**18  talk about unemployment insurance, they're just quoting**

**19  the language that is specific to unemployment insurance,**

**20  and not necessarily Hyatt's terminology.**

21          MR. GENISH:

22     Q.   Go to the last paragraph of this letter.  The

23  second or third to last sentence it uses the terminology

24  furlough/temporary layoff again; do you see that?

**25     A.   Okay.   Yep.**

NIKKI MASSEY
August 19, 2021

1    Q.   So again, it's interchanging this terminology,

2  furlough, temporary layoff; furlough/temporary layoff.

3  Did Hyatt have any rhyme or reason for when it used the

4  word furlough, temporary layoff, or furlough/temporary

5  layoff?

6         MR. BESCH:  Objection, calls for speculation.

7         **THE WITNESS:  I don't know.**

8         MR. GENISH:

9    Q.   You don't know one way or the other?

10   **A.   I don't know one way or the other.**

11   Q.   You'd agree that what transpired in March of

12  2020 was a temporary layoff; correct?

13   **A.   I agree that what transpired in March of 2020**

14  **was temporary -- intended to be temporary in nature,**

15  **yes.**

16   Q.   What transpired in March of 2020 was a

17  temporary layoff; correct?

18   **A.   It was intended to be temporary in nature,**

19  **correct.**

20   Q.   I'm trying to pin down the language here for a

21  moment.  So if you can just respond to the question with

22  a yes or a no or, you know, a clarification.

23         You would agree that what Hyatt implemented in

24  March of 2020 in California was a temporary layoff;

25  correct?

NIKKI MASSEY

August 19, 2021

1      **A.   Correct.**

2           MR. BESCH:  Objection, calls for a legal

3    conclusion, it's been asked and answered.

4           MR. GENISH:

5      Q.   I'm sorry, what was your response?

6      **A.   Again, correct, insofar that it was intended to**

7    **be temporary.**

8      Q.   It was intended to be a temporary layoff;

9    correct?

10     **A.   Correct.**

11          MR. GENISH:  I think now is a good time to take

12   a lunch break.  How long do you guys need?

13          MR. BESCH:  Our lunch is here.  So 30 minutes.

14          **THE WITNESS:  Yeah.**

15          MR. BESCH:  30 minutes is fine.

16          MR. GENISH:  Sounds good.  See you in 30

17   minutes.

18          MR. BESCH:  Okay.

19          THE VIDEO OPERATOR:  Going off the record at

20   12:09 p.m.

21          (Off the record.)

22          THE VIDEO OPERATOR:  We're back on the record

23   at 12:52 p.m.

24          MR. GENISH:

25     Q.   The temporary layoff that was implemented in

NIKKI MASSEY

August 19, 2021

 1  March of 2020 that was indefinite; correct?

 2      A.    Correct.

 3      Q.    There was no return-to-work date provided to

 4  the employees; correct?

 5      A.    Correct.

 6      Q.    The employees had no contractual right to be

 7  recalled to work; right?

 8          MR. BESCH:  Objection, it's overbroad.

 9          THE WITNESS:  Yeah, we -- those provisions may

10  have been in place in some of our union hotels.

11          MR. GENISH:

12      Q.    Absent a union contract.

13      A.    Correct.

14      Q.    The employees who were temporarily laid off in

15  March of 2020 had no contractual right to be recalled to

16  work; right?

17      A.    Correct.

18      Q.    Over the course of the entire pandemic, March

19  of 2020 through today, what period of time was the worst

20  financially for Hyatt?

21          MR. BESCH:  Objection, speculation.

22          THE WITNESS:  Yeah, it would be pure

23  speculation.  But I would say that the worst immediate

24  business impact was that -- those early few months,

25  March, April, May.

NIKKI MASSEY

August 19, 2021

```
 1          MR. GENISH:

 2     Q.   Do you think the law regarding whether or not

 3  Hyatt had an obligation to pay out accrued vacation and

 4  PTO when it implemented the temporary layoff is

 5  uncertain in any way?

 6          MR. BESCH:  Objection, calls for a legal

 7  conclusion.

 8          THE WITNESS:  I have no idea.

 9          MR. GENISH:

10     Q.   You don't know whether or not that law is

11  certain or uncertain?

12          MR. BESCH:  Same objection.

13          THE WITNESS:  Yeah, I have no idea.

14          MR. GENISH:

15     Q.   Has anyone other than your lawyers told you

16  that there's uncertainty in the law in that area?

17     A.   No.

18     Q.   Has anyone other than your lawyers told you

19  that the law is certain in that area?

20     A.   I've had no conversations about that law with

21  anyone other than lawyers.

22     Q.   And again, you've not done any of your own

23  research to figure out whether or not the law is certain

24  in that area?

25     A.   No.
```

NIKKI MASSEY

August 19, 2021

1    Q.    You previously indicated that employees had the

2  right to request their accrued vacation be paid out; do

3  you recall that?

4    **A.    I do.**

5    Q.    What was the mechanism by which employees were

6  told to request payment of their accrued vacation?

7    **A.    This would be speculation on my part, but I**

8  **would imagine that they could do it any number of ways.**

9  **They could call or E-Mail human resources, they could**

10 **reach out to their managers, they could text.  So really**

11 **just any means they have of engaging with the hotel,**

12 **they could have put in a request that way.**

13   Q.    And those that did request to have their

14 accrued vacation paid out, how were they paid out?

15        MR. BESCH:  Calls for speculation.

16        **THE WITNESS:  I don't know.**

17        MR. GENISH:

18   Q.    Was it through ordinary payroll?

19   **A.    I don't know.**

20   Q.    Was there a special payroll run for them?

21   **A.    I don't know.**

22   Q.    If an employee that was temporarily laid off

23 requests to have their vacation paid out, did it require

24 any approval by a manager?

25   **A.    No.**

NIKKI MASSEY

August 19, 2021

1   got the data, so if this is how many he says it was,

2   then that makes sense to me.

3       Q.   It says there were over 7,000; correct?

4       A.   Correct.

5            MR. GENISH:  Why don't we take that short

6   break.

7            THE WITNESS:  Okay.

8            THE VIDEO OPERATOR:  Going off the record at

9   1:57 p.m.

10           (Off the record.)

11           THE VIDEO OPERATOR:  We are back on the record

12   at 2:10 p.m.

13           MR. GENISH:

14      Q.   Has Hyatt entered into any settlement

15   agreements, either individual or class wide, related to

16   its California employees in the last two years?

17      A.   I don't know.

18      Q.   Anything in the last six months?

19      A.   I don't know.

20      Q.   I'm sorry, you don't know?

21      A.   Sorry.  I don't know.

22      Q.   Do Hyatt Hotels in California have resort fees?

23      A.   I don't know, but it's entirely possible.

24      Q.   What about destination fees?

25      A.   I don't know.

NIKKI MASSEY

August 19, 2021

```
1      Q.   What is a resort fee?
2      A.   The resort fee is typically, I guess I would
3  describe it as a maintenance fee, when you think about
4  the grounds of a resort and all the additional
5  activities that they offer, they typically are a little
6  bit tougher to maintain than your average urban
7  property, so often a resort fee is assessed.  And
8  there's -- yeah, basically that's what a resort fee is.
9      Q.   What about a destination fee?
10     A.   I don't know.  I don't know how those two
11  things are different.
12     Q.   What types of costs are the resort fee meant to
13  offset?
14     A.   I don't know, but my speculation would be that
15  it's to offset the maintenance of the grounds of the
16  resort.
17     Q.   Full-time employees in California are entitled
18  to earn 12 hotel room nights after one year of service
19  with the company; right?
20     A.   They are eligible for that perk, yes, after one
21  year of service.
22     Q.   What do you mean when you say eligible?
23     A.   Well, the way you stated it, earn 12 comp
24  nights, it doesn't mean they just get 12 comp nights.
25  They're eligible to take -- they're eligible to stay in
```

NIKKI MASSEY

August 19, 2021

1   our hotels at a complimentary rate after one year, up to

2   12 times a year.  So it's a perk.  It's not something

3   that we like give to them, it's something they're

4   eligible to request.

5       Q.   You don't give them the right to stay at a

6   Hyatt hotel?

7       A.   We give them the option to stay at a Hyatt

8   hotel for free, yes, as a perk.

9       Q.   Okay.  Temporary -- I'm sorry, part-time

10  employees, they get six hotel room nights; correct?

11      A.   They're eligible for six hotel rooms, correct.

12      Q.   If somebody at -- starts their employment with

13  Hyatt mid-year, when do they first have the right to

14  utilize the complimentary hotel room nights?

15      A.   They could book the rooms whenever they want,

16  and they'd be eligible to use those rooms as long as the

17  booking fell after their one year anniversary.

18      Q.   So it's on their one year anniversary?

19      A.   Correct, any time past their one year

20  anniversary they're eligible for that rate.

21      Q.   Hyatt employee starts on December 1st,

22  2019; December 1st, 2020 they can start utilizing their

23  complimentary hotel room nights?

24      A.   Correct.

25      Q.   When does it replenish?

NIKKI MASSEY

August 19, 2021

 1     **A.   Every year on their anniversary.  So December**

 2  **1st, 2021, they're entitled, should they choose, to 12**

 3  **more.**

 4     Q.   This is a perk or benefit that they are

 5  entitled to; correct?

 6          MR. BESCH:  Objection, calls for a legal

 7  conclusion.

 8          **THE WITNESS:  It's a perk that we offer to**

 9  **them.  Entitlement implies that they have some sort of**

10  **right to it.  It's just a perk.  It's meant to be**

11  **something nice for them to utilize, if they wish.**

12          MR. GENISH:

13     Q.   Is it your belief that they don't have the

14  right to use them?

15     **A.   I don't know what you mean by right.**

16     Q.   You said the word right.

17     **A.   I said that they are entitled to use them if**

18  **they wish.**

19     Q.   Does Hyatt have the discretion whether or not

20  to give certain employees the 12 nights versus other

21  employees?

22     **A.   It's not our practice to not give them to some**

23  **colleagues.  There have been colleagues that have abused**

24  **the privilege and have the privilege revoked.  But**

25  **that's rare.**

NIKKI MASSEY
August 19, 2021

1    Q.   Hyatt doesn't have the discretion whether or
2  not to give these bonuses out, correct, these are given
3  to every single full-time employee; correct?

**4    A.   No.**

5         MR. BESCH:  Objection, assumes facts not in
6  evidence.  Calls for a legal conclusion and misstates
7  the witness' testimony.  You can answer.

**8         THE WITNESS:  No, it's not like that.  It's**
**9  like -- I mean it is essentially a discounted rate, and**
**10  you have the option to use it every year, up to 12**
**11  times.  But it's not given to you regardless.  You**
**12  either choose to use it or you don't choose to use it,**
**13  but it's available to you.**

14         MR. GENISH:

15    Q.   You're saying it's a discounted rate; is it not
16  complimentary?

**17    A.   It is, the discount is zero.  100 percent**
**18  discount.**

19    Q.   In fact Hyatt has a different option, which is
20  discounted rates, less than full price, but you're still
21  making a payment; right?

**22    A.   Correct.  The employee rate, yes, and family**
**23  and friends.**

24    Q.   So we're not talking about discounted rooms,
25  we're talking about complimentary rooms; right?

NIKKI MASSEY

August 19, 2021

```
 1      A.   Well, the complimentary room rate is considered
 2   to be a rate.  So even though that rate is zero, the
 3   complimentary room rate is considered a rate, like a
 4   bookable rate.  If it's open and they can make it
 5   available or they can close it.
 6      Q.   Why is it considered a rate if it's free?
 7      A.   Because it's -- the way that our reservation
 8   systems work, every rate is loaded into that reservation
 9   system with different discounts, or what have you, so
10   that it happens to be a rate.  That's just the way that
11   we offer it.
12      Q.   Every single full-time employee receives these
13   12 nights; correct?
14      A.   Every single full-time employee is entitled to
15   12 nights after one year of service, and then every year
16   thereafter on their anniversary.  Should they choose to
17   use them.  But they don't receive them, like there's not
18   a value, we don't hand them 12 rooms.
19      Q.   Okay.  When an employee utilizes this hotel
20   room, they get to use the facilities at the hotel;
21   correct?
22      A.   Correct.
23      Q.   They get to use the wi-fi at the hotel;
24   correct?
25      A.   I mean correct, but they may be charged for it,
```

NIKKI MASSEY

August 19, 2021

1    Q.    Sometimes those are alcoholic beverages; right?

2    **A.    Sometimes.  If they're 21.**

3    Q.    Do certain Hyatt Hotels have free happy hour?

4    **A.    No, I don't think so.**

5    Q.    Do Hyatt Hotels have daily housekeeping?

6    **A.    Hyatt Hotels have housekeeping upon request,**

7    **yes.**

8    Q.    And those employees that are using their

9    complimentary hotel room nights get the -- have the

10   right to request housekeeping daily; correct?

11   **A.    Yes, of course.**

12   Q.    Are you aware of any Hyatt Hotels that offer

13   butler service to certain of the rooms?

14   **A.    Oh, gosh, I don't know.**

15   Q.    Indian Wells does; do you know that town?

16   **A.    No, I mean I know it, but I didn't know they**

17   **offered butler service.**

18   Q.    They do.  Do you know if the employees that

19   have access to Indian Wells Villas get to use the butler

20   service?

21   **A.    I don't.  But they can use the Q-tips.**

22   Q.    The Q-tips, right.  Is there any hotels in

23   California offer free breakfast?

24   **A.    I don't know.**

25   Q.    There are some hotels -- please go ahead.

NIKKI MASSEY

August 19, 2021

1     A.   Under certain circumstances they may.  Our

2  Hyatt Place, Hyatt House Hotels offers free breakfast

3  for eligible rates, which the complimentary rate is not.

4  And then there are hotels that have a Regency Club, and

5  we might as a nice gesture to a colleague upgrade them

6  to Regency Club access, but even at this point those are

7  closed.  It's possible, but not common.

8     Q.   They're closed because of the Corona virus?

9     A.   Correct.

10    Q.   Prior to the Corona virus though colleagues

11  that were using complimentary hotel room nights would

12  have access to those clubs; right?

13    A.   Sometimes.  It was the hotel's discretion.

14    Q.   What's in those clubs?

15    A.   It's a variety of things.  I mean sometimes

16  it's a continental breakfast, sometimes it's a full

17  breakfast.  It varies a little bit hotel by hotel.  Some

18  hotels have no club.

19    Q.   The clubs have food, drinks, alcoholic drinks

20  and the like; is that correct?

21    A.   The clubs have food and drink, many of the

22  clubs charge for alcoholic beverages, whether or not a

23  hotel even has a club is not consistent.  So, yes,

24  there's a variety of different scenarios, but one of

25  those scenarios could be a club with food, beverages and

NIKKI MASSEY

August 19, 2021

1   alcoholic beverages.

2      Q.    And often if there is such a club, the

3   colleagues utilizing their complimentary hotel room

4   nights would have access to those clubs; right?

5      A.    I don't know, because it would really be hotel

6   by hotel, and sometimes it depends on occupancy, and how

7   many guests they already have using the club, so it

8   really varies.  But sometimes a colleague might be

9   upgraded to a club level.

10      Q.    Would you agree that there is some cost to

11   Hyatt when an employee uses their complimentary hotel

12   rooms; correct?

13      A.    I mean there is, but it's very minimal.

14      Q.    Fair enough.  But there is a cost; right?

15      A.    A very small cost.

16      Q.    How much is the cost?

17      A.    Oh, gosh, I don't know.  I mean I would be

18   speculating, but $30.  It's not much.

19      Q.    $30 per night?

20      A.    Maybe.

21      Q.    You'd agree that there's a value to the

22   employees being able to stay at Hyatt Hotels for

23   free; right?

24      A.    I think the employees appreciate it.

25      Q.    There's a value to them?

NIKKI MASSEY

August 19, 2021

```
 1      A.   Yeah, I mean they appreciate it.  It's a
 2   differentiator for us.  We are one of the only companies
 3   -- we are the only company that offers free rooms.
 4      Q.   To your knowledge are there any amenities not
 5   provided to employees using their complimentary hotel
 6   room nights?
 7      A.   Again, it's hotel by hotel, but to my
 8   knowledge, no.
 9      Q.   Resort fees that are typically charged to
10   patrons are not charged to employees using their comp
11   nights; right?
12      A.   That's -- I don't think that's true.  I think
13   resort fees are still charged.  It's been a long time
14   since I've looked, but I'm pretty sure I've checked out
15   and gotten a few resort fees on my folio.
16           MR. GENISH:  I think you're going to have
17   something to talk about.  You shouldn't be charged.
18   Let's mark as Exhibit 6 the document I just uploaded.
19           (Plaintiff's Exhibit 6 marked for
20   identification.)
21           MR. BESCH:  Thank you for shrinking the size of
22   the PDF's.
23           MR. GENISH:  Are you talking to me?
24           MR. BESCH:  Yeah, they popped up much more
25   quickly.
```

NIKKI MASSEY
August 19, 2021

```
 1              MR. GENISH:  Go figure.  This multi-page
 2   exhibit is smaller than the two-page one.
 3        Q.    Marked as Exhibit 6 is a document Bates stamped
 4   Hyatt 1195 through 1198.  This is the colleague
 5   complimentary hotel room policy for California; correct?
 6        A.    This is the global complimentary room policy.
 7        Q.    It applies to California employees; correct?
 8        A.    It does.
 9        Q.    Now, on page 3 Bates stamped 1197, about
10   halfway through the page, do you see where it discusses
11   resort fees?
12        A.    I do.
13        Q.    "Resort fees will not be charged on
14   complimentary room reservations"; do you see that?
15        A.    Yes.
16        Q.    You'd agree that resort fees are not charged to
17   employees that utilize their complimentary room
18   reservations; right?
19        A.    No, not consistently.
20        Q.    That is the policy, though?
21        A.    That is the policy, yes.
22        Q.    Let me know when you're ready to sue Hyatt for
23   the reservations --
24        A.    I will.  You'll be my first call.
25        Q.    In order to book a complimentary hotel room, a
```

NIKKI MASSEY

August 19, 2021

1  colleague has to utilize their credit card; correct?

2     **A.    Correct.**

3     Q.    Why is that?

4     **A.    It's just to have a credit card on file in case**

5  **the colleague incurs additional charges during their**

6  **stay.**

7     Q.    Why not ask for it when they check in?

8     **A.    I don't know.**

9     Q.    Colleagues can be charged if they book a room

10  but never show up; is that right.

11    **A.    I don't know.  I haven't looked at this policy**

12  **in a long time.  Does it say that here?**

13    Q.    Take a look at page 2, toward the bottom, the

14  third to the last sentence.  It says, "Failure to cancel

15  colleague complimentary reservations will result in

16  cancellation fees based on hotel standard or special

17  event policies."  Do you see that?

18    **A.    Yes.**

19    Q.    Is it your understanding that employees who

20  book complimentary hotel room nights but fail to cancel

21  them in advance are charged fees?

22    **A.    I don't think that happens consistently, but**

23  **from the looks of the policy the hotels have the right**

24  **to do it.**

25    Q.    Why is that?

NIKKI MASSEY

August 19, 2021

1  compensation is something that's part of your

2  compensation, so it's your base pay, it's any bonuses

3  you earn, it's upsells or bought rooms or tips or

4  gratuities, those are all part of your compensation.

5  Perks are free lunch for colleagues, complimentary

6  rooms, discounted rooms, parking for the employee of the

7  month.  I mean those are things that are just add-ons

8  that employers do to be good employers to attract and

9  retain the best people, they're not a guaranteed part of

10  compensation.

11     Q.   Are health benefits a perk or compensation

12  package?

13     A.   Health benefits are part of the compensation

14  package.

15     Q.   Why?  Why is that not a perk?

16     A.   Because that's typically how health benefits

17  are viewed.

18     Q.   Do you think that the complimentary hotel room

19  nights are an incentive to retain employees?

20     A.   I have no idea.

21     Q.   Do you think one of the reasons why Hyatt has

22  this policy is so that employees stay with the company?

23     A.   We have the policy because we're an employer

24  that likes to take care of our colleagues.  I don't know

25  that anyone is staying at a job that they don't like or

NIKKI MASSEY

August 19, 2021

1   don't want because they get 12 free nights a year.  So I

2   don't know the answer to that.  I don't know if there's

3   people out there to whom that is so important that

4   they're hanging on with Hyatt when they'd rather be

5   somewhere else.

6       Q.   Employees get a 50 percent discount on

7   food; right?

8       A.   Correct.

9       Q.   Why 50 percent?

10      A.   Again, it's just to make it more affordable and

11  accessible for them.

12      Q.   Is the 50 percent number arbitrary, or is there

13  some calculus that went into that?

14      A.   I don't know, I didn't create the policy.

15      Q.   Do you use the hotel room perk?

16      A.   I do.

17      Q.   It has a value to you?

18      A.   I mean for me it's a nice benefit to have.  If

19  I didn't use it then I would book -- I would just book a

20  regular rate.  It's nice to have, but it isn't what's

21  keeping me with Hyatt, if that's what you're asking.

22      Q.   You answered my question.  You're not going on

23  vacation solely because you have this complimentary

24  hotel room, right; you're going on vacation and you're

25  using these comp nights in lieu of paying for a hotel;

NIKKI MASSEY

August 19, 2021

```
 1   right?

 2        A.    Correct.  Yeah.

 3        Q.    And that's customarily how the employees

 4   utilize that perk; right?

 5        A.    I believe so.

 6              MR. BESCH:  Objection, calls for speculation.

 7              MR. GENISH:

 8        Q.    The hotel -- strike that.

 9              The complimentary hotel room nights, those

10   don't roll over; right?

11        A.    Correct.

12        Q.    It's use it or lose it policy; correct?

13        A.    Correct.

14        Q.    When someone is terminated they're not paid out

15   anything for those complimentary hotel room nights that

16   they've not used; correct?

17        A.    No, they are not.

18        Q.    When someone is paid overtime there is no value

19   attributed to that perk in integrating it into the

20   calculation of overtime rate; correct?

21        A.    Correct.  Correct.

22        Q.    On-call employees don't get this benefit;

23   correct?

24        A.    Correct.

25        Q.    Why is that?
```

NIKKI MASSEY

August 19, 2021

1       A.     They -- you know, on-call employees, it's a

2   much looser employment relationship.   They're not fully

3   committed to us, we're not fully committed to them.

4   They work as needed, we call them as needed, so it's not

5   a full employment relationship in the way that a part-

6   time or full-time employee has.

7       Q.     What is the threshold number of hours to

8   categorize an employee as part time; do you know?

9       A.     Oh, gosh, I don't know.

10      Q.     The reason why part-time employees get six

11  nights and full-time employees get 12 nights is because

12  they're providing more hours of service to the Hyatt; is

13  that correct?

14      A.     Yeah, I mean to some extent, yes.

15      Q.     Why are full-time employees given 12 and part-

16  time employees given 6?

17      A.     Well, full-time employees are given 12 because

18  in order to be given full time, we know you're working

19  at least an hour average of 30 hours a week for us.   So

20  to us that constitutes a relationship in full.   Our

21  part-time colleagues, they're working consistently, but

22  it's a lesser number of hours, so it's just

23  representative of the level of employment relationship

24  we believe we have with them.

25      Q.     It's representative of the number of hours that

NIKKI MASSEY

August 19, 2021

```
 1  they're working for the company; is that right?

 2      A.   Sure.

 3      Q.   Hyatt maintains certain financial statistics

 4  for each of its hotels in California; right?

 5      A.   I don't know what you mean.

 6      Q.   It maintains the amount of revenue each of the

 7  various hotels in California derive; right?

 8      A.   Sure.

 9      Q.   An array of other financial statistics.  It

10  keeps track of its finances; correct?

11      A.   Yes.

12      Q.   And it does so on a hotel-by-hotel

13  level; correct?

14      A.   Sure, yeah.

15      Q.   One of the metrics that it keeps track of is

16  occupancy; right?

17      A.   Correct.

18      Q.   One of the metrics it keeps track of is

19  revenue; right?

20      A.   Correct.

21      Q.   One of the metrics it keeps track of is

22  profitability; right?

23      A.   Correct.

24      Q.   One of the metrics it keeps track of is average

25  hotel room rate; right?
```

NIKKI MASSEY

August 19, 2021

```
 1      A.    Correct.

 2      Q.    And it keeps track of that metric for every

 3  hotel in the world; right?

 4      A.    Correct.

 5      Q.    The average hotel room rate is kept on a global

 6  level on an annual basis; right?

 7      A.    I don't know.  I assume so.

 8      Q.    Who would be the person best equipped to answer

 9  that question?

10      A.    About what our global -- what question?

11      Q.    In what increments Hyatt keeps track of its

12  average hotel room rate for each hotel across -- in the

13  world?

14      A.    I don't know.

15      Q.    Would that be the senior VP of finance?

16      A.    Well, he would certainly make a much better

17  guess than I would.

18      Q.    Where does Hyatt store that information?

19      A.    I don't know.

20      Q.    Do you know what software they keep it in?

21      A.    I don't.

22      Q.    Do you know who specifically at Hyatt would be

23  able to provide that data?

24      A.    I don't.  I'm sorry.

25      Q.    Do you know which department?
```

NIKKI MASSEY
August 19, 2021

```
 1     A.   I don't.  Globally, I don't know.

 2     Q.   What about in the Americas?

 3     A.   That would be our SVP of finance, his

 4  department.

 5     Q.   That's Adam Rohman?

 6     A.   Yes.

 7     Q.   Is there anyone -- who does Adam Rohman report

 8  to?

 9     A.   To Pete Sears, same as me.

10     Q.   Is Adam Rohman limited to Americas?

11     A.   Yes.

12     Q.   Who is the head of finance globally?

13     A.   Our CFO Joan Bottarini.

14     Q.   Can you spell her name?

15     A.   B-O-T-T-A-R-I-N-I.

16     Q.   How does Hyatt determine at what rate it's

17  going to sell a room?

18     A.   I don't know.  I don't work in revenue.

19     Q.   Hyatt maintains data of the costs incurred to

20  run each of its hotels; right?

21     A.   I assume so.

22     Q.   And Hyatt tracks the data associated with the

23  cost to provide a room to patrons; right?

24          MR. BESCH:  Calls for speculation.

25          THE WITNESS:  I don't know.
```

August 19, 2021

```
 1  employer and their individual circumstances.

 2          MR. GENISH:

 3     Q.   We're talking about the state of the law in

 4  California; do you know?

 5          MR. BESCH:  Same objections.

 6          THE WITNESS:  I don't.

 7          MR. GENISH:  I'm going to share my screen and

 8  show you a little video.

 9          THE WITNESS:  Did the DLSE make a video?

10          MR. GENISH:  You're actually the speaker.

11     A.   Oh, good, I can't wait.

12     Q.   Do you know what video I'm about to show you?

13     A.   I am not sure.  I have a couple of guesses.

14     Q.   Who do you think it's going to be?

15     A.   I think it's going to Mark Hoplamazian.

16     Q.   How did you know?

17     A.   I don't know, just a lucky guess.  You did ask

18  if he did any videos for our colleagues, so I assumed

19  you had something in mind.

20     Q.   Have you seen a video involving Hoplamazian

21  that we've raised in this case before?

22     A.   I'm sure I have.  But let's watch it together.

23     Q.   Okay.  Let's do that.  Can you see my screen?

24     A.   I can.

25     Q.   Do you see Mr. Hoplamazian?
```

NIKKI MASSEY

August 19, 2021

```
 1     A.   I do.

 2     Q.   Is he big enough?

 3     A.   He is.

 4     Q.   Okay.

 5          (The Court Reporter interrupted for

 6  clarification of the record.)

 7          MR. GENISH:  I don't want to be off the record

 8  because I'm going to be pausing it throughout to ask

 9  questions, but you don't necessarily need to write down

10  every word that Mr. Hoplamazian says, either.  I don't

11  know how to accomplish that, though.

12          MR. BESCH:  I'm not sure I'd agree with that,

13  because we won't have a clear record otherwise.

14          MR. GENISH:  All right.  So sorry, he's a slow

15  speaker.

16          THE HOPLAMAZIAN VIDEO:  So this is actually not

17  a video, so I'm going to invite -- I'll make some

18  comments on this to start with, and I will invite other

19  comments from others.

20          MR. GENISH:  This is for the court reporter,

21  are you able to hear him clearly?

22          THE COURT REPORTER:  I can hear him fairly

23  clearly.

24          MR. BESCH:  We don't have any objection if the

25  video gets sent to the court reporter after the fact,
```

NIKKI MASSEY

August 19, 2021

```
1  she can correct the language if it's a little bit
2  difficult to follow now.
3          MR. GENISH:  That's a great idea.  I'll upload
4  it to the chat.
5          THE HOPLAMAZIAN VIDEO:  So the question is why
6  did Hyatt choose permanent layoffs over extended
7  furloughs like Marriott.
8          MR. GENISH:
9     Q.   I'm going to pause right there.  Do you know
10 what Mr. Hoplamazian is talking about there?
11    A.   I do.
12    Q.   What?
13    A.   He's talking about permanent layoffs of our
14 corporate office employees, which took place effective
15 June 1st.
16    Q.   How do you know that?
17    A.   I'm familiar with the video.
18    Q.   When did you first see it?
19    A.   Whatever the day was when it was first posted,
20 which I think was within a few days of those layoffs
21 taking place.
22    Q.   Do you know if this was distributed or
23 accessible by California employees that were laid off?
24    A.   I don't know, but it didn't address California
25 employees that were laid off.
```

NIKKI MASSEY

August 19, 2021

```
 1      Q.   I'm sorry, what was that?
 2      A.   But it wasn't meant to address California
 3   employees who were laid off.
 4      Q.   It does address the differences between
 5   permanent layoffs and extended furloughs; right?
 6      A.   I don't know, I haven't watched the whole
 7   video.
 8           MR. BESCH:  Objection, best evidence.
 9           MR. GENISH:  I'm going to rewind a little bit
10   and let's start.
11           THE HOPLAMAZIAN VIDEO:  So the question is why
12   did Hyatt choose permanent layoffs over extended
13   furloughs like Marriott.  This is a very important
14   question, and is a direct reflection of our purpose as a
15   company.  Our decisions, which I have to just reiterate,
16   were exceedingly painful; were made in response to the
17   commercial realities that we saw from COVID 19, which we
18   expected is going to continue to impact our industry
19   throughout the recovery phase.  Now, we don't exactly
20   know how long the recovery phase is, but we do know that
21   it's an extended period of time.  And we were reluctant
22   to effectively leave colleagues in an uncertain state,
23   that is we didn't want to continue to extend furloughs
24   or otherwise -- and speaking of with limited hours or
25   reduced compensation for a very extended period of time,
```

NIKKI MASSEY

August 19, 2021

1  we thought that was unfair to them.  With the

2  uncertainty of not knowing whether they would have jobs

3  on the other side of that period of time.  That is

4  actually what other companies in our industry have

5  chosen to do, which we feel not all companies, some

6  companies have done what we've done, but we feel that

7  that's actually not an expression of care.

8          MR. GENISH:

9    Q.  Do you agree with what Mr. Hoplamazian just

10  said?

11    **A.  I do.  This is a video that referred to**

12  **corporate colleagues, and we had a much clearer picture**

13  **of the fact that they weren't going to be able to**

14  **return, than we did of our hotel colleagues.**

15    Q.  Do you agree that putting employees on extended

16  furloughs puts them in an uncertain state?

17          MR. BESCH:  Objection, misstates the witness'

18  testimony.

19          **THE WITNESS:  I believe that in the corporate**

20  **office we were able to ascertain our desire to bring**

21  **people back a lot more quickly because their jobs are**

22  **not dependent on business levels, necessarily.**

23  (Overtalk)

24          MR. GENISH:

25    Q.  He stated -- pardon me, what was that that you

```
 1     A.   Well, they were all gone by then, so no.

 2     Q.   When were they terminated?

 3     A.   June 1st -- actually we had the conversation

 4  with them at some point in late May, we paid them

 5  through the end of May up to June 1st, so that they

 6  could stay on our benefits in June.  So these

 7  conversations happened in May.

 8     Q.   As of May 31st, 2020, corporate colleagues were

 9  on extended furlough; correct?

10          MR. BESCH:  Objection, misstates the witness'

11  testimony.

12          THE WITNESS:  Corporate colleagues, they were

13  still being paid by Hyatt, but they had been informed as

14  to their employment status, they had a last day, their

15  severance was processed.  So technically, no.

16          MR. GENISH:

17     Q.   At what point did they stop being on extended

18  furlough, the corporate colleagues?

19          MR. BESCH:  Objection, assumes facts not in

20  evidence and misstates the witness' testimony.

21          MR. GENISH:

22     Q.   Had they ever been?

23     A.   Had they ever been what?

24     Q.   Had corporate colleagues ever been on extended

25  furlough?
```

NIKKI MASSEY

August 19, 2021

1      A.   No, by my definition of extended furlough they

2  had not.  They were on furlough for the entire time

3  where we thought we could reasonably bring them back, as

4  soon as we assessed that we weren't going to be able to

5  bring them back, we ended their furlough.

6      Q.   And had Hyatt continued keeping them on

7  furlough it would have been extended at that point, it

8  would have been extended; correct?

9      A.   Well, that's irrelevant because we didn't do

10  that.

11      Q.   I'm asking you a question, I'm not asking for

12  your objection about relevance.  Had Hyatt kept those

13  corporate employees on furlough, at that point it would

14  have been an extended furlough; correct?

15      A.   Sure.

16      Q.   And it would have been unfair to them; right?

17      A.   Sure.

18      Q.   And it would have put them in an uncertain

19  state; right?

20      A.   No more or less uncertain than they were

21  already in on the regular furlough, but sure.

22      Q.   Keeping them any longer would not have been an

23  expression of care; right?

24           MR. BESCH:  Vague and ambiguous.  Who are we

25  talking about?

NIKKI MASSEY

August 19, 2021

```
 1              THE WITNESS:  Are we talking about the
 2   corporate colleagues?
 3              MR. GENISH:
 4   Q.   Yeah.
 5   A.   Yes.
 6   Q.   Where was this video posted?
 7   A.   I assume on Hyatt Connect.
 8   Q.   And the California field employees had access
 9   to that; right?
10   A.   I assume so.
11   Q.   Even those that were on temporary layoff;
12   right?
13   A.   I assume so.
14   Q.   Who was complaining about the insensitivity of
15   this video?
16   A.   Mostly that discussion went on between my team
17   and I.
18   Q.   Were you getting complaints from field level
19   employees?
20   A.   No.
21   Q.   You didn't receive any complaints from field
22   level employees?
23   A.   Not that I recall.
24   Q.   Who specifically thought that this was an
25   insensitive video?
```

NIKKI MASSEY

August 19, 2021

```
 1        A.    I would say a couple of members of my team.
 2   Wendy Parker, the RVP that I mentioned before, Emily
 3   Rodriguez, my RVP that I mentioned before; so a couple
 4   of my direct reports.
 5        Q.    Did you?
 6        A.    To be honest I had other things to concern
 7   myself with at that time.
 8        Q.    Did you think that this was insensitive?
 9        A.    I thought it was narrowly focused.
10        Q.    Don't worry, we won't show it to
11   Mr. Hoplamazian.
12        A.    That's okay, I would tell him.
13        Q.    Did you think that he was being insensitive
14   when he created this video?
15        A.    I think the focus of the video was very narrow.
16   I think he was attempting to be sensitive to our
17   remaining corporate colleagues, but I think that perhaps
18   he got some bad advice, and that if you film a video
19   that's just about corporate colleagues when you still
20   have many field colleagues out there, and we're trying
21   to figure out what's going on, that that's not the best
22   look.
23        Q.    Do you know where he got -- sorry, go ahead.
24        A.    I don't think he intended to be insensitive,
25   no.
```

NIKKI MASSEY

August 19, 2021

```
 1     Q.   Do you know where he got that advice?

 2     A.   I don't.

 3          MR. GENISH:  Let's continue watching.

 4          THE HOPLMAZIAN VIDEO:  We feel that that is

 5  essentially not an expression of care.  We feel that

 6  that is an unfairness to employees because it leaves

 7  them in an uncertain state, and also it leaves them in a

 8  financially diminished state.  In our case we

 9  effectuated --

10          MR. GENISH:

11     Q.   Would you agree that extending furloughs would

12  have left them in a financially diminished state?

13          MR. BESCH:  Objection, vague and ambiguous.

14  Who are we referring to?

15          THE WITNESS:  Yeah, if you're referring to the

16  corporate colleagues it -- I mean they weren't getting

17  paid, so yes, they would be in a financially diminished

18  state.

19          MR. GENISH:

20     Q.   And field level employees that are furloughed

21  but not getting paid are not in a financially diminished

22  state?

23     A.   That's not what I said.

24     Q.   Would you agree that field level employees that

25  were on furlough were in a financially diminished state?
```

NIKKI MASSEY

August 19, 2021

1      A.   Yes.

2           THE HOPLAMAZIAN VIDEO:  Layoffs, permanent

3   reductions of staff in many locations, but with it came

4   financial support through severance payments, through

5   ongoing support with respect to outplacement, and

6   assistance in helping people to try to find their next

7   position.  So we felt that that was actually the

8   appropriate thing to do.  And it's our sincere hope, my

9   sincere hope that we will be able to rebuild our

10  business, and with that, over time, be able to reunite

11  as many members of the Hyatt family as is possible."

12          MR. GENISH:

13     Q.   Was a similar video prepared for the field

14  level employees when they converted them from temporary

15  layoff to permanent layoff?

16     A.   Not that I recall.

17     Q.   Why not?

18     A.   I don't know.

19     Q.   You said you've never spoken to Mr. Hoplamazian

20  about this video; correct?

21     A.   Correct.

22     Q.   And have you ever had any form of written

23  communication with him about the video?

24     A.   No.

25     Q.   Which department at Hyatt would be best suited

NIKKI MASSEY

August 19, 2021

1  to opine about how rooms were priced?

2      **A.   I don't know.**

3      Q.   Do you have any idea which department handles

4  that type of thing?

5      **A.   Maybe revenue management, commercial services.**

6      Q.   Are those two different departments, commercial

7  services and revenue management?

8      **A.   They're -- commercial services is the**

9  **overarching department, revenue services is within**

10 **commercial services.**

11     Q.   Who runs that department?

12     **A.   Who runs the department, or who would be the**

13 **best person to speak to room pricing?**

14     Q.   Both.

15     **A.   Ased Ahmed is our Americas head of commercial**

16 **services, SVP of commercial services.  And then we have**

17 **a revenue management team who also sits in that**

18 **department, so that might be Matthew Shock.  But again,**

19 **these are just guesses.**

20     Q.   Would Ased Ahmed be the best person suited for

21 hotel room pricing in California?

22     **A.   No, Ased oversees the Americas, in total, so he**

23 **wouldn't -- I don't know that he'd have deep knowledge**

24 **of specific room pricing in California.**

25     Q.   What about the methodology for calculating the

NIKKI MASSEY

August 19, 2021

1              REPORTER'S CERTIFICATION

2              I, Diana Bryant, a Certified Shorthand

3  Reporter in and for the State of California, do hereby

4  certify:

5              That the foregoing proceedings were taken

6  before me via videoconference at the time and place

7  herein set forth; that any witnesses in the foregoing

8  proceedings, prior to testifying, were duly sworn; that

9  a record of the proceedings was made by me using machine

10  shorthand, which was thereafter transcribed under my

11  direction; that the foregoing transcript is a true

12  record of the testimony given.

13              Further, that if the foregoing pertains to

14  the original transcript of a deposition in a federal

15  case, before completion of the proceedings, review of

16  the transcript [] was [] was not requested.

17              I further certify I am neither financially

18  interested in the action nor a relative or employee of

19  any attorney or party to this action.

20        IN WITNESS WHEREOF, I have subscribed my name

21  this 26TH day of August, 2021.

22

23

24                        Diana Bryant, CSR No. 5056

25

# EXHIBIT J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--


KAREN HARTSTEIN, in her          )
representative capacity and on   )
behalf of herself and all others)
similarly situated,              )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )CASE NO.:
                                 )2:20-cv-04874-DSF-JPR
HYATT CORPORATION, a Delaware    )
corporation doing business in    )
California; and DOES 1 through   )
  0, inclusive,                  )
                                 )
          Defendants.            )


     REMOTE VIDEOTAPED VIDEO-CONFERENCE DEPOSITION OF:

                    CHRISTEN GARB

           WEDNESDAY, OCTOBER 27, 2021

             10:02 A.M. - 2:48 P.M.


REPORTED BY:

AMY P. SMITH, CSR #12154

Job No. 65015

CHRISTEN GARB

October 27, 2021

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                            --oOo--

 4

 5   KAREN HARTSTEIN, in her          )
     representative capacity and on   )
 6   behalf of herself and all others)
     similarly situated,              )
 7                                    )
             Plaintiff,               )
 8                                    )
         vs.                          )CASE NO.:
 9                                    )2:20-cv-04874-DSF-JPR
     HYATT CORPORATION, a Delaware    )
10   corporation doing business in    )
     California; and DOES 1 through   )
11   100, inclusive,                  )
                                      )
12           Defendants.              )

13

14        Remote videotaped video-conference deposition of

15   CHRISTEN GARB, taken on behalf of the Plaintiff,

16   beginning at 10:02 a.m. and ending at 2:48 p.m., on

17   Wednesday, October 27, 2021, before Amy P. Smith,

18   CSR No. 12154, a Certified Shorthand Reporter within and

19   for the State of California.

20

21                            --oOo--

22

23

24

25
```

CHRISTEN GARB

October 27, 2021

```
 1                    A P P E A R A N C E S

 2             (ALL PARTIES APPEARED REMOTELY)

 3

 4   FOR THE PLAINTIFF:

 5             BLACKSTONE LAW, APC
               BY:  JONATHAN M. GENISH
 6                  MATTHEW W. DIETZ
                    JILL J. PARKER
 7                  S. EMI MINNE
                    ATTORNEYS AT LAW
 8             8383 WILSHIRE BOULEVARD
               SUITE 745
 9             BEVERLY HILLS, CALIFORNIA 90211
               (310) 622-4278
10             jgenish@blackstonepc.com
               mdietz@blackstonepc.com
11             jparker@blackstonepc.com

12
     FOR THE DEFENDANTS:
13
               SEYFARTH SHAW, LLP
14             BY:  HOLGER BESCH
                    ATTORNEY AT LAW
15             601 SOUTH FIGUEROA STREET
               SUITE 3300
16             LOS ANGELES, CALIFORNIA 90017-5793
               (213) 270-9600
17             HBesch@seyfarth.com

18
                    -- AND --
19
               HYATT CORPORATION
20             BY:  STEPHANIE MC ALISTER
                    CORPORATE COUNSEL
21             150 NORTH RIVERSIDE PLAZA
               CHICAGO, ILLINOIS 60606-1598
22             312-780-5102
               Stephanie.mcalister@hyatt.com
23

24   VIDEOGRAPHER:

25             TIM HUNTER
```

CHRISTEN GARB

October 27, 2021

1  participate as those were -- some of them were newly

2  acquired hotels in late 2018.

3           So in a quick review of the document, those

4  are my only known changes to the program.

5      Q.   How did Hyatt decide which hotels to

6  exclude from the policy?

7      A.   I was not included in those discussions.

8      Q.   Do you know how those decisions came to be

9  made?

10     A.   I do not.

11     Q.   Who -- who was involved in the decision of

12  which hotels included -- to exclude from the policy?

13     A.   I do not know.

14     Q.   Do you know which department would be in

15  charge of that decision?

16     A.   Most likely the operational leaders of

17  each -- each region within our organization.

18     Q.   Forgive me if I'm wrong, but didn't you

19  hold one of those positions as operational leader

20  for the Americans at one point?

21     A.   So there's a difference.  I oversee revenue

22  management operation.  We have an entire discipline

23  called operations.  It oversees the operations of

24  our hotels, and those operational leaders most

25  likely were a part of those discussions.

CHRISTEN GARB

October 27, 2021

1    Q.    The decision of which hotel to exclude, is
2  that likely to be a -- on a Hyatt corporate level or
3  on a hotel level?

4    A.    I do not know a hundred percent.

5    Q.    What do you think?

6    A.    In my opinion, it's a Hyatt Corporation
7  decision in partnering with the hotel.

8    Q.    Can you tell me the policy?  The hotel
9  policy, can you tell me the parameters of it?

10   A.    In general, it offers our employees of our
11 global operating center, which is our headquarters,
12 as well as the global contact center, which is our
13 call center, and then all of the employees of our
14 managed hotels, and after one year of employment, it
15 offers our full-time employees 12 complimentary room
16 nights a year, and part-time employees six
17 complimentary room nights a year.

18        It's based upon availability, and it's an
19 amazing benefit for them to utilize in their
20 personal time, if they choose to.

21   Q.    Why do you think it's an amazing benefit?

22   A.    Because it allows our employees, including
23 myself, in their personal time, if they choose to
24 travel, to explore new areas and hotels and utilize
25 this benefit, if it's available --

CHRISTEN GARB

October 27, 2021

```
 1      Q.   I'm sorry --
 2      A.   -- and not have a cost associated with it.
 3      Q.   Are there any employees of Hyatt
 4  Corporation that do not receive this benefit?
 5      A.   Not to my knowledge.
 6      Q.   You indicated in your description of which
 7  employees get to utilize it, managed hotels.  What
 8  did you mean by that?
 9      A.   So we have many Hyatt hotels that are not
10  managed and operated by Hyatt.  They're third party.
11  We call them franchise partners.  And they work --
12  those employees are operating Hyatt hotels, but they
13  do not work for Hyatt.  They are not Hyatt
14  employees.  The hotel is managed by a third party
15  organization that we reference as a franchise.
16      Q.   Why is there a requirement that an employee
17  be employed for Hyatt -- with Hyatt Corporation for
18  at least one year before receiving this benefit?
19      A.   I did not write that rule, so I don't know
20  the why behind it.  I have my opinions.  But I
21  don't -- I don't know why that rule was implemented.
22      Q.   Did you do anything to investigate the why?
23      A.   Did I?  No.
24      Q.   What is your opinion about the why?
25      A.   My opinion is that it's to ensure someone
```

CHRISTEN GARB

October 27, 2021

1   doesn't come work for Hyatt for a month, stay at a

2   bunch of hotels for free, and then leave after a

3   month.

4           It's -- it's meant to be for our employees

5   who plan to be a part of our Hyatt family for at

6   least a year.

7       Q.   It's a way of incentivizing employees to

8   stay with Hyatt, I would imagine?

9       A.   It could be viewed that way.

10      Q.   Why would it be a problem if an employee

11  was hired, started using these nights, and then --

12  you know, immediately after being hired?  Why would

13  that be something that Hyatt would not want?

14      A.   I didn't say it's something Hyatt didn't

15  want.  I said that was my opinion.

16      Q.   Why is that your opinion?

17      A.   It's my opinion because I think hard work

18  pays off.  And so to -- just like with a lot of

19  companies, insurance benefits don't start until

20  after 90 days.  There's parameters before benefits

21  are received that have to take place.

22      Q.   Okay.  So it's a way of rewarding the

23  employee's hard work; right?

24           MR. BESCH:  Objection.  Misstates the

25  witness's testimony.

CHRISTEN GARB

October 27, 2021

```
 1            You can answer.
 2            MR. GENISH:  You can answer.
 3            THE WITNESS:  In my opinion, it's a great
 4  benefit to the employee.
 5       Q.  (BY MR. GENISH)  And you'd agree that it's
 6  a way of awarding their hard work; right?
 7            MR. BESCH:  Same objection.
 8            THE WITNESS:  I think it's a benefit.  I --
 9  I don't necessarily think it's a reward.  It's an
10  extension of a great benefit they now have access
11  to.
12       Q.  (BY MR. GENISH)  Okay.  An employee who
13  works for Hyatt Corporation receives an array of
14  benefits, health insurance and so forth; right?
15            Is that correct?
16       A.  Yes, if they enroll.
17       Q.  "If they enroll."
18            And one of the reasons why Hyatt
19  Corporation provides this hotel room benefit is in
20  exchange for their hard work for the company; right?
21            MR. BESCH:  Objection.  Misstates the
22  witnesses's testimony.
23            MR. GENISH:  You can answer.
24            THE WITNESS:  It's a benefit offered to
25  them to utilize if they wish to.
```

CHRISTEN GARB

October 27, 2021

```
 1              MR. GENISH:  I'm asking a very specific
 2    question.  So if you would just sort of listen to
 3    the question and do your best to answer it directly.
 4              THE WITNESS:  Okay.
 5       Q.   (BY MR. GENISH)  You would agree that the
 6    benefit -- the hotel room bonus benefit that we're
 7    describing here, is provided in exchange for the
 8    work that the employees provide to the Hyatt
 9    Corporation; correct?
10              MR. BESCH:  Same objection.
11              THE WITNESS:  It's a benefit they receive
12    because they are employed with Hyatt, yes.
13       Q.   (BY MR. GENISH)  And they need to be
14    employed there one year before they can receive this
15    benefit; correct?
16       A.   Yes.
17       Q.   Hyatt Corporation would not want
18    employees -- well, strike that.
19              If an employee begins their tenure
20    mid-year, let's say June 1st, hypothetically, when
21    would they start to earn the hotel room bonus?
22       A.   One year later.
23       Q.   So if an employee starts on June 1st, 2020,
24    on June 1st, 2021, they receive 12 nights, if
25    they're full time, of this hotel bonus; is that
```

CHRISTEN GARB

October 27, 2021

 1  correct?

 **2      A.   That is my understanding, yes.**

 3      Q.   And how long do they have to utilize those

 4  12 nights?

 **5      A.   A calendar -- a full calendar year.**

 **6  They're valid for one year.**

 7      Q.   One year from their anniversary or from

 8  January 1st?

 **9      A.   From the year of their employment, is my**

 **10  understanding.**

 11      Q.   Okay.  And if an employee does not use

 12  their 12 nights, do they lose those nights, or do

 13  they carry over to the following year?

 **14      A.   They do not carry over to the following**

 **15  year.**

 16      Q.   So it's a use-it-or-lose-it policy?

 **17      A.   Correct.**

 18      Q.   How did Hyatt Corporation decide to provide

 19  12 nights to full-time employees and six nights to

 20  part-time employees?

 **21      A.   I was not a part of those decisions or**

 **22  discussions when this program was created.  I don't**

 **23  know.**

 24      Q.   Did you do any investigation prior to the

 25  deposition to find out?

CHRISTEN GARB

October 27, 2021

```
 1      A.    No, I did not.

 2      Q.    Did you speak to anyone about it, perhaps?

 3      A.    No, I did not.

 4      Q.    An employee needs to work for Hyatt

 5  corporation for 12 months in order to get 12 nights.

 6            In essence, they're working -- they're

 7  getting one night for each month of service; is that

 8  correct?

 9            MR. BESCH:  Objection.  Misstates the

10  witness's testimony.

11            MR. GENISH:  You can answer.

12            THE WITNESS:  It could be viewed that way.

13            I -- once again, I wasn't part of writing

14  the program, so I -- I don't know how that was taken

15  into -- how it was developed.

16            MR. BESCH:  Jon, it's been about an hour,

17  so while you're gathering your thoughts, is this a

18  good spot for just a five-minute break?

19            MR. GENISH:  Sure.  We can take a short

20  break.

21            Did you want to take a rest room break,

22  Holger?

23            MR. BESCH:  Yeah, if we can.  It doesn't

24  have to be immediate, but if this is a good spot,

25  take a few minutes.  It would be great.
```

CHRISTEN GARB

October 27, 2021

```
 1              MR. GENISH:  Now is as good a time as any.
 2    No problem.
 3              MR. BESCH:  All right.  Perfect.
 4              THE VIDEOGRAPHER:  We're going off the
 5    record at 10:59 a.m.
 6                        (Recess taken.)
 7              THE VIDEOGRAPHER:  And we're back on the
 8    record at 11:08 a.m.
 9      Q.  (BY MR. GENISH)  There are a number of
10    questions that I've asked related to the terms of
11    the policy, how it was created, why the decisions
12    were made that you said you were not involved in.
13              Do you know who was involved in it?
14      A.  I do not.
15      Q.  Is there anyone at Hyatt Corporation that
16    would know?
17      A.  The person I would go to, if I was going to
18    ask that question, is Nikki Massey.
19      Q.  And did you go to Nikki Massey prior to
20    your deposition to ask --
21      A.  No, I did not.
22      Q.  -- (inaudible) to the policy?
23      A.  No, I did not.
24      Q.  Okay.  Twelve -- strike that.
25              Full-time employees are given 12 nights,
```

CHRISTEN GARB

October 27, 2021

1  owned by third parties?

2      A.   Both.   There are some that are owned by

3  Hyatt and some that are owned by third parties, but

4  they're managed by Hyatt.

5      Q.   And the employees are Hyatt Corporation

6  employees; right?

7      A.   Yes.

8      Q.   Okay.   Does the owner of the hotel have

9  discretion whether or not to implement this policy?

10      A.   Not to my knowledge.

11      Q.   Does the hotel itself receive any form of

12  revenue when this hotel room policy is utilized at

13  their facility?

14      A.   I'm sorry.   Did you say do they lose

15  revenue or gain revenue?

16      Q.   Are they -- do they receive any sort of

17  payment from Hyatt Corporation or from some other

18  third-party fund or something else when a hotel room

19  is booked at their -- a complimentary hotel room is

20  booked through this policy?

21      A.   No, they do not.

22      Q.   When a room is utilized under this policy,

23  what rate is inputted into the Reserve software?

24      A.   Zero dollars.

25      Q.   Is that in all circumstances?

CHRISTEN GARB

October 27, 2021

1          MR. BESCH:  Jonathan, we lost you for a

2   moment.  We're trying to reconnect.

3          MR. GENISH:  Can you hear me?

4          MR. BESCH:  We --

5          **THE WITNESS:  There we go.**

6          **Okay.  I can hear you now, I believe.**

7     Q.   (BY MR. GENISH)  The rate of zero dollars

8   you said is inputted into the Reserve system when a

9   room is utilized under this policy?

10         MR. BESCH:  Jonathan, you cut out about

11  halfway through the question.  Would you repeat it

12  one more time, please.

13         MR. GENISH:  Sure.

14    Q.   (BY MR. GENISH)  When a room is utilized

15  under the policy, you said a rate of zero dollars is

16  input into the system?

17    **A.   Yes, to the rate plan for this program is a**

18  **zero dollar rate.**

19    Q.   And that's because the hotel receives zero

20  dollars when the room is utilized?

21    **A.   That's correct.**

22    Q.   Taking a look back at the policy,

23  colleagues may only reserve one complimentary rate

24  room per night.

25         Why is that part of the policy?

CHRISTEN GARB

October 27, 2021

 1      A.    You can reserve the complimentary night for

 2  up to three nights at one hotel.  That's the policy.

 3      Q.    Why?

 4      A.    I don't know.  I didn't write it.

 5      Q.    Did you conduct any investigation to

 6  ascertain why that is the policy?

 7      A.    No, I did not.

 8      Q.    Do you know who wrote this policy?

 9      A.    No, I do not.

10      Q.    Is there anyone at Hyatt Corporation who

11  would know?

12      A.    If I was to go to somebody to ask that

13  question, I would go to Nikki Massey.

14      Q.    Do you know anyone else that might know the

15  answer to that question?

16      A.    No, I do not.

17      Q.    Why do you think there's a cap on the

18  number of nights an employee can utilize this

19  benefit at one particular hotel?

20      A.    In my opinion, it's to prevent one hotel

21  from getting hit with thousands of employees over a

22  period of time because they're a very popular

23  destination.  And so it helps prevent too many

24  complimentary stays at one or a grouping of very

25  popular destinations.

CHRISTEN GARB

1      Q.   And why wouldn't the hotel want too many

2   complimentary hotel room stays at their hotel?

3           MR. BESCH:  Objection.  Calls for

4   speculation.

5           **THE WITNESS:  I don't know.**

6      Q.   (BY MR. GENISH)  You don't know?  Because

7   they want revenue; right?

8           Come on.  These are easy ones.

9           Why wouldn't a hotel want too many

10  employees to utilize the complimentary hotel room

11  nights at their hotel?

12     **A.   If they're running high occupancy, then**

13  **they are not maximizing their revenue.**

14     Q.   Okay.  Sorry.  I'm just reviewing the

15  policy.  Give me one moment.

16     **A.   Uh-huh.**

17     Q.   You indicated that hotels do not receive

18  any revenue when the hotel room is used under this

19  policy.  Is that something that you would be privy

20  to?

21     **A.   There's a zero dollar value to the booking,**

22  **so they do not receive revenue unless the employee**

23  **spends their personal dollars elsewhere in the**

24  **hotel.**

25     Q.   Do you know if hotels receive any revenue

CHRISTEN GARB

October 27, 2021

1  when World of Hyatt points are utilized at their

2  hotels?

**3      A.    The hotels do receive compensation when**

**4  World of Hyatt points are utilized.**

5      Q.    From whom?

**6      A.    From Hyatt.**

7      Q.    Do you know how that amount is calculated?

**8      A.    I do not.**

9      Q.    Who would know that?

**10     A.    Amy Weinberg, who I referenced earlier.**

11     Q.    So they receive compensation when World of

12  Hyatt points are utilized but not when the comp room

13  benefit is utilized; is that right?

**14     A.    Correct, two different programs.**

15     Q.    Do you know why the hotels receive

16  compensation when World of Hyatt points are utilized

17  at their facility?

**18     A.    I was not included in that process.**

19     Q.    If I can direct your attention to page 3 of

20  Exhibit 2, one percent of each participating hotel's

21  room inventory will be reserved for the colleagues

22  complimentary rooms.

23         Do you see that?

**24  A.    Yes.**

25         MR. BESCH:  There's more to the sentence,

CHRISTEN GARB

October 27, 2021

```
 1      Q.   What is his job?
 2      A.   He's vice president of revenue management
 3  analytics.
 4      Q.   What does revenue management analytics do?
 5      A.   He oversees all of our analytics from
 6  showing production of our overall hotels, certain
 7  promotions, offers that we run, and assists in
 8  showing incrementally.  So we know if we ran a
 9  global offer open to the general public, did it
10  provide incremental revenue for us, is one example.
11      Q.   Okay.  Just on the same page, in some
12  countries complimentary hotels -- or strike that --
13  complimentary rooms may be considered a taxable
14  benefit, and, therefore, could be subject to
15  personal income tax.
16           Do you see that?
17      A.   I do see that.
18      Q.   Do you know which countries that applies
19  to?
20      A.   I do not.
21      Q.   So there are times where an employee has to
22  pay tax if they utilize the benefit?
23           MR. BESCH:  Objection.  Assumes facts not
24  in evidence.  Calls for speculation.
25           THE WITNESS:  Based upon what I see in the
```

CHRISTEN GARB

October 27, 2021

```
 1   policy, that's what I know.
 2       Q.   (BY MR. GENISH)   That's what you what,
 3   ma'am?  I'm sorry.
 4       A.   That's what I know, is based upon reading
 5   that -- that portion of the document.
 6       Q.   Okay.  In your experience, do you find that
 7   employees really like this benefit?
 8       A.   In my experience, yes.
 9       Q.   Something that they find to be valuable?
10       A.   I personally feel it's a great benefit.
11   I'm an employee.
12       Q.   Is it valuable to you?
13       A.   If it's available.
14       Q.   How often do you use it?
15       A.   I personally do not very often because I
16   tend to want to go to locations over higher demand
17   time frames when it's not available.
18       Q.   When was the last time you utilized it?
19       A.   I honestly can't recall.  The last time I
20   was going to use it was a few months ago here in
21   Dallas, but my plans changed, so I did not.
22       Q.   Do you recall ever having used the hotel
23   room benefit?
24       A.   Yes.
25       Q.   Where?
```

CHRISTEN GARB

October 27, 2021

```
 1      A.   I believe one of the last times was in the
 2 hill country of Texas outside of San Antonio years
 3 ago with my family.
 4      Q.   And why did you utilize the hotel room
 5 bonus then?
 6      A.   Because it was available.  And if it's not
 7 available, then I book the employee rate, which is
 8 preferable.
 9      Q.   How much is the employee rate?
10      A.   It varies by location.
11      Q.   The time that you used it, this last one
12 that you're describing, how much would you have paid
13 had you not utilized the hotel room bonus?
14      A.   I don't recall for that location.  The
15 price varies based upon location.  And similar to
16 how an employee books a comp room, it's the same
17 process to see -- if they're not available, to see
18 the employee rates, and what they are by each
19 location.  So they do vary locally by each location.
20      Q.   If you give an estimate to me, what do you
21 think you would have paid had you not utilized the
22 benefit?
23      A.   A little less than a hundred dollars a
24 night.
25      Q.   Okay.
```

CHRISTEN GARB

October 27, 2021

1       A.    Maybe more.

2       Q.    How many nights did you use it?

3       A.    We used comps for three nights, and then

4   paid employee, I believe, for the other one.  But I

5   don't remember what the rate was.

6       Q.    Is that something that employees frequently

7   do?  They utilize the comp nights for part of it,

8   and then pay for remaining nights?

9             MR. BESCH:  Objection.  Calls for

10  speculation.

11            THE WITNESS:  If they're wanting to stay

12  more than three nights, then, yes.  That's the

13  process they have to follow because the comp room

14  can only be booked for a maximum of three nights.

15      Q.    (BY MR. GENISH)  In your experience, is

16  that something that employees frequently do?

17            MR. BESCH:  Same objection.

18            THE WITNESS:  It depends on how long

19  they're staying.  Some trips I've had personally

20  have been shorter.  Some have been much longer, and

21  there was no comp employee night available at all.

22      Q.    (BY MR. GENISH)  So in the trip that you're

23  describing, let's assume for -- for hypothetical

24  purposes, the price that you paid for that fourth

25  night was a hundred dollars.

CHRISTEN GARB

October 27, 2021

1           You actually saved $300 utilizing the comp
2    night benefit; right?
3        **A.   I could view it that way, yes.**
4        Q.   It had a value to you for that trip, at
5    least, of $300; correct?
6           MR. BESCH:  Objection.  Misstates the
7    witness's testimony.
8           **THE WITNESS:  In my mind, I didn't assign a**
9    **value to the first three nights because they were**
10   **complimentary.**
11       Q.   (BY MR. GENISH)  Money that you didn't need
12   to spend that you otherwise would have.
13          So you would agree that there was a $300
14   value, assuming a hundred per night number that you
15   described; right?
16          MR. BESCH:  Objection.  Argumentative.
17   Assumes facts not in evidence.  Misstates the
18   witness's testimony.
19          Go ahead.
20          **THE WITNESS:  I didn't view it that way.  I**
21   **viewed it as a complimentary room for three nights,**
22   **and I'm paying for the last night.  I didn't put a**
23   **math equation to it in my mind.**
24       Q.   (BY MR. GENISH)  If there was $300 that you
25   would have otherwise spent that you did not need to

CHRISTEN GARB

October 27, 2021

 1  because of this benefit; true?

 2          MR. BESCH:  Objection.  Assumes facts not

 3  in evidence.  Misstates the witness's testimony.

 4  It's argumentative.

 5          **THE WITNESS:  That's not how I viewed it.**

 6      Q.   (BY MR. GENISH)  But is it true?

 7          MR. BESCH:  Same objection.

 8          **THE WITNESS:  Not necessarily because maybe**

 9  **the value would have been different based upon the**

10  **dates or length of stay that I was looking at.**

11      Q.   (BY MR. GENISH)  The dates that you did

12  stay, that's a fund that you did not need to expend

13  because you had this benefit.

14          So in lieu of spending funds -- right? --

15  you saved $300 by having access to this benefit for

16  that trip?  Is that not correct?

17          MR. BESCH:  Objection.  Argumentative.

18  Assumes facts not in evidence.  Misstates the

19  witness's testimony.

20          **THE WITNESS:  I didn't view that with the**

21  **dollar amount assigned to the benefit.  I viewed it**

22  **as I'm enjoying my employee benefit because I did**

23  **not see a value assigned to those days because they**

24  **were complimentary.**

25      Q.   (BY MR. GENISH)  I'm going to ask you a

CHRISTEN GARB

October 27, 2021

```
 1   really easy question.  Okay?

 2          You would agree that there is a value to

 3   employees by having this benefit; right?

 4          MR. BESCH:  Objection.  Argumentative.

 5          THE WITNESS:  I don't see it as a value.  I

 6   see it as a benefit.

 7     Q.   (BY MR. GENISH)  What's the difference?

 8     A.   It's a benefit I receive as an employee.

 9     Q.   It's not valuable?

10     A.   It's valuable, but I'm not putting -- I'm

11   not assigning a value.  That's just not how my mind

12   works.

13     Q.   I'm not asking you to assign any value.

14   I'm asking for specific dollars amount.

15          I just want to know if you would agree that

16   it's valuable to employees to have this benefit;

17   correct?

18     A.   Yes.

19     Q.   It is of value to the employee; correct?

20          MR. BESCH:  Objection.  Misstates the

21   witness's testimony.

22          THE WITNESS:  I feel it's a value.  I can't

23   assign a value amount to that.  It --

24          MR. GENISH:  Of course.  And I'm not asking

25   you to.  But I think you answered my question.
```

CHRISTEN GARB

October 27, 2021

1       Q.    (BY MR. GENISH)   It is a value to employees
2   to have this benefit; correct?

3             MR. BESCH:  Same objection.

4             THE WITNESS:  It's a benefit that's
5   valuable.

6             MR. GENISH:  I should have stated earlier,
7   Holger, if he objects, he's welcome to object and
8   he's preserving it for the record, but unless he
9   instructs you not to answer, you can still answer
10  the question.

11            THE WITNESS:  Okay.  Thank you.

12      Q.    (BY MR. GENISH)  Are you aware of any other
13  hotels that offer this type of benefit?

14      A.    Other hotel companies?

15      Q.    Yeah.

16      A.    Off the top of my head, I'm not a hundred
17  percent sure.  I would make the assumption they do,
18  but I'm not a hundred percent sure.

19      Q.    You're not aware of any?

20      A.    No.

21      Q.    Do you think that having this hotel room
22  bonus makes Hyatt stand out as an employer in this
23  industry?

24            MR. BESCH:  Objection.  It's argumentative.
25  Misstates the witness's testimony.  She did not use

CHRISTEN GARB

October 27, 2021

1   the word "bonus."

2           You may answer.

3           **THE WITNESS:  I think it provides a great**

4   **benefit to our employees who work for Hyatt.**

5       Q.   (BY MR. GENISH)  Do you think the benefit

6   makes Hyatt stand out as an employer?

7       **A.   I feel it's a nice perk, and if it's**

8   **available, fantastic.**

9       Q.   I don't think you answered the question.

10          Do you think it makes Hyatt stand out as an

11  employer because it offers this benefit?

12      **A.   Yes, I do.**

13      Q.   Okay.  Do you think employees choose to be

14  employed by Hyatt as opposed to other hotel brands

15  because of this benefit?

16          MR. BESCH:  Objection.  Calls for

17  speculation.

18          **THE WITNESS:  I do not.**

19      Q.   (BY MR. GENISH)  Why not?

20      **A.   I think it's a part of a benefit package.**

21  **I think most employees, including myself, that start**

22  **the job -- I'm being hired to do the pay assigned to**

23  **that job, the hours worked, how I'm treated, the**

24  **people I work with.  I think that's what really**

25  **helps someone make a decision of where they work.**

CHRISTEN GARB

October 27, 2021

1          The employee benefit comp program to me is

2    a part of a great benefit that is tied into that.

3          I don't know if that's the one thing that

4    would make someone's decision.  I think so many of

5    the other items I just shared would be a much larger

6    priority in their decisionmaking process.

7       Q.   Okay.  But this hotel room benefit is one

8    of the components that would -- an employee would

9    consider in deciding whether to join Hyatt or join a

10   competitor; right?

11      A.   It could be a part of their review of the

12   benefits offered.  And, yes, could be a part of

13   helping them make their decision.

14      Q.   One of the terms of the policy is that the

15   employee must be an employee at the time that they

16   stay at the hotel; right?

17      A.   Correct.

18      Q.   In other words, if they are an employee

19   when they book it, but they resign or are fired in

20   the interim, they cannot then utilize that hotel

21   room; correct?

22      A.   That is correct.  You have to be an active

23   employee.

24      Q.   "You have to be an active employee."

25          Why is that?

CHRISTEN GARB

October 27, 2021

1  witness's testimony.  Vague and ambiguous.

2          THE WITNESS:  She would be the person I

3  would start with, and I know if she didn't know the

4  answer, she would lead me to the best person.

5      Q.   (BY MR. GENISH)  Is there anyone at Hyatt

6  Corporation who, to your knowledge, would know the

7  answer to these questions more so than Nikki Massey?

8      A.   Not to my knowledge.

9      Q.   I know that you indicated that you weren't

10  sure why or how it was determined which hotels would

11  be excluded from the policy.

12          Do you have any idea, though, how those

13  hotels were chosen?

14      A.   No, I do not.

15      Q.   In looking at it, many of them are Park

16  Hyatt in well-known popular areas like New York,

17  Milan, Tokyo.

18          Do you have an idea of whether or not the

19  hotels chosen to opt out of the program are more

20  expensive Hyatt hotels around the world?

21      A.   Park Hyatt tends to be a brand that is the

22  highest -- has the highest operating costs.  That is

23  something I'm aware of.  But I don't know the direct

24  correlation with this program's impact.

25      Q.   Are Alila, A-l-i-l-a, brands also

CHRISTEN GARB

October 27, 2021

```
 1  correlated with high operational costs?
 2      A.    They are, yes.
 3      Q.    Destination Residences, are they affiliated
 4  with high operational costs?
 5      A.    I don't know, per se, if it's high
 6  operating costs with the Destination Residences.
 7            If you have a 200-unit residence, you could
 8  be dealing with 200 different owners.  It's a very
 9  different operating model.  But I don't know if it's
10  due to high operating costs.  I just know that it's
11  a very different operating model, that brand.
12      Q.    Destination Residences are condominiums?
13      A.    I'm sorry?
14      Q.    Are Destination Residences condominiums?
15      A.    They vary.  They are a mix of hotel rooms,
16  some of them.  Some of them are like condo units.
17  Some have homes in them.  But they are unique owners
18  that are a part of that property that are part of
19  the residential program.
20      Q.    Let's take a look at the list of hotels
21  that are not part of the program.  Are they all
22  hotels that tend to operate with high operating
23  costs or have a different model than the typical
24  Hyatt hotel?
25      A.    As I shared, Park Hyatt I know tends to
```

CHRISTEN GARB

October 27, 2021

```
 1  have a high operating cost model, the Residences due
 2  to the complexity of ownership.  The others I don't
 3  know the answer.
 4          I know franchise is listed there, and those
 5  are excluded due to not being Hyatt employees.
 6      Q.   Any of the hotels on that list that you
 7  believe are not associated with high operating
 8  costs?
 9      A.   Not to my knowledge.
10      Q.   Okay.  To your knowledge, all of them are
11  either high operating costs or operate differently
12  than the typical Hyatt hotel; right?
13          MR. BESCH:  Objection.  Misstates the
14  witness's testimony.
15          THE WITNESS:  I don't know.
16      Q.   (BY MR. GENISH)  Do you know why hotels
17  with high operating costs are listed here?
18      A.   I do not know.
19      Q.   When you referred to "operating costs,"
20  what are you referring to?
21      A.   Operating costs are not my expertise.  So
22  it's not an area I can speak greatly to.  But it's,
23  in general terms, the cost to operate the hotel.
24      Q.   What would that include?
25      A.   Everything, labor, lights, everything
```

CHRISTEN GARB

October 27, 2021

1    within the hotel.

2            But once again, operating costs are not my

3    expertise, at all.

4        Q.   You indicated -- I'm just referring to your

5    answer to a previous question.

6            We talked about hotels that have high

7    operating costs.  So I'm trying to understand what

8    was meant by that comment.

9            When you say "high operating costs," which

10   operating costs are you talking about?

11       A.   So there is a cost per occupied room that,

12   once again, finance oversees.  And it's what -- if a

13   guest stays in that room, what it costs the hotel to

14   operate that room.

15           And so for example, a hotel in a small city

16   that is a small hotel that does not offer luxurious

17   amenities will have a lower operating cost than a

18   hotel in a massive big city that offers many

19   luxurious amenities would have a higher cost.

20           That's how I view it in my mind.

21       Q.   Okay.  "Cost for occupied room," is that a

22   term of art?

23       A.   I'm sorry.  Is a what?

24       Q.   The "cost per occupied room," is that a

25   term that's utilized within Hyatt's operating

CHRISTEN GARB

October 27, 2021

 1  system?

 2      A.   It is referenced in our finance teams.  It

 3  is not a commonly used reference in disciplines or

 4  with employees.  It's a finance term.

 5      Q.   It's a finance term within -- that's

 6  utilized in Hyatt's financials; true?

 7      A.   Yes.

 8      Q.   Okay.  Is that a number that's calculated

 9  for each hotel?

10      A.   Yes.

11      Q.   Is that a number that's calculated for

12  Hyatt Corporation globally?

13      A.   I don't know.

14      Q.   Is it a number that's calculated for Hyatt

15  hotels per region?

16      A.   I don't know.

17      Q.   Where have you seen the use of that term?

18      A.   I have seen the use of that term from a

19  sales perspective.  For example, if I am at a hotel

20  and I'm considering taking a hundred-room group, and

21  so over those hundred rooms, over a certain period

22  of days, and I'm building in everything the group is

23  asking for, which has a value, and I'm trying to

24  determine my break-even, so then I can build what

25  rate I should offer that group, that is where the

CHRISTEN GARB

October 27, 2021

1  cost per occupied room typically the sales leader

2  can get from their finance leader at the hotel to

3  help incorporate that into ensuring they put

4  together the best analysis and the best offering for

5  that group.

6       Q.   What's a -- what's a break-even?

7       A.   A break-even is, if I'm going to sell a

8  hundred rooms to a group and with what I know

9  they're going to bring and what I know my cost for

10 occupied room is or what I'm going to include in it,

11 at what rate would I break even?  Meaning, I don't

12 profit, but I cover all my costs.

13      Q.   Got it.

14      A.   It's utilized in sales when groups

15 typically are being reviewed.  I'm going off my

16 memory of being in sales a long time ago.

17      Q.   How does Hyatt calculate the cost of the

18 occupied room?

19      A.   I don't know.  That would be a finance

20 question.

21      Q.   Who in finance would be able to answer

22 that?

23      A.   I -- the person I would go to Adam Rohman,

24 who I referenced earlier.

25      Q.   Okay.  He would also be able to answer the

CHRISTEN GARB

October 27, 2021

1  unconstrained demand at 90 percent.  If we're below

2  90 percent, we want that benefit to be available to

3  our employees.

4        MR. BESCH:  Jonathan, I think it's been

5  about another hour.  Can we have a break in a

6  minute?

7        MR. GENISH:  Sure.

8    Q.  (BY MR. GENISH)  When you say you would

9  want your employees to utilize it if it's under

10  90 percent, why is that?

11    A.  Because it's a benefit we want to provide

12  to our employees.  It's part of our culture.  I

13  mean, it's why we created -- or why Hyatt created

14  the benefit program and the thresholds around it is

15  to be able to provide that benefit to our employees.

16    Q.  One of the restrictions on the policy is

17  that you can't stay in your own hotel; right?

18    A.  Yes.  That's accurate.

19    Q.  Okay.  Can employees stay in hotels in the

20  same city where their hotel is?

21    A.  They can.

22    Q.  They can.

23        So the only restriction is one of the ones

24  enumerated on Exhibit 2 or their own hotel; right?

25    A.  Correct, or a hotel that's offering the

CHRISTEN GARB

October 27, 2021

```
 1   benefit.  If it's a franchised hotel, they -- they
 2   can't.  It's not available then.
 3       Q.    Why not allow employees to utilize the
 4   benefit at their own hotel?
 5       A.    I don't know.  I wasn't a part of that
 6   decisionmaking.
 7       Q.    Did you conduct any investigation to find
 8   out?
 9       A.    No, I did not.
10       Q.    Do you have any idea as to why that
11   restriction exists?
12       A.    I don't know.
13            MR. GENISH:  We can take a break now,
14   Holger.
15            MR. BESCH:  Great.  Thank you.
16            THE VIDEOGRAPHER:  And we're going off the
17   record at 2:28 p.m.
18                    (Recess taken.)
19            THE VIDEOGRAPHER:  And we're back on the
20   record at 2:39 p.m.
21       Q.    (BY MR. GENISH)  Did you read the
22   deposition transcript of Nikki Massey?
23       A.    I have not.
24       Q.    Well, I'll represent to you she testified
25   that she estimated the cost to Hyatt each time
```

CHRISTEN GARB

October 27, 2021

 1    anyone occupies one of its rooms to be approximately

 2    $30.

 3              Does that sound about right to you?

 4       A.   It does, but I know it varies by hotel,

 5    market, and brand.  And it can vary drastically.

 6              So I would not apply that value to every

 7    hotel.  For our select service hotels, I think that

 8    sounds about accurate.

 9       Q.   Could you provide a range, perhaps?

10       A.   I would be estimating, but I would say

11    probably 30 up to maybe a hundred, depending on the

12    hotel and location.

13       Q.   And if I were to ask you to estimate an

14    average across all the hotels?

15       A.   Probably closer to that 30.  I think

16    there's more hotels that fall on the lower end than

17    the higher end.

18       Q.   Okay.

19       A.   But, once again, I'm estimating.

20       Q.   I would imagine that employees that utilize

21    the hotel room benefit tend to use it -- utilize it

22    in more popular areas around the globe.  Would you

23    say that's accurate?

24       A.   Yes and no.  I think it's based where

25    they're needing to go.  I think sometimes they're

CHRISTEN GARB

October 27, 2021

```
 1  using it for a kid's sporting game that's in a small

 2  town somewhere.  So, no, it's not super popular

 3  destinations.  I think it really varies.

 4          But, yes.  From the standpoint of, you

 5  know, beach resorts and destinations, I'm sure those

 6  are very popular.

 7          MR. GENISH:  Give me just one second.

 8          At this point I have no other questions for

 9  this witness.

10          But I am going to suspend the deposition in

11  light of the fact that this was a witness that was

12  produced in response to topics for which she is

13  unable to testify and has not -- and has indicated

14  that she's not able to testify and has indicated

15  she's not conducted any research to educate herself

16  on, as well as there are a number of topics that

17  nobody has been produced on yet for this specific

18  deposition notice.

19          So we intend to move to compel.  And for

20  that reason, we're going to hold this deposition

21  open and suspend it rather than concluding it.

22          MR. BESCH:  Yeah.  I suggest we meet and

23  confer on whatever you want to meet and confer about

24  with regards to those issues and -- before you move

25  to compel.
```

CHRISTEN GARB

October 27, 2021

1          But I'm happy to discuss that with you.

2   And, yes, certainly we still have witnesses to

3   produce on some of the topics.  And I think in

4   particular for 15 to 17 we'll provide somebody to

5   testify on those which we did designate this witness

6   for, and she did say she was unable to answer.

7          So we'll definitely work with you on that,

8   and any other issues you have, let's chat by phone.

9          MR. GENISH:  Yeah.

10          And just for purposes of the record, one

11   more reason is the -- the documents that were

12   requested but have not yet been produced and were

13   not produced in advance of the deposition, of

14   course.

15          But we'll speak about that in our meet and

16   confer.

17          MR. BESCH:  Sure.  Let's talk offline.

18          MR. GENISH:  Okay.  Thank you so much for

19   your time today, Ms. Garb.

20          **THE WITNESS:  No, thank you, I guess.**

21          MR. GENISH:  You're welcome.

22          THE REPORTER:  And, Counsel, did you need a

23   copy?

24          MR. BESCH:  Yes, please.

25          And please let me know when you send it

CHRISTEN GARB

October 27, 2021

```
 1  this time, so I actually know that it's there.

 2          THE VIDEOGRAPHER:  We're going off the

 3  record at 2:48 p.m.

 4      (The deposition was adjourned at 2:48 p.m.)

 5                     --oOo--

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CHRISTEN GARB
October 27, 2021

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA        )
                                )  SS.
 4   COUNTY OF SAN BERNARDINO    )

 5

 6           I, AMY P. SMITH, a certified shorthand

 7   reporter for the State of California, do hereby certify:

 8           That prior to being examined, the witness

 9   named in the foregoing deposition was sworn by me to
10   testify to the truth, the whole truth, and nothing but
11   the truth;
12           That the said deposition was taken down by me
13   in stenotype at the time and place therein stated and
14   thereafter reduced to typewriting under my direction and
15   that the deposition transcript is a true and correct
16   record of the proceedings here held.
17           I further certify that I am not of counsel or
18   attorney for any of the parties hereto or in any way
19   interested in the event of this cause and that I am not
20   related to any of the parties thereto.
21           Dated this 29th day of October, 2021.
22
23
24                    AMY P. SMITH
25
```